# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DENNIS P. RIVERO, M.D.,

      Plaintiff,

vs.                              No. CIV 16-0318 JB\SCY

BOARD OF REGENTS OF THE UNIVERSITY
OF NEW MEXICO d/b/a UNIVERSITY OF NEW
MEXICO HEALTH SCIENCES CENTER,

      Defendant.

## <u>MEMORANDUM OPINION AND AMENDED ORDER[1]</u>

**THIS MATTER** comes before the Court on: (i) the Defendant University of New Mexico Board of Regents' Motion and Memorandum for Summary Judgment, filed December 5, 2017 (Doc. 139); (ii) the Defendant University of New Mexico Board of Regents' Amended Motion and Memorandum for Summary Judgment, filed December 8, 2017 (Doc. 143)("UNM's MSJ"); (iii) the Plaintiff's Motion for Summary Judgment and Memorandum of Law as to Certain of Defendant Board of Regents of the University of New Mexico's Affirmative

---

[1]The Court previously entered an Order, filed September 24, 2018 (Doc. 211)("Order"), that: (i) granted the requests in the Defendant University of New Mexico Board of Regents' Motion and Memorandum for Summary Judgment, filed December 5, 2017 (Doc. 139), and in the Defendant University of New Mexico Board of Regents' Amended Motion and Memorandum for Summary Judgment, filed December 8, 2017 (Doc. 143); (ii) denied the requests in Plaintiff's Motion for Summary Judgment and Memorandum of Law as to Certain of Defendant Board of Regents of the University of New Mexico's Affirmative Defenses, filed December 8, 2017 (Doc. 144); (iii) denied the requests in the Plaintiff's Motion in Limine to Exclude Complaints Against Plaintiff Prior to 2006, filed December 8, 2017 (Doc. 145); (iv) denied the requests in the Plaintiff's Motion in Limine to Prohibit and Exclude Use of the Term "Psychological" in Reference to "Psychiatric" Evaluations, filed December 8, 2017 (Doc. 146); and (v) denied the requests in the Plaintiff's Motion to Recuse the Honorable James O. Browning, filed July 17, 2018 (Doc. 203). <u>See</u> Order at 7-8. In the Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion that details the Court's rationale for the previous Order.

Defenses, filed December 8, 2017 (Doc. 144)("Rivero's MSJ"); (iv) the Plaintiff's Motion in Limine to Exclude Complaints Against Plaintiff Prior to 2006, filed December 8, 2017 (Doc. 145)("Complaints MIL"); (v) the Plaintiff's Motion in Limine to Prohibit and Exclude Use of the Term "Psychological" in Reference to "Psychiatric" Evaluations, filed December 8, 2017 (Doc. 146)("Psychological MIL"); and (vi) the Plaintiff's Motion to Recuse the Honorable James O. Browning, filed July 17, 2018 (Doc. 203)("Recusal Motion"). The Court held hearings on June 26, 2018, and August 13, 2018. The primary issues are: (i) whether the Court may reconsider the Honorable William P. Lynch's, United States Magistrate Judge for the District of New Mexico, ruling on the illegal-medical-inquiry claim's date of accrual in the Order Denying Motion to Dismiss, filed December 22, 2016 (Doc. 43)("MTD Order"); (ii) whether Plaintiff Dennis Rivero, M.D.'s claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794, of an improper medical examination and constructive discharge based on UNM's [2] request for psychiatric evaluations is time-barred, because Dr. Rivero filed suit five years after the request was made; (iii) whether UNM improperly required Dr. Rivero to submit to psychiatric evaluations as a condition of his return to full-time employment when it believed that he had a history of a lack of professionalism; (iv) whether UNM constructively discharged Dr. Rivero by revoking its offer of full-time employment after Dr. Rivero objected to the evaluations and by

_____

[2]For ease and clarity, the Court refers to Defendant Board of Regents of the University of New Mexico d/b/a University of New Mexico Health Sciences Center as UNM. When necessary, the Court will specify to which entity it is referring. The Board of Regents of the University of New Mexico is the named Defendant because N.M.S.A. § 21-7-4 makes it the University's suable entity.

allegedly asking for the evaluations without a legitimate basis; (v) whether Dr. Rivero stated a claim for retaliation that is preserved for trial, because UNM did not address this claim in its MSJ; (vi) whether the Court should strike UNM's affirmative defenses (I), (II), and (III) -- "Plaintiff failed to state a claim for which relief can be granted," "Plaintiff's claims are barred by the statute of limitations," and "Plaintiff's claims are barred by the doctrine of laches and waiver," Rivero's MSJ ¶ 11, at 9 -- because Magistrate Judge Lynch addressed these defenses in the MTD Order; (vii) whether the Court should strike UNM's affirmative defenses (XIII) and (XIV) -- "At all times Defendant UNM acted in accordance with its policies and regulations, and applied such polices and regulations consistently and fairly" and "Defendant UNM fulfilled any and all obligations it had to Plaintiff under contract or statute," Rivero's MSJ ¶ 11, at 9 -- for being without factual support; (viii) whether the Court should strike UNM's affirmative defense (XV) -- "Defendant reserves the right to amend its Answer to Plaintiffs' Complaint to include additional Affirmative Defenses once facts supporting same become known," Rivero's MSJ ¶ 11, at 9 -- for being without substance; (ix) whether the Court should exclude complaints against Dr. Rivero made before 2006 for being irrelevant; (x) whether the Court should preclude UNM from using the term "psychological" instead of "psychiatric" in reference to the examination requirement it imposed on Dr. Rivero, because the term "psychological" is misleading; and (xi) whether the Court should recuse itself from this case because the Honorable James O. Browning, United States District Judge for the District of New Mexico, the presiding judge, has taught a semester-long class at the University of New Mexico School of Law ("School of Law")

on five occasions, waiving all pay on three occasions and reallocating his pay to fund a law student's help in writing a law review article in the fall of 2015 and 2017 -- although on three occasions his waiver of pay may have been treated by UNM as a donation to UNM -- and because he has been acquainted with several Regents from the University of New Mexico Board of Regents ("Board of Regents"), including the current President and the Student Regent for 2017-2018. As to UNM's MSJ, the Court concludes that, viewing the evidence in the light most favorable to Dr. Rivero: (i) the Court may and will reconsider the MTD Order; (ii) Dr. Rivero's claim of an improper medical inquiry under the Rehabilitation Act is time-barred, but his constructive discharge claim is not; (iii) the complaints relating to Dr. Rivero's professionalism provide UNM with a legitimate basis to seek psychiatric examinations; (iv) UNM's request for psychiatric examinations was not a discriminatory act and, thus, cannot be the basis of Dr. Rivero's constructive discharge claim; and (v) Dr. Rivero stated a claim of retaliation under the Rehabilitation Act, but the statute of limitations bars it and he cannot make a prima facie case. Accordingly, the Court grants UNM's MSJ. This grant of summary judgment renders Rivero's MSJ and the Psychological MIL moot. The Court denies the Complaints MIL, because the pre-2006 complaints are relevant. Finally, the Court concludes that its ties with the School of Law and its acquaintances with members of the Board of Regents do not support an appearance of impropriety and that it does not have an interest that could be substantially affected by the proceeding's outcome. The Court, thus, denies the Recusal Motion.

# FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in their summary judgment motion papers for UNM's MSJ.  See UNM's MSJ ¶¶ 1-51, at 3-11; Response in Opposition to Defendant's Motion and Memorandum for Summary Judgment ¶¶ 1-51, at 1-8, filed March 8, 2018 (Doc. 191)("Rivero's Response"); id. ¶¶ 1-44, at 8-18;[3] Defendant University of New Mexico Board of Regents' Reply in Support of Its Motion for Summary Judgment ¶¶1-51, at 1-10, filed February 2, 2018[4] (Doc. 169)("UNM's Reply"); id. at ¶¶ 1-44, at 10-13.  The Court also takes additional undisputed facts helpful to determining the issues here from the summary judgment motion papers for Rivero's MSJ.[5]  See Rivero's MSJ

---

[3]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  Dr. Rivero did not abide by the local rule and letter his additional facts; instead, he numbered them. The Court keeps with Dr. Rivero's convention when citing to his additional facts.

[4]UNM's Reply was filed before Rivero's Response because Rivero's Response is a document consolidating two previous responses to UNM's MSJ: (i) Plaintiff's Responses and Objections to Defendant's Undisputed Material Facts and Statement of Undisputed Material Facts in Partial Response to Defendant's Motion and Memorandum for Summary Judgment, filed January 12, 2018 (Doc. 160); and (ii) Response in Opposition to Defendant's Motion and Memorandum for Summary Judgment, filed January 12, 2018 (Doc. 161).  Rivero's Response replaces these two motions, and they have been withdrawn from the docket.  See Order Granting Amended Unopposed Motion to Withdraw and Replace Docs. 160 and 161 with Consolidated Response to Defendant's Amended Motion for Summary Judgment, filed February 22, 2018 (Doc. 186).

[5]Rivero's MSJ asks the Court only to "strike certain affirmative defenses" and is thus more limited in its recital of the undisputed facts.  The parties stated that the Court could draw facts from both sets of briefing and combine the facts, so the Court does.  See Transcript of

¶¶ 1-47, at 2-11; University of New Mexico Board of Regents' Response Brief in Opposition to Certain of Defendant Board of Regents of the University of New Mexico's Affirmative Defenses ¶¶ 1-47, at 1-7, filed January 12, 2018 (Doc. 159)("UNM's Response"); id. ¶¶ 1-12, at 7-9;[6] Reply in Support of Plaintiff's Motion for Summary Judgment and Memorandum of Law as to Certain of Defendant Board of Regents of the University of New Mexico's Affirmative Defenses ¶¶ 1-47, at 2-7, filed February 14, 2018 (Doc. 179)("Rivero's Reply"); id. ¶¶ 1-12, at 7-9.

### 1. **Background on Dr. Rivero's Employment with UNM.**

Dr. Rivero began his employment with UNM in 1992 as an orthopedic surgeon. See UNM's MSJ ¶ 1, at 3 (asserting this fact)(citing Deposition of Dr. Dennis P. Rivero at 20:8-12 (taken September 15, 2017), filed December 8, 2017 (Doc. 143-1)("Rivero Depo. 143"));[7] Dr. Rivero's Response ¶ 1, at 1 (admitting this fact). UNM promoted Dr. Rivero to associate professor in 1998 and to full professor in 2005. See Rivero's Response ¶ 1, at 1 (asserting this fact)(citing Memorandum from Dr. Jane E. Henney to Dr. Dennis Rivero at 2 (dated June 5,

---

Motion Proceedings at 99:1-100:20 (Court, Norvell, Marcus)(taken June 26, 2018), filed July 17, 2018 (Doc. 202).

[6]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b). UNM did not abide by the local rule and letter its additional facts; instead, it numbered them. The Court keeps with UNM's convention when citing to its additional facts.

[7]Dr. Rivero and UNM have filed excerpts from the same deposition, and thus the excerpts from the deposition have different docket numbers. The Court thus includes the docket number when citing the deposition for easier reference.

1998), filed March 8, 2018 at 2 (Doc. 191-1); Letter from Dr. R. Philip Eaton to Dr. Dennis

Rivero at 1 (dated May 27, 2005), filed March 8, 2018 (Doc. 191-1)).[8]  Dr. Rivero left UNM in

January, 2007, to practice in Tulsa, Oklahoma, "voluntarily, ostensibly so that he could water ski

more often," among other reasons.  UNM's MSJ ¶ 23, at 6 (asserting this fact)(citing Rivero

Depo. 143 at 147:15-25; id. at 148:15-149:6).[9]  When Dr. Rivero left UNM in 2007, he was

serving as the Division Chief of Adult Reconstruction in the Department of Orthopaedics and

Rehabilitation.  See Rivero's Response ¶ 1, at 8 (asserting this fact)(citing Deposition of

Dr. Dennis P. Rivero at 155:8-20 (taken September 15, 2017), filed March 8, 2018 (Doc. 191-

---

[8]The local rules provide that "[a]ll material facts set forth in the Response will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  Because Dr. Rivero proffers this additional fact in his Response, and because UNM does not address this fact in its Reply, the Court deems this fact undisputed.  Further, UNM admits this fact generally by saying that, since 1994, Dr. Rivero "was promoted twice since that time."  UNM's MSJ ¶ 6, at 4 (citing Rivero Depo. 143 at 50:9-20).  Rivero's MSJ proffers that he "was promoted to full professor, receiving enthusiastic and often glowing recommendations from colleagues and peers."  Rivero's MSJ ¶ 2, at 2 (asserting this fact)(citing Letter to Dr. Dennis Rivero from Dr. R. Philip Eaton at 1 (dated May 27, 2005), filed December 8, 2017 (Doc. 144-14)).  UNM admits that he was promoted to full professor, but disputes that Dr. Rivero received "glowing recommendations from colleagues and peers," correctly noting that the record does not support his assertion. UNM's Response ¶ 2, at 1.  Accordingly, the Court concludes that it is undisputed only that UNM promoted Dr. Rivero to full professor.

[9]Dr. Rivero purports to dispute this fact "as incomplete.  Dr. Rivero had other reasons for leaving, and only did so because he was assured that he could return to UNM."  Rivero's Response ¶ 23, at 5 (citing Deposition of Dr. Dennis P. Rivero at 149:3-25 (taken September 15, 2017), filed March 8, 2018 (Doc. 191-2)).  He does not dispute, however, that one of the reasons he left New Mexico was to water ski, so the Court deems this fact undisputed.

2)("Rivero Depo. 191")).[10]  While practicing in Oklahoma, however, Dr. Rivero "maintained a 0.05 full time equivalent (FTE) position at UNM, where he would return one day per month to perform certain surgeries."  UNM's MSJ ¶ 24, at 6 (asserting this fact)(citing First Amended Complaint to Recover Damages for Violation of the Rehabilitation Act of 1973 ¶ 14, at 3, filed September 9, 2016 (Doc. 28)("FAC")).[11]  Dr. Rivero "performed [these surgeries] on people with whom [he] had a prior relationship, or in assistance of other UNM physicians, who handled the pre-operative and post-operative procedures."  UNM's MSJ ¶ 25, at 6 (asserting this fact)(citing Rivero Depo. 143 at 175:25-176:20).[12]

---

[10]UNM admits this fact but argues that it is immaterial.  See UNM's Reply ¶ 1, at 10. The Court will therefore consider this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion.  SEC v. Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).

[11]Dr. Rivero purports to dispute this fact "as incomplete.  Dr. Rivero also could perform surgeries more than one day per month if he so chose."  Rivero's Response ¶ 24, at 5 (citing Rivero Depo. 191 at 175:1-14).  While Dr. Rivero could have spent two days in a row at UNM one month and not returned the next, he does not dispute, however, that he returned at a rate of one day per month in a 0.05 FTE position.  See Rivero Depo. 191 at 175:1-14.  Further, in his own MSJ, Dr. Rivero states that while practicing at a 0.05 FTE at UNM, he "attend[ed] to patients about one day a month."  Rivero's MSJ ¶ 4, at 2 (citing Rivero Depo. 144 at 147:7-25; id. at 153:10-154:3; id. at 154:17-155:7).  The Court accordingly deems this fact undisputed.

[12]Dr. Rivero purports to dispute this fact "as a mischaracterization," asserting that "[t]he cited testimony states that Dr. Rivero performed surgeries on new patients as well, and he was unrestricted."  Rivero's Response ¶ 25, at 5 (citing Deposition of Dr. Robert Cumming Schenck, Jr. at 49:18-24 (taken September 13, 2017), filed March 8, 2018 (Doc. 191-4)("Schenck Depo. 191") Dr. Rivero has filed excerpts from the same deposition with his Response and his MSJ, and thus the excerpts from the deposition have different docket numbers.  The Court thus includes the docket number when citing the deposition for easier reference.)  The portion of

- 8 -

During Dr. Rivero's twenty-two-year employment with UNM, UNM "regularly reappointed" Dr. Rivero -- even during his full-time employment in Oklahoma -- with each reappointment "expressly stat[ing] that Dr. Rivero 'does not have . . . a physical or mental condition that could interfere with his ability to perform <u>the essential functions of his position</u>.'" Rivero's Response ¶ 2, at 9 (emphasis in Rivero's Response)(quoting Letter from Dr. Robert C. Schenck, Jr. to Dr. Robert Bailey at 1 (dated May 17, 2010), filed March 8, 2018 (Doc. 191-14); Letter from Dr. Robert C. Schenck, Jr. to Dr. Robert Bailey at 2 (dated May 28, 2008), filed March 8, 2018 (Doc. 191-14); Memorandum from Dr. Moheb Moneim to Dr. Robert Bailey at 3 (dated July 11, 2006), filed March 8, 2018 (Doc. 191-14); Memorandum from Dr. Moheb Moneim to Dr. Mark Hauswald at 4 (dated September 27, 2004), filed March 8, 2018 (Doc. 191-14); and citing Letter to Muskogee Reg'l Med. Ctr. from Alison Weber at 15 (dated June 16, 2008), filed March 8, 2018 (Doc. 191-5); Board of Regents of the University of New Mexico's Supplemental Responses to Plaintiff Dennis Rivero's First Set of Interrogatorries [sic], First Requests for Production of Documents, and First Requests for Admission, No. 4 Answer at 2,

_____

Dr. Schenck's deposition cited does not say that Dr. Rivero performed surgeries on new patients and that he was unrestricted; rather, it says that Dr. Rivero was "unsupervised" in the operating room. Schenck Depo. 191 at 49:18-24. The fact that Dr. Rivero purports to dispute admits that he performed surgeries on new patients. Further, it is an accurate representation of Dr. Rivero's testimony that he tended to operate on patients with whom he had a "preexisting relationship" or with his "partners," who "had to do the pre-op and . . . the post-op[,] . . . it wasn't possible for me to assume full responsibility for the care." Rivero Depo. 191 at 175:25-176:20. Further, in Rivero MSJ, he states that when he worked at UNM at 0.05 FTE, he "attend[ed] to patients about one day a month. Rivero's MSJ ¶ 3, at 2 (citing Deposition of Dr. Dennis P. Rivero at 147:7-25 (taken September 15, 2017), filed December 8, 2017 (Doc. 144-1)("Rivero Depo. 144"); <u>id.</u> at 153:10-154:3; <u>id.</u> at 154:17-155:7). Accordingly, the Court deems this fact undisputed.

filed March 8, 2018 (Doc. 191-13); Letter from Dr. Robert Bailey to Dr. Dennis Rivero at 5 (dated July 26, 2012), filed March 8, 2018 (Doc. 191-14); Letter from Rita Sorrels at 1 (dated August 6, 2010), filed March 8, 2018 (Doc. 191-15)). <u>See</u> UNM's Reply ¶ 2, at 10 (not disputing this fact). Further, "[d]uring his time at UNM, Dr. Rivero was never disciplined or subject to any adverse employment action." Rivero's MSJ ¶ 3, at 2 (asserting this fact)(citing Deposition of Dr. Dennis P. Rivero at 21:8-15 (taken September 15, 2017), filed December 8, 2017 (Doc. 144-1)("Rivero Depo. 144"); <u>id.</u> at 154:7-155:7; <u>id.</u> at 312:2-8). <u>See</u> UNM's Response ¶ 3, at 2 (not disputing this fact). This record means that "Dr. Rivero was never suspended, sanctioned, placed on probation, or otherwise disciplined during his entire tenure, nor was he subject to any medical board complaints." Rivero's Response ¶ 3, at 9 (asserting this fact)(citing Rivero Depo. 191 at 154:17-155:7; <u>id.</u> at 159:16-18; <u>id.</u> at 312:3-8; Board of Regents of the University of New Mexico's Responses to Plaintiff Dennis Rivero's First Set of Interrogatorries [sic], First Requests for Production of Documents, and First Requests for Admission, Nos. 1 & 3 Answers at 2, filed March 8, 108 (Doc. 191-16)). <u>See</u> UNM's Reply ¶ 3, at 10 (not disputing this fact). Two residents who worked under Dr. Rivero did not feel that he "was unprofessional or a threat to anyone's safety in his role as a surgeon, and in fact, Dr. Rivero's meticulous nature was a benefit to the practice and the patients"; that Dr. Rivero's "colleagues respected him highly and did not want him to leave in 2006"; and "that it is was [sic] delightful to see how much his patients enjoyed him." Rivero's Response ¶ 4, at 9 (asserting this fact)(citing Deposition of Dr. Deana Mercer at 8:1-7 (taken September 12, 2017), filed March 8,

2018 (Doc. 191-17)("Mercer Depo."); <u>id.</u> at 8:25-9:9; <u>id.</u> at 11:2-12:2; <u>id.</u> at 18:2-24; <u>id.</u> at 18:9-24; Deposition of Dr. Andrew James Paterson at 9:1-2 (taken October 18, 2017), filed March 8, 2018 (Doc. 191-18)("Paterson Depo."); <u>id.</u> at 10:8-16; <u>id.</u> at 11:17-23; <u>id.</u> at 14:10-15:6).[13] "Christine Long, L.P.N., a surgical tech who worked in the operating room with Dr. Rivero from 1992 to 2007," thought that Dr. Rivero "was always in control in his operating room" and demanded a professional environment, and that "his patients seemed to love him." Rivero's Response ¶ 5, at 9-10 (asserting this fact)(citing Deposition of Christine Long at 6:20-7:5 (taken October 18, 2017), filed March 8, 2018 (Doc. 191-19)("Long Depo."); <u>id.</u> at 7:20-9:17; <u>id.</u> at 11:6-12:10; <u>id.</u> at 17:19-18:14; <u>id.</u> at 13:6-18; <u>id.</u> at 24:13-24:33).[14] Nurse Araceli Martinez, who worked with Dr. Rivero in the General Orthopedic and Faculty Orthopedic clinics from 1992 to 2007, held the view that "Dr. Rivero's patients 'loved him,'" and stated that she "never received any complaints about Dr. Rivero nor ever saw him act unprofessionally." Rivero's Response ¶ 6, at 10 (quoting Deposition of Araceli Martinez at 13:13 (taken October 17, 2017),

---

[13]UNM argues that this fact is immaterial. <u>See</u> UNM's Reply ¶¶ 4-6, at 11 (responding to Dr. Rivero's additional undisputed material facts 4-6 in the same paragraph). UNM asserts that "[t]he fact that certain of Plaintiff's colleagues were unaware of Plaintiff's professionalism issues does not negate the fact that these issues existed, and that they were well-documented." UNM's Reply ¶¶ 4-6, at 11 (citing UNM MSJ's undisputed material facts 8-22) The Court will therefore consider this fact undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b). The Court has previously held that a "relevance argument similarly does not dispute the fact" and that "relevance is a legal argument that is best left for the Analysis Section" of this opinion. <u>SEC v. Goldstone</u>, 2015 WL 5138242, at *27 n.95.

[14]UNM states that this fact is immaterial, as discussed <u>supra</u> note 13. The Court therefore deems this fact undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b); <u>supra</u> note 13.

filed March 8, 2018 (Doc. 191-3)("Martinez Depo."); and then citing id. at 11:2-12:24; id. at 13:7-21; id. at 14:10-25; id. at 31:20-25; id. at 16:7-21; id. at 17:16-18:1; id. at 20:3-5; id. at 23:1-17; id. at 20:22-24).[15]

## 2. Dr. Rivero's Unprofessional Behavior.

Early in his career at UNM, in September 1993, Dr. Rivero "unleashed a 10 minute stream of obscenities at a resident." UNM's MSJ ¶ 2, at 3 (asserting this fact)(citing Letter from Dr. Kambiz Behzadi to Dr. Moheb Moneim at 20-21 (dated September 18, 1993), filed December 8, 2017 (Doc. 143-1)).[16] Dr. Rivero construed "this incident as mere locker room

---

[15]UNM again states that this fact is immaterial, as discussed supra note 13. The Court therefore deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b); supra note 13.

[16]Dr. Rivero purports to dispute this fact because "the cited exhibit [is] inadmissible hearsay" and "on the grounds of relevance and materiality: Defendant's own admitted time period of focus is from 2003 to 2006." Rivero's Response ¶ 2, at 1-2 (citing UNM's MSJ ¶ 6, at 4; Complaints MIL). The portion of the record that Dr. Rivero cites to argue UNM's period of focus is 2003-2006 does not dispute this fact; UNM never states it was only concerned with Dr. Rivero's conduct from 2003 to 2006. Dr. Rivero objects to much of UNM's use of exhibits on hearsay grounds. See, e.g., Rivero's Response ¶¶ 4, 9, 32, 33, at 2-3, 6. Hearsay is a statement, other than one the declarant made while testifying at the trial or hearing, offered for the truth of the matter asserted. See Fed. R. Evid. 801. "Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). The Court recognizes that it cannot rely on evidence that will not be admissible at trial. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment. Hearsay testimony cannot be considered because '[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'" (alterations in original)(citations omitted) (quoting Thomas v. IBM, 48 F.3d 478, 485 (10th Cir. 1995)). The Court can rely, however, on evidence submitted in a form that would be inadmissible at trial as long as the Court determines that the evidence will be presented in an admissible form:

This does not mean that evidence must be submitted in "a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, . . . (1986). Indeed, parties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). However, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury" in some form. *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)(citing *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence")).

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)(alterations in original). Here, Dr. Rivero notes no portion of the record to specifically controvert this fact, only arguing it is inadmissible and irrelevant. The letter upon which UNM relies for this fact is hearsay, because Dr. Behzadi did not make the statements it contains "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and UNM relies on the letter for the truth of what it asserts -- that Dr. Rivero screamed obscenities at a resident for ten minutes. While this letter is supposedly part of Dr. Rivero's credentialing record, and thus could be admissible hearsay under the business exception, UNM has not laid the foundation for this exception, and the statements within the letter likely do not meet this exception. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission."). UNM can establish this fact with evidence admissible at trial, however, as Dr. Rivero recognized the letter in question and discussed the incident it concerned, admitting to using obscene language and yelling at a resident. See Rivero Depo. 143 at 30:11-35:18. Further, Dr. Rivero, "when confronted with the exhibit, demonstrated a lack of remorse . . . [and a] general lack of remorse was one of the reasons for UNM's concern regarding Plaintiff's unprofessional behavior." UNM's Reply ¶ 2, at 1. Dr. Rivero also disputes this fact "[t]o the extent otherwise necessary," Rivero's Response ¶ 2, at 2, but points to no "portions of the record upon which [he] relies," D.N.M.LR-Civ. 56.1(b). The Court thus deems this fact undisputed and will discuss relevancy in the Analysis. See D.N.M.LR-Civ. 56.1(b); supra note 10.

talk." UNM's MSJ ¶ 3, at 4 (asserting this fact)(citing Rivero Depo. 143 at 35:10-18).[17] In 1994, Dr. Rivero "refused to allow UNM to culture him to determine the source of an outbreak of methicillin resistant staphylococcus areus ('MRSA')." UNM's MSJ ¶ 4, at 4 (asserting this fact)(citing Memorandum from Kim Oldewage to Dr. Moheb Moneim at 19 (dated October 7, 1994), filed December 8, 2007 (Doc. 143-1)).[18] Dr. Rivero knew "of the severity of the MRSA problem in hospitals." UNM's MSJ ¶ 5, at 4 (asserting this fact)(citing Rivero Depo. 143 at 28:3-6).[19] Later, Dr. Rivero requested "that a nurse whom he was dating be assigned to his

---

[17]Dr. Rivero purports to dispute this fact "on the grounds of relevance and materiality," and because "the Defendant abridges and mischaracterizes Dr. Rivero's testimony." Rivero's Response ¶ 3, at 2 (citing Rivero Depo. 191 at 30:11-15; id. at 31:21-32:14; id. at 33:3-10; id. at 34:20-35:9; id. at 35:19-22). In the Rivero Depo., Dr. Rivero stated that the incident in question was resolved in his favor, and described residency as being "very much like a football game." Rivero Depo. 191 at 34:1-4. See id. at 32:4-14. He went on to say that, during the incident, there were "obscenities on both sides of the field. I don't think that -- that's the way men talk to each other in a locker room, and that's the way men talk to each, and that's the way I talk to my friends sometimes." Rivero Depo. 191 at 35:14-18. This evidence shows that UNM's proffered fact is not a mischaracterization, and a relevance argument also does not dispute the fact, so the Court deems it undisputed. See D.N.M.LR-Civ. 56.1(b); supra note 10. Further, UNM notes that this fact "concerns statements made in [Dr. Rivero's] deposition in 2017." UNM's Reply ¶ 3, at 2.

[18]Dr. Rivero "objects to the cited exhibit as inadmissible hearsay. Dr. Rivero further objects on the grounds of relevance and materiality." Rivero's Response ¶ 4, at 2. The memorandum on which UNM relies is hearsay, which UNM has not established as meeting an exception, for the same reasons as the letter discussed supra note 16. UNM can establish this fact with evidence admissible at trial, however, as Dr. Rivero discussed the incident the memorandum concerns and admitted to refusing a MRSA culture, see Rivero Depo. 143 at 26:9-27:5, so the Court deems this fact undisputed and will deal with relevance in the Analysis.

[19]Dr. Rivero "objects on the grounds of relevance and materiality" and "on the grounds that Defendant abridges and mischaracterizes Dr. Rivero's testimony." Rivero's Response ¶ 5, at 2 (citing Rivero Depo. 191 at 28:7-29:21). Dr. Rivero was asked at his deposition if he is "aware

operating room." UNM's MSJ ¶ 8, at 4 (asserting this fact)(citing Rivero Depo. 143 at 50:9-20).[20] In 2003, Dr. Rivero "had a disagreement [with Dr. David Pitcher, Assistant Dean for Clinical Affairs,] about procedures governing transfer of a patient over the Physician Access Line Service (PALS),"[21] and "Dr. Pitcher escalated the incident in a letter to Dr. Rivero's department chair at the time, Dr. Moheb Moneim." Rivero's Response ¶ 7, at 10 (asserting this fact)(citing Rivero Depo. 191 at 44:11-49:16; Deposition of Dr. David E. Pitcher at 6:9-13 (taken September 11, 2017), filed March 8, 2018 (Doc. 191-20)("Pitcher Depo."); id. at 19:9-21:25; Email from Dr. David Pitcher to Dr. Moheb Moneim at 12 (dated January 1, 2003), filed March

_____

of the seriousness of MRSA . . . in -- in hospitals" and he responded, "[o]f course, I am." Rivero Depo. 191 at 28:4-6. This fact is thus not a mischaracterization of Dr. Rivero's testimony, and the portion of the Rivero Depo. to which Dr. Rivero cites in an attempt to show the mischaracterization only elaborates why he refused the culture. See Rivero Depo. 191 at 28:7-29:21. This additional information does not change the fact that Dr. Rivero refused the culture, knowing the seriousness of MRSA, so the Court deems this fact undisputed.

[20]UNM's undisputed material fact 8 states that this request was "against policy," UNM's MSJ ¶ 8, at 4, but Dr. Rivero disputes the fact, saying only that the "Defendant has provided no evidence of any policy or standards of professionalism violated," Rivero's Response ¶ 8, at 3. He does not dispute, however, that he requested that his girlfriend be assigned to his operating room, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b); supra note 8. Because UNM does not point to a policy that this request violated, writing only that "it is obvious why such an assignment would be discouraged," the Court does not include this portion of UNM's proffered fact as undisputed. UNM's Reply ¶ 8, at 3.

[21]The "Physician Access Line Service is a consultation, transfer, and referral service," allowing "community physicians to reach UNM physicians quickly." UNM PALS, Med. Home Portal, https://nm.medicalhomeportal.org/services/provider/20860 (last visited Feb. 27, 2019). Part of being on call involves taking PALS calls. See Schenck Depo. 191 at 41:9-18; id. at 42:11-13.

- 15 -

8, 2018 (Doc. 191-5)("Pitcher Complaint")).[22] "Dr. Rivero defended himself by submitting his own written rebuttal, [which asserts] that Dr. Pitcher had falsely accused Dr. Rivero of wrongdoing." Rivero's Response ¶ 9, at 11 (asserting this fact)(citing Letter from Dr. Dennis Rivero to Dr. Moheb Moneim at 10-13 (dated January 17, 2003), filed March 8, 2018 (Doc. 191-20)).[23] As a result of a memorandum that John Trotter, PhD, Vice Dean of the UNM School of

---

[22] Dr. Rivero began this fact with the sentence: "In spite of his consummate professionalism and obvious benefit that Dr. Rivero brought to UNM, a singular dispute an administrator in 2003 caused subjected [sic] Dr. Rivero to a campaign against his competence and character." Rivero's Response ¶ 7, at 10. Dr. Rivero points to no portion of the record that shows this fact, so the Court does not adopt it. Further, UNM disputes this portion of the fact, alleging that the "Plaintiff's acts of unprofessionalism are well-documented." UNM's Reply ¶¶ 7-13, at 11 (responding to Dr. Rivero's additional facts 7-13 within the same paragraph). Although UNM provides no portion of the record to show this unprofessionalism, many of the undisputed facts that the Court has adopted show complaints which UNM received concerning Dr. Rivero's demeanor. UNM also, however, purports to dispute Dr. Rivero's proffered facts 7-13 as immaterial, but as discussed supra note 10, this argument does not controvert the facts and, therefore, the Court will deem them undisputed.

Dr. Rivero's next proffered fact is as follows: "Dr. Pitcher falsely accused Dr. Rivero, based upon third-party hearsay, of acting improperly and rude as to a staff member assisting in the transfer." Rivero's Response ¶ 8, at 11 (asserting this fact)(citing Pitcher Complaint; Pitcher Depo. at 24:9-22; Email from Alex Herrera to Dr. Dennis Rivero at 9 (dated January 8, 2003), filed March 8, 2018 (Doc. 191-20)). This fact, however, stems solely from inadmissible hearsay evidence. The portion of the Pitcher Depo. to which Dr. Rivero cites reads into the record what the email states, and then Dr. Pitcher verifies: "That's an accurate reading of this, yes." Pitcher Depo. at 24:22. See id. at 24:2-24. Dr. Rivero is thus offering the email for the truth of the statements therein -- that the PALS operator did not feel Dr. Rivero was rude, and the email is therefore inadmissible as Dr. Rivero has not established an exception that makes it admissible. UNM has disputed this fact only as immaterial. See supra note 16.

[23] The Court has altered Dr. Rivero's proffered fact, because it originally avers that Dr. Rivero's letter "show[s] that Dr. Pitcher had falsely accused Dr. Rivero of wrongdoing." Rivero's Response ¶ 9, at 11. This statement would be offering the letter for the truth of what it asserts, and is thus inadmissible hearsay, as Dr. Rivero's own out-of-court statements, when he attempts to use them against UNM, do not fall under the opposing-party-statement exclusion,

- 16 -

Medicine, issued, Dr. Pitcher "recused himself from any dealings with Dr. Rivero." Rivero's Response ¶ 11, at 11 (asserting this fact)(citing Memorandum from John Trotter, PhD to Dr. Dennis Rivero, Dr. David Pitcher, Dr. Moheb Moneim, Dr. Robert Bailey, and Dr. Susan Scott at 13 (dated February 11, 2004), filed March 8, 2018 (Doc. 191-5)("Trotter Memorandum"); Pitcher Depo. at 38:2-17).[24] Further, the Trotter Memorandum states that the "event" between

_____

and he has not established that this letter falls under any other exception to the rule against hearsay evidence. The Court admits this evidence for the limited purpose of showing that Dr. Rivero wrote such a letter and the contents of the letter -- but not that the statements within the letter are true. UNM disputes this fact as immaterial, but that does not controvert the fact that such a letter was written, and thus the Court deems this fact undisputed.

Dr. Rivero's next fact states: "Dr. Pitcher ultimately admitted to having incomplete information when denigrating Dr. Rivero." Rivero's Response ¶ 10, at 11 (citing Email from Dr. David Pitcher to Dr. Moheb Moneim and Dr. Mark Hauswald at 14 (dated April 14, 2003), filed March 8, 2018 (Doc. 191-20)("Pitcher Email")). The Pitcher Email cited does not make an admittance that Dr. Pitcher denigrated Dr. Rivero or that he did so with incomplete information. It reads, in part:

> Though I drew my personal conclusions based on second hand information and my own interaction with Dr. Rivero, my intent in forwarding this information to you was for you to proceed with obtaining further input so as to create your own balanced view, and act on that information if you felt it was appropriate. I know enough to know that there are multiple sides to a story, and I only provided mine.

Pitcher Email at 14. Further, even if Dr. Rivero's proffered fact did not misconstrue the exhibit, it would rely on inadmissible hearsay evidence, because he is offering the Pitcher Email to prove the veracity of the statements therein and offers no exception for it to be admissible. The Court therefore does not adopt this fact.

[24]The Court does not adopt the entirety of Dr. Rivero's proffered fact 11, because the portions of the record to which Dr. Rivero cites does not support some parts of the proffered fact. The first sentence reads: "But then, Dr. Pitcher requested that Dr. Robert Bailey -- his friend and the Associate Dean for Clinical Affairs -- investigate the incident." Rivero's Response ¶ 11, at 11 (citing Bailey Depo. at 6:19-23; Pitcher Depo. at 25:14-15; id. at 36:12-37:8). The portion of the Bailey Depo. to which Dr. Rivero cites provides only that Dr. Bailey is the Associate Dean

- 17 -

Dr. Rivero and Dr. Pitcher is "not to be considered in any evaluations of Dr. Rivero's professional standing or performance." Trotter Memorandum at 13. See Rivero's Response ¶ 11, at 11 (asserting this fact).[25] Dr. Pitcher continued to send emails concerning Dr. Rivero to their colleagues -- discussing a "concerning incident" between the two, Email from Dr. David Pitcher to Dr. Robert Bailey and Dr. Dr. Mark Hauswald at 1 (dated May 6, 2005), filed March

for Clinical Affairs. See Bailey Depo. at 6:19-23. The portion of the Pitcher Depo. to which Dr. Rivero cites provides that Dr. Pitcher considers Dr. Bailey a friend, and that there is an email stating that Dr. Trotter said Dr. Pitcher told him that Dr. Bailey would mediate -- but does not provide that Dr. Pitcher asked Dr. Bailey to mediate. See Pitcher Depo. at 25:14-15; id. at 36:12-37:8. The Court concludes that the record does not support this sentence and thus the Court does not adopt it as a fact.

Dr. Rivero's next sentence states: "A third administrator, Dr. John Trotter, issued a memorandum prohibiting Dr. Pitcher from being involved in any matters pertaining to the employment of Dr. Rivero and not to consider the complaint in any of Dr. Rivero's evaluations." Rivero's Response ¶ 11, at 11 (citing Trotter Memorandum at 13; Pitcher Depo. at 38:2-17). First, the portion of the Trotter Memorandum that the Court has received in the record does not "prohibit[] Dr. Pitcher from being involved in any matters pertaining to the employment of Dr. Rivero," Rivero's Response ¶ 11, at 11; rather, it states: "Given the nature of Dr. Rivero's allegations concerning Dr. Pitcher, an appropriate third party . . . agreed upon by both physicians will be present at any meetings between the two addressing Dr. Rivero's professional standing or performance, in order to ensure that all such meetings are free of any perceived bias," Trotter Memorandum at 13. Dr. Pitcher testified at his deposition that he "recall[ed] the essence of th[e] document" and that it caused him to recuse himself "from anything having to do with Dr. Rivero." Pitcher Depo. at 38:9, 12. Accordingly, the Court does not adopt Dr. Rivero's fact as written. UNM purports to dispute this fact as immaterial, as discussed supra note 22, and as this argument does not controvert the fact, the Court deems the remaining fact undisputed. See supra note 10.

[25]UNM purports to dispute this fact as immaterial, as discussed supra note 22, and as this argument does not controvert the fact, the Court deems the fact undisputed. See supra note 10. This statement in the Trotter Memorandum is not inadmissible hearsay for the purpose of illustrating that UNM had notice that Dr. Trotter determined that the dispute between Dr. Pitcher and Dr. Rivero should not be considered in Dr. Rivero's professional evaluations.

8, 2018 (Doc. 191-21)("May 6 Pitcher Email"), and that Dr. Pitcher is "gravely concerned about

Dr. Rivero," Email from Dr. David Pitcher to Dr. Robert Bailey and Dr. Mark Hauswald at 3

(dated August 10, 2005), filed March 8, 2018 (Doc. 191-21)("Aug. 10 Pitcher Email") --

"without Dr. Rivero's knowledge and despite [that] Dr. Pitcher . . . knew Dr. Rivero only 'in

passing.'" Rivero's Response ¶ 12, at 11-12 (asserting this fact)(quoting Pitcher Depo. at 19:11;

and then citing Affidavit of Dennis P. Rivero, M.D. ¶ 3, at 1 (executed January 12, 2018), filed

March 8, 2018 (Doc. 191-26)("First Rivero Aff.")).[26]

In mid-2006, UNM Hospital patient advocate Willie Barela emailed Dr. Rivero to "pass[]

along a complaint . . . made by a patient asserting that Plaintiff bullied her because she did not

speak English. The patient claimed Plaintiff . . . asked her if she was ashamed she did not know

---

[26]The Court cites to the portion of the record that supports Dr. Rivero's fact and not all of the email exchanges to which he cites, because they are either not emails from Dr. Pitcher or it is unclear that they are discussing Dr. Rivero. Further, the Court does not adopt the entirety of Dr. Rivero's fact 12, because the record to which Dr. Rivero cites does not support the entire fact. First, the Court will not adopt Dr. Rivero's characterization that Dr. Pitcher "continued to demean and belittle Dr. Rivero's character" through the cited email exchanges, Rivero's Response ¶ 12, at 11, because this allegation is an inference not a fact. Second, the Pitcher Depo. does not show that "Dr. Pitcher was unclear and vacillated as to explanations pertaining to the content of the e-mails, his reason for sending them, and their intent." Rivero's Response ¶ 12, at 11 (citing Pitcher Depo. at 39:12-40:10). The portion of the Pitcher Depo. on which Dr. Rivero relies considers only the "concerning incident" email, discusses the incident as Dr. Pitcher remembers it, states that Dr. Rivero's action could have been accidental, and states that Dr. Pitcher did not discuss the incident with Dr. Rivero. See Pitcher Depo. at 39:12-40:10. Dr. Rivero also describes these email exchanges as "consistent back-channel communication among administrators," Rivero's Response ¶ 12, at 11, but cites no portion of the record showing such consistency. For these reasons, the Court adopts Dr. Rivero's fact as provided above. UNM purports to dispute this fact as immaterial, as discussed supra note 22, and as this argument does not controvert the fact, the Court deems it undisputed.

English."   UNM's MSJ ¶ 9, at 4 (asserting this fact)(citing Email from Willie Barela to Dr.

Dennis Rivero at 23 (dated June 30, 2006), filed December 8, 2017 (Doc. 143-1)("June 30

Barela Email").[27]   In response to the complaint, Dr. Rivero "sa[id] that Mr. Barela and UNM

encouraged 'groundless['] complaints."   UNM's MSJ ¶ 10, at 4 (asserting this fact)(quoting

Email from Dr. Dennis Rivero to Willie Barela at 22 (dated June 30, 2006), filed December 8,

2017 (Doc. 143-1)("Rivero Email")).[28]   Dr. Rivero "also informed Mr. Barela that he would no

---

[27]In response, Dr. Rivero writes: "Dr. Rivero objects to the cited exhibit as inadmissible hearsay.  To the extent any content of the exhibit is characterized, Dr. Rivero states that it speaks for itself and disputes Def.'s UMF 9 to the extent it is inconsistent therewith."   Rivero's Response ¶ 9, at 3.  First, the Court notes that this email does not present a double hearsay problem, because the substance of the complaint is not offered for the truth of the matter asserted -- i.e., that Dr. Rivero treated the patient with the disrespect which she contends that he did. Rather, the email is offered to prove that Barela had received a complaint against Dr. Rivero from a patient.  While the email itself is hearsay -- for the reasons discussed supra note 16 -- UNM would be able to provide this evidence in an admissible form, as Dr. Rivero recognized the email and remembered the incident, but had problems as to the substance of the complaint itself. See Deposition of Dennis P. Rivero at 70:2-72:20 (taken September 15, 2017), filed February 2, 2018 (Doc. 169-1)("Rivero Depo. 169")).  Accordingly, the Court admits this undisputed fact, not to prove the allegations of the complaint, but to show that Barela had received it and passed it along to Dr. Rivero.  As to Dr. Rivero's assertion that the email "speaks for itself," Rivero's Response ¶ 9, at 3, the Court notes that it omitted the portion of UNM's fact that states that the patient had said that Dr. Rivero "told her that she needed to learn to speak English," UNM's MSJ ¶ 9, at 4, as this language is not in the email, see June 30 Barela Email at 23.

[28]Dr. Rivero purports to dispute this fact and objects to UNM's "mischaracterization of Dr. Rivero's response as an 'insult.'"   Rivero's Response ¶ 10, at 3 (quoting UNM's MSJ ¶ 10, at 4).  The Court removed UNM's characterization of the Rivero Email from the fact, so mischaracterization is no longer an issue.  To attempt to dispute the fact, Dr. Rivero states that "UNM consistently refused to investigate Dr. Rivero's statements in defense of himself when his character and integrity were wrongfully attacked."   Rivero's Response ¶ 10, at 3 (citing Rivero Depo. 191 at 84:13-20; id. at 84:24-85:5; id. at 85:15-86:12; id. at 87:1-12).  The Court first notes that Dr. Rivero did not attach page 86 of his deposition to his Response.  The testimony does not refute the fact that the Rivero Email states: "Mr. Barela, I have better things to do than

longer see patients at the General Ortho clinic, a clinic that is used by many indigent patients."
UNM's MSJ ¶ 11, at 4 (asserting this fact)(citing Rivero Email at 22).[29] "Moreover, Plaintiff
informed Mr. Barela that he would not speak Spanish to patients, despite the fact that he was
fluent in Spanish, and he implied to Mr. Barela that Spanish speaking general ortho clinic
patients caused him the most difficulty." UNM's MSJ ¶ 12, at 5 (asserting this fact)(citing
Rivero Email at 22).[30] On the same day, Dr. Rivero sent another email, "stating that he would

_____

to respond to this type of complaint which is groundless, and is apparently encouraged by you
and the institution." Rivero Email at 22. Dr. Rivero's assertion that UNM's "misportrayal of Dr.
Rivero's e-mail . . . ignores the fundamental groundlessness of this and all other complaints
against Dr. Rivero" similarly does not dispute the fact. Rivero's Response ¶ 10, at 3 (citing
Rivero's Response ¶ 32, at 6). The Court therefore deems the fact as it provides undisputed.

[29]Dr. Rivero purports to dispute this fact "to the extent it is inconsistent with the express
statement of Dr. Rivero in the cited exhibit. Dr. Rivero continued to see patients in the 'General
Ortho' clinic." Rivero's Response ¶ 11, at 3 (citing Martinez Depo. at 23:21-24). The portion of
the Martinez Depo. to which Dr. Rivero cites does not show that Dr. Rivero continued to work at
the General Orthopedic clinic; rather, it discusses whether Martinez believed that "Dr. Rivero
was unable to perform his work as an orthopedic surgeon" or if she "ever fe[lt] that Dr. Rivero
had a mental condition." Martinez Depo. at 23:18-24. Martinez testified at her deposition,
however, that she worked with Dr. Rivero "throughout his tenure at UNM." Martinez Depo. at
12:21-24. This fact does not negate that the Rivero Email states: "In the future I will go out of
my way to avoid contact with patients in the General Ortho clinic," and "[i]f I never had to see
another patient in the General Ortho clinic it would be just fine with me, but I will in the future
just keep my distance from these patients." Rivero Email at 22-23. Dr. Rivero also "disputes the
allegations purported to be contained in the exhibit." Rivero's Response ¶ 11, at 3 (citing Rivero
Depo. 191 at 81:13-23; id. at 82:12-83:2; id. at 84:24-85:5). The portion of the Rivero Depo. to
which Dr. Rivero cites disputes the veracity of the patient's complaint, however, and not the
contents of the Rivero Email. The Court therefore deems this fact undisputed.

[30]Dr. Rivero purports to dispute this fact "to the extent it is inconsistent with the express
statement of Dr. Rivero in the cited exhibit and to the extent that Defendant characterizes an
implication not present in the text of the cited statement." Rivero's Response ¶ 12, at 3. The
Rivero Email states:

never operate on a particular patient because of a simple misunderstanding regarding payment." UNM's MSJ ¶ 22, at 6 (asserting this fact)(citing Email from Dr. Dennis Rivero to Willie Barela and Dr. Moheb Moneim at 26 (dated June 30, 2006), filed December 8, 2017 (Doc. 143-1)("Payment Email"); Rivero Depo. 143 at 140:22-141:1).[31]

---

> In the future I will go out of my way to avoid contact with patients in the General Ortho clinic, nor will I speak spanish [sic] to them, (although I am fluent in spanish [sic] and as a courtesy to the patients and the hospital I often speak to them in spanish [sic]) as it is in this clinic where I find the most unappreciative patients, who complain the most, demand the most, and believe that somehow I am their slave and I am obligated to do whatever they want from me. It would seem that this is the clinic where all of the complaints come from.

Rivero Email at 22-23. He also wrote: "If I never had to see another patient in the General Ortho clinic it would be just fine with me., [sic] but I will in the future just keep my distance from these patients who are nothing but problems for me." Rivero Email at 23. The Court thus concludes that UNM's proffered fact is an accurate representation of the Rivero Email, and that this fact is undisputed as Dr. Rivero has provided nothing to challenge it. See D.N.M.LR-Civ. 56.1(b).

[31]Dr. Rivero disputes this fact "as a mischaracterization. Dr. Rivero explained clearly the procedure by which patients must be cleared financially and his obligations as a physician in that situation." Rivero's Response ¶ 22, at 5 (citing Rivero Depo. 191 at 138:23-140:25). This fact is not a mischaracterization. Dr. Rivero wrote in the Payment Email: "Please tell [the patient] that I will NOT be doing his surgery on any date, for any amount of money, under any circumstances and that I will no longer see him." Payment Email at 26. He went on to state: "The facts of the matter are that I did indeed schedule him for surgery (did not deny him care) but explained to him that his self pay status as I understood it would require him to pay the hospital 50% (not me) which would probably be about 8-10 thousand." Payment Email at 26. The patient "seems to think that he has been financially cleared, which I do not think is the case." Payment Email at 26. At his deposition, Dr. Rivero explained what UNM Hospital historically did with self-pay patients and that it changed this policy -- ostensibly without telling Dr. Rivero -- leading to a "misunderstanding" of the payment procedures. Rivero Depo. 143 at 140:25. See id. at 138:20-140:21. Dr. Rivero still decided to cancel the patient's surgery and wrote that he would "no longer see him." Payment Email at 26. See Rivero Depo. 143 at 141:1-19. The Court thus deems this fact undisputed.

Later in 2006, Barela sent Dr. Rivero another complaint which he had received from one of Dr. Rivero's patients, who alleged that Dr. Rivero "compared [the] patient to a monkey, and informed the patient 'the only thing [Dr. Rivero] would prescribe is Church.'" UNM's MSJ ¶ 14, at 5 (asserting this fact)(quoting Email from Willie Barela to Dr. Dennis Rivero at 25 (dated August 3, 2006), filed December 8, 2017 (Doc. 143-1)("Aug. 3 Barela Email").[32] The patient who made this complaint was a former intravenous ("IV") drug user, and Dr. Rivero "describ[ed] a study regarding monkeys and drugs to the patient in question, and attempted to apply it to the patient's situation." UNM's MSJ ¶¶ 15-16, at 5 (citing Aug. 3 Barela Email at 25; Rivero Depo. 143 at 120:22-121:6).[33] In the Aug. 3 Barela Email, Barela repeatedly uses the term "claims" when describing the patient's allegations against Dr. Rivero. UNM's MSJ ¶ 18, at

---

[32]Dr. Rivero "objects to [this fact] as hearsay[,] and disputes its factual assertions as a misrepresentation of the event at issue. Further, a resident present with Dr. Rivero asserted that Dr. Rivero did nothing wrong." Rivero's Response ¶ 14, at 4 (citing Rivero Depo. 191 at 119:19-121:23). As discussed supra note 27, there is no double hearsay problem with the Aug. 3 Barela Email, because it is not offered to prove the truth of the complaint but that Barela had received a complaint. UNM could prove that Barela received such complaint through admissible evidence, because Dr. Rivero recalled receiving this Email and that such complaint had been made, although he disputed the substance of the complaint as being "a gross misrepresentation of what occurred." Rivero Depo. 143 at 119:22-23. See id. at 118:1-120:5. That the substance of the complaint is in dispute, however, does not dispute the fact that it was made, so the Court deems this fact undisputed.

[33]Dr. Rivero raises the same objection to this fact as the one discussed supra note 32, see Rivero's Response ¶ 15, at 4, and for the same reasons provided supra note 32, the Court deems this fact undisputed.

5 (asserting this fact)(citing Aug. 3 Barela Email at 25).[34]  Dr. Rivero emailed Barela in response, "accusing him of 'attacking physicians' based on allegations with 'very little truth' to them."  UNM's MSJ ¶ 17, at 5 (asserting this fact)(quoting Email from Dr. Dennis Rivero to Willie Barela at 25 (dated August 4, 2006), filed December 8, 2017 (Doc. 143-1)("Aug. 4 Rivero Email")).[35]  Barela responded to Dr. Rivero's email, "stating that he viewed patient claims objectively, and stating that he respected Plaintiff very much."  UNM's MSJ ¶ 19, at 6 (asserting this fact)(citing Email from Willie Barela to Dr. Dennis Rivero at 24 (dated August 7, 2006), filed December 8, 2017 (Doc. 143-1)("Aug. 7 Barela Email")).[36]  Dr. Rivero responded to Barela's second email with his own email, in which he wrote:

---

[34]Dr. Rivero "objects to [this fact] as hearsay and as speculation, as there is no evidence of Mr. Barela's own state of mind."  Rivero's Response ¶ 18, at 4.  UNM's fact provides that Barela's use of the term "claims" "indicat[es] that he was not accepting the claim without question."  UNM's MSJ ¶ 18, at 5 (citing Aug. 3 Barela Email at 25).  This indication is not a fact, so the Court has not adopted it.  Further, the Court's adopted fact is not hearsay, because the Aug. 3 Barela Email is not offered to prove the truth of the statements it contains, just to show what language it uses.  See supra note 16 (discussing hearsay).  Accordingly, the Court deems this fact undisputed.

[35]UNM characterizes this email Dr. Rivero sent as "scathing," UNM's MSJ ¶ 17, at 5, and Dr. Rivero disputes this fact "as a mischaracterization," arguing the email is "an adamant defense against untruths aimed at Dr. Rivero's character and professional acumen and stature." Rivero's Response ¶ 17, at 4.  The Court thus removes UNM's characterization from the fact and deems the remainder undisputed.

[36]Dr. Rivero disputes this fact "as hearsay and disputes it to the extent it is inconsistent with the express content of the cited exhibit and to the extent Defendant characterizes an implication not present in the text of the cited exhibit."  Rivero's Response ¶ 19, at 4.  The email is not hearsay, because UNM is not providing it to prove the truth of its statements, but rather to show what it says.  See supra note 16 (discussing hearsay).  The Court has removed UNM's characterization of this email and thus deems the adopted fact undisputed.

- 24 -

Your manner and approach to this, in my opinion is reprehensible and thoroughly disrespectful of Physicians, and I am amazed that you have no idea how much I dislike you and your methods, which effectively try to lower our status to servants who are expected to get on our knees before patients. You may think you are doing what your job requires, and so be it, but it is WRONG, WRONG and WRONG, and I intend to bring it up with your boss.

. . . .

WHy [sic] is that this year in the past few months I have had four of these, (one where I did not even set eyes on the patient) when in the past fourteen years I never heard from your predecessor?

Email from Dr. Dennis Rivero to Willie Barela at 24 (dated August 7, 2006), filed December 8, 2017 (Doc. 143-1)("Aug. 7 Rivero Email"). See UNM's MSJ ¶ 20, at 6 (asserting this fact)(citing Aug. 7 Rivero Email at 24).[37] Dr. Rivero "does not regret sending the [Aug. 7 Rivero Email]." UNM's MSJ ¶ 21, at 6 (asserting this fact)(citing Rivero Depo. 143 at 106:17-107:25).[38] "Moreover, [one] of Dr. Rivero's former patients filed a claim with the U.S. Office of

---

[37]Dr. Rivero disputes this fact "to the extent it is inconsistent with the express statement of Dr. Rivero in the cited exhibit" and argues that "it is incomplete, as Dr. Rivero also expresses concern about receiving complaints about patients whom he has 'not even set his eyes on,' which is a challenge to Mr. Barela's objectivity and thoroughness." Rivero's Response ¶ 20, at 4. Because the Court quotes the full paragraph of the portion of the email to which UNM cites in its MSJ, and includes the portion of the Aug. 7 Rivero Email to which Rivero purports to quote in his Response, the Court deems this fact undisputed.

[38]Dr. Rivero argues that this fact is hearsay and "disputes it to the extent it is inconsistent with the express content of the cited exhibit and to the extent that Defendant characterizes the e-mail as 'angry.' Dr. Rivero had a right to defend himself against baseless accusations." Rivero's Response ¶ 21, at 4 (citing Rivero Depo. 191 at 108:2-18). First, neither the deposition nor the email constitutes hearsay, because they are statements that UNM "offer[s] against an opposing party," that "was made by the party in an individual . . . capacity." Fed. R. Evid. 801. Further, the fact is consistent with Dr. Rivero's deposition testimony, for he was asked "do you regret sending that e-mail" and he responded "[n]o." Rivero Depo. 143 at 107:18-21. The Court has

Civil Rights in the federal Health and Human Services Department, alleging that Dr. Rivero made derogatory statements about Mexicans." UNM's MSJ ¶ 13, at 5 (asserting this fact)(citing Letter from Ralph Rouse to Steven McKerman at 1-2 (stamped March 1, 2007), filed December 8, 2017 (Doc. 143-2)("OCR Letter")).[39]

---

removed portions of UNM's proffered fact that the deposition testimony does not support, including UNM's characterization of the email as "angry." The portion of the Rivero Depo. to which Dr. Rivero cites does not bring into dispute that he did not regret sending that email, but rather supports this fact because Dr. Rivero says "[t]here's nothing wrong with the language [in the email], sir" and "I was tired of [Barela] attacking me every time instead of trying to resolve the issues." Rivero Depo. 191 at 108:4-5, 16-18. Accordingly, the Court deems this adopted fact undisputed.

[39]Dr. Rivero purports to dispute this fact "to the extent it is inconsistent with the express statements in the cited exhibit. Furthermore, Dr. Rivero was never asked about the allegations of the Complaint, and an accompanying resident refuted the allegations." Rivero's Response ¶ 13, at 3 (citing Rivero Depo. 191 at 186:16-188:16; Letter from Dr. Shannon Redmon at 14 (dated July 29, 2008), filed March 8, 2018 (Doc. 191-5)). First, although Dr. Rivero does not dispute the OCR Letter as inadmissible hearsay, the Court determines that the evidence is admissible. The OCR Letter is not double hearsay, because it is not offered to prove the truth of the complaints but rather that UNM had received notice of complaints made to the United States Department of Health and Human Services Office for Civil Rights. Further, UNM may provide the evidence that such complaints were made in an admissible form, as Dr. Rivero acknowledged that such complaints were filed against UNM and that UNM knew of them. See Rivero Depo. 191 at 186:16-187:7. Second, the fact is not inconsistent with the statements in the OCR Letter, for the Letter states that a patient complained about Dr. Rivero's making statements "reflecting his belief that persons of Mexican origin, such as [the patient and her son], would not pay for services rendered by the Hospital, and they did not have the means to pay for services rendered and other derogatory statements about Mexicans." OCR Letter at 1. UNM's proffered fact says, "two of Dr. Rivero's former patients," but the Court changed this to "one" to more accurately reflect the statements in the OCR Letter. UNM's MSJ ¶ 13, at 5. The portions of the record to which Dr. Rivero cites to dispute this fact merely dispute the veracity of the complaint itself and not that such a complaint was made. See Rivero Depo. 191 at 186:16-188:16; Letter from Dr. Shannon Redmon at 14. The Court therefore deems this fact undisputed.

3.    **Dr. Rivero's Request to Return to Full Time Employment with UNM.**

After several months of working at UNM at 0.05 FTE, Dr. Rivero "contacted the chair of UNM's Department of Orthopedics, Dr. Robert Schenck, asking to return full time" or to 0.75 FTE.  UNM's MSJ ¶ 26, at 7 (asserting this fact)(citing FAC ¶16, at 3).  See Rivero's Response ¶ 26, at 5 (admitting this fact).  "Dr. Rivero sought to increase his level of participation to .75 to 1.0 FTE, or completely full-time, as Defendant had promised."  Rivero's MSJ ¶ 5, at 3 (asserting this fact)(citing Rivero Depo. 144 at 152:19-24).[40]  "In a letter to Dr. Schenck in support of his request, Plaintiff stated that he had 'learned his lesson.'"  UNM's MSJ ¶ 27, at 7 (asserting this fact)(quoting Letter from Dr. Dennis Rivero to Dr. Robert Schenck, Jr. at 28 (dated June 24, 2007), filed December 8, 2017 (Doc. 143-1)("Request Letter")).[41]  Dr. Rivero "noted that the lesson was that [it is important that] he . . . get along with people."  UNM's MSJ ¶ 28, at 7

---

[40]"UNM disputes the inference that any agent of UNM 'promised' [Dr. Rivero] that he could return to full time, much less that this was contractually binding.  Plaintiff merely had a conversation with Dr. Schenck and was told informally that he could return if he so desired."  UNM's Response ¶ 5, at 2.  UNM admits, however, that Dr. Schenck told Dr. Rivero he could return to full time status and notes no portion of the record to dispute this "promise."  The Court thus deems this fact undisputed.  Further, UNM argues the fact is immaterial, UNM's Response ¶ 5, at 2, but again immateriality does not bring the fact into dispute, see supra note 10.

[41]Dr. Rivero "disputes [this fact] as immaterial and an incomplete statement of an exhibit that speaks for itself."  Rivero's Response ¶ 27, at 5.  The Court will deal with materiality in the Analysis.  See supra note 10.  Further, that the statement is "incomplete" does not refute that Dr. Rivero wrote: "I would like to reassure you that I have learned my lesson."  Request Letter at 28.  The Court thus deems this fact undisputed.

(citing Rivero Depo. 143 at 163:5-9).[42] "Dr. Schenck asked Plaintiff to apologize to Mr. Barela."

UNM's MSJ ¶ 29, at 7 (asserting this fact)(citing Rivero Depo. 143 at 171:10-16).[43] Dr. Rivero

"wr[o]te a letter of apology, but the letter included a[] . . . paragraph denying all inappropriate

behavior."[44] UNM's MSJ ¶ 30, at 7 (asserting this fact)(citing Letter from Dr. Dennis Rivero to

---

[42] Dr. Rivero "disputes [this fact] as immaterial and a misstatement of the cited testimony." Rivero's Response ¶ 28, at 5. This response does not specifically controvert the fact, because the Court will deal with materiality in the Analysis, and this fact, as the Court adopts it, is not a misstatement of the deposition testimony. See D.N.M.LR-Civ. 56.1(b). The testimony reads:

> Q.    All right. Let me back up a little bit. In -- in the first sentence you said, "I would like to reassure you that I have learned my lesson." What lesson was that?
>
> A.    It's important to get along with people.

Rivero Depo. 191 at 163:5-9. Accordingly, the Court deems this fact undisputed.

[43] Dr. Rivero purports to dispute this fact as immaterial, see Rivero's Response ¶ 29, at 5, however, as discussed supra note 10, a materiality argument does not controvert the asserted fact, so the Court deems this fact undisputed.

[44] UNM also asserts that "Mr. Barela later stated that he did not believe that Plaintiff was truly contrite, and that Plaintiff was the worst physician with whom he interacted at UNM." UNM's MSJ ¶ 31, at 7 (citing Notes at 31 (undated), filed December 8, 2017 (Doc. 143-1)). Dr. Rivero disputes this fact "as hearsay and immaterial and as a scandalous mischaracterization of testimony taken out of context. The notes cited speak for themselves." Rivero's Response ¶ 31, at 5. These notes are hearsay, offered to prove that Barela said these things, and UNM has offered no exception under which the Court may admit this evidence. In its Reply, UNM states:

> Plaintiff does not dispute UMF No. 31. Plaintiff admits that the notes speak for themselves. Moreover, these notes explain why UNM officials reasonably believed that Plaintiff had no intention of improving his professionalism. UNM noted that Mr. Barela did not believe that Plaintiff was truly contrite.

Willie Barela at 29 (dated June 11, 2007), filed December 8, 2017 (Doc. 143-1)("Apology Letter")).[45] "Shortly after Plaintiff requested a return to full time employment, Dr. Robert Bailey sent an e-mail describing alleged ['[i]ssues involving Dr. Rivero from ~2003-2006']": (i) a complaint made against Dr. Rivero to the accreditation organization Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") "alleging unprofessional behavior"; (ii) "[a]pproximately 10 patient complaints alleging that Dr. Rivero made disparaging comments about a patient's inability to speak English, Dr. Rivero's focus on money and payment, his dismissing of patients because of concerns that he would not get paid, and his anger management issues"; (iii) a complaint to the United States Department of Health and Human Services' Office for Civil Rights "alleging discrimination against a patient because he did not speak English," which required "an extensive response"; (iv) "[c]omplaints from a Coalition that advocated for improved healthcare for indigent and other patients"; (v) "[a] complaint from an Indian Health

---

Accordingly, Plaintiff was not sincere when he carried out the one action that he was asked to take.

UNM's Reply ¶ 31, at 6.  This Reply provides no basis on which this hearsay evidence is admissible.  Although the notes could show UNM's state of mind, there is no indication on these notes of who compiled them or when.  Further, UNM clearly wants to prove Barela's belief that Dr. Rivero was not sincere in his apology, but this is hearsay contained within the hearsay of the notes, and inadmissible.  The Court accordingly does not admit this evidence.

[45] Dr. Rivero purports to dispute this fact as immaterial and argues that UNM "mischaracterizes the cited exhibit as containing an 'unnecessary' paragraph, though Dr. Rivero states that Defendant made a practice of disregarding any statements of Dr. Rivero that defended his conduct, integrity, and character."  Rivero's Response ¶ 30, at 5.  With this characterization omitted from the fact, and because the Court will deal with materiality in the Analysis, the Court deems this fact undisputed.

Services physician in Chinle, AZ regarding a consult with Dr. Rivero"; (vi) "[a] complaint from a physician from the organization Healthcare for the Homeless regarding a PALS consult with Dr. Rivero"; (vii) "[a] complaint from the [operating room] director involving anger management issues"; (viii) "[a] complaint from a surgeon regarding anger management"; (ix) "[a] request from the Patient Assistance Coordinator that he not have to interact with Dr. Rivero, prompted by previous interactions with Dr. Rivero." UNM's MSJ ¶ 32, at 7-8 (asserting this fact)(quoting and citing Email from Dr. Robert Baily to Dr. David Pitcher, Dr. Robert Katz, John Trotter, PhD, Dr. Paul Roth, and Steve McKernan at 1 (dated November 5, 2007), filed December 8, 2017 (Doc. 143-3)("Complaints Email")).[46]  About seven months later, "JCAHO

---

[46]Dr. Rivero disputes this fact as misleading, because, in the Complaints Email, "Dr. Bailey at no time mentions anything about 'professionalism,'" Rivero's Response ¶ 32, at 6, and UNM's proffered fact construes the Complaints Email as a "history concerning Plaintiff's lack of professionalism," UNM's MSJ ¶ 32, at 7.  The nature of the complaints speaks for itself, so the Court inserts quoted language from the Complaints Email describing the complaints as "issues." Complaints Email at 1.  Dr. Rivero also disputes the Complaints Email as hearsay, and states that UNM "provides no supporting evidence of the veracity or bases for complaints cited by Dr. Bailey, who has could [sic] not state that he investigated them."  Rivero's Response ¶ 32, at 6 (citing Deposition of Dr. Robert Bailey at 106:8-14 (taken September 11, 2017), filed March 8, 2018 (Doc. 191-5)("Bailey Depo.")).  The Complaints Email is not offered to prove the truth of the complaints it outlines; it is offered to prove UNM's notice of complaints made against Dr. Rivero.  Therefore, the Complaints Email is admissible solely to show that UNM had notice of a number of complaints brought against Dr. Rivero.  That these complaints are ungrounded or that "Dr. Rivero was never found to have been at fault for any complaints," as Dr. Rivero argues, does not dispute the fact that such complaints were made and that UNM knew of them.  Rivero's Response ¶ 32, at 6 (citing Board of Regents of the University of New Mexico's Supplemental Responses and Objections to Plaintiff Dennis Rivero's Second Set of Requests for Production of Documents, and Second Requests for Admission at 2 (undated), filed March 8, 2018 (Doc. 191-8)).  UNM is offering this evidence to show its concern with Dr. Rivero's conduct in the workplace, its belief that he had issues, and not that these complaints are true  For this limited

released a national Sentinel Event Alert noting that unprofessional behavior 'undermine[s] a culture of safety,' and instituted a New Leadership Standard that addresses disruptive and unprofessional behavior." UNM's MSJ ¶ 33, at 8 (quoting <u>Sentinel Event Alert Issue 40: Behaviors That Undermine a Culture of Safety</u>, Joint Commission at 1 (dated July 9, 2008), filed December 8, 2017 (Doc. 143-4)("Sentinel Alert")).[47] At the time, UNM School of Medicine had a "Statement of Professionalism," which states:

> In the School of Medicine, there is a commitment to the attributes of professionalism, which include altruism, accountability, excellence, duty, honesty, integrity and respect. For clinical faculty engaged in patient care, there is a further responsibility to apply these attributes to their interactions with patients, patient families, and significant others such that patient health care needs and the privacy and confidentiality of patient information takes precedence over self-interest.

---

purpose, to show UNM's concern with Dr. Rivero's return to full-time employment, the Complaints Email is not hearsay and is admissible.

[47]Dr. Rivero disputes the fact as immaterial and the Sentinel Alert as hearsay. <u>See</u> Rivero's Response ¶ 33, at 6. As previously discussed, a materiality argument does not specifically controvert the fact, so the Court deems this fact undisputed. <u>See</u> <u>supra</u> note 10. Further, the Sentinel Alert is not inadmissible hearsay, because UNM is not offering it to prove the truth of the matters it asserts -- that unprofessional behavior is unsafe -- but to show that such Alert issued, and is thus admissible for that purpose. UNM asserts that the Sentinel Alert is admissible as a business record of JCAHO, <u>see</u> UNM's Reply ¶ 33, at 7, but the Court cannot make that determination, as UNM has not laid the appropriate foundation for this, <u>see</u> <u>United States v. Ary</u>, 518 F.3d at 786.

"Statement of Professionalism," UNM School of Medicine (approved October 24, 2002), filed December 8, 2017 (Doc. 143-5). <u>See</u> UNM's MSJ ¶ 33, at 8 (asserting this fact)(citing the Statement of Professionalism).[48]

---

[48]UNM's proffered fact states that JCAHO's Sentinel Alert "reinforced UNM's existing commitment to the professionalism of its physicians." UNM's MSJ ¶ 33, at 8 (citing the Statement of Professionalism). The Court does not see how the Statement of Professionalism shows that the Sentinel Alert reinforced UNM's commitment to professionalism and thus does not adopt this fact. It is true, however, that UNM had a Statement of Professionalism at the time, and the Court thus provides that Statement as a fact. Dr. Rivero disputes this fact as discussed <u>supra</u> note 47, and contends the Statement is hearsay. The Statement of Professionalism is not hearsay, however, as it does not qualify as a "statement," <u>see</u> Fed. R. Evid. 801(c), because it is unclear whether it is intended as an assertion, <u>see</u> Fed. R. Evid. 801(a). <u>See also</u> <u>Schimpf v. Gerald, Inc.</u>, 52 F. Supp. 2d 976, 992 (E.D. Wis. 1999)(Adelman, J.)("I am presently unconvinced that an existing policy is itself any type of statement."). As Dr. Rivero claims the Statement of Professionalism is hearsay, he bears the burden of "whether an assertion is intended" and, because this is an "ambiguous and doubtful case[, it] will be resolved against him and in favor of admissibility." Fed. R. Evid. 801 advisory committee's note to subdivision (a). Further, even if the Statement of Professionalism constitutes a "statement" for the rule against hearsay, the Statement is not offered for the truth of the matter, but to show that UNM had such a statement. Dr. Rivero does not dispute that UNM had such a statement, but rather argues that UNM "has never specifically defined 'professionalism' as it applied to Dr. Rivero, but has excluded the statutory definition of professionalism from its consideration." Rivero's Response ¶ 33, at 6 (citing <u>Rivero v. Board of Regents of the Univ. of N.M.</u>, D-202-CV-2011-08104, Transcript of Proceedings at 139:7 (dated August 3, 2012), filed March 8, 2018 (Doc. 191-10); Schenck Depo. 191 at 37:8-38:11; N.M. Stat. Ann. § 61-6-15; N.M. Admin. Code 16.10.8.8). This evidence does not bring into dispute that UNM had adopted a Statement of Professionalism, and neither does Dr. Rivero's assertion that UNM "had no policies that it applied with respect to professionalism or the imposition of the medical examination" UNM required of him. Rivero's Response ¶ 33, at 6 (citing Rivero's Interrogatory No. 4, Answer at 1-2 (undated), filed March 8, 2018 (Doc. 191-9)). Further, the exhibit to which Dr. Rivero cites contradicts his assertion that UNM had no policies on professionalism, and UNM points to a number of documents requiring that physicians act professionally, although UNM admits that it "has no set policy pertaining to mental examinations." Rivero's Interrogatory No. 4, Answer at 2. <u>See</u> Rivero's Interrogatory No. 4, Answer at 1. The Court accordingly deems this fact undisputed.

While Dr. Rivero awaited UNM's decision on his request to return to full time status, he "continued to work full-time in Oklahoma in private practice."[49] Rivero's MSJ ¶ 7, at 3 (asserting this fact)(citing Rivero Depo. 144 at 174:15-21). See UNM's Response ¶ 7, at 2 (not disputing this fact). Three years later, in 2010, Dr. Rivero "filed a Complaint with the Academic Freedom and Tenure Committee, claiming that Dr. David Pitcher had been spreading false rumors about him, and that this prevented him from returning to full time status." UNM's MSJ ¶ 34, at 9 (asserting this fact)(citing Letter from Dr. Dennis Rivero to Dr. Victor Strasburger at 1 (dated October 5, 2010), filed December 8, 2017 (Doc. 143-6)). See Rivero's MSJ ¶ 8, at 3 (asserting this fact)(citing Rivero Depo. 144 at 186:2-6).[50] "The [Academic Freedom and Tenure

---

[49]Dr. Rivero proffers that UNM "impeded [his attempt to return to full time status], despite recommendations and high regard of Dr. Rivero's colleagues." Rivero's MSJ ¶ 6, at 3 (citing Rivero Depo. 144 at 180:19-25; id. at 183:2-186:6). The deposition testimony does not support this "fact," and the Court cannot adopt it. Dr. Rivero testified that, every quarter, he would discuss with Dr. Schenck his request's progress, and that he has "no doubt that Dr. Schenck advocated on my behalf at the beginning of the affair." Rivero Depo. 144 at 184:2-4. See id. at 183:2-20. Dr. Rivero stated that "residents or the faculty wr[ote] a letter to Dr. Roth asking for [his] return," but admits he only knows that through "testimony." Rivero Depo. 144 at 184:11-12, 14. Dr. Rivero then discussed a department meeting in "the summer of 2008," Rivero Depo. 144 at 184:20, where Dr. Roth told everyone at the meeting "words to the effect, [']Dr. Rivero will not be allowed to return because, if he does, civil lawsuits will follow him,[']" Rivero Depo. 144 at 185:2-5, but does not discuss how he knows this occurred. Dr. Rivero thus points to no personal knowledge that his colleagues provided recommendations or that UNM impeded his request.

[50]Dr. Rivero disputes UNM's version of this fact as immaterial. See Rivero's Response ¶ 34, at 6. This argument does not specifically controvert the proffered fact, and Dr. Rivero proffers the same fact in his MSJ, so the Court deems this fact undisputed. See supra note 10.

Committee] found Plaintiff's Complaint to be without merit." UNM's MSJ ¶ 35, at 9 (asserting this fact)(citing Rivero Depo. 143 at 206:14-207:14).[51]

Then, "[o]n December 10, 2010, Dr. Robert Schenck -- Chairman of the Department of Orthopedic Surgery and Rehabilitation -- and Dr. Rivero met with one another to discuss possible terms by which Dr. Rivero would" increase his employment.[52] Rivero's MSJ ¶ 9, at 3 (asserting this fact)(citing Rivero Depo. 144 at 206:10-207:14; Deposition of Dr. Robert Cumming Schenck, Jr. at 11:13-24 (taken September 13, 2017), filed December 8, 2017 (Doc. 144-2)("Schenck Depo. 144"); Note at 13 (dated December 10, 2010), filed December 8, 2017 (Doc. 144-1)). See UNM's Response ¶ 9, at 3 (admitting this fact). "The outcome of the meeting was memorialized by a handwritten note." Rivero's Response ¶ 27, at 14 (asserting this fact)(citing Note at 13).[53] See UNM's Reply ¶¶ 27-28, at 12 (not disputing this fact). "At the

---

[51]Dr. Rivero disputes this fact as immaterial, see Rivero's Response ¶ 35, at 6, but as discussed supra note 10, the Court deals with materiality issues in the Analysis and, thus, because Dr. Rivero notes no portion of the record specifically controverting this fact, the Court deems this fact undisputed.

[52]Dr. Rivero's proffered fact states, after the "would," "return to full-time status, which included four counseling sessions." Rivero's MSJ ¶ 9, at 3. The Court notes that, although UNM admits this fact, its own proffered fact and the record shows that the planning with Dr. Schenck was to increase Dr. Rivero's employment -- to 0.75 FTE -- and not to full-time status. See UNM's MSJ ¶ 36, at 9 (asserting this fact)(citing Rivero Depo. 143 at 206:14-207:14). See Rivero's Response ¶ 36, at 7 (admitting this fact); id. at ¶ 27, at 14 (asserting this fact). Accordingly, the Court has changed Dr. Rivero's proffered fact to match the record, and deems it undisputed. The Court discusses the counseling sessions later.

[53]The Note is inadmissible hearsay, but Dr. Schenck testified as to the contents of the Note, stating that he remembered making the statements contained therein except for the phrase,

- 34 -

meeting with Dr. Schenck, Plaintiff agreed to attend four counseling sessions, and if he attended

the counseling sessions, he could gradually return to 0.75 FTE." UNM's MSJ ¶ 37, at 9

(asserting this fact)(citing Rivero Depo. 143 at 206:14-207:14).[54] See Rivero's Response ¶ 28, at

15 (asserting this fact).[55] They also agreed that a term of Dr. Rivero's return be that "Dr. Rivero

---

"absolve of complicity by Pitcher." Schenck Depo. 191 at 107:22-23 (internal quotation marks omitted)(quoting Note at 13). See Schenck Depo. 191 at 107:8-108:24.

[54]Dr. Rivero purports to dispute this fact "to the extent that it omits the complete content of the outcome of the meeting with Dr. Schenck," Rivero's Response ¶ 37, at 7, but this response does not specifically controvert this fact, so the Court deems it undisputed, see D.N.M.LR-Civ. 56.1(b).

[55]The Court will not adopt the entirety of Dr. Rivero's additional fact 28. Besides saying that Dr. Schenck and Dr. Rivero agreed to four counseling sessions, it provides: "Counseling at no point involved a 'psychiatric evaluation.' Indeed, counseling was an informal approach, as exhibited in a document from 2009, wherein Dr. Schenck stated that he had provided 'counseling' to Dr. Rivero." Rivero's Response ¶ 28, at 15 (citing Rivero Depo. 191 at 210:1-14; id. at 215:23-216:11; Letter from Sandra Bell to Univ. Orthopedics at 16 (dated June 10, 2009), filed March 8, 2018 (Doc. 191-5)). Dr. Rivero testified that his understanding of counseling involves "[g]etting advice from somebody" and that he "never agreed to a psychiatric evaluation." Rivero Depo. 191 at 210:3, 5. Dr. Rivero admitted that "a psychiatrist might do the counseling," but argued that this fact "does not mean that [he is] agreeing to a mental evaluation." Rivero Depo. 191 at 215:25-216:2. Dr. Schenck testified that his understanding of counseling involved "[p]sychological or psychiatric counseling" for "four sessions," and not "a medical examination." Schenck Depo. 191 at 108:13-14; id. at 109:11, 14. These depositions reveal that both parties to this meeting had different understandings of what was meant by counseling, as Dr. Rivero inferred something informal which anybody could do, see Rivero Depo. 191 at 210:10-16, and Dr. Schenck meant something a physician does, see Schenck Depo. 191 at 108:13-24. Further, the letter that Dr. Rivero cites has no indication what was meant by the "discussion/counseling" that Dr. Rivero received, so the Court cannot say that it is a fact that counseling was to be informal. Letter from Sandra Bell to Univ. Orthopedics at 16. Finally, with no definition of "psychiatric evaluation," the Court cannot soundly say for a fact that counseling is not a psychiatric evaluation. As Dr. Schenck testified, both psychiatrists and psychologists may provide counseling, with the difference being that "[a] psychiatrist can prescribe medicines, and can prescribe counseling," Schenck Depo. 191 at 108:23-24, see id. at

was not to be on call," because "being 'on call' created too much stress for Dr. Rivero, which triggered his 'lack of professionalism.'" Rivero's Response ¶ 29, at 15 (asserting this fact)(first quoting Deposition of Dr. Robert Cumming Schenck, Jr. at 79:19 (taken September 13, 2017), filed March 8, 2018 (Doc. 191-4)("Schenck Depo. 191"); then quoting id. at 79:25-80:1; and then citing Schenck Depo. 191 at 41:8-18; id. at 78:15-80:7). See UNM's Reply ¶ 29, at 12 (not disputing this fact).[56] "Dr. Strasburger suggested that Plaintiff meet with Dr. Jeff Katzman, a psychiatrist, for his counseling." UNM's MSJ ¶ 38, at 9 (asserting this fact)(citing Email from Dr. Victor Strasburger to Dr. Dennis Rivero at 32 (dated December 11, 2010), filed December 8, 2017 (Doc. 143-1)("Strasburger Email")).[57] Dr. Rivero emailed "Dr. Katzmann [sic], stating that he would like to set up counseling sessions," UNM's MSJ ¶ 39, at 9 (asserting this fact)(citing Email from Dr. Dennis Rivero to Dr. Jeff Katzman at 32 (dated December 21, 2010), filed December 8, 2017 (Doc. 143-1)("Counseling Email")), "contingent upon [Dr. Rivero's]

---

108:13-14, which seems to allow the inference that an evaluation that a psychiatrist conducts may involve counseling and, thus, the Court concludes that Dr. Rivero's proffered fact is incorrect.

[56]UNM does not dispute this fact, but "states that Plaintiff's proposed 'no call' status is immaterial. A materiality argument does not specifically controvert the fact, so the Court deems it undisputed. See supra note 10.

[57]Dr. Rivero disputes this fact as immaterial. This response does not specifically controvert the fact, and the Court will deal with materiality in the Analysis, so the Court deems this fact undisputed. See supra note 10. The email offered for this purpose of showing that the statement was made is not hearsay, and thus is admissible.

finalizing an agreement to return," Rivero's Response ¶ 39, at 7.[58]   Dr. Rivero, however, "probably would not have seen [Dr. Katzman] under any circumstances."   UNM's MSJ ¶ 40, at 9 (asserting this fact)(citing Rivero Depo. 143 at 223:15-23).[59]

---

[58] Dr. Rivero disputes UNM's proffered fact as a mischaracterization, see Rivero's Response ¶ 39, at 7, so the Court adds his assertion as to not misconstrue the exhibit -- which says that Dr. Rivero will contact Dr. Katzmann "to arrange [their] meetings" when "the agreement that will allow [Dr. Rivero] to transition back to .75FTE . . . is formalized," Counseling Email at 32.   Dr. Rivero also disputes the fact as immaterial and irrelevant, but this response does not specifically controvert the fact, so the Court deems it undisputed.   UNM similarly states that "[t]he fact that the e-mail was contingent upon finalizing an agreement to return is irrelevant," UNM's Reply ¶¶ 38-39, at 7, but this does not specifically controvert the fact, so the Court deems it undisputed.

[59] Dr. Rivero disputes this fact as "immaterial, irrelevant, and a mischaracterization of testimony."   Rivero's Response ¶ 40, at 7.   The Court has removed UNM's characterization of Dr. Rivero's email to Dr. Katzman as "a falsehood," UNM's MSJ ¶ 40, at 9, but concludes the remainder of the fact is not a mischaracterization of Dr. Rivero's testimony.   The relevant portion of his deposition reads as follows:

> Q.      But you -- it sounded like -- like you were willing to go see a psychiatrist, though?
>
> A.      No.
>
> Q.      Then why -- so you were not planning to see him at all under any circumstances?
>
> A.      Probably not, sir.   In all truthfulness, I probably would have not even -- even if the addendum had come out properly, I probably would have objected to it.   The reason I agreed to this was because Dr. Strasburger implied it, and I didn't want to get into an argument with him.

Rivero Depo. 191 at 223:15-25.   Accordingly, because materiality will be dealt with in the Analysis and does not specifically controvert the fact, see supra note 10, the Court deems this fact undisputed.

### 4.    **The Addendum.**

"In early 2011," Dr. Rivero received an addendum to his employment contract.  Rivero's

Response ¶ 30, at 15 (asserting this fact)(citing Addendum No. 1 to Contract UNM School of

Medicine By and Between The University of New Mexico and Dennis P. Rivero, M.D. (dated

February 15, 2011), filed November 9, 2016 (Doc. 28-1)("Addendum"); Rivero Depo. 191 at

225:6-227:11).   See UNM's Reply ¶¶ 30-32, at 12 (admitting this fact).   The Addendum

"required Dr. Rivero to submit to . . . 'a four-part psychiatric evaluation by a board-certified

psychiatrist acceptable to the Chair of the Department of Orthopedics and Rehabilitation,'" the

cost of which was to be borne by Dr. Rivero, and the time spent in such "examinations would be

considered 'administrative leave.'" [60]    Rivero's Response ¶ 31, at 15-16 (asserting this

---

[60]The Court does not find the entirety of Dr. Rivero's proffered additional fact 31 undisputed and admissible.  The first sentence reads: "The Addendum did not reflect the basic directive reached in December 2010 regarding counseling."  Rivero's Response ¶ 31, at 15 (citing Rivero Depo. 191 at 298:18-299:16; id. at 299:25-300:5; id. at 300:14-23).  Dr. Rivero felt that "[t]he addendum was completely different from what was discussed," Rivero Depo. 191 at 300:19-20, but UNM maintains that this psychiatric evaluation requirement "constituted the four counseling sessions to which [Dr. Rivero] agreed at the meeting with Dr. Schenck," UNM's MSJ ¶ 41, at 9.  See Rivero's Interrogatory No. 5, Answer at 1-2 (undated), filed March 8, 2018 (Doc. 191-24)("UNMH determined that one way to address the concerns about professionalism, and to allow Plaintiff to return to his desired 0.75 FTE, would be to have Plaintiff undergo psychological counseling, which would necessarily include an evaluation.").  The Addendum itself does not describe what is meant by "Psychiatric Evaluation," so the Court cannot say what this term means with respect to Dr. Rivero.  This lack of a definition is not material, however, for as discussed in the Analysis infra Part II, even if the psychiatric evaluation constituted a more in-depth examination than merely counseling as Dr. Rivero asserts, UNM is still entitled to summary judgment.
        The second sentence reads:

fact)(quoting Addendum ¶ 2 and (a), at 2; and citing Rivero's Request for Admission No. 17 (undated), filed March 8, 2018 (Doc. 191-23)). See UNM's Reply ¶¶ 30-32, at 12 (admitting this fact). The Addendum also provides that "Dr. Schenck and the Associate Dean of Academic Affairs would have access to" progress reports following each part of the evaluation which describe Dr. Rivero's continued participation in the evaluation, the psychiatrist's recommendations -- such recommendations the Addendum deems mandatory -- and Dr. Rivero's compliance with these recommendations.[61] Rivero's Response ¶ 31, at 16 (asserting this

---

Instead, the Addendum's terms were harsh and required Dr. Rivero to submit to an onerous medical psychiatric examination as a condition of employment, specifically "a four-part psychiatric evaluation by a board-certified psychiatrist acceptable to the Chair of the Department of Orthopedics and Rehabilitation" in an attempt to delve for a "psychological condition."

Rivero's Response ¶ 31, at 15-16 (citing Addendum ¶ 2, at 2; Rivero's Request for Admission No. 17 at 1 (undated), filed March 8, 2018 (Doc. 191-23); Rivero's Interrogatory No. 5, Answer at 1). This "fact" characterizes the terms of the Addendum, which is not a fact, and states that this requirement was imposed to find a psychological condition, which the record does not support. Although UNM's answer to Rivero's Interrogatory 5 says, "[i]n order to determine how to improve Plaintiff's professionalism, it was necessary to determine if Plaintiff was suffering from a psychological condition," Rivero's Interrogatory 5, Answer at 1, it also says that "UNMH determined that one way to address the concerns about professionalism, and to allow Plaintiff to return to his desired 0.75 FTE, would be to have Plaintiff undergo psychological counseling, which would necessarily include an evaluation," Rivero's Interrogatory 5, Answer at 1-2. This answer does not say that UNM imposed the evaluation/counseling requirement to determine if Dr. Rivero had a psychological condition, but the answer could support that inference. An inference, however, is not a fact. The Court also does not adopt Dr. Rivero's "fact" that he would have to pay for the psychiatrist "out-of-pocket," Rivero's Response ¶ 31, at 16, because the Addendum states that the cost of the evaluation "shall be borne by Rivero," Addendum ¶ 2(b), at 2. The Court therefore adopts the fact as provided, without Dr. Rivero's characterizations or inferences.

[61]Again, the Court does not admit the entirety of Dr. Rivero's proffered fact as he writes it, because the record does not support a portion of it. This portion of Dr. Rivero's fact 31 reads:

fact)(citing Addendum ¶ 2(c), at 2). <u>See</u> UNM's Reply ¶¶ 30-32, at 12 (admitting this fact). The

reports and recommendations that the psychiatrist would provide "were to be 'confidential,'"

although a copy may be "placed in Dr. Rivero's medical staff file."[62] Rivero's Response ¶ 31, at

16 (asserting this fact)(quoting Addendum ¶ 2(d), at 2). <u>See</u> UNM's Reply ¶¶ 30-32, at 12

---

"Then Dr. Schenck and the Associate Dean of Academic Affairs would have access to Dr. Rivero's psychiatric records, irrespective of content and would know of the expressly mandatory 'treatment recommendations.'" Rivero's Response ¶ 31, at 16 (quoting Addendum ¶ 2(c), at 2; and citing Rivero Depo. 191 at 250:3-16). The Addendum does not state that Dr. Schenck and the Associate Dean of Academic Affairs would have unfettered access to Dr. Rivero's psychiatric records, but that they would be provided "progress reports . . . following each of the four (4) parts of the Psychiatric Evaluation, setting forth any recommendations by the psychiatrist performing the Psychiatric Evaluation, and compliance with those recommendations and/or requirements." Addendum ¶ 2(c), at 2. The portion of Dr. Rivero's deposition to which he cites does not change this language, as it repeats the Addendum's requirement that the psychiatrist's treatment recommendations would be mandatory. <u>See</u> Rivero Depo. 191 at 250:3-16. The Court therefore adopts the fact as provided, which the record supports.

[62]This portion of Dr. Rivero's proffered fact states: "Ostensibly, Dr. Rivero's records were to be 'confidential,' except they would be placed in Dr. Rivero's medical staff file, allowing any future parties who may seek to credential Dr. Rivero (including other hospitals) to review the records of psychiatric evaluations." Rivero's Response ¶ 31, at 16 (quoting Addendum ¶ 2(d), at 2). The portion of the Addendum to which Dr. Rivero cites reads:

> Rivero will execute all necessary consents and/or authorizations to enable the psychiatrist performing the Psychiatric Evaluation to provide reports and other recommendations in respect of Rivero (arising out of the Psychiatric Evaluation) directly to the Department Chair and to the [Associate Dean of Academic Affairs]. In this connection, any such reports and recommendations from the Psychiatric Evaluation shall be kept confidential except as may be necessary to ensure compliance with this Addendum and a copy thereof may be maintained in Rivero's confidential medical staff file in the Office of Clinical Affairs.

Addendum ¶ 2(d), at 2. The reports, thus, were not necessarily going to be placed in Dr. Rivero's medical staff file, which is also confidential, and there is no indication who would have access to this file. Accordingly, the Court will not adopt Dr. Rivero's fact in full.

(admitting this fact). "Discretionary determination of [Dr. Rivero's] non-compliance [with the Addendum] by UNM would lead to termination, but it would be deemed a resignation." Rivero's Response ¶ 31, at 16 (asserting this fact)(citing Addendum ¶ 3, at 3). <u>See</u> UNM's Reply ¶¶ 30-32, at 12 (admitting this fact). "The Addendum contains no term as to Dr. Rivero's 'on call' status," and "Dr. Rivero would be forced to waive all rights to appeal internally or to legal recourse for any abuse or discrimination or wrongful act by UNM regarding the records stemming from the medical examination, <u>including constitutional rights</u>." Rivero's Response ¶ 31, at 16 (asserting this fact)(emphasis in Rivero's Response)(citing Addendum ¶ 7, at 5). <u>See</u> UNM's Reply ¶¶ 30-32, at 12 (admitting this fact). "The conditions of the Addendum were required to be met for Dr. Rivero to increase his level of employment with UNM." Rivero's Response ¶ 32, at 16 (asserting this fact)(citing Addendum ¶ 5, at 4; Rivero's Request for Admission No. 17). <u>See</u> UNM's Reply ¶¶ 30-32, at 12 (admitting this fact).[63]

"Dr. Rivero was shocked by the requirements of the Addendum and wanted to find out the basis for them, especially the requirement of a medical psychiatric exam and why he would

---

[63]The Court does not adopt Dr. Rivero's proffered fact 33. The proffered fact states: "Dr. Schenck consulted no policies regarding 'professionalism' in assisting in the drafting of the Addendum." Rivero's Response ¶ 33, at 16 (citing Schenck Depo. 191 at 175:11-17). UNM notes that "Dr. Schenck did not draft the addendum at issue." UNM's Reply ¶ 33, at 12 (citing Schenck Depo. 191 at 113:7-16). Dr. Schenck stated at his deposition that he did not draft the Addendum, although he "participated in giving some of the bullet points of how [they] would structure coming back." Schenck Depo. 191 at 113:14-15. <u>See id.</u> at 113:10-11. Further, the portion of the Schenck Depo. to which Dr. Rivero cites for his fact states that Dr. Schenck did not know if a UNM policy existed regarding referring physicians to psychiatric examinations. This fact is thus lacks support in the record, and the Court will not adopt it.

have to waive all rights to appeal given that he had never been disciplined."  Rivero's Response ¶ 34, at 16-17 (asserting this fact)(citing Rivero Depo. 191 at 298:18-299:16; id. at 302:17-23).[64] "Dr. Schenck acknowledged that [he believed] the Addendum was 'onerous' and 'draconian.'" Rivero's Response ¶ 35, at 17 (quoting Schenck Depo. 191 at 179:5, 14).[65]  Dr. Rivero "sent an e-mail to Dr. Schenck, asking for an extension of time to sign the Addendum, and noting that he agreed to counseling, but complaining about the language regarding the psychological evaluation."  UNM's MSJ ¶ 42, at 10 (asserting this fact)(citing Email from Dr. Dennis Rivero to Dr. Robert Schenck, Jr. at 1 (dated March 9, 2011), filed December 8, 2017 (Doc. 143-7)("Extension Email")).[66]  Thereafter, "Dr. Rivero sought access to his 'Credentialing File' to investigate any support whatsoever for the requirement of a psychiatric investigation," and so, "on March 24, 2011, . . . to view his Credentialing File before the deadline to accept of April 10, 2011, Dr. Rivero visited the Office of Clinical Affairs at UNMHSC with his attorney."  Rivero's Response ¶ 36, at 17 (asserting this fact)(citing Rivero Depo. 191 at 244:25-245:21; id. at 247:1-

---

[64]In response, UNM states this fact is immaterial and that "this procedural history is at issue in a prior pending state action," but otherwise does not dispute it.  UNM's Reply ¶¶ 34-38, at 13.  Accordingly, the Court deems this fact undisputed, because materiality does not specifically controvert the fact.  See supra note 10.

[65] In response, UNM states that this fact is immaterial, but otherwise does not dispute it. See UNM's Reply ¶¶ 34-38, at 13.  Accordingly, the Court deems this fact undisputed, because materiality does not specifically controvert the fact.  See supra note 10.

[66]Dr. Rivero disputes this fact "to the extent that the e-mail identifies the 'harsh' provisions in the Addendum."  Rivero's Response ¶ 42, at 7.  This response does not specifically controvert this fact, so the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

22; id. at 250:18-254:13).[67]  "Records custodian Virginia Kelley had begun to take Dr. Rivero to

a room to review his file when, in an urgent and unexpected interruption, Dr. Bailey called from

his clinical rounds to stop Ms. Kelley from allowing Dr. Rivero to access his own file."  Rivero's

Response ¶ 37, at 17 (asserting this fact)(citing Rivero Depo. 191 at 251:14-252:10).[68]

> Dr. Rivero calmly discussed this issue, and to preserve the file's contents while
> resolving permission to access it, Dr. Bailey and he reached a compromise in
> which copies of the alleged contents of the file were made by Ms. Kelley and
> placed in a manila envelope and sealed for safe keeping.

Rivero's Response ¶ 37, at 17 (asserting this fact)(citing Rivero Depo. 191 at 252:17-253:17;

Board of Regents of the University of New Mexico's Second Supplemental Responses and

Objections to Plaintiff Dennis Rivero's Second Set of Requests for Production of Documents,

and Second Requests for Admission at 1-2 (undated), filed March 8, 2018 (Doc. 191-27)).[69]

---

[67]The Court has removed the language "having set an appointment" from its adoption of Dr. Rivero's fact, Rivero's Response ¶ 36, at 17, because Rivero's deposition testimony does not support this alleged fact, see Rivero Depo. 191 at 251:7-13 (Dr. Rivero discussing how he called and asked whether he needed an appointment to view his file, and the person on the telephone said "No," with no mention whether Dr. Rivero made an appointment or went without one). UNM states that this fact is immaterial, but does not otherwise dispute it.  See UNM's Reply ¶¶ 34-38, at 17.  Thus, with no part of the record specially controverting the fact, the Court deems it undisputed.  See D.N.M.LR-Civ. 56.1(b).

[68]UNM states that this fact is immaterial and concerns "procedural history at issue in a prior pending state action," but otherwise does not dispute it.  UNM's Reply ¶¶ 34-38, at 17.  As discussed supra note 10, however, materiality is an argument that the Court addresses in the Analysis and does not specifically controvert this fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[69]UNM states that this fact is immaterial and concerns "procedural history at issue in a prior pending state action," but otherwise does not dispute it.  UNM's Reply ¶¶ 34-38, at 17.  As discussed supra note 10, however, materiality is an argument that the Court addresses in the

"Immediately thereafter Dr. Bailey informed Dr. Schenck of Dr. Rivero's visit to the office of clinical affairs, asking, 'Do we really want to do this?' in reference to Dr. Rivero's potential increase in FTE." Rivero's Response ¶ 38, at 17 (asserting this fact)(citing Email from Dr. Robert Bailey to Scot Sauder and Dr. Robert Schenck, Jr. at 3 (dated March 24, 2011), filed March 8, 2018 (Doc. 191-5)("Bailey Hesitation Email"); Schenck Depo. 191 at 142:7-144:7).[70] "Dr. Schenck . . . admitt[ed] that there was nothing wrong with Dr. Rivero seeking to review his file."[71] Rivero's Response ¶ 39, at 17 (asserting this fact)(citing Schenck Depo. 191 at 145:9-146:11). See UNM's Reply ¶ 39, at 17 (not disputing this fact).

---

Analysis and does not specifically controvert this fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[70]UNM states that this fact is immaterial and concerns "procedural history at issue in a prior pending state action," but otherwise does not dispute it. UNM's Reply ¶¶ 34-38, at 17. As discussed supra note 10, however, materiality is an argument that the Court addresses in the Analysis and does not specifically controvert this fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b). Finally, admissible evidence establishes this fact, because, although the email is inadmissible hearsay, Dr. Schenck testified at his deposition that Dr. Bailey asked him this question. See Schenck Depo. 191 at 143:11-17.

[71]The Court does not adopt the entirety of this proffered fact. As Dr. Rivero offered it, this sentence read: "Dr. Schenck withdrew the Addendum despite admitting that there was nothing wrong with Dr. Rivero seeking to review his file." Rivero's Response ¶ 39, at 17 (citing Schenck Depo. 191 at 145:9-146:11). UNM denied this "to the extent that it implies that Dr. Scehnck [sic] withdrew the Addendum because plaintiff sought to review his file." UNM's Reply ¶ 39, at 13. As Dr. Rivero provided the fact, it implies that Dr. Schenck withdrew the Addendum, because Dr. Rivero sought to review his credentialing file, which Dr. Schenck's deposition testimony does not support. See Schenck Depo. 191 at 145:9-146:11. The Court thus adopts the fact as provided. Further, the Court does not adopt the second sentence of Dr. Rivero's proffered fact, which states: "Dr. Schenck also stated that he would have been forced to terminate Dr. Rivero, despite the fact that there was nothing wrong with him seeking to access the file and that he had not inquired any further than the statement by Dr. Bailey." Rivero's

Then, on April 4, 2011, in response to Dr. Schenck's suggestion that Dr. Rivero accept that he has been unprofessional, Dr. Rivero responded: "I am sorry you feel that way."  Email from Dr. Dennis Rivero to Dr. Robert Schenck, Jr. at 33 (dated April 4, 2011), filed December 8, 2017 (Doc. 143-1)("Professionalism Email")).  See UNM's MSJ ¶ 43, at 10 (asserting this fact)(citing Professionalism Email); Email from Dr. Robert Schenck, Jr. to Dr. Dennis Rivero at 33 (dated April 4, 2011), filed December 8, 2017 (Doc. 143-1)).[72]  "The next day, Dr. Schenck withdrew the [A]ddendum."  UNM's MSJ ¶ 44, at 10 (asserting this fact)(citing FAC ¶ 40, at 8).  See Rivero's Response ¶ 44, at 10 (admitting this fact);[73] Rivero's MSJ ¶ 18, at 5 (asserting this

---

[72]Dr. Rivero disputes UNM's proffered fact "as mere argumentation and conjecture not supported by the content of the exhibit cited."  Rivero's Response ¶ 43, at 7.  The Court has removed UNM's inferences from the fact and quoted from the Professionalism Email to address this issue.  The Professionalism Email is not hearsay, because it is a statement that UNM "offer[s] against an opposing party" that "was made by the party in an individual . . . capacity."  Fed. R. Evid. 801.  The email that Dr. Schenck sent to which Dr. Rivero was responding in the Professionalism Email is hearsay when offered by UNM, but UNM does not offer it to prove the truth of the statements therein, but to show notice to Dr. Rivero and, thus, his response.  As Dr. Rivero points to no portion of the record controverting that he sent the Professionalism Email and does not dispute its contents, the Court deems this fact undisputed.

[73]Dr. Rivero avers that "Dr. Schenck withdrew the Addendum because Dr. Rivero sought to access his credentialing file to find justification for the implication of a psychiatric disorder from the Addendum."  Rivero's Response ¶ 44, at 10 (citing Dr. Rivero's additional undisputed

- 45 -

fact)(citing Schenck Depo. 144 at 142:7-144:7; Email from Dr. Robert Schenck, Jr. to Dr.

Dennis Rivero, Ira Bolnick, John Trotter, PhD, Mary Jacintha, and Dr. Paul Echols at 1 (dated

April 5, 2011), filed December 8, 2017 (Doc. 144-4)("Withdrawal Email")).[74]

### 5. Dr. Rivero's Resignation.

"In the subsequent months," Dr. Rivero continued to try to access his credentialing file,

but was unable to get it. Rivero's Response ¶ 40, at 18 (asserting this fact)(citing Bailey

Hesitation Email at 3; Email from Dr. Robert Bailey to Scot Sauder and Dr. Robert Schenck, Jr.

at 4 (dated April 4, 2011), filed March 8, 2018 (Doc. 191-5); Email from Dr. Dennis Rivero to

Dr. Robert Bailey at 4-5 (dated April 3, 2011), filed March 8, 2018 (Doc. 191-5); Email from Dr.

---

material facts ¶¶ 36-39, at 17-18). The Court adopts Dr. Rivero's additional facts 36-39, as provided supra. The Court will not adopt as fact or otherwise infer that Dr. Schenck withdrew the Addendum because Dr. Rivero requested access to his credentialing file. Dr. Schenck testified that he withdrew it for two reasons: (i) an interaction that Dr. Bailey had with Dr. Rivero following the credentialing file incident -- leading to Dr. Bailey's asking, again, "Do we really want to bring him back?" Schenck Depo. 191 at 145:17; and (ii) Dr. Schenck's belief that, if Dr. Rivero signed the Addendum, UNM would "get this problem flaring up again, [and] he would lose his job," Schenck Depo. 191 at 145:21-22. See Schenck Depo. 191 at 145:9-25.

[74]The Withdrawal Email is the only evidence in the record before the Court establishing when Dr. Schenck withdrew the Addendum, as he does not discuss the date in the excerpts of his deposition provided. The Withdrawal Email is not hearsay, because it qualifies as an admission by a party opponent. See Fed. R. Evid. 801(d)(2). In the Tenth Circuit, "an employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue." Johnson v. Weld Cty., 594 F.3d 1202, 1209 (10th Cir. 2010)(quoting Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1314 (10th Cir. 2005)(per curiam)). Dr. Schenck was clearly involved in withdrawing the Addendum, see Schenck Depo. 144 at 142:7-144:7, so his statements constitute a party-opponent admission and the Withdrawal Email is therefore not hearsay, see Johnson v. Weld Cty., 594 F.3d at 1209.

Robert Bailey to Dr. Dennis Rivero at 5 (dated March 24, 2011), filed March 8, 2018 (Doc. 191-5); Email from Dr. Robert Bailey to Elizabeth Camp, Scot Sauder, and Alison Webster at 6 (dated April 11, 2011), filed March 8, 2018 (Doc. 191-5); Email from Dr. Robert Bailey to Scot Sauder and Dr. Robert Schenck, Jr. at 7 (dated April 15, 2011), filed March 8, 2018 (Doc. 191-5); Email from Dr. Dennis Rivero to Alison Webster at 10 (dated April 15, 2011), filed March 8, 2018 (Doc. 191-5)).[75]  "As a result, Dr. Rivero . . .file[d] a Verified Petition for Alternative Writ of Mandamus with the State District Court to obtain access" to the credentialing file.  Rivero's Response ¶ 41, at 18 (asserting this fact)(citing Rivero v. Board of Regents of the Univ. of N.M., D-202-CV-2011-08104, Verified Petition for Alternative Writ of Mandamus at 1, filed in state court on August 11, 2011, filed in federal court on December 8, 2017 (Doc. 144-6)).[76]  Also,

---

[75] UNM states that this fact is immaterial as it "concern[s] the procedural history regarding Plaintiff's attempts to obtain his file," but otherwise does not dispute it.  UNM's Reply ¶¶ 40-42, at 13.  Accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).  The Court does not adopt this fact as Dr. Rivero provides in full, however, because it lacks support in the record.  Dr. Rivero's full fact 40 reads: "In the subsequent months, Dr. Bailey and University counsel offered access to the files, and then withdrew such offers. Ultimately, UNMSHC stonewalled Dr. Rivero, refusing to respond to written inquiries for access."  Rivero's Response ¶ 40, at 18.  The emails to which he cites, however, do not support that UNM withdrew access to Dr. Rivero's files, stonewalled him, or did not respond to his inquiries.  The emails show Dr. Bailey responding to Dr. Rivero's requests and telling him how to view his file.  Further, these emails are hearsay, and Dr. Rivero has not established that they are admissible.  See supra note 16.  Thus, they are admissible to prove that UNM had notice of Dr. Rivero's desire to view his credentialing file, but not for the truth of the statements which they contain.

[76] UNM states that this fact is immaterial as it "concern[s] the procedural history regarding Plaintiff's attempts to obtain his file," but otherwise does not dispute it.  UNM's Reply ¶¶ 40-42, at 13.  Accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

"[o]n January 20, 2012, Plaintiff filed an administrative complaint with the [Equal Employment Opportunity Commission ('EEOC')], claiming that the psychological evaluation requirement was not job related and consistent with business necessity." UNM's MSJ ¶ 45, at 10 (asserting this fact)(citing EEOC Charge of Discrimination Charge No. 543-2012-00600 at 1 (dated January 20, 2012), filed December 8, 2017 (Doc. 143-8)). See Rivero's Response ¶ 45, at 7 (admitting this fact). During this time, Dr. Rivero "continued to maintain his University Hospital privileges[,] renewed[] with statements from UNM noting that plaintiff was not disabled and that he did not require accommodation." UNM's MSJ ¶ 47, at 10 (asserting this fact)(citing Letter from Dr. Robert Schenck, Jr. to Dr. Robert Bailey at 1 (dated May 2, 2012), filed December 8, 2017 (Doc. 143-9)). See Rivero's Response ¶ 47, at 7-8 (admitting this fact).[77] In 2013, "[a]fter two years of litigation, and three evidentiary hearings, the State District Court found that UNM had unlawfully withheld documents from Dr. Rivero and ordered production of all documents relating to Dr. Rivero." Rivero's Response ¶ 42, at 18 (asserting this fact)(citing Rivero v. Board of Regents of the Univ. of N.M., D-202-CV-2011-08104, Order on Petition for Writ of Mandamus ¶ 5, at 5, filed in state court on August 12, 2013, filed in federal court on December

---

[77]As UNM offers this fact, it begins with the statement "[a]fter Plaintiff failed to sign the [A]ddendum," UNM's MSJ ¶ 47, at 10, which Dr. Rivero disputes as a characterization, noting that UNM withdrew the Addendum, see Rivero Response ¶ 47, at 7-8. Although it is clear from the record that Dr. Rivero did not sign the Addendum, the Court cannot say that he "failed to sign it," because it was withdrawn before the deadline. UNM's Reply ¶ 47, at 9.

8, 2017 (Doc. 144-7)("Order on Petition")).[78] "Upon production of such documents, and filing

of affidavits by Dr. Bailey and Dr. John Trotter," Dr. Rivero realized that the only document

which mentions that he may need a psychiatric evaluation is the Addendum, and Dr. Rivero felt

that the disclosed documents did not reveal a reason for UNM's psychiatric evaluation

requirement. Rivero's Response ¶ 43, at 18 (asserting this fact)(citing Rivero Depo. 191 at

250:3-10; Affidavit of John Trotter, PhD for Respondent Board of Regents of the University of

New Mexico d/b/a The University of New Mexico Health Sciences Center (executed January 15,

2014), filed December 8, 2017 (Doc. 144-8)("Trotter Aff."); Affidavit of Respondent Robert A.

Bailey, M.D. (executed January 24, 2014), filed December 8, 2017 (Doc. 144-9)("Bailey

Aff.")).[79] See UNM's Reply ¶ 43, at 13 (not disputing this fact).

---

[78] UNM states that this fact is immaterial as it "concern[s] the procedural history regarding Plaintiff's attempts to obtain his file," but otherwise does not dispute it. UNM's Reply ¶¶ 40-42, at 13. Accordingly, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[79] The Court will not find as fact that UNM provided Dr. Rivero "no evidence of a reason for requiring a psychiatric evaluation," Rivero's Response ¶ 43, at 18, because Dr. Rivero has not "refer[red] with particularity to those portions of the record" that supports this fact, D.N.M.LR-Civ. 56.1(b). Dr. Rivero's testimony states that UNM did not suggest that he had a mental disorder and that the Addendum is the only document that implies he does. See Rivero Depo. 191 at 250:3-10. The two affidavits which he cites state that UNM produced all documents pertaining to Dr. Rivero. See Trotter Aff. at 1; Bailey Aff. at 1. If Dr. Rivero received "all documents relating to Dr. Rivero" for which he asked, Rivero's Response ¶ 42, at 18, then, necessarily, the evidence on which UNM relied in deciding to request a psychiatric evaluation must have been disclosed. UNM does not help clear up what documents Dr. Rivero received, for in its Reply, it states that this fact "actually supports UNM's position[, because t]he fact that there was no document that indicated that Plaintiff needed a psychiatric evaluation indicates that UNM did not consider Plaintiff to be disabled," and that "an employer can require a psychiatric fitness for duty evaluation to address professionalism concerns without regarding

"Plaintiff continued to work at 0.05 FTE until May 21, 2014, when he . . . resigned."

UNM's MSJ ¶ 46, at 10 (asserting this fact)(citing Rivero Depo. 143 at 268:20-22; id. at 272:5-

11).[80] Dr. Rivero felt that "[n]othing justified the onerous and draconian [A]ddendum," and that

Dr. Schenck betrayed his trust, "defamed him publicly throughout the mandamus case," and

"turned on him so suddenly when he sought his credentialing file." Rivero's Response ¶ 44, at 18

(asserting this fact)(citing Rivero Depo. 191 at 271:1-274:4; id. at 274:10-275:4).[81] See UNM's

MSJ ¶ 48, at 10 (citing Memorandum from Dr. Dennis Rivero to Dr. Robert Schenck, Jr. at 1-2

(dated May 21, 2014), filed December 8, 2017 (Doc. 143-10)("Resignation Letter"))(stating that

_____

the employee as disabled." UNM's Reply ¶ 43, at 13. Thus, the Court can find only that Dr. Rivero felt there was no evidence of a reason for the request, as this is what the record supports.

[80]Dr. Rivero disputes this fact "to the extent it mischaracterizes Dr. Rivero's constructive discharge as a voluntary resignation." Rivero's Response ¶ 46, at 7. As Dr. Rivero alleges that he was constructively discharged, whether his discharge was "voluntary" is a determination that the Court makes in the Analysis, and thus the Court removes the term voluntary from its adoption of UNM's fact. As a constructive discharge necessarily involves a resignation, see infra Analysis Section I.C., the Court deems this fact as adopted, without the term "voluntary," undisputed.

[81]The Court has altered Dr. Rivero's proffered fact so that the record supports it. The Court also removes the last sentence, because it is not a fact but a legal conclusion: "Therefore, the workplace having become intolerable, no reasonable person could have remained, and Dr. Rivero was constructively discharged." Rivero's Response ¶ 44, at 18. Whether Dr. Rivero was constructively discharged is a conclusion that the Court must determine in the Analysis, based on the facts. UNM disputes this fact as immaterial, but the Court deals with materiality in the Analysis. The Court therefore deems Dr. Rivero's subjective belief of his working conditions undisputed.

Dr. Rivero "accused Dr. Schenck of betrayal and other personal slights").[82]  Dr. Rivero's

Resignation Letter does not mention any harassment that "he had allegedly been subjected to";

along with describing how he felt betrayed, defamed, and turned on by Dr. Schenck, he asserts

how "the affidavits submitted in a separate legal action Plaintiff brought against Defendant the

prior January certifying production of all documents constituted 'confirmation' of the alleged

impropriety of the psychological evaluation requirement."  UNM's MSJ ¶ 50, at 11 (asserting

this fact)(citing Resignation Letter).[83]  With the exception of withholding documents from

Dr. Rivero, "[n]o UNM employee or official treated Plaintiff inappropriately prior to his

resignation, and he was permitted to continue performing surgeries one day a month."  UNM's

MSJ ¶ 49, at 11 (asserting this fact)(citing Rivero Depo. 143 at 268:20-269:7).[84]

---

[82]The Court does not adopt this proffered fact in full, which states: "In his resignation letter, Plaintiff did not seek to resolve his dispute with the Department Chairman.  Instead, he accused Dr. Schenck of betrayal and other personal slights against him."  UNM's MSJ ¶ 48, at 10 (citing Resignation Letter).  There is no indication in the record that Dr. Rivero had a dispute with Dr. Schenck, and the Court concludes that it is better to phrase Dr. Rivero's accusations as his subjective belief and not characterize what he said.

[83]Dr. Rivero "objects to the mischaracterization of the resignation letter."  Rivero's Response ¶ 50, at 8.  UNM's original fact states that Dr. Rivero's "letter merely focused on his assertion" regarding the affidavits, UNM's MSJ ¶ 50, at 11, but as Dr. Rivero notes, there are other assertions in the Letter.  Accordingly, the Court has revised the proffered fact to account for the other assertions Dr. Rivero makes in the Resignation Letter and, concluding that this fact is no longer a mischaracterization, deems the fact undisputed.

[84]Dr. Rivero disputes this fact, stating:

While Dr. Rivero continued to conduct surgery one day per month, he was requested to do so by Dr. Schenck.  Furthermore, the cumulative conduct of UNM, including the forcing of litigation to obtain documents wrongfully withheld

"On April 19, 2016, Plaintiff brought his original Complaint in the instant case."  UNM's MSJ ¶ 51, at 11 (asserting this fact)(citing Complaint to Recover Damages for Violations of the Americans with Disabilities Act, filed April 19, 2016 (Doc. 1)("Complaint")).  See Rivero's Response ¶ 51, at 8 (admitting this fact).

## PROCEDURAL BACKGROUND

Dr. Rivero received notices of the right to sue from the EEOC on January 29, 2016, and April 14, 2016.  See Complaint ¶¶ 7-8, at 2.  Dr. Rivero then filed his Complaint on April 19, 2016, in the United States District Court for the District of New Mexico, invoking federal-question jurisdiction under 28 U.S.C. § 1331 by alleging two causes of action against UNM for violations of the American with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA").  See Complaint ¶ 5, at 2.[85]  With leave of Magistrate Judge Lynch,[86] Dr. Rivero filed his FAC, this

---

and the public and private defamatory statements as to his character and competence, constitute inappropriate treatment.

Rivero's Response ¶ 49, at 8 (citing Dr. Rivero's additional undisputed material facts ¶¶ 38-44, at 17-18).  The proffered facts to which Dr. Rivero cites do not establish that Dr. Schenck requested that he continue to work one day per month or that UNM defamed his character.  Although the state court lawsuit found that UNM inappropriately withheld Dr. Rivero's documents from him, this finding does not dispute the fact that Dr. Rivero states "[n]obody did anything inappropriate towards me."  Rivero Depo. 143 at 269:6-7.  The Court thus concludes that, as modified to account for the document-withholding, this fact is undisputed.

[85]First, Dr. Rivero asserts that UNM's requirement that Dr. Rivero undergo medical examinations, which are neither job-related nor a business necessity, in exchange for UNM's approving an increase in his hours, violated the ADA, 42 U.S.C. § 12112(d)(4).  See Complaint ¶¶ 49-51, at 9.  Second, Dr. Rivero alleges that UNM constructively discharged him by acting as though he had a disability -- "an unspecified mental impairment, that he in fact did not have" -- despite having "no documents to substantiate its perception of a mental impairment" and no

time alleging that UNM violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701-794a and 790 et seq. ("Rehabilitation Act").  See FAC ¶ 1, at 1.  The FAC brings only one claim against UNM: Dr. Rivero asserts that UNM violated the Rehabilitation Act, 29 U.S.C. § 794(a), by rendering his working conditions intolerable and constructively discharging him, because UNM required Dr. Rivero to submit to medical examinations before authorizing an increase in his hours as a result of its belief that he had some mental impairment -- despite there allegedly not being any business purpose for the medical examinations and no documentation showing that Dr. Rivero suffered from any mental impairment.  See FAC ¶¶ 46-56, at 9-11.

### 1.     The MTD Order.

On December 22, 2016, Magistrate Judge Lynch denied the Defendant University of New Mexico Board of Regents' Motion to Dismiss Plaintiff's First Amended Complaint to Recover Damages for Violation of the Rehabilitation Act of 1973, filed October 7, 2016

---

legitimate reason for denying Dr. Rivero's request for an increase in hours when he objected to the medical examinations, which actions rendered Dr. Rivero's working conditions "irreparably intolerable."  Complaint ¶¶ 54-61, at 10-11.

[86]In the District of New Mexico, all civil cases are randomly assigned to two Magistrate Judges to handle pursuant to 28 U.S.C. § 636, which allows a Magistrate Judge to "conduct any or all proceedings in a jury or nonjury civil matter" upon the parties' consent under rule 73 of the Federal Rules of Civil Procedure.  28 U.S.C. § 636.  See Fed. R. Civ. P. 73.  Magistrate Judge Lynch and the Honorable Steven C. Yarbrough, United States Magistrate Judge for the District of New Mexico, were initially assigned to this case, with Magistrate Judge Lynch randomly assigned to conduct the dispositive proceedings.  See Notice of Assignment, filed April 20, 2016 (Doc. 2).  Both Dr. Rivero and UNM provided consent to proceed before a Magistrate Judge, so Magistrate Judge Lynch initially handled the dispositive matters in this case until his retirement, discussed infra note 87.  See Notice of Rule 73 Consent Received by All Parties, filed June 7, 2016 (Doc. 14).

(Doc. 33)("MTD"). Magistrate Judge Lynch notes that, "[t]hough inartfully pled, Dr. Rivero brings two separate claims within 'Count One':" (i) UNM's attempt "to require psychiatric testing without a legitimate purpose; and" (ii) constructive discharge. MTD Order at 6. UNM brought its MTD under rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting "that both parts of Dr. Rivero's claim are barred by the applicable statute of limitations." MTD Order at 6. See MTD at 1, 5.

Magistrate Judge Lynch observes that "[t]he Rehabilitation Act does not identify a statute of limitations. In the Tenth Circuit, Rehabilitation Act claims are treated similarly to claims under 42 U.S.C. § 1983, and the state personal injury statute of limitations is read-in to the statute." MTD Order at 6 (citing Levy v. Kan. Dep't of Social & Rehab. Servs., 789 F.3d 1164, 1172-74 (10th Cir. 2005); McCarty v. Gilchrist, 646 F.3d 1281, 1289 (10th Cir. 2011)). Magistrate Judge Lynch determined that, as to the psychiatric testing claim, both parties' assertions when the claim accrued are wrong. See MTD Order at 7. Magistrate Judge Lynch writes:

> Here, UNM did require Dr. Rivero to undergo medical testing -- psychiatric testing, to be precise -- as a condition of increased employment. Additionally, Dr. Rivero did not find out that UNM had no business necessity for these requirements until affidavits were filed by Drs. Trotter and Baily in the state case which averred that all of the documents had been produced, and Dr. Rivero was able to determine that UNM had no evidence or documentary support to substantiate its requirement of psychiatric testing. The affidavits were filed, respectively, on January 15 and January 24, 2014. Given that a plaintiff must prove that his employer had no business necessity for the required medical testing, Dr. Rivero's claim under § 794 for the psychiatric testing was not complete and cognizable until January 2014. Given that the Rehabilitation Act prohibits an employer from requiring medical testing only when the employer

- 54 -

> lacks a business necessity for that testing, 42 U.S.C. § 12112(d)(4), the lack of business necessity is an element of the claim. Dr. Rivero only had access to information sufficient to establish this element beginning in January 2014. The statute of limitations has not run.

MTD Order at 8 (citations omitted)(citing FAC at 10-11). As to the constructive discharge claim, Magistrate Judge Lynch notes that "the employee's resignation based on the discriminatory conduct by the employer is an essential -- indeed, the defining -- element of the constructive discharge." MTD Order at 9 (citing Green v. Brennan, 136 S. Ct. 1769, 1777 (2016)). Accordingly, Magistrate Judge Lynch concludes that, for the constructive discharge claim, "[t]he statute of limitations did not begin running until Dr. Rivero in fact terminated his employment in May 2014." MTD Order at 9. Magistrate Judge Lynch thus denies UNM's MTD. See MTD Order at 9.[87]

2.     **UNM's MSJ.**

UNM first moved for summary judgment on December 5, 2017. See Defendant University of New Mexico Board of Regents' Motion and Memorandum for Summary Judgment at 1. It quickly filed an amended motion on December 8, 2017, to add a disclosure pursuant to D.N.M.LR-Civ. 7.1. See UNM's MSJ at 1 n.1. In UNM's MSJ, UNM notes that, while

---

[87] Magistrate Judge Lynch retired from the judiciary in the fall of 2017 and, with Magistrate Judge Lynch's retirement, the case was randomly reassigned to the Honorable Jerry H. Ritter, United States Magistrate Judge for the District of New Mexico, to conduct the dispositive proceedings. See Reassignment Notice, filed September 5, 2017 (Doc. 115). The parties did not provide consent this time, so the case was reassigned to Judge Browning as the trial judge on October 3, 2017. See Reassignment Notice, filed October 3, 2017 (Doc. 123).

Dr. Rivero asserts only one claim in the FAC, he actually alleges two claims: (i) improper medical inquiry; and (ii) constructive discharge. See UNM's MSJ at 12.

UNM first argues that it is entitled to summary judgment regarding the medical examination, because "the claim is barred by the statute of limitations." UNM's MSJ at 12. UNM notes that, unlike for a claim under the ADA, pursuing a Rehabilitation Act claim against a university does not require filing an administrative claim with the EEOC before bringing suit and, thus, the statute of limitation "begins to run when the cause of action accrues." UNM's MSJ at 13. UNM notes that caselaw in the United States Court of Appeals for the Tenth Circuit establishes that Rehabilitation Act claims are analogous to those under 42 U.S.C. § 1983, providing for a three-year limitations period. See UNM's MSJ at 13. According to UNM, Dr. Rivero, therefore, "cannot prevail on any claim on any act that accrued prior to April 19, 2013," three years before his Complaint's filing. UNM's MSJ at 13. UNM asserts that a Rehabilitation Act claim "accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action" -- so, according to UNM, Dr. Rivero's claim accrued in January, 2011, when he received the Addendum requiring psychiatric evaluations as a condition to return to full-time employment. UNM's MSJ at 14 (quoting Baker v. Bd. of Regents of the State of Kan., 991 F.2d 628, 632 (10th Cir. 1993)). UNM argues that, while this argument conflicts with Magistrate Judge Lynch's holding that Dr. Rivero's cause of action accrued in 2014, see MTD Order at 8, the undisputed facts make it clear that Dr. Rivero found out about the injury -- which is all that is needed for a "complete and present cause of action" in a civil rights claim -- no later

than January 20, 2012, because he was aware of the medical examination requirement by then, UNM's MSJ at 15 (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)). UNM asserts that Dr. Rivero did not have to determine that the examination requirement was illegal for the cause of action to accrue; that accrual occurred when he knew of the requirement. See UNM's MSJ at 15-16. Further, UNM argues that, even if the cause of action did not accrue until Dr. Rivero determined that the examination was improper, the claim is still time-barred, because he filed a complaint with the EEOC on January 20, 2012, stating "that he was required to submit to a psychological evaluation, and that this evaluation was not job related or consistent with business necessity." UNM's MSJ at 16.

UNM also asserts that the psychiatric evaluation requirement "was job related and consistent with business necessity." UNM's MSJ at 16. It states that employers may require a "fitness for duty examination" when they have legitimate, non-discriminatory evidence that would cause a reasonable person to doubt the employee's capacity to perform his or her job. UNM's MSJ at 17 (citing Adair v. City of Muskogee, 823 F.3d 1297, 1312 (10th Cir. 2016)). UNM asserts that courts have found psychological examinations "appropriate if the employee has demonstrated a deterioration in his or her ability to conduct himself in a professional manner." UNM's MSJ at 17. After discussing a number of cases, UNM comes to the conclusion that "there is substantial precedent for psychological evaluations in cases where employees have demonstrated a possibility that their lack of professionalism was interfering with their work, even where incidents demonstrating this lack of professionalism were few." UNM's MSJ at 18 (citing

Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811 (6th Cir. 2003); Conrad v. Bd. of Johnson Cty. Comm'rs, 237 F. Supp. 2d 1204 (D. Kan. 2002)(Maxse, M.J.); Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306 (11th Cir. 2013); Mickens v. Polk Cty. Sch. Bd., 430 F. Supp. 2d 1265 (M.D. Fla. 2006)(Merryday, J.); Fritsch v. City of Chula Vista, No. 98-0972-E-CGA, 2000 WL 1740914 (S.D. Cal. Feb. 22, 2000)(Enright, J.)). UNM contends that this precedent provides support for its conclusion that Dr. Rivero's "lack of professionalism, rudeness, over-reaction, and anger" justified a psychological examination. UNM's MSJ at 19. UNM asserts that Dr. Rivero's conduct means that the examination was "job related and consistent with business necessity," warranting summary judgment for UNM on Dr. Rivero's claim of a Rehabilitation Act violation. UNM's MSJ at 20.

Finally, as to the constructive discharge claim, UNM asserts that the Rehabilitation Act imposes the same standards as the ADA for claims of discriminatory termination, under which constructive discharge falls. See UNM's MSJ at 20. UNM thus maintains that making a prima facie case under the Rehabilitation Act requires Dr. Rivero to establish that: (i) he "is a disabled person within the meaning of the ADA"; (ii) he "is able to perform the essential functions of the job, with or without reasonable accommodation"; and (iii) "the employer terminated [the] employment under circumstances which give rise to an inference that the termination was based on [his] disability." UNM's MSJ at 21 (first alteration in UNM's MSJ)(quoting Morgan v. Hill, 108 F.3d 1319, 1323 (10th Cir. 1997)). UNM asserts that Dr. Rivero cannot meet this test, because he is not a disabled person under the ADA, and because it did not terminate him --

noting that it is thus unnecessary to determine whether he "was able to perform the essential functions of his job." UNM's MSJ at 21. UNM notes that Dr. Rivero

> does not claim that he has a physical or mental impairment, or that he has a record of such impairment . . . . [The] sole basis for his claim that UNM regarded him as disabled is the fact that UNM required him to undergo a psychological evaluation as a condition of increased hours and because of his professionalism issues.

UNM's MSJ at 21. This psychiatric evaluation requirement, UNM asserts, is not enough to meet the ADA definition of disability,[88] because the caselaw establishes "that a requirement that an employee undergo a psychological evaluation does not equal a perception of impairment." UNM's MSJ at 22 (citing cases). UNM maintains that the undisputed facts do not indicate that it regards Dr. Rivero as impaired and, thus, he does not meet the ADA definition of "disabled." UNM's MSJ at 23. Further, UNM avows that "the plain facts are that Plaintiff was not discharged." UNM's MSJ at 23. UNM also notes that "a finding of constructive discharge **may not be based solely on a discriminatory act**." UNM's MSJ at 23 (emphasis in UNM's MSJ)(quoting Bennett v. Quark, Inc., 258 F.3d 1220, 1229 (10th Cir. 2001), overruled on other grounds as recognized by Boyer v. Cordant Techs., Inc., 316 F.3d 1137, 1140 (10th Cir. 2003)). UNM asserts that, because Dr. Rivero's constructive discharge claim is based only on the psychiatric evaluation requirement, and because he offers no evidence that this requirement caused his working conditions to deteriorate, there are no grounds for a constructive discharge claim. See UNM's MSJ at 24-25. Finally, UNM argues that Dr. Rivero waited an unreasonable

---

[88] The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

amount of time to resign -- three years after receipt of the Addendum, and five months after

receipt of affidavits showing that UNM disclosed his entire personnel file -- and, thus, foreclosed

his claim of constructive discharge.  See UNM's MSJ at 25.

**3.      Rivero's Response.**

Dr. Rivero filed his consolidated response to UNM's MSJ on March 8, 2018.  See

Rivero's Response at 1.  First, he argues that UNM does not have the needed objective evidence

to justify the psychiatric examination requirement.  See Rivero's Response at 20.  He notes that

UNM's definition of professionalism contains criteria which "are by varying degrees subjective,"

thus precluding the "objective basis" needed to require a medical examination.  Rivero's

Response at 21.  Dr. Rivero also cites to record evidence, allegedly contradicting UNM's

assertion that he lacked professionalism, to conclude that there are genuine issues of material fact

as to whether the psychiatric examination requirement was job-related and consistent with

business necessity, thus arguing that summary judgment is improper.  See Rivero's Response at

22-24.

Second, Dr. Rivero argues that there is "a genuine issue of material fact as to the nature

and scope of the psychiatric examination," again precluding summary judgment on whether the

examination was job-related and consistent with business necessity.  Rivero's Response at 25.

He asserts that the Addendum contains no language limiting the psychiatric examination's scope

and would have granted UNM "unfettered access to Dr. Rivero's psychiatric records, irrespective

of content," making it so invasive that UNM must have "regarded Dr. Rivero as disabled."

Rivero's Response at 24. Further, Dr. Rivero argues that these records "would be placed in Dr. Rivero's medical staff file, allowing any future parties who may seek to credential Dr. Rivero (including other hospitals) to review the records of psychiatric evaluations." Rivero's Response at 25. Dr. Rivero maintains that he would also "be forced to waive all rights to appeal internally or to legal recourse." Rivero's Response at 25. Dr. Rivero asserts that the Addendum's psychiatric evaluation requirement also does not match the agreement that Dr. Rivero and Dr. Schenck reached in December, 2010, for Dr. Rivero to participate in counseling to return to full-time status. See Rivero's Response at 25. Finally, Dr. Rivero distinguishes all the cases that UNM cites for the proposition that unprofessional behavior provides grounds for a psychiatric evaluation, noting that the conduct in those cases was much more egregious than his own. See Rivero's Response at 26-27. He asserts that there is no question that he "would be unable to perform essential job functions," so UNM must show that he suffered some medical condition "present[ing] a direct threat" to be justified in its psychiatric evaluation requirement. Rivero's Response at 28.

Dr. Rivero also argues that he makes a prima facie case of constructive discharge. See Rivero's Response at 28. Dr. Rivero posits that, if the psychiatric examination was not job-related and consistent with business necessity, then it "is *per se* discriminatory under the Rehabilitation Act." Rivero's Response at 29. While recognizing that some cases do not "automatically imply a 'regarded as disabled' classification" upon a party required to undergo a medical examination, Dr. Rivero asserts that "[t]he Addendum's invasiveness, its limitless scope,

and waiver of all legal rights" means that "[a]nyone subjected to it must be presumed to be mentally ill." Rivero's Response at 29. Dr. Rivero argues that there is evidence showing UNM regarded him as having a mental condition limiting his ability to work and that "UNM is seeking to confirm its presupposition" with the Addendum's psychiatric evaluation requirement. Rivero's Response at 30. Dr. Rivero asserts that UNM viewed his purported "lack of professionalism" as precluding his return to full-time status and his stress to be "the emotional trigger that caused [him] to be substantially limited in his ability to work as a surgeon," thus meaning that UNM regarded him as disabled. Rivero's Response at 30-31. Dr. Rivero argues that the fact that UNM treated him as disabled is enough for him to be "'regarded as' disabled." Rivero's Response at 31. Dr. Rivero avers that UNM "treated [him] as though he could not perform his job under the type of stress that was a normal part of . . . his job" by not allowing him to return to full-time employment without following the Addendum's requirements. Rivero's Response at 31. This treatment, Dr. Rivero argues, creates a genuine issue of material fact whether UNM regarded him as disabled. See Rivero's Response at 32. Further, he asserts that "a dispute with Dr. David Pitcher in 2003 . . . contributed to a culture of animosity toward Dr. Rivero," creating an intolerable workplace. Rivero's Response at 32-33. Dr. Rivero alleges that, adding to this hostile environment, "Dr. Schenck played a deceitful and manipulative game with Dr. Rivero, at once purporting to be his friend, facilitating the delay engaged in by other administrators, and then presenting baiting and switching the agreement to return." Rivero's Response at 33. Dr. Rivero also argues that Dr. Schenck retaliated against him for requesting his

credentialing file -- which Dr. Rivero requested to find evidence that the psychiatric examination was illegal -- by thereafter withdrawing the Addendum and precluding Dr. Rivero's return to full-time status at UNM. See Rivero's Response at 33. Dr. Rivero asserts that UNM's later document production reveals no reason to require a psychiatric examination and shows that he "was demoted without notice from his role as Chief of Adult Reconstruction." Rivero's Response at 34. Dr. Rivero argues that these cumulative actions "created a workplace in which no reasonable person could continue to work," forcing him to resign. Rivero's Response at 34.

In response to UNM's assertion that the FAC is untimely, Dr. Rivero notes that there must be a discharge for a claim of constructive discharge to accrue. See Rivero's Response at 34. Thus, he agrees with Magistrate Judge Lynch's decisions in the MTD Order regarding when his causes of action accrued. See Rivero's Response at 35. Finally, Dr. Rivero argues that his claim of retaliation is preserved for the jury to determine at trial, because UNM did not address this claim in UNM's MSJ. See Rivero's Response at 35.

### 4.    **UNM's Reply**.

UNM replied on February 2, 2018. See UNM's Reply at 1. First, UNM argues that Dr. Rivero brings two causes of action -- one "for the alleged illegal medical inquiry itself" and the other "for constructive discharge" -- with separate dates of accrual. UNM's Reply at 14. UNM allows that the constructive discharge cause of action accrued when Dr. Rivero resigned, but reasserts that the cause of action for the medical inquiry accrued when Dr. Rivero received the Addendum, pursuant to the discovery rule. See UNM's Reply at 14 (citing Filer v. Polston, 886

F. Supp. 2d 790, 796 (S.D. Ohio 2012)(Rose, J.)).  UNM argues that, even if the cause of action

for the medical inquiry accrued when Dr. Rivero knew of the alleged legal injury, this cause of

action would still be time-barred, because Dr. Rivero's EEOC filing on January 20, 2012,

"demonstrate[s] conclusively that Plaintiff had all of the information needed to file his

Rehabilitation Act claim no later than that date," UNM's Reply at 15, and he filed his original

complaint more than three years later, <u>see</u> UNM's Reply at 15.  <u>See</u> <u>also</u> UNM's Reply at 14.

Further, UNM asserts that this filing does not toll the statute of limitations for this cause of

action, because "[a]n E.E.O.C. administrative action was not a prerequisite for Plaintiff's

Rehabilitation Act claim."  UNM's Reply at 14.  UNM posits that, because Dr. Rivero "has

failed to even attempt to refute this argument" that the medical inquiry claim is time-barred, the

argument "should be deemed as accepted."  UNM's Reply at 15.

Second, UNM asserts that the psychiatric evaluation requirement "was job related and

consistent with business necessity."  UNM's Reply at 15.  UNM asserts that it offered the

psychiatric evaluations to Dr. Rivero "to help him return to full-time employment, and to assuage

the concerns of many individuals who were opposed to allowing Plaintiff to return full time."

UNM's Reply at 15.  UNM notes that it had no contractual obligation to increase Dr. Rivero's

hours as he years earlier had reduced his time to a 0.05 FTE on his own volition.  <u>See</u> UNM's

Reply at 15.  Further, UNM contends that Dr. Rivero knew that his agreement with Dr. Schenck

to attend counseling sessions involved meeting with a psychiatrist, because Dr. Rivero

"contacted a UNM psychiatrist to set them up."  UNM's Reply at 15 (citing UNM's MSJ ¶¶ 36-

39, at 9). Accordingly, UNM maintains that the Addendum's language "generally followed the agreed upon four counseling sessions with a psychiatrist." UNM's Reply at 15 (citing UNM's MSJ ¶ 41, at 9). UNM notes that Dr. Rivero does not dispute that a psychiatric evaluation may be appropriate under certain circumstances, but that he unsuccessfully attempts to distinguish those cases and to argue, without evidence, that the evaluations UNM required "were especially onerous." UNM's Reply at 16. UNM argues that the caselaw allows an employer to require a medical evaluation where the employer has "sufficient evidence to raise the question" whether "the employee is incapable of performing his job," and notes the number of complaints brought against Dr. Rivero. UNM's Reply at 16 (citing Adair v. City of Muskogee, 823 F.3d at 1312-13). See id. at 16-17. While Dr. Rivero argues "that many of these complaints were not proven," UNM asserts "that the staggering coincidence of these multiple complaints, even if not proven, certainly would cause a reasonable person to inquire as to Plaintiff's level of professionalism, requiring the need for some type of psychological evaluation." UNM's Reply at 17. For example, UNM notes that it "received 10 complaints from individuals claiming that [Dr. Rivero] disparaged their inability to speak English," which, even if the complaints' substance are not proven, the number "creates a reasonable concern, in the aggregate, that Plaintiff had a pattern of disparaging individuals with limited English proficiency." UNM's Reply at 17. UNM argues that some of the complaints have "some demonstrable basis in truth," because a patient complained that Dr. Rivero compared him to a monkey and Dr. Rivero admits to discussing with that patient a study in which monkeys could not resist drugs. See UNM's

Reply at 18. UNM also notes Dr. Rivero's own statements in the emails that he authenticated in his deposition, in which he blamed the messenger -- Barela, the patient advocate who "was merely passing along patient complaints, without taking sides" -- used all capital letters, and threatened to report Barela to his supervisor. UNM's Reply at 18.

Third, UNM asserts that the psychiatric evaluation requirement "was not open-ended, in the manner that Plaintiff suggested." UNM's Reply at 19. UNM maintains that the requirement "consisted of four sessions with a board certified psychiatrist, in order to determine how Plaintiff could best improve his professionalism." UNM's Reply at 19. UNM asserts that, while Dr. Rivero would have to follow the psychiatrist's recommendations to increase his employment, he never underwent an evaluation and therefore has no basis for believing that these recommendations would be onerous. See UNM's Reply at 19. UNM also asserts that it needed access to the records of the evaluations so that it could ensure Dr. Rivero was taking steps to improve his professionalism. UNM's Reply at 19. Further, UNM maintains that there are separate professionalism requirements for Dr. Rivero at a 0.05 FTE and as a full-time surgeon, because, at 0.05 FTE, Dr. Rivero only "operated on patients with whom he had a pre-existing relationship, or he performed surgeries alongside UNM surgeons, who would conduct the pre operative and post operative services," limiting Dr. Rivero's exposure to conscious patients. UNM's Reply at 20. See id. at 19-20. UNM asserts that, at 0.05 FTE, Dr. Rivero "was relieved from the day-to-day demands of professionalism," but, as a full-time surgeon, his "professionalism issues would need to be addressed." UNM's Reply at 20.

Fourth, UNM argues that it did not regard Dr. Rivero as disabled, so he was not constructively discharged.  See UNM's Reply at 20.  UNM notes that, in each of Dr. Rivero's reappointment letters, it clearly states that he is not disabled, suffers no impairment, and needs no accommodation, and that no documents in Dr. Rivero's personnel file indicate that he suffers from an impairment.  See UNM's Reply at 20.  UNM states that Dr. Rivero focuses on the psychiatric evaluation requirement and Dr. Schenck's suggestion that Dr. Rivero not be on call to establish that UNM regarded Dr. Rivero as disabled.  See UNM's Reply at 21.  UNM asserts that Dr. Rivero's argument, however, has no merit, because caselaw establishes that an employer's requirement that an employee undergo psychiatric evaluation does not equate to a perception of impairment.  See UNM's Reply at 21 (citing Lanman v. Johnson Cty., 393 F.3d 1151, 1157 (10th Cir. 2004), superseded on other grounds by statute, 42 U.S.C. § 12102(3)(A); Manson v. Gen. Motors Corp., 66 F. App'x 28, 36 (7th Cir. 2003); Mickens v. Polk Cty. Sch. Bd., 430 F. Supp. 2d 1265, 1274 (M.D. Fla. 2006)(Merryday, J.)).  UNM states that Dr. Rivero does not dispute the caselaw, but instead maintains that the requirement involves "such an extensive examination" that UNM must have considered him mentally ill, but cites no "facts, case law, or expert testimony that would indicate that a simple four part psychological evaluation indicated a belief on the part of UNM that he was mentally impaired."  UNM's Reply at 22.  UNM asserts that Dr. Rivero exaggerates the psychiatric evaluation requirement.  See UNM's Reply at 22.  Further, UNM argues that Dr. Schenck's excusal of Dr. Rivero from being on call, which "was one aspect of a particular job," does not mean that UNM considered Dr. Rivero "incapable of

working as a surgeon, let alone incapable of working in general." UNM's Reply at 23 (citing Martin v. Kansas, 996 F. Supp. 1282, 1290 (D. Kan. 1998)(Lungstrum, J.)). UNM asserts that Dr. Rivero's argument that this excusal shows UNM regarded him as disabled is effectively an argument "than an employer regards an employee as disabled if it makes any accommodation for any of the employee's difficulties," which is not a correct statement of the law. UNM's Reply at 23 (citing Cigan v. Chippewa Falls Sch. Dist., 388 F.3d 331, 335 (7th Cir. 2004); Kalekiristos v. CTF Hotel Mgmt. Corp., 958 F. Supp. 641, 659-60 (D.D.C. 1997)(Attridge, M.J.); Whitlock v. Mac-Gray, Inc., No. Civ.A. 00-10546-GAO, 2002 WL 31432688, at *3 (D. Mass. Oct. 30, 2002)(O'Toole, J.)).

Fifth, UNM argues that, even if it regarded Dr. Rivero as disabled, Dr. Rivero still cannot make a case for constructive discharge. See UNM's Reply at 24. UNM asserts that constructive discharge requires more than a discriminatory act, and that "there must also be aggravating factors that make staying at the job intolerable." UNM's Reply at 25 (internal quotation marks omitted)(quoting Boyer v. Cordant Techs., Inc., 316 F.3d at 1140). UNM contends that actions ancillary to the working conditions cannot establish constructive discharge; the working conditions themselves must be intolerable. See UNM's Reply at 25 (citing Jaffe v. Sedgwick Claims Mgmt. Servs., Inc., Case No. 2:17-cv-03421-ODW (Ex), 2017 WL 316561, at *4 (C.D. Cal. July 24, 2017)(Wright, J.)). UNM construes Dr. Rivero's dispute with Dr. Pitcher as a personality conflict, with no evidence that Dr. Pitcher regarded Dr. Rivero as disabled nor that such regard motivated the conflict. See UNM's Reply at 25. As to Dr. Rivero's contention that

Dr. Schenck "'played a deceitful and manipulative game' with him," UNM reasserts that Dr. Rivero knew the counseling sessions would be with a psychiatrist, because he had contacted one for this purpose. UNM's Reply at 25-26 (quoting Rivero's Response at 33). Further, UNM notes that Dr. Schenck did not draft the Addendum and withdrew it only after Dr. Rivero "refused to admit his prior unprofessionalism, which was the entire reason why counseling was suggested." UNM's Reply at 26 (citing UNM's MSJ ¶¶ 33, 43-44, at 8, 10). UNM asserts that, after Dr. Schenck withdrew the Addendum, Dr. Rivero "stayed on at UNM at the behest of Dr. Schenck." UNM's Reply at 26. UNM argues that Dr. Rivero's problems with Dr. Pitcher and Dr. Schenck "were in the nature of 'personality conflicts and strong differences of opinion' that do not support a claim for constructive discharge." UNM's Reply at 26 (quoting Sanchez v. Gen. Growth Mgmt. Co., 136 F.3d 1328, 1998 WL 44520, at *1 (5th Cir. Jan. 23, 1998)(per curiam)). UNM also argues that these actions which Dr. Rivero describes did not impact his working conditions. See UNM's Reply at 26.

Finally, UNM asserts that Dr. Rivero "has not preserved a retaliation claim for trial." UNM's Reply at 27. UNM notes that the FAC contains only "the conclusory averment that '[t]he decision to revoke the offer of more hours was also motivated by retaliation because Dr. Rivero objected to the illegal medical inquiry.'" UNM's Reply at 27 (quoting FAC ¶ 53, at 10). UNM also notes that the FAC does not list "retaliation" as its own cause of action and that the FAC has only one Count for "violation of the Rehabilitation Act." UNM's Reply at 28 (quoting FAC at 9). UNM asserts that "it was reasonable for UNM to rely on" Magistrate Judge Lynch's

determination in the MTD Order that the FAC contains two causes of action: (i) "the allegedly illegal medical inquiry"; and (ii) "the alleged constructive discharge." UNM's Reply at 28. UNM argues that, even if the FAC states a claim for retaliation, the claim would be time-barred, because Dr. Rivero waited five years after Dr. Schenck withdrew the Addendum to sue. See UNM's Reply at 28. UNM asserts that Dr. Rivero's failure to acknowledge his unprofessional behavior rendered the Addendum pointless, so Dr. Rivero's "retaliation claim is wholly without merit." UNM's Reply at 28.

### 5. Rivero's MSJ.

Dr. Rivero filed Rivero's MSJ on December 8, 2017. See Rivero's MSJ at 1. In Rivero's MSJ, Dr. Rivero asks the Court to strike some of UNM's affirmative defenses raised in the Defendants University of New Mexico Board of Regents' Answer to Plaintiff's First Amended Complaint to Recover Damages for Violation of the Rehabilitation Act of 1973, filed January 5, 2017 (Doc. 45)("Answer"). See Rivero's MSJ at 1. Dr. Rivero first discusses UNM's affirmative defenses I, that the "Plaintiff failed to state a claim for which relief can be granted," Answer at 10; II, that the "Plaintiff's claims are barred by the statute of limitations," Answer at 10; and III, that the "Plaintiff's claims are barred by the doctrine of laches and waiver," Answer at 10. See Rivero's MSJ at 11. Dr. Rivero asserts that these affirmative defenses "are all based on the assertion the claims under the Rehabilitation Act in the FAC are barred by the statute of limitations," Rivero's MSJ at 11, which he contends the MTD Order already addressed, see Rivero's MSJ at 11-12. Dr. Rivero asserts that the factual record supports the FAC's allegations

and the MTD Order's conclusions. See Rivero's MSJ at 12. Dr. Rivero cites the Supreme Court of the United States' decision in Green v. Brennan to argue that the limitations period does not begin until "the plaintiff has a complete and present cause of action," which, for a constructive discharge claim, requires resignation. Rivero's MSJ at 12 (citing Green v. Brennan, 136 S. Ct. at 1776-77). Dr. Rivero argues that the MTD Order's "logic as to the timeliness of claims filed under the Rehabilitation Act may now be supported with facts." Rivero's MSJ at 13. Dr. Rivero quotes the MTD Order's analysis:

> "Dr. Rivero did not find out that UNM had no business necessity for the[ psychiatric examination] requirements until affidavits were filed by Drs. Trotter and Bailey in the state case which averred that all of the documents had been produced, and Dr. Rivero was able to determine that UNM had no evidence or documentary support to substantiate its requirement of psychiatric testing . . . . The affidavits were filed, respectively, on January 15, and January 24, 2014 . . . . Given that a plaintiff must prove that his employer had no business necessity for the required medical testing, Dr. Rivero's claim under § 794 for the psychiatric testing was not complete and cognizable until January 2014."

Rivero's MSJ at 14 (quoting MTD Order at 8). Dr. Rivero thus asserts that his "claims under the Rehabilitation Act were timely filed both upon the initial filing of the Original Complaint on April 19, 2016 (in relation back to the claims) and upon the filing of the FAC," "less than three years from the time of accrual." Rivero's MSJ at 14. Dr. Rivero notes that he resigned from UNM in May, 2014 -- less than three years before the Complaint's filing -- so he argues that his constructive discharge claim is also timely. See Rivero's MSJ at 14.

Dr. Rivero notes the law-of-the-case doctrine as an additional ground for striking UNM's affirmative defenses I through III. See Rivero's MSJ at 15. According to Dr. Rivero, the law-of-

the-case doctrine "posits that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Rivero's MSJ at 15 (quoting United States v. Monsisvais, 946 F.2d 114, 115 (10th Cir. 1991)). Dr. Rivero asserts that a court may

> depart from the doctrine in "three exceptionally narrow circumstances: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice."

Rivero's MSJ at 15 (quoting United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)). Dr. Rivero argues that neither law nor fact has changed since the MTD Order, and that the decision is not clearly erroneous, so none of the exceptions to law-of-the-case doctrine applies here and the finding of timeliness should remain. See Rivero's MSJ at 15-16.

Dr. Rivero then discusses UNM's affirmative defense XIII: "At all times Defendant UNM acted in accordance with its policies and regulations, and applied such policies and regulations consistently and fairly." Answer at 10. See Rivero's MSJ at 16. Dr. Rivero argues that the Court should strike this defense, because it lacks factual support -- "[t]he record contains no evidence that UNM has applied any of its policies or regulations with respect to any of the claims brought by Dr. Rivero in the FAC," and "there is evidence that Defendant violated its own Policy C70[89] by failing to provide Dr. Rivero with his requested records." Rivero's MSJ at

---

[89] UNM's Policy C70: Confidentiality of Faculty Records provides rules as to how "[p]ersonnel files concerning faculty of the University of New Mexico[] shall be gathered, retained, disclosed, and used by academic or administrative units of the University." UNM

16.    Dr. Rivero notes that, in response to his interrogatory asking UNM to provide facts to support its affirmative defenses, UNM "states that 'UNM's policies require faculty members to act in a professional manner, and to treat each [sic] other employees, as well as patients, with respect.'"    Rivero's MSJ at 17 (quoting Board of Regents of the University of New Mexico's Supplemental Responses to Plaintiff Dennis Rivero's First Set of Interrogatorries [sic], First Requests for Production of Documents, and First Requests for Admission, No. XIII Answer at 3, filed December 8, 2017 (Doc. 144-12)("Rivero's First Interrogatories, Supplemental Answer")). Dr. Rivero posits that UNM's "supplemental answer clarifies no further," because it "states only that, 'professional and institutional standards require UNM to maintain protect its patients,

---

Faculty Handbook, C70: Confidentiality of Faculty Records at 1, filed December 18, 2017 (Doc. 144-15)("Policy C70").    Policy C70 provides that the personnel file "must include any written information used to any degree in making a decision concerning the employment, rank or status of a faculty member," and that they shall be "compiled or retained" for the sole purpose of "administering the University personnel system."  Policy C70 at 1.  "Faculty members have the right to know and the responsibility to examine their personnel files," with the exception of confidential information.    Policy C70 at 1.    As to the right of inspection, the Policy C70 provides:

> Each faculty member has the right to inspect and review without unreasonable delay by the university (normally within two weeks) any record or file maintained on him or her by the University subject to the provisions of this Policy and any limitations imposed by law.  If additional time is needed to produce a record for inspection, the faculty member shall be informed in writing of the reason for the delay and the date such record will be available.

Policy C70 at 1.  The Policy states that UNM will redact documents for which the author wishes to remain confidential or, if it "does not appear feasible to protect the identity of the author through redaction, the document may be accurately summarized in writing."  Policy C70 at 2. Further, the faculty member cannot inspect any "information [that] is confidential under this Policy, or privileged under law."  Policy C70 at 2.

families, employees, and staff by maintaining professional standards, and addressing issues of unprofessionalism and disruptive behavior.'"  Rivero's MSJ at 17 (quoting Rivero's First Interrogatories, Supplemental Answer, No. XIII at 5).  Further, Dr. Rivero asserts that UNM has no actual policies relevant to its psychiatric examination requirement to implement, because "UNM states that it 'has no set policy pertaining to Mental Examinations.'"  Rivero's MSJ at 17 (quoting Board of Regents of the University of New Mexico's Second Supplemental Responses to Plaintiff Dennis Rivero's First Set of Interrogatorries [sic], First Requests for Production of Documents, and First Requests for Admission, No. 4 Second Supplemental Answer at 6, filed December 8, 2017 (Doc. 144-13)).

Dr. Rivero also argues that UNM's affirmative defense XIV -- that the "Defendant fulfilled any and all obligations it had to Plaintiff under contract or statute," Answer at 11 -- lacks factual support, see Rivero's MSJ at 17.  Dr. Rivero notes that, in response to his interrogatories to explain its affirmative defenses with respect to XIV, UNM "states, 'See above Affirmative Defenses.  Discovery is ongoing.  UNM reserves the right to supplement its Answer to its Interrogatory.'"  Rivero's MSJ at 18 (quoting Rivero's First Interrogatories, Supplemental Answer, No. XIII at 5).[90]  Dr. Rivero maintains that, because UNM "has neither amended nor supplemented its explanation of this affirmative defense" and "has failed to specify which

---

[90]The portion of Rivero's First Interrogatories, Supplemental Answer provided to the Court does not contain UNM's explanation for its affirmative defense XIV, but ends at XIII. The document contains the language "Discovery is ongoing.  UNM reserves the right to supplement its Answer to its Interrogatory," but this is under the response to XIII.  Rivero's First Interrogatories, Supplemental Answer, No. XIII at 5.

affirmative defenses apply to its answer," affirmative defense XIV lacks factual support and the Court should strike it.  Rivero's MSJ at 18.

Finally, Dr. Rivero challenges UNM's affirmative defense XV, that the "Defendant reserves the right to amend its Answer to Plaintiff's Complaint to include additional Affirmative Defenses once facts supporting the same become known."  Answer at 11.  See Rivero's MSJ at 18.  Dr. Rivero asserts that the Court should strike this defense, because the "[d]iscovery is closed and dispositive motions will have been exchanged.  Any additional defenses would prejudice Dr. Rivero at such a late stage of litigation."  Rivero's MSJ at 18.

**6.**      **UNM's Response.**

UNM responded on January 12, 2018.  See UNM's Response at 1.  UNM first asserts that the Court is not bound by the MTD Order regarding its affirmative defenses I through III and summary judgment is improper as to these defenses.  See UNM's Response at 9-10.  UNM argues that the "Court has the discretion to reconsider parts of the [MTD] Order . . . to hold that Plaintiff's medical examination claims are barred by the applicable statute of limitations," and "to hold that Plaintiff failed to state a claim for constructive discharge upon which relief can be granted."  UNM's Response at 11.  UNM notes that courts have the "inherent power to reopen any interlocutory matter in its discretion," meaning that any

> "order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all of the parties *does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities*."

UNM's Response at 11-12 (emphasis in UNM's Response)(quoting Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.), superseded on other grounds by statute, Fed. R. Civ. P. 59).  UNM asserts that the MTD Order is "entirely interlocutory: it provided a final judgment as to none of the rights and liabilities of any of the parties" and, thus, Dr. Rivero's argument as to the law-of-the-case doctrine fails.  UNM's Response at 12.  UNM further notes that Dr. Rivero cites two cases which "concern[] the question of whether an earlier appellate ruling could be overturned; neither discussed interlocutory district court orders."  UNM's Response at 12 (discussing United States v. Monsisvais and United States v. Alvarez).  Accordingly, UNM posits that the-law-of-the-case doctrine "require[s] that district courts remain consistent with earlier *appellate* rulings" and does not apply "to a district court's own non-final orders."  UNM's Response at 12 (emphasis in original).  UNM notes that the Tenth Circuit, in Allison v. Bank One-Denver, 289 F.3d 1223 (10th Cir. 2002), upheld a district court's decision that appeared to contradict its earlier, oral ruling, stating that "[a] lower court's ability to depart from its own prior decisions is discretionary."  UNM's Response at 13 (internal quotation marks omitted)(quoting Allison v. Bank One-Denver, 289 F.3d at 1247).

UNM therefore argues that the Court has discretion to revisit the MTD Order "and to alter that decision so that it is more consistent with applicable law."  UNM's Response at 14.  UNM asserts that, "in the context of a civil rights claim, the cause of action accrues, indicating a 'complete and present cause of action' when the plaintiff finds out about the injury, not when the plaintiff obtains all relevant facts."  UNM's Response at 14 (quoting Wallace v. Kato, 549 U.S.

at 388; and citing Baker v. Bd. of Regents of the State of Kan., 991 F.2d at 632). UNM argues

that, "because 'the discovery rule hinges upon actual, as opposed to legal, injury,'" Dr. Rivero's

claim of an illegal medical examination accrued in March, 2011, which is when he alleges that

he received the Addendum with the psychiatric examination requirement. UNM's Response at

14 (quoting Filer v. Polston, 886 F. Supp. 2d at 796). UNM also notes that, as of January 20,

2012, Dr. Rivero was aware of the psychiatric evaluation requirement and believed that it

violated his rights, because he filed a charge of discrimination with the EEOC alleging this

violation. See UNM's Response at 15. UNM maintains that the Rehabilitation Act incorporates

New Mexico's three-year statute of limitations for personal injury and does not require

exhaustion of administrative remedies. See UNM's Response at 9. Accordingly, UNM argues

that, because Dr. Rivero knew of the examination requirement and believed it illegal more than

three years before he filed his Complaint, the medical examination claim is time-barred and,

thus, Dr. Rivero "is not entitled to summary judgment as to the statute of limitations defense

regarding that cause of action." UNM's Response at 15. See id. at 15-16.

UNM concedes that Dr. Rivero's claim for constructive discharge did not accrue until he

resigned and, thus, that the statute of limitations does not bar that claim. See UNM's Response

at 16. UNM argues, however, that neither the FAC "nor facts developed through discovery

establish a claim for constructive discharge." UNM's Response at 16. Although the MTD Order

found that Dr. Rivero's FAC states a claim for constructive discharge, UNM asserts that the

Court may revisit this decision. See UNM's Response at 16. UNM notes that "'[t]he bar is quite

high' for proving constructive discharge." UNM's Response at 16 (quoting Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002)). Further, UNM asserts that constructive discharge requires that the employer take deliberate action which "makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit," using an objective, reasonable-person standard to judge intolerability. UNM's Response at 16 (internal quotation marks omitted)(quoting MacKenzie v. City & Cty. of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005), abrogated on other grounds by Lincoln v. BNSF Ry. Co., 900 F.3d 1166 (10th Cir. 2018)). UNM argues that, in Dr. Rivero's FAC, his "sole claim regarding constructive discharge concerned the filing of affidavits by two UNM officials, in a state mandamus action, indicating that all documents had been submitted," which Dr. Rivero took to mean UNM had no legal grounds for its psychiatric evaluation requirement and, "[a]s a consequence, [he] alleged that conditions had become intolerable." UNM's Response at 16-17. UNM notes that Dr. Rivero "does not allege that the affidavits that UNM submitted actually affected his working conditions," but that "he only alleges that they affected his subjective view of those working conditions." UNM's Response at 17. UNM asserts that it submitted the affidavits that the state court ordered in response to Dr. Rivero's action, so it was not UNM's deliberate act, and posits that "the only deliberate act at issue in the instant case was the requirement that Plaintiff undergo a psychological evaluation." UNM's Response at 17. UNM argues that the psychiatric evaluation requirement is not enough for a constructive discharge claim, but, even if it is sufficient, Dr. Rivero waited too long to resign to prevail on this claim.

See UNM's Response at 17 (citing Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991)). UNM argues that, because Dr. Rivero "remained at UNM for three years after being given this supposedly onerous Addendum," his claim must fail, because "he clearly did not find the conditions so terrible that he felt he had no choice but to quit." UNM's Response at 18. UNM posits that, if the affidavits rendered Dr. Rivero's working conditions intolerable, he still waited too long to quit, because UNM filed the affidavits in January, 2014, and Dr. Rivero waited to resign until May, 2014. See UNM's Response at 18 (citing Smith v. Bath Iron Works Corp. for the proposition that a four-month gap between the conduct and the resignation precludes a claim for constructive discharge). According to UNM, therefore, Dr. Rivero is not entitled to summary judgment on UNM's affirmative defenses I through III. See UNM's Response at 18.

UNM then argues that it "has produced substantial evidence in support of" its affirmative defense XIII, that it followed its policies, and applied them fairly and consistently. UNM's Response at 19. UNM argues that it has "policies indicating that unprofessional behavior be addressed swiftly and decisively," and that "the Joint Commission, upon which UNM relies for its accreditation, also requires that medical facilities address unprofessional conduct." UNM's Response at 19 (citing Board of Regents of the University of New Mexico's Second Supplemental Responses to Plaintiff Dennis Rivero's First Set of Interrogatorries [sic], First Requests for Production of Documents, and First Requests for Admission, No. 4 Answer, Supplemental Answer, and Second Supplemental Answer at 4-8, filed January 12, 2018

(Doc. 159-3)("Rivero's First Interrogatories, Second Supplemental Answer"). UNM asserts that Dr. Rivero "had demonstrated episodes of severe unprofessional behavior, which UNM was required to address pursuant to its policies and those of its accreditation body." UNM's Response at 19 (citing UNM's MSJ at 4-6). UNM posits that "[i]t is well settled that an employer can use psychological evaluations to determine the cause of unprofessional behavior without violating the Americans With Disabilities Act." UNM's Response at 19 (citing Lanman v. Johnson Cty., 393 F.3d at 1157). UNM argues that it would be "practically impossible" to draft a formal policy "governing when a physician exhibiting unprofessional behavior is referred to a mental health evaluation," so it is irrelevant that UNM does not have such a policy. UNM's Response at 19. UNM notes that it has referred physicians to mental health evaluations in the past, see UNM's Response at 19 (citing Rivero's First Interrogatories, Second Supplemental Answer, No. 3 at 2-3), and that Dr. Schenck did not draft the Addendum, so it is irrelevant that he did not consult any policies on mental health evaluations, see UNM's Response at 20.

UNM also asserts that its affirmative defense XIV has factual support, stating that, in response to Dr. Rivero's interrogatories, UNM referred to its other affirmative defenses, because "the facts supporting the other affirmative defenses clearly also support UNM's defenses that it fulfilled its obligations under contract or statute." UNM's Response at 20. According to UNM, Dr. Rivero "has not argued that UNM violated its contractual duties to him," and only "that UNM violated the Rehabilitation Act's prohibition of medical examinations by requiring him to undergo a psychological evaluation as a condition of increased hours." UNM's Response at 20.

UNM asserts that the Rehabilitation Act "allows medical examinations that are 'job-related and consistent with business necessity," UNM's Response at 20 (quoting 42 U.S.C. § 12212(d)(4)(A)), and its affirmative defenses V and VI -- on which Dr. Rivero does not seek summary judgment -- are based on this exception and contain factual support, see UNM's Response at 20-21. Accordingly, UNM argues that it did not violate the Rehabilitation Act, therefore "acted in accordance with its statutory obligations," and that "summary judgment is inappropriate as to that affirmative defense." UNM's Response at 21.

### 7.    The First Disclosure Letter.

The Court issued a disclosure letter to the parties on January 23, 2018.[91] See Letter from the Court to Eric D. Norvell, Alfred A. Park, and Lawrence M. Marcus (dated January 23, 2018), filed January 23, 2018 (Doc. 163)("First Disclosure Letter"). The First Disclosure Letter's body states in full:

> I want to bring a matter to your attention. I have, with my law clerks, reviewed the Judicial Code of Conduct and do not believe this matter requires me to recuse myself. I want everyone, however, to be fully informed and comfortable with my participation in the case.
>
> In the fall of 2017, I co-taught a class at the University of New Mexico School of Law called "Church and State" with Andy Schultz. We have taught the class together on four other occasions. We taught similar classes from January until May in 2010 and 2012, and in the fall of 2006 and of 2015.

---

[91]At this point in time, the Court had yet to meet with the parties, and had ruled on only two non-dispositive motions. See Stipulated Order Amending Case Management Deadlines, filed January 5, 2018 (Doc. 155); Stipulated Order Granting Unopposed Motion to Exceed Page Limits for Filing a Response in Opposition to Defendant's Motion for Summary Judgment, filed January 16, 2018 (Doc. 162).

In addition to weekly classes, Mr. Schultz and I usually have to meet once before the semester begins to discuss the curriculum and once after the semester ends to grade papers. We also usually invite the students to one of our homes for the last class, food, and refreshments.

The last class was at my home on November 21, 2017, and both Mr. Schultz and his wife were present. We met on January 6, 2018 to grade papers and assign grades. To my knowledge, we are done with the class.

I waive my pay for the class.[92]  In exchange, UNM gives me a student to help me write a law review article and he or she receives my pay.[93]  The student helping me last fall may do some more work on the article in the future.[94]  I also have made him an offer to serve as my law clerk for 2019-2020 and he has orally accepted.

I believe that I can be fair and impartial. I see no reason to recuse myself. Please call my Courtroom Deputy Clerk, Michelle Behning (505-348-2289), if anyone objects. I have instructed Ms. Behning not to tell me who calls. If anyone objects, or has any questions, we can perhaps, have a telephonic conference. If Ms. Behning does not receive any calls, I will proceed to handle the case.

First Disclosure Letter at 1-2. Nobody called Ms. Behning about the First Disclosure Letter.

---

[92]It is the Court's memory that, for the first three classes it taught, it just declined the pay. Only for the last two classes has it gotten a research assistant in exchange.

[93]The article is on the free exercise and establishment clauses of the First Amendment to the Constitution of the United States of America, the topic of the class. The Court, after writing a lengthy paper on this topic and after teaching this School of Law class five times, has always thought it might have something to say and to contribute on the subject. The Court has, because of the crush of cases in the District of New Mexico, never been able to finish it or ever get too far in working on it. At this stage of the Court's career, chances are fairly faint that the Court will ever finish the article. The research assistant position has, however, given the Court the opportunity to work with two more law students, one of whom the Court has hired as a law clerk for 2019-2020, and the other has become a law clerk for one of the District's Magistrate Judges.

[94]The research assistant never did more work on the law review article and is unlikely to ever work on it.

8.     **Rivero's Reply**.

Dr. Rivero replied on February 14, 2018.  See Rivero's Reply at 1.  Dr. Rivero first argues that UNM's Response "offer[s] no grounds by which to apply the exceptions to the law of the case doctrine that would warrant revisiting of the affirmative defenses."  Rivero's Reply at 9. Dr. Rivero states that he does not dispute that the Court has discretion to revisit the MTD Order, but that reconsideration is unwarranted.  See Rivero's Reply at 9 & n.3.  Dr. Rivero asserts that "denials of motions to dismiss are conclusive" and so "any dispute as to such a denial could have been taken up on immediate appeal under the collateral order doctrine."[95]  Rivero's Reply at 9-10 (citing NCDR, L.L.C. v. Mauze & Bagby P.L.L.C., 745 F.3d 742, 748 (5th Cir. 2014)("Whether or not a later summary judgment motion is granted, denial of a motion to dismiss is conclusive as to the right to avoid the burden of litigation . . . . To be considered conclusive, it should be unlikely that the district court will revisit the order."  (citations and internal punctuation omitted))).  Further, Dr. Rivero notes that the law-of-the-case doctrine also "holds that a court should generally adhere to its own prior rulings."  Rivero's Reply at 10 (internal quotation marks omitted)(quoting United States v. Lacey, Case No. 89-10054-01-SAC,

---

[95]The Court notes for the reader's convenience that this is an incorrect statement of the law.  The collateral order doctrine applies to only district courts' decisions: (i) "that are conclusive"; (ii) "that resolve important questions completely separate from the merits"; and (iii) "that would render such important questions effectively unreviewable on appeal from final judgment in the underlying action."  Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 867 (1994).  All three requirements must be met for an interlocutory order to be immediately appealable under the collateral order doctrine, see Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. at 867, and a denial of a motion to dismiss does not, in all circumstances, meet all three requirements, see, e.g., Van Cauwenberghe v. Baird, 486 U.S. 517 (1988).

1994 U.S. Dist. LEXIS 7392, at *19 (D. Kan. May 6, 1994)(Crow, J.)).  Dr. Rivero maintains

that the Court "adheres to a three-factor analysis for reconsideration of an interlocutory order."

Rivero's Reply at 10.  According to Dr. Rivero, the Court should: (i) "restrict its review of a

motion to reconsider prior ruling in proportion to how thoroughly the earlier ruling addressed the

specific findings or conclusions that the motion to reconsider challenges," Rivero's Reply at 10

(internal quotation marks omitted)(quoting Anderson Living Tr. v. WPX Energy Prod., L.L.C.,

308 F.R.D. 410, 434 (D.N.M. 2015)(Browning, J.)); (ii) "consider the case's overall progress and

posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any

direct evidence the parties may produce, and use those factors to assess the degree of reasonable

reliance the opposing party has placed in the Court's prior ruling," Rivero's Reply at 11 (internal

quotation marks omitted)(quoting Anderson Living Tr. v. WPX Energy Prod., L.L.C., 308

F.R.D. at 434); and (iii)

> "be more inclined to grant motions for reconsideration if the movant presents
> (i) new controlling authority -- especially if the new authority overrules prior law
> or sets forth an entirely new analytical framework; (ii) new evidence -- especially
> if the movant has a good reason why the evidence was not presented the first time
> around; or (iii) a clear indication -- one that manifests itself without the need for
> in-depth analysis or review of the facts -- the Court erred,"

Rivero's Reply at 12 (quoting Anderson Living Tr. v. WPX Energy Prod., L.L.C., 308 F.R.D. at

434-35).  Dr. Rivero argues that the MTD Order thoroughly addressed UNM's arguments

regarding timeliness in its MSJ and Response, as UNM raised the same arguments in the MTD.

See Rivero's Reply at 11.  Dr. Rivero also argues that he placed considerable, reasonable

reliance on the MTD Order, noting the substantial discovery in which he and UNM have

engaged, and that, despite the extensive discovery, UNM "has come forward with no material facts that change any aspect of the previously denied Motion to Dismiss." Rivero's Reply at 11. Dr. Rivero further asserts that "there is no clear indication of error by the Court," so UNM "does not clear the threshold for reconsideration," Rivero's Reply at 12, and, thus, the Court should not reconsider UNM's statute of limitations arguments, see Rivero's Reply at 13.

Dr. Rivero then argues that, if the Court reconsiders UNM's statute of limitations arguments, Green v. Brennan "disposes of Defendant's assertions that Dr. Rivero's claims are time-barred." Rivero's Reply at 13. Dr. Rivero restates the events that lead to the intolerable workplace that caused his resignation:

> [T]he discriminatory presentation of the illegal medical inquiry in the Addendum, the obstructionist and unlawful withholding of documents by UNM administrators, the withdrawal of the discriminatory Addendum when Dr. Rivero sought a basis for its terms, the fostering of frivolous defenses to the Mandamus Action to further facilitate wrongful withholding documents, and the filing of affidavits in January 2014 affirming that no additional documents existed for production.

Rivero's Reply at 13-14 (citing Rivero's MSJ ¶¶ 10-26, at 3-7). Accordingly, Dr. Rivero asserts that the medical inquiry claim did not accrue until UNM filed affidavits attesting it produced all documents, because this notification is when Dr. Rivero could "determine that UNM had no business necessity for the psychiatric examinations," and that the constructive discharge claim did not accrue until he resigned on May 21, 2014. Rivero's Reply at 14. Dr. Rivero notes that the Court could determine that "the claim for discrimination for the illegal medical inquiry, because of its innate relationship to Dr. Rivero's termination of employment, may not have

accrued as an independent claim until such time as Dr. Rivero resigned," although the MTD Order rejected this interpretation. Rivero's Reply at 14 n.4. Dr. Rivero responds to UNM's argument that he waited too long to resign by noting the Supreme Court's logic in <u>Green v. Brennan</u> that it "doubt[s] that a victim of employment discrimination will continue to work in an intolerable environment merely because he can thereby extend the limitations period for a claim of constructive discharge." Rivero's Reply at 14 (internal quotation marks omitted)(quoting <u>Green v. Brennan</u>, 136 S. Ct. at 1781). Dr. Rivero argues that he "had endured years of denigration of his reputation," Rivero's Reply at 14; that Dr. Schenck and other administrators turned on him, <u>see</u> Rivero's Reply at 15; and that the affidavits declaring UNM disclosed all documents, with no basis for the psychiatric examination requirement, "were the discriminatory straws that broke the camel's back," Rivero's Reply at 15 (citing <u>Ulibarri v. Lopez</u>, No. 95-2291, 1996 U.S. App. LEXIS 27185, at *6 (10th Cir. 1996)). Dr. Rivero asserts that his "workplace was brimming with deceit, betrayal, and distrust, and no reasonable person could have continued to remain employed there." Rivero's Reply at 15.

According to Dr. Rivero, UNM's Reply in support of its own MSJ states "that Dr. Rivero did not respond to its arguments that the claims in the FAC are time-barred," which he asserts is not true, because Dr. Rivero incorporated his MSJ arguments in his Response. Rivero's Reply at 15 (citing Rivero's Response at 34-35). Dr. Rivero posits that this incorporation cannot be mistaken "as anything but an express refutation of the statute of limitations claims." Rivero's

Reply at 15.  Dr. Rivero thus asserts that he adequately responded to UNM's MSJ arguments regarding the statute of limitations.  See Rivero's Reply at 15.

Dr. Rivero then underscores that reconsideration of UNM's affirmative defenses I and III is improper, and that these defenses do not survive because of UNM's reassertion that Dr. Rivero's FAC did not make a constructive discharge claim.  See Rivero's Reply at 16. Dr. Rivero notes that Magistrate Judge Lynch "held that constructive discharge was adequately (if 'inartfully') pled, enough so to survive a motion to dismiss," and Dr. Rivero asserts that this finding is conclusive as to bring the case through discovery.  Rivero's Reply at 16 (quoting MTD Order at 6).  Dr. Rivero maintains that, because UNM notes no new evidence to contest Dr. Rivero's constructive discharge claim, UNM is merely rehashing its same arguments, which the Court should not reconsider.  See Rivero's Reply at 16.  As to UNM's assertion that Dr. Rivero waited too long to resign, Dr. Rivero posits that UNM is "ask[ing] the Court to ignore facts that support the fostering of an intolerable workplace . . . [and] insinuate that that nothing happened during a purported gap of time when Dr. Rivero sought answers for why the Addendum contained its oppressive requirements."  Rivero's Reply at 17.  Dr. Rivero argues that his workplace became intolerable when he determined that UNM had no basis for the psychiatric evaluation requirement upon UNM's filing of affidavits showing it produced all documents, and that he resigned within a reasonable time of this determination.  See Rivero's Reply at 17. Dr. Rivero states that he "cleared out his locker during his monthly visit after the affidavits were filed and did not return to UNM," then tendered his formal resignation on May 14, 2014, which

he contends was a reasonable date "given the gravity and significance of Dr. Rivero's circumstances as discussed in detail in the record of this case." Rivero's Reply at 17 (citing Resignation Letter at 1). As to the defense of laches and waiver, Dr. Rivero argues that UNM's response to his interrogatory refers to its affirmative defense II response, which in turn refers to its MTD and statute-of-limitations defense. See Rivero's Reply at 17-18 (citing Rivero's First Interrogatories, Supplemental Answer, Nos. III. & II at 2). Dr. Rivero argues that UNM's MTD "contains no mention, explanation, or preservation of the defenses of 'laches and waiver,' and the statute of limitations defense provides no explanation of, and bears no relation to, the 'laches and waiver' defense," so UNM has not preserved it, and the Court should strike it. Rivero's Reply at 18.

Dr. Rivero asserts that, although UNM attempts to preserve its affirmative defense XIII by citing to "pages of general statements[,] . . . this paper blizzard does not mean that UNM actually implemented any of those statements." Rivero's Reply at 18. Dr. Rivero asserts that UNM concedes that it has no set policy regarding mental examinations and, because Dr. Schenck gave Dr. Rivero the Addendum and is UNM's agent, "Dr. Schenck was responsible for understanding which policies were applied in presenting the document to Dr. Rivero." Rivero's Reply at 19. See Rivero's Reply at 18-19.

Finally, Dr. Rivero contends that UNM responds to his motion to strike affirmative defense "XIV with a vague and unclear assertion that it has adhered to statutory obligations, whatever those obligations may be." Rivero's Reply at 19. Dr. Rivero argues that, because of

UNM's apparent assertion that affirmative defenses "V and VI constitute the defenses pertaining to the Rehabilitation Act," affirmative defense "XIV is superfluous and should be stricken, since Aff. Def. V and VI encompass the entirety of Aff. Def. XIV." Rivero's Reply at 19. Dr. Rivero argues that, if this apparent assertion is not the case, then the Court should strike UNM's affirmative defense XIV, because UNM "can cite to no other statute or contract applicable in this case." Rivero's Reply at 19.

### 9. The Complaints MIL.

Dr. Rivero filed the Complaints MIL on December 8, 2017. See Complaints MIL at 1. Dr. Rivero anticipates that UNM "will attempt to introduce documentary evidence related to so-called 'complaints' from patients, staff, administration, or other parties pertaining, directly or indirectly, to Dr. Rivero . . . as far back as 1992." Complaints MIL at 1. Dr. Rivero contends that any complaint "not relevant to the time frame at issue in this litigation" is stale, and requests that the Court "prohibit[] the introduction, mention, allusion or other exposure of the jury to [such] complaints." Complaints MIL at 1. Dr. Rivero argues that "[t]he relevant time frame pertaining to any complaints regarding Dr. Rivero is 2006 and thereafter," and that complaints before 2006 "are irrelevant, as they are too remote in time," and, at trial, "could mislead and confuse the jury and impermissibly prejudice the jury against Dr. Rivero." Complaints MIL at 4.

According to Dr. Rivero, UNM "cited as a basis for refusing to allow Dr. Rivero back without the onerous requirements of the Addendum as an 'increase in complaints,' not all complaints cumulatively," and, in UNM's MSJ, UNM "acknowledges a notable gap between

early complaints (in the mid-1990s) and later complaints (around 2006)." Complaints MIL at 4 (quoting Board of Regents of the University of New Mexico's Supplemental Responses to Plaintiff Dennis Rivero's First Set of Interrogatorries [sic], First Requests for Production of Documents, and First Requests for Admission, No. 5 Answer at 2, filed December 8, 2017 (Doc. 145-5); and citing UNM's MSJ ¶ 6, at 4). Dr. Rivero therefore argues that 2006 and after is the relevant time frame for complaints. See Complaints MIL at 5. Dr. Rivero also maintains that UNM's assertion of his "'long history' of complaints is overstated." Complaints MIL at 5 (quoting Joint Status Report at 6, filed January 31, 2017 (Doc. 48)). Dr. Rivero notes that he worked at UNM for fifteen years before entering private practice, and that "[h]e was never disciplined or subject to an adverse employment action." Complaints MIL at 5. Further, Dr. Rivero notes that UNM promoted him to full professor in 2005 and that UNM provides "no evidence of complaints that were temporally proximate to [this] promotion." Complaints MIL at 5. Dr. Rivero posits that, "if there were such complaints and they were so substantial as to give rise to a required psychiatric examination," it would be odd for UNM to promote him. Complaints MIL at 5. Finally, Dr. Rivero clarifies that he does not want the Court to exclude "evidence of the dispute between Dr. David Pitcher and Dr. Rivero from 2002-2003," as "this dispute forms a foundational basis of the motives of Defendant that led to the illegal medical inquiry and constructive discharge allegations of the FAC." Complaints MIL at 5-6.

10.    **The Complaints MIL Response**.

UNM responded on January 12, 2018.  <u>See</u> Defendant University of New Mexico Board of Regents' Response Brief in Opposition to Plaintiff's Motion in Limine to Exclude Complaints Prior to 2006 at 1, filed January 12, 2018 (Doc. 158)("Complaints MIL Response").  UNM contends that the complaints made before 2006 are relevant, "because at least one UNM physician cited these incidents to explain why he opposed Plaintiff's return to UNM." Complaints MIL Response at 3 (citing Complaints Email at 1).  UNM also asserts that these complaints "make it more probable that UNM officials were genuinely concerned about Plaintiff's unprofessional behavior, and also make it more probable that UNM had good grounds for this concern."  Complaints MIL Response at 3.  UNM argues that Dr. Rivero's "lack of professionalism dates back to 1993, and provides insight into Plaintiff's pattern of behavior as a physician."  Complaints MIL Response at 3.  UNM notes that, while Dr Rivero "appeared to have improved his behavior between 1994 and 2003," he could have made these changes "to improve his standing at UNM," which UNM argues is a possibility, because, "once his position was more secure, Plaintiff began to revert to his old unprofessional ways."  Complaints MIL Response at 3.  UNM maintains that, with the complaints made in 2006, "it was certainly reasonable for UNM to have concerns that lack of professionalism was Plaintiff's standard behavioral pattern."  Complaints MIL Response at 5.

UNM further notes that its concerns with returning Dr. Rivero to full-time employment also stemmed from his lack of "contrition for his earlier unprofessional behavior."  Complaints

MIL Response at 4 (citing UNM's MSJ ¶ 31, at 7).  UNM believes that Dr. Rivero's deposition

validated this concern, when Dr. Rivero dismissed a vulgar outburst in the operating room "as

locker room talk" and "trivialized his refusal to be treated for MRSA."  Complaints MIL

Response at 4 (citing Rivero Depo. 143 at 35:10-18; id. at 26:13-28:25).  UNM argues that Dr.

Rivero's "very recent deposition testimony regarding these older incidents makes it more

probable that Plaintiff was not truly contrite regarding his earlier lack of professionalism," and,

thus, these incidents are "highly relevant to UNM's case."  Complaints MIL Response at 4.

UNM posits that, because accreditation services for hospitals and hospitals in general recently

started taking professionalism issues more seriously, the actions it took after JCAHO's Sentinel

Alert in 2008 should "be viewed in light of ch[an]ges in attitude regarding professionalism."

Complaints MIL Response at 5.  According to UNM, this change in attitude means "it would

make sense for UNM to revisit Plaintiff's history when he was trying to return to full-time

employment," making the older complaints relevant.  Complaints MIL Response at 5.

Accordingly, UNM argues that "the probative value of the older complaints . . . is not

substantially outweighed by any danger of unfair prejudice."  Complaints MIL Response at 5.

UNM underscores that, for the Court to exclude the older complaints, the danger of unfair

prejudice "must *substantially* outweigh the" probative value of the evidence.  Complaints MIL

Response at 6 (emphasis in Complaints MIL Response).  UNM also notes the Court's conclusion

that exclusion "is an extraordinary remedy and should be used sparingly," such as where "the

evidence . . . [has] an undue tendency to suggest decision on an improper basis, commonly,

though not necessarily, an emotional one." Complaints MIL Response at 6 (internal quotation marks omitted)(quoting SEC v. Goldstone, 233 F. Supp. 3d 1149, 1166 (D.N.M. 2017)(Browning, J.)). UNM contends that this standard is not met here, and that Dr. Rivero's "pattern of unprofessional behavior is to be considered as a whole," meaning that "any evidence that exemplifies this behavioral pattern, even if it is fairly old evidence, suggests decision on a proper basis." Complaints MIL Response at 6. Finally, UNM asserts that all the complaints Dr. Rivero seeks to exclude are relevant to his unprofessionalism in his practice of medicine and to his lack of contrition. See Complaints MIL Response at 6-7. According to UNM, for the evidence to mislead the jury or confuse the issues, it would have to be tangentially related to the facts at issue, which UNM asserts is not the case here. See Complaints MIL Response at 7 (citing SEC v. Goldstone, 233 F. Supp. 3d at 1168). UNM thus requests that the Court not exclude the older complaints. See Complaints MIL Response at 7.

### 11.    The Complaints MIL Reply.

Dr. Rivero replied. See Reply in Support of Motion in Limine to Exclude Complaints Against Plaintiff Prior to 2006 at 1, filed February 7, 2018 (Doc. 174)("Complaints MIL Reply"). Dr. Rivero asserts that the Complaints MIL Response "fails to provide any persuasive reason why complaints dating back to 1993 against Dr. Rivero should not be excluded as evidence at trial." Complaints MIL Reply at 1. According to Dr. Rivero, the Complaints Email provides a list of complaints which Dr. Bailey did not investigate and which are unsubstantiated, thus never finding him at fault, tempering any of "UNM's so-called 'genuine concern' about the

complaints." Complaints MIL Reply at 2 (quoting Complaints MIL Response at 3). Dr. Rivero asserts that the complaints from 2003 are "dubious" and, "as unsubstantiated complaints, are themselves prejudicial." Complaints MIL Reply at 2. Dr. Rivero argues that the probative values of the complaints dating to 1993 "is questionable, especially in light of the admitted 'mov[ing] beyond these early difficulties.'" Complaints MIL Reply at 2 (quoting UNM's MSJ ¶ 6, at 4). Dr. Rivero states that "UNM must pick a position: either Dr. Rivero's conduct improved or it did not," and that his conduct as a physician did not include only complaints, but promotions "with glowing recommendations from colleagues." Complaints MIL Reply at 2 (citing Rivero's MSJ ¶ 2, at 2).

According to Dr. Rivero, because UNM states that Dr Rivero's conduct improved, it is judicially estopped from asserting the opposite, and, therefore, "at the very least, any and all complaints prior to 2003 are precluded from introduction." Complaints MIL Reply at 3. Further, Dr. Rivero posits that, because his "promotion to full professor in 2005 was unencumbered by any complaints, and Dr. Rivero was never [a] recipient of any discipline at any time, the uninvestigated and unsubstantiated complaints prior to 2006 should be excluded." Complaints MIL Reply at 3. Dr. Rivero asserts that these complaints have a "frail probative value" and "will serve to merely prejudice the jury against Dr. Rivero." Complaints MIL Reply at 3. Dr. Rivero contends that UNM is preposterous in asserting that he tried to behave until his position was more secure and notes that there is no evidence supporting this assertion. See Complaints MIL Reply at 3. Dr. Rivero posits that this assertion is "aimed at merely painting

Dr. Rivero in a negative light as a habitual, deceitful, career-long problem, and to prejudice the jury against him." Complaints MIL Reply at 4. Dr. Rivero argues that it is more likely that he was never unprofessional and that UNM is exaggerating to defend its psychiatric evaluation requirement. See Complaints MIL Reply at 3. Finally, Dr. Rivero notes that UNM referenced no policy when it imposed the Addendum, so its argument regarding professionalism polices is merely "lip service." Complaints MIL Reply at 4 (citing Schenck Depo. 191 at 175:11-24).

12.    **The Psychological MIL.**

Dr. Rivero filed the Psychological MIL on December 8, 2017. See Psychological MIL at 1. Dr. Rivero requests that the Court prohibit UNM from using the term "psychological" instead of the term "psychiatric" at trial to describe the Addendum's medical examination requirement, because he anticipates that UNM will attempt to use the term "psychological," which "is misleading and falsely attempts to mollify the harsh and overreaching attempt by UNM[] to force an invasive medical examination on Dr. Rivero as a condition of increased full-time equivalent ('FTE') in employment." Psychological MIL at 1. Dr. Rivero posits that, central to the conditions of his return to a 0.75 FTE or higher employment with UNM is the Addendum's "four-part 'psychiatric evaluation'" requirement. Psychological MIL at 2 (quoting Addendum ¶ 2, at 2). Dr. Rivero asserts that, in repeatedly referring to this requirement as a "psychological examination," UNM is "attempt[ing] to redefine that type of examination that [it] sought to impose on Dr. Rivero." Psychological MIL at 2 (citing Joint Status Report at 7-8). Dr. Rivero

notes that the Addendum uses the word "psychiatric" fifteen times in paragraph 2, but never uses the word "psychological." Psychological MIL at 4.

Dr. Rivero argues that, with respect to the Addendum's requirement, "a 'psychiatric' evaluation can only be performed by a duly licensed medical doctor (M.D.) or doctor of osteopathy (D.O.) specializing in the field of psychiatry with the corresponding ability [to] prescribe drugs and other psychiatric interventions." Psychological MIL at 4. According to Dr. Rivero, "[a] 'psychological' evaluation, on the other hand, may be performed by individuals without the extent of medical training and experience of duly licensed M.D.s or D.O.s." Psychological MIL at 4. Dr. Rivero contends that "the term 'psychiatric' has a more serious connotation," because "[i]t implies a heightened level of urgency and severity, one that gives rise to an implication (and rightly so) of medical intervention." Psychological MIL at 4. Dr. Rivero asserts that the term "'psychological,' however, implies a softer and less severe approach." Psychological MIL at 4-5. As UNM is a hospital, Dr. Rivero argues that the difference in terms "would not be lost on the Addendum's drafters, and Defendant has no defense of an honest mistake." Psychological MIL at 5. Dr. Rivero requests that the Court preclude use of the word "psychological" in reference to the Addendum's requirements, as he asserts that to allow UNM to use this word would "confuse and mislead [the jury] into believing that words do not actually say what they say." Psychological MIL at 5.

13.    **The Psychological MIL Response.**

UNM responded on January 12, 2018.  See Defendant University of New Mexico Board of Regents' Response Brief in Opposition to Plaintiff's Motion in Limine to Prohibit and Exclude Use of the Term "Psychological" in Reference to "Psychiatric" Evaluations at 1, filed January 12, 2018 (Doc. 157)("Psychological MIL Response").  UNM asserts that its use of the term "psychological" to refer to the evaluation requirement at trial is appropriate, because "the connotation of the term 'psychological' is more relevant to UNM's defense, that Plaintiff was not regarded as disabled, and is a more accurate description of UNM's intentions when it required Plaintiff to submit to the evaluations at issue as a condition of increased hours of employment."  Psychological MIL Response at 1-2.  Further, UNM argues that "psychiatry and psychology are, in actuality, very similar," with the main difference being that psychiatrists can prescribe drugs.  Psychological MIL Response at 2.  UNM also notes an internet source which states that, while psychiatrists are members of a medical specialty, they "have more in common with clinical psychologists than with other physicians."  Psychological MIL Response at 2 (internal quotation marks omitted)(quoting Clinical Psychology, Encyclopedia.com at 1 (dated 2008), filed January 12, 2018 (Doc. 157-1)).  UNM contends that the Addendum does not "indicate[] that UNM believed that Plaintiff needed drugs."  Psychological MIL Response at 2-3. UNM argues that it "can be forgiven for using imprecise language in the Addendum," because the two professions are similar with almost interchangeable terminology, and "well settled precedent stat[es] that 'the use (or misuse) of mental health terminology' generally does not

establish that the employer in question believed that the employee suffered from an impairment." Psychological MIL Response at 3 (quoting Lanman v. Johnson Cty., 393 F.3d at 1157).

UNM then argues that, while the meanings of the terms "psychology" and "psychiatric" are similar, "the connotations are different enough that UNM should be allowed to use the term 'psychological' rather than 'psychiatric.'" Psychological MIL Response at 3. UNM posits that the connotation around "psychological" is more natural, while "psychiatric" implies a severe mental impairment. Psychological MIL Response at 3. UNM states that, because it wants to show it did not regard Dr. Rivero as being impaired and merely wanted to correct his unprofessional behavior, using "psychological" to describe the evaluation requirement is relevant to UNM's defense to the constructive discharge claim. See Psychological MIL Response at 3.

Finally, UNM contends that "the probative value of the use of the term 'psychological' is not substantially outweighed by any danger of unfair prejudice." Psychological MIL Response at 3. UNM notes the Court's decision in SEC v. Goldstone that evidence is unfairly prejudicial where it tends "to suggest decision on an improper basis." Psychological MIL Response at 4 (quoting SEC v. Goldstone, 233 F. Supp. 3d at 1166). UNM contends that "the term 'psychiatric' . . . is more likely to trigger an emotional response among fact-finders" than the term "psychological," so UNM's use of "psychological" "should not be excluded on the grounds of prejudice." Psychological MIL Response at 4.

14.     **The Psychological MIL Reply.**

Dr. Rivero replies.  See Reply in Support of Motion in Limine to Prohibit and Exclude Use of the Term "Psychological" in Reference to "Psychiatric" Evaluations at 1, filed February 7, 2018 (Doc. 173)("Psychological MIL Reply").  Dr. Rivero first posits that the Psychological MIL Response "provides no genuine, persuasive reason to permit [UNM] to use the term 'psychological' in reference to the illegal medical evaluations" and actually "support[s] Dr. Rivero's motion to exclude its use as unfairly prejudicial."  Psychological MIL Reply at 1. Dr. Rivero asks the Court to find as an admission UNM's request to use the term "psychological" rather than "psychiatric," because the term "'psychiatric' implies a 'severe mental impairment.'"  Psychological MIL Reply at 2 (quoting Psychological MIL Response at 3).  See id. at 2 n.1 (contending that "[t]his knowing implication indicates the overbreadth and illegality of the Addendum").  Dr. Rivero asserts that any prejudice to UNM by using the term "psychiatric" is "wrought by its own words," because "[t]he Addendum says what it says -- 'psychiatric evaluations' -- and Defendant should not be able to introduce a softer term merely because it regrets how it drafted the document."  Psychological MIL Reply at 2 (quoting Addendum ¶ 2, at 2).  Dr. Rivero asserts that UNM is attempting to mitigate the emotions from "the implication of the word that UNM chose to employ."  Psychological MIL Reply at 3.

Dr. Rivero notes that UNM only brought up the impreciseness of the Addendum's language in its Psychological MIL Response.  See Psychological MIL Reply at 4.  According to Dr. Rivero, this argument is "meritless given UNM's position as a singularly sophisticated

institution."  Psychological MIL Reply at 3.  Further, Dr. Rivero notes the Addendum's signatures, ostensibly showing that a team of licensed attorneys, physicians, and medical professionals drafted the Addendum.  See Psychological MIL Reply at 4 (citing Addendum at 6).  Accordingly, Dr. Rivero asserts that Lanman v. Johnson County is distinguishable, because the misuse of language there "was the informal bandying of dubiously good-natured jibes" and "not the formalized contractual language" here.  Psychological MIL Reply at 4 (citing Lanman v. Johnson Cty., 393 F.3d at 1157).

As to UNM's assertion that the term "psychological" is useful to its defense, Dr. Rivero asserts that UNM is, in effect, "ask[ing] the Court to permit it to create facts out of thin air to suit its defense and to evade the liability that comes with the facts that actually do exist."  Psychological MIL Reply at 4 (emphasis in Psychological MIL Reply).  Dr. Rivero discards UNM's assertion that psychiatry and psychology are similar medically, because UNM bases this assertion on "a general online reference."  Psychological MIL Reply at 4.  Dr. Rivero posits that UNM makes this assertion to excuse the Addendum's sloppy language, but that "a review of the Addendum on its face betrays the rigor, severity, and precision with which its language was chosen." Psychological MIL Reply at 5.  See id. at 4.  Finally, Dr. Rivero argues that he "will be unfairly prejudiced by UNM's use of the term 'psychological' because it is not a word that is present anywhere on the Addendum and unduly mitigates the actual severity of the face of the Addendum and the intent of UNM to impose an illegal medical inquiry upon him."  Psychological MIL Reply at 5.

15.     **The Second Disclosure Letter.**

On June 22, 2018, the Court sent another disclosure letter to the parties.[96]  See Letter from the Court to Eric D. Norvell, Alfred A. Park, and Lawrence M. Marcus (dated June 22, 2018), filed June 22, 2018 (Doc. 200)("Second Disclosure Letter").  The Second Disclosure Letter's body states in full:

> I want to bring one matter to your attention.  I have, with my law clerks, reviewed the Judicial Code of Conduct and do not believe this matter requires me to recuse myself.  I want everyone, however, to be fully informed about and comfortable with my participation in the case.
>
> Last fall, and in several prior years, I have co-taught a 2-unit course on religious liberty at the University of New Mexico School of Law.  I think this is the fifth time I have taught the class.  I have waived pay on three occasions. I am uncertain how the University of New Mexico School of Law has treated that waiver, but it may have considered it a donation to the school or the UNM Foundation.  The last two times I taught the class, I have asked the University of New Mexico School of Law to use the money to pay a law student to help me with a law review article that I am writing, and it has complied with that request.  In light of my role in teaching this class at the University of New Mexico School of Law, I believe I can remain fair and impartial to all parties in this case.
>
> I have also known different University of New Mexico Regents over the years.  As to people who have served as Regents since this case was filed on November 1, 2017, to the present, I know Robert M. Doughty III, President.  He is a lawyer, and a few years ago (before this case was filed), he and his wife attended a dinner party at our home.  I have not been in his home, and I do not otherwise socialize with him. It has been a while since I saw him.  I do not have a

---

[96]As the Court proposed to hear argument on the dispositive motions on June 26, 2018, see Amended Notice of Hearing, filed May 10, 2018 (Doc. 199), the Court asked its staff if it had sent a disclosure letter in this case, and the staff did not see on the docket that the Court had sent a disclosure letter.  The Court then prepared a letter and sent it.  That the Court forgot the first letter and did not see it on the docket explains the duplicative, second letter, and why the two letters are similar but not exactly the same.

substantially different relationship with him than I do with other members of the bar. I think I can remain fair and impartial to all parties.

Garrett Adcock is a student at the University of New Mexico School of Law. He previously externed for me.[97] I have not seen him recently. He invited me by mail to his graduation, which I attended, but I was planning to go anyway. I do not believe I saw him or got to speak with him. Again, I believe that I can be fair and impartial to all parties.

I might have met Michael Brasher at a lunch before I became judge; I became a judge in 2003. I do not otherwise socialize with Mr. Brasher. Again, I believe that I can be fair and impartial to all parties.

If regents before November 1, 2017, are relevant to this issue, I would be glad to make disclosures regarding them. I believe, however, that I can remain fair and impartial to all parties.

I believe that I can be fair and impartial. I see no reason to recuse myself. If, however, anyone has any questions or concerns, call my Courtroom Deputy Clerk, Carol Bevel (505-348-2289) and we can have a telephonic hearing. I have instructed Ms. Bevel not to tell me who calls.

Second Disclosure Letter at 1-2.

Nobody called Ms. Bevel about the Second Disclosure Letter. Further, Ms. Bevel made courtesy calls to counsel for both parties on June 25, 2018, to ensure they had received the Second Disclosure Letter and to ask if they had any objections. Neither party raised any objections. Ms. Bevel recalls talking to Dr. Rivero's counsel, who informed her that he had talked to his client and that Dr. Rivero did not have any objection to the Court's presiding over the case.

---

[97]Mr. Adcock externed for the Court in the summer of 2017.

16.     **The June 26 Hearing.**

On June 26, 2018, the Court held a hearing on UNM's MSJ, Rivero's MSJ, the Complaints MIL, and the Psychological MIL.  See Clerk's Minutes at 1, filed June 26, 2018 (Doc. 201)("Clerk's Minutes").  The parties also discussed pretrial conference and trial settings.  See Transcript of Motion Proceedings at 76:15-16 (Court)(taken June 26, 2018), filed July 17, 2018 (Doc. 202)("June 26 Tr.").  This was the first time the parties appeared before the Court.  See June 26 Tr. at 77:11-13 (Court).

a.     **Broad Argument Regarding UNM's MSJ.**

The hearing began with argument on UNM's MSJ.  See June 26 Tr. at 3:1-2 (Court).  UNM admitted that Dr. Rivero is "a technically proficient surgeon, but [noted that] he had . . . some serious issues with his professionalism and his interaction with patients, nurses, and other members of the medical staff."  June 26 Tr. at 3:12-16 (Marcus).  UNM contended that Dr. Rivero moved to Oklahoma and maintained a 0.05 FTE at UNM when these professionalism issues became more severe.  See June 26 Tr. at 3:17-24 (Marcus).  UNM stated that, when Dr. Rivero wanted to return to full-time employment with UNM, his "professionalism became a much bigger problem" and caused "many members of the UNM medical staff to have serious reservations about allowing him to come back full-time."  June 26 Tr. at 4:2-3, 8-10 (Marcus).  UNM said that Dr. Schenck and Dr. Rivero reached a compromise to address the professionalism issues and allow Dr. Rivero to return full time -- Dr. Rivero would attend four counseling sessions, and so Dr. Rivero contacted a UNM psychiatrist.  See June 26 Tr. at 4:13-23 (Marcus).

UNM argued that the Addendum memorializes this compromise, see June 26 Tr. at 4:23-25 (Marcus), but that Dr. Rivero refused to sign the Addendum, because he believed its psychiatric evaluation requirement was an illegal medical inquiry, see June 26 Tr. at 5:3-4 (Marcus). UNM contended that, to prove this illegality, Dr. Rivero attempted to get his records while still working at UNM for three years and then, only after receiving all his records, did Dr. Rivero quit and claim constructive discharge, "despite the fact that he had been working at UNM for three years with no problems." June 26 Tr. at 5:13-14 (Marcus). See id. at 5:6-14 (Marcus).

UNM then turned to the deficiencies in Dr. Rivero's lawsuit, first arguing that his claim for an illegal medical inquiry "is barred by the statute of limitations[,] because he received the [A]ddendum . . . in 2011, and [he] did not bring the litigation until 2016." June 26 Tr. at 6:8-9, 11-12 (Marcus). Further, UNM asserted that the medical inquiry "was job related and consistent with business necessity," because it "was an attempt to have plaintiff resolve his issues with professionalism," and therefore not illegal. June 26 Tr. at 6:15-19 (Marcus). As to Dr. Rivero's claim of constructive discharge, UNM maintained that it never regarded Dr. Rivero as disabled, which is "a prerequisite for any claim for constructive discharge under the Rehabilitation Act." June 26 Tr. at 6:22-24 (Marcus). See id. at 6:20-22 (Marcus). UNM also argued that Dr. Rivero "was never constructively discharged," because "there was no harassment of any sort," "[h]is work continued to be valued," and "no one ever gave him any problems." June 26 Tr. at 7:5-10 (Marcus). UNM thus asserted that his working conditions were not so intolerable that he could not bear to attend work anymore. See June 26 Tr. at 7:10-14 (Marcus).

In response, Dr. Rivero contended that "his relationships with colleagues and his work was unparalleled as a physician," that he was "one of the best [orthopaedic surgeons] in the southwest," and so clearly he was not "a problem physician" as UNM contends. June 26 Tr. at 8:3, 6-10 (Norvell).[98] Dr. Rivero asserted that he presented the Court reliable evidence "that he was not, in fact, suffering from professionalism issues." June 26 Tr. at 8:13-15 (Norvell). Dr. Rivero maintained that his agreement with Dr. Schenck to attend four counseling sessions "was starkly different from" the Addendum, which required psychiatric evaluations. June 26 Tr. at 8:25-9:1 (Norvell). See id. at 8:19-9:2 (Norvell). Dr. Rivero noted UNM's contention in the Psychological MIL Response that the term "psychiatric" "indicate[s] a severe mental impairment." June 26 Tr. at 9:4 (Norvell). See id. at 9:1-4 (Norvell). Dr. Rivero asserted that the Addendum shocked him, because "it was so broad and so invasive and without any limitation," June 26 Tr. at 9:14 (Norvell), and because "[i]t was not tailored toward any aspect of counseling that the parties had agreed upon . . . to improve patient interactions," June 26 Tr. at 9:7-9 (Norvell). See id. at 9:5-19 (Norvell). Dr. Rivero maintained that he sought to review his credentialing file to determine the basis for the Addendum's onerous requirements. See June 26 Tr. at 9:20-24 (Norvell). Dr. Rivero asserted that, as a result, UNM precluded his efforts to review his file, Dr. Schenck withdrew the Addendum, and Dr. Rivero had to file an action in state court to access his file. See June 26 Tr. at 9:25-10:8 (Norvell). Dr. Rivero argued that,

---

[98] The June 26 Tr. erroneously labels the speaker of this portion of the transcript, specifically 7:25-13:16, as Lawrence Marcus, UNM's counsel. It is clear from the context that the true speaker is Eric Norvell, Dr. Rivero's counsel, because the argument is for Dr. Rivero's side rather than for UNM's.

when Dr. Trotter and Dr. Bailey certified that all documents had been produced, Dr. Rivero realized that UNM had no basis for the Addendum's requirement and his claim for the illegal medical inquiry accrued. See June 26 Tr. at 10:9-17 (Norvell). Dr. Rivero stated that "[h]e left UNM in January, never returned, and tendered his formal resignation, constructive discharge in May of 2014." June 26 Tr. at 18-20 (Norvell). Dr. Rivero asserted that "[n]othing has changed" since Magistrate Judge Lynch determined that his claims were timely filed, so law of the case requires that Magistrate Judge Lynch's holding stand. June 26 Tr. at 11:1 (Norvell). See id. at 10:22-11:7 (Norvell).

Dr. Rivero argued that "there is a question of fact as to" whether UNM regarded him as disabled, and that the Addendum's overbreadth precludes the examination from being a proper "fitness for duty" examination. June 26 Tr. at 11:17, 22-23 (Norvell). See id. at 11:16-24 (Norvell). Further, Dr. Rivero noted Dr. Schenck's statements "that stress was a consideration" and "that Dr. Rivero's reaction to stress was a disabling condition that would make it more difficult for him to succeed in returning to UNM." June 26 Tr. at 7-11 (Norvell). As to unbearable working conditions, Dr. Rivero maintained that they began with a dispute with Dr. Pitcher in 2003 and continued, because of "administrative vendettas" and Dr. Schenck's flip-flopping in advocating for Dr. Rivero. June 26 Tr. at 13:4-5 (Norvell). See id. at 12:23-13:8 (Norvell). Dr. Rivero stated that UNM's withholding of his file and "frivolous defenses submitted in litigation" also added to the unbearable working conditions. June 26 Tr. at 13:10 (Norvell). See id. at 13:9-14 (Norvell). Dr. Rivero asserted that the facts regarding his

professionalism issues are in dispute and not clear, because UNM provides unsubstantiated, uninvestigated complaints to support the Addendum's requirements. See June 26 Tr. at 17:5-18 (Norvell). Dr. Rivero also noted that "there is really no clarity as to what professionalism means." June 26 Tr. at 18:19-20 (Norvell). Dr. Rivero argued that "there are questions of fact as to whether UNM regarded Dr. Rivero as disabled," facts which the jury should determine. June 26 Tr. at 18:3-4 (Norvell). See id. at 18:2-18 (Norvell). Dr. Rivero maintained that "UNM can present no evidence that [it] ever did, in fact, find any deterioration of his essential job duties," and that "it's a question of fact whether the professionalism claim constitutes an essential job function." June 26 Tr. at 19:4-6, 7-9 (Norvell). Dr. Rivero argued that "the facts of the extent of the overbreadth of the [A]ddendum is something that is certainly preserved for trial, because . . . of the legal requirement that it be more narrow to befit the particulars of an approach to . . . improve professionalism." June 26 Tr. at 19:11-19 (Norvell). As to the "issue of fact that precludes the Court from deciding the legal issues that are in" UNM's MSJ, June 26 Tr. at 20:8-9 (Court), Dr. Rivero responded that UNM took complaints "at face value," June 26 Tr. at 21:3 (Norvell), so "how can there be a truly sensible determination of unprofessional action, if all the complaints that were made were unsubstantiated?" June 26 Tr. at 21:5-8 (Norvell).

b. **Argument Regarding the Illegal-Medical-Inquiry Claim.**

UNM then underscored its statute-of-limitations argument for the alleged illegal medical inquiry, noting that Dr. Rivero received the Addendum in March, 2011, and that Dr. Rivero "testified at his deposition that at about that time he believed very strongly that his rights were

violated." June 26 Tr. at 22:4-6 (Marcus).  See id. at 21:25-22:6 (Marcus).  UNM argued that, at

that time, Dr. Rivero "had a complete and present cause of action," June 26 Tr. at 22:7-8

(Marcus), because "[h]e had everything needed to file the complaint regarding the allegedly

medical inquiry," June 26 Tr. at 22:10-12 (Marcus).  Yet, UNM stated, Dr. Rivero "did not file

the complaint for the illegal medical inquiry until 2016, . . . more than five years after he

received the [A]ddendum."  June 26 Tr. at 22:13-16 (Marcus).  UNM maintained that Baker v.

Board of Regents of the State of Kansas and other cases make clear that "the cause of action

accrues when the action takes place."  June 26 Tr. at 22:18-19 (Marcus).  See id. at 22:16-19

(Marcus).  UNM asserted that, contrary to Magistrate Judge Lynch's ruling, Dr. Rivero did not

need his entire credentialing file for the cause of action to accrue.  See June 26 Tr. at 23:15-18

(Marcus).  UNM posited that Magistrate Judge Lynch made an error in holding that Dr. Rivero

did not have a complete and present cause of action until he received his full employment file,

and that this error should be fixed.  See June 26 Tr. at 24:16-25 (Marcus).  UNM maintained that

the Court can revisit Magistrate Judge Lynch's decision, and that Dr. Rivero "has misinterpreted

the Law of the Case Doctrine."  June 26 Tr. at 23:25 (Marcus).  See id. at 23:19-23 (Marcus).

In response, Dr. Rivero argued that Magistrate Judge Lynch considered the statute-of-

limitation arguments which UNM makes in the MTD Order, that discovery produced no new

facts to change Magistrate Judge Lynch's decision, and that Green v. Brennan clearly supports

this decision.  See June 26 Tr. at 25:25-26:14 (Norvell).  According to Dr. Rivero, the facts have

not changed, because discovery has confirmed what Magistrate Judge Lynch assumed as true.

See June 26 Tr. at 26:24-27:2 (Norvell). Dr. Rivero argued that, as Magistrate Judge Lynch determined, "Dr. Rivero did not have a complete picture of the reason for the [A]ddendum" until UNM certified that it produced his entire record, June 26 Tr. at 27:2-4 (Norvell), and although he "may have believed there was a cause of action [earlier], he did not know," June 26 Tr. at 27:10-11 (Norvell). See June 26 Tr. at 27:2-13 (Norvell). The Court questioned why the trigger for the statute of limitations did not occur much earlier when the harm occurred with the Addendum's presentment. See June 26 Tr. at 27:14-25 (Court). Dr. Rivero responded that the credentialing file which he sought would contain the basis for the Addendum and that, when he sought it, UNM refused access and precluded him from determining this basis. See June 26 Tr. at 28:1-18 (Norvell). Dr. Rivero contended that these documents confirmed a factual basis "that there was no underlying rationale behind presenting the psychiatric examination." June 26 Tr. at 29:1-3 (Norvell). See id. at 28:19-29:3 (Norvell).

UNM responded that Dr. Rivero "could have filed suit back in 2011, or early 2012 . . . [a]nd then he could have engaged in discovery to get his file." June 26 Tr. at 30:3-5 (Marcus). UNM asserted that plaintiffs file suits "upon information and belief" "all the time." June 26 Tr. at 30:24, 31:1 (Marcus). UNM maintained that all Dr. Rivero needed to bring suit was the belief "that his rights were violated" and noted that he had such a belief when he received the Addendum. June 26 Tr. at 31:12-13 (Marcus). See id. at 31:9-14 (Marcus). UNM asserted that it did nothing to prevent Dr. Rivero "from bringing the litigation within the three year statute of limitation[, a]nd, therefore, there is no tolling." June 26 Tr. at 31:15-17 (Marcus).

As to the merits of Dr. Rivero's illegal medical inquiry claim, UNM argued that "the medical inquiry was clearly job related and consistent with business necessity," and, therefore, legal. June 26 Tr. at 32:22-23 (Marcus). See id. at 32:18-23 (Marcus). UNM asserted that Lanman v. Johnson County stands for the proposition that "singling out a person for a psychiatric evaluation does not necessarily mean that the employer deems the person or regards the person as disabled," June 26 Tr. at 34:11-14 (Marcus), and allows employers to determine the cause of an employee's troubling behavior, especially where the employee cares for others, see June 26 Tr. at 35:1-5. UNM posited that physicians are "responsible for the care and safety of others," so an employer may single out a physician whose behavior is troubling without it meaning the physician suffers from a psychiatric disorder. June 26 Tr. at 35:6-7 (Marcus). See id. at 35:5-12 (Marcus). UNM noted that all the complaints filed against Dr. Rivero, although there may not be proof for each complaint, in the aggregate paints a "troubling picture." June 26 Tr. at 35:25 (Marcus). See id. at 35:15-36:20 (Marcus). UNM asserted that "a patient did come away from [an] interaction with Dr. Rivero thinking that he was being compared with a monkey. Whether that was Dr. Rivero's intention or not," June 26 Tr. at 36:21-24 (Marcus), that statement shows Dr. Rivero "really needs to work on his skills with interacting with his patients," June 26 Tr. at 37:2-3 (Marcus). Further, UNM maintained that, "in more recent years, medical accreditation organizations have added a renewed focus on professionalism." June 26 Tr. at 37:11-13 (Marcus). Accordingly, UNM asserted that the Addendum's requirement "was clearly job related, consistent with business necessity, consistent with UNM's continued accreditation,

frankly," because UNM "couldn't bring [Dr. Rivero] back if he continued to act" unprofessionally. June 26 Tr. at 38:1-5 (Marcus).

Dr. Rivero responded that the evidence does not support UNM's assertion that Dr. Rivero's professionalism issues warranted the imposition of four psychiatric evaluations, because the complaints were unsubstantiated or because Dr. Rivero was not found at fault. See June 26 Tr. at 38:11-39:13 (Norvell). As to his interactions with Barela, Dr. Rivero argued that "[h]e had to defend his reputation and his position," because there was no physician advocate to do so. June 26 Tr. at 39:17-18 (Norvell). See id. at 39:14-18 (Norvell). Also, as to the patient who believed Dr. Rivero likened him to a monkey, Dr. Rivero contended that "a resident on duty signed a letter that said there was no unprofessionalism on Dr. Rivero's part." June 26 Tr. at 40:8-10 (Norvell). Dr. Rivero further argued that, for the examination requirement to be proper, "there has to be a particularized approach, we call it possibly narrowly tailored approach, and a showing that Dr. Rivero was unable to perform his essential job functions." June 26 Tr. at 39:21-24 (Norvell). Dr. Rivero asserted that UNM has made no showing that he was unable to perform essential job functions or that UNM's accreditation with JCAHO was jeopardized. See June 26 Tr. at 39:24-40:2 (Norvell). Accordingly, Dr. Rivero argued that the Addendum is "oppressive" and "not designed to address the so-called issues of professionalism that UNM is here stating that it is meant to." June 26 Tr. at 40:19-22 (Norvell). Dr. Rivero maintained that he never presented a violent threat, and operated without complaint both in Oklahoma and at UNM from 2006 until 2014, so there is no basis to single out him with the illegal, oppressive

Addendum requirements.  See June 26 Tr. at 41:4-19 (Norvell).  Dr. Rivero asked the Court where the line is with respect to mental examinations, because it is not good policy to allow "any sort of mental examination, no matter how invasive or onerous, to force employees to submit to whatever employment practices they have."  June 26 Tr. at 42:8-11 (Norvell).  See id. at 42:4-12 (Norvell).

The Court questioned whether the Albuquerque Police Department ("APD") could require an officer, who received a number of citizen complaints, to undergo psychological testing four times a year without regarding that officer as disabled.  See June 26 Tr. at 42:17-43:4 (Court).  Dr. Rivero responded that officers, like physicians, interact with many people on a yearly basis, but underscored that "[i]t would behoove and be incumbent upon APD to investigate the veracity of those complaints before presuming that someone is necessarily ripe for some fitness for duty exam, much less some psychiatric examination."  June 26 Tr. at 43:14-18 (Norvell).  The Court clarified that, based on Dr. Rivero's response, "there is nothing wrong, per se, with picking out one police officer and somehow getting to the point of requiring that one police officer to be examined -- psychological examination three or four times a year."  June 26 Tr. at 44:9-13 (Court).  Dr. Rivero did not want to "agree with the term 'single one out,'" because, in his view, "there would have to be a real legal basis" for the requirement.  June 26 Tr. at 44:17-19 (Norvell).  The Court asked what the test would be, see June 26 Tr. at 44:21-23 (Court), and Dr. Rivero responded that he "believe[s] it would be a threat to the public, as police officers are servants of the public and interact with the public, and wield some level of real

authority and power," June 26 Tr. at 44:25-45:3 (Norvell), or a "showing that the essential job functions are not being met," June 26 Tr. at 45:10-11 (Norvell).  The Court then asked what the standard is for a physician, and for judging "whether a condition that's being imposed is job related and consistent with the job."  June 26 Tr. at 45:24-25 (Court).  See id. at 45:22-25 (Court).  Dr. Rivero stated that "[t]he standard is whether Dr. Rivero has shown indications of the inability to perform essential job functions or presents a direct threat," June 26 Tr. at 46:1-4 (Norvell), and asserted that UNM has not shown evidence of either problem, see June 26 Tr. at 46:11-15 (Norvell).

UNM provided the last word on the psychiatric examination requirement, arguing that it is clear that Dr. Rivero's "professionalism was an impediment to his performing part of his job duties . . . . [H]e was refusing to see patients in the general ortho clinic[, a]nd then he said he wasn't going to speak Spanish to them."  June 26 Tr. at 47:14-18 (Marcus).  UNM posited that Dr. Rivero is fluent in Spanish and that his refusal to speak the language is not good for UNM's standing with the United States Department of Health and Human Services' Office for Civil Rights when UNM is accused of not providing translators.  See June 26 Tr. at 47:19-23 (Marcus).  UNM asserted that the JCAHO put down its foot and did not want physicians to get away with being difficult any longer, so, to keep its accreditation, UNM had to do something with Dr. Rivero.  See June 26 Tr. at 47:24-48:11 (Marcus).  Regarding Dr. Rivero's interactions with Barela, UNM argued that Dr. Rivero "threatened Mr. Barela's livelihood" and "overreacted," because "[h]e gets one complaint from the general ortho clinic" and says he will

not talk to those patients anymore.  June 26 Tr. at 48:17-18, 21-22 (Marcus).  See id. at 48:17-25 (Marcus).   UNM contended that Dr. Rivero is an excellent surgeon, but underscored the importance of being able to professionally interact with patients and staff.  See June 26 Tr. at 49:2-15 (Marcus).  UNM maintained that the emails which Dr. Rivero sent Barela are undisputed and that, instead of trying to clear up the patients' complaints, Dr. Rivero blames the messenger.  See June 26 Tr. at 49:16-50:1 (Marcus).  UNM noted that, in Lanman v. Johnson County, the employee did not behave in a threatening manner, but merely acted "in a weird manner" and the employer required a fitness for duty exam.  June 26 Tr. at 50:7 (Marcus).  See id. at 50:2-13 (Marcus).  UNM also noted that, in Owusu-Ansah v. Coca-Cola Co., the employee "banged his hand on a table and said someone was going to pay," but he had no prior incidents showing a propensity for violence, and he had to complete a fitness for duty examination.  June 26 Tr. at 50:17-18 (Marcus).  See id. at 50:14-25 (Marcus).  UNM asserted that this case is worse than Lanman v. Johnson County or Owusu-Ansah v. Coca-Cola Co., because "you have a surgeon responsible for people's lives showing this type of difficulty with his interactions," June 26 Tr. at 51:1-3 (Marcus), who "has a whole history of making things difficult, of having problems with his professional interactions," June 26 Tr. at 51:14-16 (Marcus).  See June 26 Tr. at 51:1-16 (Marcus).  UNM conceded that it did not receive any complaints about Dr. Rivero after 2006, but noted that this absence is not surprising and is irrelevant, because, at that point, Dr. Rivero was working at UNM only one day a month, so he was "not really interacting much with conscious patients," but rather "performing surgery, . . . assisting other surgeons with the surgeries,

or . . . working on patients with whom [he] ha[d] a preexisting relationship."  June 26 Tr. at 51:25-52:4 (Marcus).  See id. at 51:17-52:8 (Marcus).  Finally, UNM posited that, if Dr. Rivero believed that he was acting professionally, it did not make sense that he agreed to four counseling sessions or contacted a psychiatrist to set up the sessions.  See June 26 Tr. at 52:9-13 (Marcus).

      **c.**      **Argument Regarding the Merits of the Constructive Discharge Claim.**

The parties then turned to the constructive discharge issue, with UNM arguing that this claim "is completely without merit."  June 26 Tr. at 52:19 (Marcus).  UNM asserted that the first prong of a constructive discharge claim requires "either a disability or a perception of disability," June 26 Tr. at 53:1 (Marcus), and that there is no evidence that Dr. Rivero has a disability, or "that UNM perceived him or regarded him as having a disability," June 26 Tr. at 53:4-5 (Marcus).  See id. at 52:25-53:5 (Marcus).  UNM noted that it renewed Dr. Rivero's privileges each year, "with a statement saying that he does not have a disability."  June 26 Tr. at 53:6-7 (Marcus).  UNM contended that its evaluation requirement does not imply that it regarded Dr. Rivero as disabled; rather, there must be "something corroborating to indicate that UNM perceived him to have a disability."  June 26 Tr. at 53:13-14 (Marcus).  See id. at 53:8-14 (Marcus).  Further, UNM argued that Dr. Schenck's compromise that Dr. Rivero did not need to be on call does not mean Dr. Schenck regarded him as disabled.  See June 26 Tr. at 53:15-21 (Marcus).  UNM posited that Dr. Schenck was trying to help Dr. Rivero, because they were friends, and Dr. Schenck was attempting to find a way to bring Dr. Rivero back full-time while

avoiding his professionalism issues. See June 26 Tr. at 54:8-17 (Marcus). UNM noted that Dr. Rivero cited his personality conflict with Dr. Pitcher as causing tension at work, which UNM argued "does not indicate constructive discharge." June 26 Tr. at 55:10-11 (citing Turnwall v. Tr. Co. of Am., 146 F. App'x 983 (10th Cir. 2005)(unpublished)). See id. at 55:1-12 (Marcus). Accordingly, UNM contended that Dr. Rivero fails "to produce sufficient evidence to survive summary judgment." June 26 Tr. at 55:18-19 (Marcus).

UNM argued that the second prong of constructive discharge requires an action that is "motivated by a perception of disability," and that, again, there is no evidence of such an action. June 26 Tr. at 55:22-23 (Marcus). UNM contended that the necessary motivation is lacking in the alleged personality conflict with Dr. Pitcher of which Dr. Rivero complains. See June 26 Tr. at 56:1-5 (Marcus). UNM argued that Dr. Rivero's working conditions were not so bad that "a reasonable person would not want to come in to work," so Dr. Rivero was not constructively discharged. June 26 Tr. at 56:10-11 (Marcus). See id. at 56:6-11 (Marcus). UNM also asserted that a constructive discharge claim cannot rest on one discriminatory act, that there must be other aggravating factors, and that Dr. Rivero asserts that there was only one discriminatory act -- the allegedly illegal medical inquiry. See June 26 Tr. at 56:12-25 (Marcus). UNM noted that, after the Addendum, Dr. Rivero worked as usual for three more years with nobody treating him inappropriately until he received all the documents in his credentialing file and, suddenly, in his subjective mind, he believed UNM had no reason for the Addendum, and he felt his working conditions deteriorated. See June 26 Tr. at 57:1-20 (Marcus).

Dr. Rivero responded that the law does not support UNM's contention that a single discriminatory act does not constitute constructive discharge. See June 26 Tr. at 58:14-24 (Norvell). Dr. Rivero contended that the Addendum is not the only act which created a hostile work environment, but that, in isolation, "it would give rise to a question as to whether that singular act was severe enough to give rise to -- regarded as [disabled] status for Dr. Rivero." June 26 Tr. at 59:5-7 (Norvell). See id. at 59:3-7 (Norvell). Dr. Rivero argued that, because UNM allows "that the term 'psychiatric' implies severe mental impairment," June 26 Tr. at 59:9-10 (Norvell), the Addendum's requirement of a psychiatric evaluation insinuates that UNM regarded Dr. Rivero as having a severe mental impairment, see June 26 Tr. at 59:11-12 (Norvell). Dr. Rivero asserted that the Addendum's language combined with Dr. Schenck's suggestion to reduce Dr. Rivero's time on call "because stress brought about some disabling factor," June 26 Tr. at 59:15-16 (Norvell), creates a question of fact for the jury to determine whether Dr. Schenck perceived Dr. Rivero as disabled because of his reaction to stress, see June 26 Tr. at 59:13-18 (Norvell). Dr. Rivero argued that these aspects combined with Dr. Rivero's conflict with Dr. Pitcher "underpinned an environment of hostility . . . and later gives ground to the perception of Dr. Rivero having potentially being regarded as disabled." June 26 Tr. at 60:2-3, 5-6 (Norvell). See id. at 59:24-60:6 (Norvell). Dr. Rivero maintained that his "dispute with Dr. Pitcher laid the groundwork" for "[t]he constructive discharge, the unbearable working conditions, . . . [and the] regarded as status of Dr. Rivero as being disabled." June 26 Tr. at 60:8-13 (Norvell). Dr. Rivero also argued that Dr. Schenck treatment of Dr. Rivero was a "flip-flop,"

because "[h]e went from being his friend to being manipulative, creating a very difficult environment where Dr. Rivero was unable to trust his own supervisor." June 26 Tr. at 60:16-29 (Norvell). Dr. Rivero also noted that, when he sought access to his credentialing file, Dr. Schenck "withdrew the [A]ddendum, because he felt as though that was an act of aggression, when it was a completely legal act." June 26 Tr. at 60:23-25 (Norvell). As to UNM's assertion that Dr. Rivero could have filed suit and received the documents, Dr. Rivero noted that he filed suit -- the mandamus action. See June 26 Tr. at 61:3-9 (Norvell). Dr. Rivero posited that, when he received all the documents and determined that UNM had no basis for the Addendum's requirements, he could not "continue to work in an environment like that, where the [A]ddendum -- when he's perceived as being -- possessing a severe mental impairment." June 26 Tr. at 61:15-18 (Norvell). See id. at 61:10-21 (Norvell).

UNM responded that Dr. Rivero's "alleged success in Oklahoma is irrelevant," because UNM "do[es] not know the details of his career in Oklahoma," so UNM is only "considering his behavior and what happened to him in New Mexico." June 26 Tr. at 62:4-8 (Marcus). UNM asserted that the mandamus action is also irrelevant, because the state court is dealing with how UNM handled the documents, and because Dr. Rivero provides no evidence that this handling was done to get Dr. Rivero to quit. See June 26 Tr. at 62:9-17 (Marcus). UNM argued that Dr. Rivero's counsel is twisting its words, because it stated that Dr. Rivero was not perceived as having a severe mental impairment. See June 26 Tr. at 62:18-22 (Marcus). Further, UNM asserted that there is no evidence that Dr. Schenck was manipulative, and posited that

- 118 -

Dr. Schenck revoked the Addendum only after Dr. Rivero "continued to refuse to sign it." June 26 Tr. at 64:4 (Marcus). See id. at 63:21-64:5 (Marcus). UNM noted that Dr. Rivero continued working at UNM for three years after it revoked the Addendum, more than a reasonable amount of time, so his constructive discharge claim should fail, because precedent counsels that there is no constructive discharge where the employee continued to work for three years after the last alleged act of discrimination. See June 26 Tr. at 64:5-21 (Marcus). UNM argued that a constructive discharge claim cannot wholly rest on one discriminatory act, so again Dr. Rivero's claim must fail, because he "is essentially basing his one claim of constructive discharge on this one act and his subjective interpretation of that act years after the fact, after he received the documents." June 26 Tr. at 65:4-7 (Marcus). See id. at 65:1-8 (Marcus). UNM conceded that Dr. Rivero stopped coming to work after receiving the documents, but he stayed on the payroll for four months afterward until he tendered his resignation. See June 26 Tr. at 65:9-12 (Marcus).

The Court asked whether, by singling out Dr. Rivero and requiring a psychiatric examination, and arguing that the examination is consistent with business necessity and that it is job related, UNM is, in some way, saying that Dr. Rivero is mentally disabled. See June 26 Tr. at 65:18-66:5 (Court). UNM conceded that the psychiatric evaluation requirement shows that it believed Dr. Rivero had a problem, but asserted that "there is a difference between a problem and a problem that limits or substantially limits a major life activity. And that's the standard for disabled." June 26 Tr. at 66:8-11 (Marcus). See id. at 66:6-11 (Marcus). The Court pressed back: "But isn't that a very fine line to draw, the university saying that this is -- this

psychological examination is job related, it's a business necessity, and yet say he's not disabled and it's not impacting or impairing life activities?"  June 26 Tr. at 66:12-16 (Court).  UNM stated that "[i]t may be a fairly thin line," June 26 Tr. at 66:18 (Marcus), but asserted that Dr. Rivero's issue with professionalism does not limit a major life activity, June 26 Tr. at 66:19-25 (Marcus).

Dr. Rivero responded that his colleagues' testimony disputes UNM's assertion that he acted unprofessionally, because the testimony provides that patients loved Dr. Rivero and continue to request his services.  See June 26 Tr. at 67:21-68:10 (Norvell).  Dr. Rivero noted that he has never been sued nor been reported to the Medical Board, and that it does not make sense that UNM allowed him to operate if it believed he needed a psychiatric evaluation.  See June 26 Tr. at 68:13-20 (Norvell).  Dr. Rivero contended that, because the complaints were never investigated, they do not have merit.  See June 26 Tr. at 68:21-23 (Norvell).  Dr. Rivero noted that, when these complaints supposedly increased immediately before he moved to Oklahoma and reduced his time at UNM to 0.05 FTE, Dr. Schenck and twenty-three of Dr. Rivero's colleagues did not want him to leave.  See June 26 Tr. at 68:23-69:8 (Norvell).  Dr. Rivero maintained that UNM knew how Dr. Rivero behaved in Oklahoma, because that hospital provided UNM with information regarding his status and credentials every two years, and nothing in those reports support UNM's assertion of unprofessionalism.  See June 26 Tr. at 69:9-15 (Norvell).  Finally, Dr. Rivero argued that, under Green v. Brennan, there is no longer a two-step process "where a case is filed on discrimination, and then amended to include constructive

discharge[;] when constructive discharge is filed the discrimination claim is incorporated[, which] plays into the statute of limitations argument." June 26 Tr. at 70:2-7 (Norvell).[99]

The Court asked how Rehabilitation Act claims differ from Title VII claims regarding constructive discharge, and Dr. Rivero responded that the standard is the same, but that Title VII requires exhaustion of administrative remedies. See June 26 Tr. at 70:8-22 (Court, Norvell). The Court questioned how the Addendum alone created an intolerable working environment, especially because Dr. Rivero continued to work. See June 26 Tr. at 71:2-10 (Court). Dr. Rivero contended that there were aggravating circumstances in addition to the Addendum: UNM administrators impeded Dr. Rivero's access to his credentialing file, UNM's continued obstruction through frivolous litigation, and Dr. Schenck accused Dr. Rivero of unprofessional behavior and stated that he believed that stress hindered Dr. Rivero's work. See June 26 Tr. at 71:11-72:2 (Norvell).

UNM briefly responded to Dr. Rivero's argument, contending that there were a number of unprofessional actions that concerned UNM and that it wanted to determine the cause before it allowed him to return to full-time employment. See June 26 Tr. at 72:10-73:10 (Marcus). UNM asserted that constructive discharge requires a work environment so intolerable that a reasonable person would resign and noted that Dr. Rivero's staying for three years after the Addendum's

_____

[99]The Court does not address this argument in the Analysis, because Green v. Brennan expressly states that "constructive discharge is a claim distinct from the underlying discriminatory act," 136 S. Ct. at 1779 (citing Pa. State Police v. Suders, 542 U.S. 129, 149 (2004)), and that "[t]he limitations-period analysis is always conducted claim by claim, 136 S. Ct. at 1782.

presentment strains his credibility.  See June 26 Tr. at 73:11-15 (Marcus).  It also appeared to UNM that Dr. Rivero is attempting to use his constructive discharge claim to get around the statute-of-limitations issue with his illegal medical inquiry claim.  See June 26 Tr. at 73:16-24 (Marcus).

The Court stated its inclination to rule on the legal issues that UNM's MSJ raises, because it believes that the factual issues are largely undisputed.  See June 26 Tr. at 74:3-13 (Court).  The Court also stated that it would review Magistrate Judge Lynch's decision, as it does not understand why the accrual date for the medical inquiry claim would be the production of Dr. Rivero's credentialing file.  See June 26 Tr. at 74:14-24 (Court).  The Court had no inclination on the merits of the medical inquiry claim, but did not believe that the events gave rise to a claim for constructive discharge.  See June 26 Tr. at 74:25-75:9 (Court).

### d.    Discussion on Scheduling.

The parties then turned to scheduling issues.  See June 26 Tr. at 76:15-16 (Court).  Dr. Rivero verified that discovery had ended, that there is no pretrial conference or trial setting, and that both parties had filed a pretrial order.  See June 26 Tr. at 76:8-12 (Norvell).  Dr. Rivero indicated that he would like to go to trial in December, and UNM stated that a trial at end of December would work with its schedule.  See June 26 Tr. at 79:8-16 (Norvell, Court, Marcus).  Both parties agreed that trial would last about five days.  See June 26 Tr. at 80:8-11 (Norvell, Marcus).  After consulting its calendar, the Court stated that it would set the trial for the week of December 3.  See June 26 Tr. at 80:12-14 (Court).  The Court then set the pretrial conference for

"8:30 on November 20." June 26 Tr. at 81:22 (Court). The Court noted that trial would start at

8:30 am, with the jury coming in at 9:00 am. See June 26 Tr. at 82:12-14 (Court).

### e. Argument Regarding the Complaints MIL.

The parties then turned to the Complaints MIL, with Dr. Rivero arguing that remote

complaints from 1992 would be unfairly prejudicial and not relevant to the jury. See June 26 Tr.

at 82:15-83:7 (Court, Norvell). Dr. Rivero asserted that UNM would use the older complaints to

"try to paint Dr. Rivero in a bad light, to cherry-pick and misrepresent Dr. Rivero's conduct long

before the material issues that are in front of the Court with respect to the motion for summary

judgment and the merits that are going to be discussed at trial." June 26 Tr. at 83:14-19

(Norvell). Dr. Rivero argued that, because UNM promoted him to full professor in 2005 with no

complaints, discipline, or suspension, any complaints before 2005 are immaterial. See June 26

Tr. at 83:20-24 (Norvell). Dr. Rivero contended that there is no basis for the complaints, and so

it is preposterous for UNM to believe that he acted professionally for ten years and then reverted

to misbehavior. See June 26 Tr. at 83:25-84:7 (Norvell). Accordingly, Dr. Rivero requested

"that the Court limit any timeframe in discussion of complaints with respect to Dr. Rivero." June

26 Tr. at 84:8-10 (Norvell).

UNM responded that the older complaints against Dr. Rivero "are highly relevant to this

case," because "there was a substantial increase in complaints regarding his lack of

professionalism as early as 2003." June 26 Tr. at 84:19-22 (Marcus). UNM thus contended that

the complaints after 2003 are certainly relevant as a pattern of Dr. Rivero's behavior and as

rationale for the Addendum.  See June 26 Tr. at 84:25-85:2 (Marcus).  UNM argued that the complaints from the 1990s are also relevant, because they help to understand Dr. Rivero's later behavior and show that the period of calm, without complaints, "was more of an anomaly."  June 26 Tr. at 85:9-10 (Marcus).  See id. at 85:3-11 (Marcus).  Accordingly, UNM asserted that the factfinder should consider these older complaints to determine if UNM appropriately required the Addendum for Dr. Rivero to return full time.  See June 26 Tr. at 85:12-19 (Marcus).  UNM noted that, when questioned about his issues in the 1990s -- including his refusal to be tested for MRSA and a ten-minute barrage of obscenities -- Dr. Rivero responded in a concerning manner by not having remorse, not admitting that he made any mistakes, and not acknowledging that he needed to improve his professionalism.  See June 26 Tr. at 85:20-86:24 (Marcus).

Dr. Rivero responded that there is no pattern of misbehavior because there is a decade with no incident.  See June 26 Tr. at 87:6-9 (Norvell).  As to the barrage-of-obscenities incident, Dr. Rivero admitted that he had a disagreement with a colleague and that they both swore at each other, but stated that they are now good friends.  See June 26 Tr. at 87:10-18 (Norvell).  Further, Dr. Rivero contended that his refusal to be tested for MRSA was justified, because he had no pattern of infection, so he did not need to be tested, and the individual administering the test barged in and interfered with his clinical rounds.  See June 26 Tr. at 87:19-88:2 (Norvell).  Accordingly, Dr. Rivero argued that the 1990s incidents are "nonsensical" and the others before 2006 have dubious value, so any complaints before 2006 "would create confusion, undue prejudice, and those other elements in 403."  June 26 Tr. at 88:7, 11-13 (Norvell).  The Court

stated that it was "not inclined to keep complaints out," because "it would probably be the best for the jury to have a robust record." June 26 Tr. at 88:16-19 (Court).

### f.     <u>Argument Regarding the Psychological MIL.</u>

Dr. Rivero then argued for the Psychological MIL, asserting that "[t]he connotative implications of psychological attempt to mollify the actual facts of this case, which are that UNM presented a psychiatric exam." June 26 Tr. at 89:20-23 (Norvell). Dr. Rivero noted that UNM admits that the term "psychiatric" "gives rise to the implication of a severe mental disorder," June 26 Tr. at 90:2-3 (Norvell), but that this term is the one that UNM uses fifteen times in the Addendum, June 26 Tr. at 89:23-25 (Norvell). Accordingly, Dr. Rivero asserted that UNM should use the word it chose to use in the Addendum -- "psychiatric" -- and not mollify it, as this variance would confuse the jury and create undue influence as the jury considers the effect which the Addendum had on Dr. Rivero. <u>See</u> June 26 Tr. at 90:3-15 (Norvell).

UNM responded that "[t]he terms 'psychiatric' and 'psychological' in the clinical sense are fairly interchangeable," because "[p]sychologists can do almost everything that psychiatrists do, except prescribe drugs." June 26 Tr. at 90:21-24 (Marcus). According to UNM, the Addendum provides no evidence that UNM believed Dr. Rivero needed medication, so there is no real distinction in the clinical sense between the words. <u>See</u> June 26 Tr. at 90:24-91:4 (Marcus). UNM contended, however, that, for lay people and for the potential jury, "psychiatry has an extremely powerful connotation that it indicated a severe condition," June 26 Tr. at 91:11-13 (Marcus), a connotation lacking in the clinical sense, so "UNM has the right to use a more

neutral term to try to avoid having a jury reach a decision based solely on emotion," June 26 Tr. at 91:19-21 (Marcus). See id. at 91:10-21 (Marcus). UNM asserted that a psychological evaluation is very similar to a psychiatric evaluation, that the personality evaluation it sought could be conducted by a psychologist or a psychiatrist, but that it chose to have Dr. Rivero talk to a psychiatrist. See June 26 Tr. at 93:2-7 (Marcus).

Dr. Rivero responded that the Addendum says nothing about a personality test and that it specifies a psychiatric evaluation by a board-certified psychiatrist. See June 26 Tr. at 93:12-16 (Norvell). Dr. Rivero maintained that, should UNM use different language, it changes the Addendum's meaning. See June 26 Tr. at 93:19-21 (Norvell). Dr. Rivero also argued that nobody could objectively perceive the Addendum as requesting a psychological evaluation or personality tests. See June 26 Tr. at 93:22-94:2 (Norvell).

The Court stated its inclination that it will not prevent UNM from arguing that the psychiatric evaluation is a psychological examination, but that UNM should not replace the term "psychiatric" with "psychological" when discussing the evaluation requirement in opening statements and while questioning witnesses in front of the jury. See June 26 Tr. at 94:7-17 (Court). The Court allowed that, should UNM explain to the jury in the trial's evidentiary phase how, in the clinical sense, there is little difference between the two, UNM could call the Addendum's requirement what it wants in closing. See June 26 Tr. at 94:18-95:2 (Court). Otherwise, including in the opening, the Court believed, using the term "psychological" would be argumentative. See June 26 Tr. at 95:5-10 (Court).

### g.    **Argument Regarding Rivero's MSJ.**

Dr. Rivero then argued for his MSJ, and stated that the Court could rule on the portion of his MSJ discussing the statute-of-limitations defense at the same time the Court rules on UNM's MSJ statute-of-limitations argument.  <u>See</u> June 26 Tr. at 95:19-96:4 (Court, Norvell).  Dr. Rivero argued that UNM has provided no evidence to show that the doctrine of laches and waiver bars his constructive discharge claim, and noted that Magistrate Judge Lynch determined, in the MTD Order, that Dr. Rivero adequately stated a claim for constructive discharge.  <u>See</u> June 26 Tr. at 96:14-25 (Norvell).    Accordingly, Dr. Rivero argued that the Court should strike UNM's affirmative defenses I -- failure to state a claim -- and III -- laches and waiver -- with respect to his constructive discharge claim.  <u>See</u> June 26 Tr. at 97:4-12 (Norvell).    Dr. Rivero also requested that the Court strike UNM's affirmative defense XIII -- that it acted in accordance with its policies -- because, while UNM provided many policies, it admitted that it applied none with regards to the Addendum and that it had no set policy regarding psychiatric evaluations.  <u>See</u> June 26 Tr. at 97:13-25 (Norvell).  Regarding UNM's affirmative defense XIV -- that it fulfilled all contractual and statutory obligations -- Dr. Rivero noted that UNM stated it would supplement this defense and averred that this response is inadequate, because it does not provide "a fair sense of how that defense applies."  June 26 Tr. at 98:6-7 (Norvell).  <u>See</u> <u>id.</u> at 98:1-8 (Norvell).  Finally, Dr. Rivero requested that the Court strike UNM's affirmative defense XV -- a reservation of right to amend the Answer -- as it is "not really a defense."  June 26 Tr. at 98:12-13 (Norvell).  <u>See</u> <u>id.</u> at 98:9-13 (Norvell).

In response, UNM conceded that its affirmative defense XV could be stricken.  See June 26 Tr. at 100:22-25 (Marcus).  UNM maintained, however, that the Court should not strike affirmative defense I regarding the constructive discharge claim, because the Complaint provides no facts supporting such a claim.  See June 26 Tr. at 101:1-9 (Marcus).  UNM argued that its laches and waiver defense also applies to the constructive discharge claim, because Dr. Rivero worked at UNM for three years after receiving the Addendum despite his assertion that his working conditions were intolerable.  See June 26 Tr. at 101:16-24 (Marcus).  Regarding affirmative defense XIII, UNM asserted that it followed its polices and regulations, because there is no set policy on psychiatric evaluations, and there cannot be one, as every situation is different.  See June 26 Tr. at 102:8-14 (Marcus).  UNM also averred that it has policies regarding professionalism and disability discrimination, and that Dr. Rivero has provided no evidence that UNM violated such policies.  See June 26 Tr. at 102:19-103:2 (Marcus).  As to affirmative defense XIV, UNM argued that it fulfilled all obligations to Dr. Rivero under contract, because he reduced to 0.05 FTE voluntarily, and because UNM was not required to raise this time to full time, as the contract provided for 0.05 FTE and Dr. Rivero was essentially asking for a new contract.  See June 26 Tr. at 103:3-15 (Marcus).  Finally, UNM asserted that, as far as the statute is concerned, the Rehabilitation Act requires that the medical inquiry be a business necessity and job related, which it believes substantial evidence supports such a conclusion, and that, therefore, the Court should not strike this defense.  See June 26 Tr. at 103:16-104:2 (Court).

Dr. Rivero responded that Magistrate Judge Lynch's MTD Order addresses the failure-to-state-a-claim and the laches-and-waiver-doctrine defenses, and that Dr. Rivero thus overcame these defenses.  See June 26 Tr. at 104:12-20 (Norvell).  As to UNM's defense regarding policies, Dr. Rivero noted that Dr. Schenck testified that he did not apply any policy regarding the Addendum, that there is no evidence of UNM applying its policies, and that UNM has provided evidence only that policies existed.  See June 26 Tr. at 104:21-105:2 (Norvell).  Finally, Dr. Rivero asserted that UNM's reference to other defenses in its explanation of its affirmative defense XIV "defeats the purpose of fairness with respect to what Dr. Rivero would seek to litigate going forward."  June 26 Tr. at 105:5-7 (Norvell).  See id. at 105:3-7 (Norvell).

The Court then provided its inclination that it would rule in favor of UNM's MSJ, finding that the statute of limitations bars Dr. Rivero's medical inquiry claim and that he failed to state a constructive discharge claim.  See June 26 Tr. at 105:17-25 (Court).  Dr. Rivero then emphasized that he still has a retaliation claim that was briefed and, therefore, that still exists.  See June 26 Tr. at 107:6-8 (Norvell).  UNM responded that it was operating under Magistrate Judge Lynch's division of the Complaint into a claim for an illegal medical inquiry and a claim for constructive discharge, and that it had no notice of a retaliation claim.  See June 26 Tr. at 107:19-24 (Marcus).  UNM argued that, if the FAC were interpreted to state a retaliation claim, it "would be clearly time-barred because the likely retaliation, which was the [A]ddendum[,] took place [in] April 2011, more than five years before plaintiff brought the lawsuit."  June 26 Tr. at 108:4-7 (Marcus).  See id. at 108:2-7 (Marcus).  Dr. Rivero conceded that whether he stated a retaliation

claim is in dispute.  See June 26 Tr. at 108:8-14 (Court, Norvell).  The Court questioned whether the briefings discussed the retaliation claim.  See June 26 Tr. at 108:23-25 (Court).  UNM clarified that Dr. Rivero "asserted it in his response" and that it had responded but "got no reply."  June 26 Tr. at 109:4-6 (Marcus).  UNM reasserted that Magistrate Judge Lynch divided the FAC into two causes of action and that it operated under that structure, so it did not need to address retaliation in its MSJ.  See June 26 Tr. at 109:9-14 (Marcus).  UNM argued, however, that if there were a retaliation claim, it is "very obviously time-barred."  June 26 Tr. at 109:15-16 (Marcus).  The Court thanked the parties for their time and stated it would try to get "some opinions and orders out."  June 26 Tr. at 110:11 (Court).

**17.    The Recusal Motion.**

On July 17, 2018, Dr. Rivero requested that the Court recuse pursuant to 28 U.S.C. § 455. See Recusal Motion at 1.  Dr. Rivero asserts that, in requesting recusal, he "seeks to protect the judge and this proceeding from the outward appearance of which impartiality might reasonably be questioned and, in turn, protect the integrity of any decision, ruling, or verdict entered in this case."  Recusal Motion at 1.  Dr. Rivero contends that "[t]he disclosures by Judge Browning as to his relationship with the University of New Mexico and its Regents give rise to an objectively reasonable question of impartiality," so "recusal is proper."  Recusal Motion at 3.  Dr. Rivero notes the First and Second Disclosure Letter's disclosures: the Court's teaching at the School of Law; the Court's having students and its co-teacher at its home; the Court's waiver of pay being used to pay a law student to help the Court write an article; how that law student accepted a

clerkship with the Court; how the Court's waiver of pay may have been treated as a donation to the School of Law or the UNM Foundation on one occasion; and the Court's acquaintanceships with Mr. Doughty, the current President of the Board of Regents, and Mr. Adcock, the Student Regent for 2017-2018. See Recusal Motion at 4-6 (citing First Disclosure Letter at 1-2; Second Disclosure Letter at 1-2).

Dr. Rivero states that the next business day, Monday, June 25, 2018, the Court's assistant called Mr. Norvell to ask if he had received the Second Disclosure Letter. See Recusal Motion at 6. Dr. Rivero states that, as the Court had scheduled the hearing on the parties' dispositive motions for the next day, and Dr. Rivero was "proceeding to travel to New Mexico for the hearing," he "had the opportunity to review the Second Disclosure Letter only once without sufficient time to reflect upon the disclosures." Recusal Motion at 6 (citing Affidavit of Dr. Dennis P. Rivero ¶¶ 2-4, at 1 (dated July 17, 2018), filed July 17, 2018 (Doc. 203-1)("Second Rivero Aff.")). Accordingly, Dr. Rivero states that Mr. Norvell informed the Court's "assistant that Dr. Rivero would proceed without discussion of the Second Disclosure Letter." Recusal Motion at 6 (citing Second Rivero Aff. ¶ 5, at 1).

Dr. Rivero asserts that a United States judge shall recuse where his or her "impartiality might reasonably be questioned," Recusal Motion at 7 (citing 28 U.S.C. § 455(a)), which is a test "of objective reasonableness, that is, whether the judicial officer's impartiality might reasonably be questioned under the circumstances," Recusal Motion at 7 (citing Lunde v. Helms, 29 F.3d 367, 370 (8th Cir. 1994)). Dr. Rivero asserts that a judge is also required to recuse where he or

she has a financial or any other interest that could be substantially affected by the proceeding. See Recusal Motion at 7 (citing 28 U.S.C. § 455(b)(4)). Here, Dr. Rivero argues that the Court "has more than a mere association to Defendant University of New Mexico and its Board of Regents," and that the Court has "developed strong ties that may implicate a reasonable question of impartiality" requiring recusal. Recusal Motion at 7 (citing Lunde v. Helms, 29 F.3d at 371).

Dr. Rivero first contends that the Court's employment at the School of Law "could give rise to a reasonable question of impartiality." Recusal Motion at 8 (bolding omitted). According to Dr. Rivero, the Court's redirection of pay to a School of Law student to write an article "presumably under [the Court's] authorship . . . can be reasonably viewed as a redirection of pecuniary benefit from Defendant into the form of employment of law students." Recusal Motion at 8. Dr. Rivero contends that this benefit "could be viewed as having additional value above direct compensation to the judge, as the student resources did not impact the federal court's budget." Recusal Motion at 8. Dr. Rivero concedes that the Code of Judicial Conduct allows for compensation for teaching law, but argues that there is a "problem of perception here," that "[a]n objective observer could perceive, even incorrectly, that, given the benefits of resources from UNM law school, a judge in a similar position could, even unintentionally or subconsciously, favor the institution from which he has garnered recent benefit." Recusal Motion at 8. Further, Dr. Rivero posits that the Court's employment "was ultimately with and under Defendant Board of Regents, whose authority governs the UNM School of law as well as the School of Medicine/University of New Mexico Health Sciences Center." Recusal Motion at

8-9.  Dr. Rivero notes that his own employment relationship "was also with and under the Defendant Board of Regents."  Recusal Motion at 9.  Dr. Rivero therefore argues that there is a

> strain on the perception of impartiality when (i) a judge and a plaintiff in a case have been employees of a defendant, (ii) a judge has occasionally and quite recently worked for the defendant, (iii) the plaintiff is directly adversarial to that defendant, and (iv) the defendant's alleged illegal and improper employment practices are directly at issue in the litigation.

Recusal Motion at 9.

Dr. Rivero also contends that the Court's ties with the Board of Regents "could create an objectively reasonable question as to his impartiality."  Recusal Motion at 9.  Dr. Rivero asserts that the Court's associations with the Board of Regents appear "mainly personal" and "do not necessarily negate impartiality, but their personal nature coupled with the employment relationship with Defendant objectively give rise to a reasonable question of impartiality," warranting recusal under 28 U.S.C. § 455.  Recusal Motion at 9.  Finally, Dr. Rivero argues that the case's special circumstances "create a unique context in which recusal preserves the integrity not only of the Court's stature but of any ruling as to the merits of the case," as, should UNM win, it would be "a Pyrrhic victory."  Recusal Motion at 10.  Dr. Rivero further argues that, should he win, UNM's federal funding "could face additional scrutiny or sanction, including withdrawal of funding, pursuant to an adverse holding of discriminating," potentially souring UNM's relationship with the Court.  Recusal Motion at 10 (citing 10 C.F.R. §§ 4.233, 4.46, 4.48).  Accordingly, Dr. Rivero requests that the Court recuse.  See Recusal Motion at 10.

18.     **The Recusal Motion Response.**

UNM responded on July 31, 2018.  See Response Brief in Opposition to Motion to Recuse the Honorable James O. Browning, filed July 31, 2018 (Doc. 208)("Recusal Motion Response").  UNM argues that motions brought pursuant to 28 U.S.C. § 455 "must be timely filed."  Recusal Motion Response at 1 (citing Willner v. Univ. of Kan., 848 F.2d 1023, 1028 (10th Cir. 1988)(per curiam)).  UNM notes that the Court was assigned to the case on October 3, 2017, and sent the First Disclosure Letter on January 23, 2018.  See Recusal Motion Response at 2.  UNM therefore argues that the Recusal Motion is untimely, because Dr. Rivero waited to file it "over nine months after Judge Browning was initially assigned to the case, and almost six months after Judge Browning sent his First Disclosure Letter."  Recusal Motion Response at 2.  UNM posits that, significantly, the First Disclosure Letter "was the only one of the two Disclosure Letters that contained any reference to anything that could remotely be considered even *de minimus* compensation to Judge Browning from UNM[, and] Judge Browning noted that he believed that he could be impartial."  Recusal Motion Response at 2.  UNM asserts that the Recusal Motion is also untimely as to the Second Disclosure Letter, despite a gap of only a month, because "the Court held a dispositive Motions hearing on June 26, 2018," and "the Court's actions clearly demonstrated that it was expecting any parties with objections to respond prior to the hearing."  Recusal Motion Response at 3.  See id. at 2-3.  According to UNM, the Court's assistant calling the parties before the hearing to ask if they received the Second Disclosure Letter and if they had any objections underscores this expectation.  See Recusal

Motion Response at 2. UNM argues that recusal at this time would be prejudicial to it, because it "invested a substantial amount of time preparing for and attending the hearing, and would be a waste of judicial resources." Recusal Motion Response at 3.

UNM asserts that Dr. Rivero's delay in objecting "cannot be excused by his statements in his affidavit," because it "is not notarized, which renders it insufficient as testimony." Recusal Motion Response at 3 (citing Second Rivero Aff. at 1). Further, UNM asserts that Dr. Rivero's inability to "reflect upon the disclosures" is also an insufficient excuse for delay, because "he admits that he was able to review the disclosure letter" and that he "is represented by counsel, who is well-qualified to advise him regarding whether a judge should be recused based on disclosures." Recusal Motion Response at 3 (citing Second Rivero Aff. ¶ 3, at 1). UNM argues that it would be a waste of judicial resources and a "manipulation of the judicial process" should the Court recuse now, Recusal Motion Response at 3, because the dispositive motions hearing likely would need to be repeated and it would give Dr. Rivero "a second bite at the proverbial apple," Recusal Motion Response at 4.

Finally, UNM argues that the disclosures are not sufficient to warrant the Court's recusal. See Recusal Motion Response at 4. UNM notes that the Tenth Circuit's "test is whether a reasonable person, *knowing all the relevant facts*, would harbor doubts about the judge's impartiality." Recusal Motion Response at 4 (internal quotation marks omitted)(emphasis in Recusal Motion Response)(quoting Hinman v. Rogers, 831 F.2d 937, 939 (10th Cir. 1987)). UNM argues that, here, "a reasonable person, knowing all relevant facts, would not have any

reason to harbor doubts about the judge's impartiality."  Recusal Motion Response at 4.  As Dr. Rivero states in the Recusal Motion that he "is only concerned about the appearance of impropriety," UNM questions how he can argue, with "no concerns that Judge Browning lacks integrity," that an "informed, reasonable person would have such concerns."  Recusal Motion Response at 5.

UNM argues that the Court's teaching at the School of Law does not give it "a substantial financial interest in UNM."  Recusal Motion Response at 5.  UNM posits that the judge's connections in Lunde v. Helms, which the United States Court of Appeals for the Eighth Circuit decided did not warrant recusal, are similar to the Court's here, because that judge was an alumnus of the university, made financial contributions to the university's foundation, and provided educational programs at the university.  See Recusal Motion Response at 5 (citing Lunde v. Helms, 29 F.3d at 370-71).  Further, UNM notes the judge's substantial ties to the school in Willner v. University of Kansas -- he was a director of the university's alumni association and served as President of the law school's Board of Governors -- still did not require recusal.  See Recusal Motion Response at 5-6 (citing Willner v. Univ. of Kan., 848 F.2d at 1026, 1028).  UNM posits that "it is unlikely that there are any federal or state judges in New Mexico who have no connection with the" School of Law, because it "is the only law school in the state."  Recusal Motion Response at 6.  UNM also asserts that it is irrelevant that the Court has socialized with Mr. Doughty and Mr. Adcock, because they are not sued individually; rather, "[t]he Board of Regents, as a whole, is named in the lawsuit, because it is simply the body that

can sue or be sued on behalf of UNM itself." Recusal Motion Response at 6 (citing N.M. Stat. Ann. § 21-7-4). UNM notes that a judgement against it will not personally affect any of the Board of Regents members. See Recusal Motion Response at 6. Further, UNM posits that "no current member of the Board of Regents was serving on the Board of Regents at any time relevant to this litigation." Recusal Motion Response at 6. UNM argues that the Recusal Motion "is based solely on speculation," Recusal Motion Response at 6, and that the Court should deny the Recusal Motion, see Recusal Motion Response at 7.

**19.    The Recusal Motion Reply.**

Dr. Rivero replies. See Reply in Support of Motion to Recuse the Honorable James O. Browning, filed August 10, 2018 (Doc. 208)("Recusal Motion Reply"). Dr. Rivero contends that the Recusal Motion is timely, noting that he received the Second Disclosure Letter four days before a dispositive motions hearing and that the information provided "is not easily or quickly digested," especially while preparing for the hearing. Recusal Motion Reply at 1. Further, Dr. Rivero notes that he filed the Recusal Motion before the Court had ruled on any of the motions before it. See Recusal Motion Reply at 1. As to UNM's assertion that recusal would be prejudicial, Dr. Rivero posits that he "also prepared for and attended the hearing," so "any impact of a recusal will be uniformly distributed." Recusal Motion Reply at 2. Further, Dr. Rivero contends that his affidavit is technically valid, because 28 U.S.C. § 1746 "permits unsworn affidavits submitted with filings when such affidavits comply with the requirements of the statute." Recusal Motion Reply at 2. Dr. Rivero argues that his affidavit is also logical,

because he had to prepare for the hearing, and because he "would be prejudiced in the face of a demand for immediate response to the Second Disclosure Letter." Recusal Motion Reply at 2.

Dr. Rivero argues that the Court's connections with UNM warrants recusal, because an objectively reasonable person could question the Court's impartiality. See Recusal Motion Reply at 3. Dr. Rivero notes that the Court "has had an intermittent employment relationship with UNM and not suffered the consequences of UNM's administrative caprice," and has interacted with Board of Regents members "who have ultimate discretion over [the Court's] ongoing albeit intermittent relationship with the University," while Dr. Rivero has no relationship with any of the Board of Regents members. Recusal Motion Reply at 3. Dr. Rivero asserts that UNM has provided no evidence to support its statement "that 'no current member of the Board of Regents was serving on the Board at any time relevant to this litigation' . . . , and it is facially untrue." Recusal Motion Reply at 4 (quoting Recusal Motion Response at 6). Dr. Rivero argues that "[t]he reputation of the Board of Regents and its members who stood by and supported discriminatory polices are certainly at stake," so any outcome adverse to UNM would affect the Board of Regents and could potentially turn it against the Court. Recusal Motion Reply at 4. Dr. Rivero asserts that the Court should act with integrity, which he posits includes "the necessity to revisit conclusions through analyses of the parties involved in the case, who may elucidate areas that may have been overlooked in determining the propriety of continuing as a judge in this matter." Recusal Motion Reply at 4. Finally, Dr. Rivero argues that UNM's reliance on Willner v. University of Kansas and Lunde v. Helms is misplaced. See

Recusal Motion Reply at 5-6. Dr. Rivero asserts that the <u>Willner v. University of Kansas</u> court did not reach the merits in its decision, because it "simply ruled on the basis that the plaintiff's objection was untimely, having moved for recusal one year after having learned of the judge's" potential conflict. Recusal Motion Reply at 5 n.1 (citing <u>Willner v. Univ. of Kan.</u>, 848 F.2d at 1029). Dr. Rivero distinguishes <u>Lunde v. Helms</u>, because the university did not employ the judge, as is the case here. <u>See</u> Recusal Motion Reply at 6 (citing <u>Lunde v. Helms</u>, 29 F.3d at 370). Accordingly, Dr. Rivero requests that the Court recuse. <u>See</u> Recusal Motion Reply at 6.

20. **<u>The August 13 Hearing</u>.**

The Court held a telephonic hearing out of district on the Recusal Motion on August 13, 2018, to which the parties consented. <u>See</u> Notice of Defendant's Consent to the Court's Telephonic Appearance for the Hearing Scheduled for A ugust [sic] 13, 2018 at 8:30AM at 1, filed August 2, 2018 (Doc. 206); Plaintiff's Consent to Telephonic Hearing on August 13, 2018 at 1, filed August 7, 2018 (Doc. 207). The Court began by asking UNM if it consented to the Court conducting the hearing out of district, because the Court understood UNM to have consented only to a telephonic hearing. <u>See</u> Transcript of Motion Proceedings at 3:13-18 (Court)(taken August 13, 2018), filed November 28, 2018 (Doc. 219)("Aug. 13 Tr."). UNM stated that it consented. <u>See</u> Aug. 13 Tr. at 3:19-20 (Marcus).

Dr. Rivero argued first, stating that he is not comfortable with the Court's participation in the case and requesting that the Court recuse based on the Court's association with UNM as provided in the Disclosure Letters. <u>See</u> Aug. 13 Tr. at 4:5-20 (Norvell). Dr. Rivero asserted

that, under 28 U.S.C. § 455(a), a federal judge must recuse from "any proceeding in which his impartiality might be reasonably be questioned," Aug. 13 Tr. at 4:23-25 (Norvell), which is a test of "objective reasonableness, whether a judicial officer's impartiality might be reasonably questioned under the circumstances," Aug. 13 Tr. at 5:1-4 (Norvell). See id. at 4:21-5:5 (Norvell). Dr. Rivero believed that "what it comes down to is the continued, and potentially intermittent and recurring employment with UNM, and the benefit that is garnered and may be ongoing by the Court." Aug. 13 Tr. at 5:21-24 (Norvell). Dr. Rivero also asserted that an outside party may view as a direct, ongoing benefit the Court's redirection of pay to a student for article-writing help. See Aug. 13 Tr. at 6:2-17 (Norvell). Dr. Rivero argued that, because this case is an employment suit, the Court's employment relationship with UNM also gives rise to a reasonable question of the Court's impartiality. See Aug. 13 Tr. at 6:18-21 (Norvell). Dr. Rivero asserted that "it would be a pyrrhic victory if the defendant won." Aug. 13 Tr. at 8:23-24 (Norvell).

UNM responded that Dr. Rivero was aware of the Court's teaching at the School of Law in January, 2018, so his Recusal Motion based on this fact is untimely under the caselaw. See Aug. 13 Tr. at 9:11-22 (Marcus). UNM contended that Dr. Rivero "ignored the letter" instead of filing a motion to recuse in January, 2018, so "he waived any claims for recusal, any attempt at recusal based on any facts mentioned in the first letter." Aug. 13 Tr. at 8-11 (Marcus). As to the Second Disclosure Letter, UNM noted that the Court "went out of [its] way to make sure that [it] received an answer prior to the hearing," by calling counsel for both parties "and got consent

from both sides in this case." Aug. 13 Tr. at 10:17-22 (Marcus). UNM argued that, "by giving consent early on, prior to the hearing, Mr. Norvell has also waived any claims for recusal." Aug. 13 Tr. at 10:23-25 (Marcus). UNM averred that recusal now means the dispositive motions hearing would be "a massive waste of judicial resources," Aug. 13 Tr. at 11:6-7 (Marcus), and a waste of time for both parties, see Aug. 13 Tr. at 11:2-13 (Marcus). UNM argued that Dr. Rivero is attempting to manipulate the judicial process to "get a second bite at the proverbial apple." Aug. 13 Tr. at 11:16-17 (Marcus). See id. at 11:14-18 (Marcus). UNM noted that the Court's reputation for ensuring that there is no appearance of a conflict of interest and asserted that no reasonable person, knowing all the facts, would believe there is a conflict of interest here. See Aug. 13 Tr. at 11:24-12:10 (Marcus). UNM also contended that the Court's relationship with the School of Law is more like that of a volunteer rather than an employee. See Aug. 13 Tr. at 12:11-19 (Marcus). UNM noted that "[t]here is no ground for a private . . . cause of action[] to result in the pulling of federal funding" as Dr. Rivero contends. Aug. 13 Tr. at 13:11-14 (Marcus). See id. at 13:9-17 (Marcus)(citing Greater L.A. Council on Deafness v. Cmty. Television of S. Cal., 719 F.2d 1017, 1022 (9th Cir. 1983)). UNM also posited that, while the Court has some relationship with two individuals on the Board of Regents, the Court does not have a relationship with the "Board of Regents as a whole." Aug. 13 Tr. at 14:16 (Marcus). See id. at 14:14-16 (Marcus). UNM did not believe that the case would have any impact on these individuals of the Board of Regents, so UNM argued there is no conflict of interest based on these passing social ties. See Aug. 13 Tr. at 14:20-15:9 (Marcus).

Dr. Rivero responded that he is not trying to manipulate the judicial process.  See Aug. 13 Tr. at 16:22-25 (Norvell).  Dr. Rivero asserted that he is properly asking for recusal under 28 U.S.C. § 455(a) and that, while "[t]imeliness can be a consideration," Aug. 13 Tr. at 16:8 (Norvell), where "a disqualifying circumstance appears," Aug. 13 Tr. at 16:5-6 (Norvell), the judge must recuse, see Aug. 13 Tr. at 16:4-7 (Norvell).  Dr. Rivero noted that he filed the Recusal Motion before the Court made any decision, during a time when the Court was preoccupied with a criminal case in July.  See Aug. 13 Tr. at 16:16-23 (Norvell).  Dr. Rivero underscored that the question is not of the Court's reputation, but of objective perspective -- whether an objective, reasonable person would view the facts as requiring disqualification under 28 U.S.C. § 455(a).  See Aug. 13 Tr. at 16:25-17:13 (Norvell).  Dr. Rivero reasserted that the Court has an employment relationship with UNM and, with this case being about Dr. Rivero's employment relationship with UNM, recusal is warranted.  See Aug. 13 Tr. at 17:25-18:5 (Norvell).  Finally, Dr. Rivero asked that the Court review United States v. Moskovits, 866 F. Supp. 178 (E.D. Pa. 1994)(Pollak, J.), because the judge occasionally taught at the University of Pennsylvania and, after the school initiated disciplinary proceedings against the criminal defendant, its student, the judge recused.  See Aug. 13 Tr. at 18:6-22 (Norvell).

The Court indicated that it will likely deny the Recusal Motion, but that it will "take a hard look at it, [and] review all those cases."  Aug. 13 Tr. at 19:9-10 (Court).  See id. at 19:4-10 (Court).  The Court reminded the parties that it had closely examined the issue with its law clerks before it sent the Disclosure Letters "and had decided that no more than a disclosure would be

appropriate here," because "there was not a conflict that required [the Court] to recuse." Aug. 13 Tr. at 19:13-15 (Court). See id. at 19:11-15 (Court). The Court stated that it "welcomed any questions or anything at that time [it sent the Disclosure Letters], but [it] had made a determination." Aug. 13 Tr. at 19:16-17 (Court). The Court posited that it has not had a problem with its relationship with UNM in past cases, which "lends a lot of support to the fact that objectively people have looked at these facts and had not had any problem." Aug. 13 Tr. at 19:21-23 (Court). The Court underscored that it would not characterize its relationship with UNM as "anything other than an employment relationship." Aug. 13 Tr. at 19:25-20:1 (Court). The Court stated that, "after [it] made this many disclosures, d[id] the additional work of making sure that [Courtroom Deputy Clerk] Ms. Bevel called everybody before the hearing so that there was plenty of time, I simply can't . . . run the Court this way." Aug. 13 Tr. at 20:21-25 (Court). The Court stated that it is not appropriate to file a motion to recuse after it worked hard in advance of the hearing and gave a preliminary ruling at the hearing, which it knows upset Dr. Rivero. See Aug. 13 Tr. at 20:25-21:6 (Court). The Court posited that any problem needed to be raised before the hearing, but underscored its belief that there is not an objective problem here. See Aug. 13 Tr. at 21:9-13 (Court). The Court noted that many other United States Judges for the District of New Mexico have ties with UNM, and so the Court's recusal from this case may mean no other judge in the District of New Mexico can take cases involving UNM. See Aug. 13 Tr. at 22:1-18 (Court). Finally, the Court posited that it has an obligation to keep and decide cases if there is no basis for recusal. See Aug. 13 Tr. at 22:19-22 (Court).

21.     **The Order.**

The Court entered the Order, filed September 24, 2018 (Doc. 211)("Order"), which rules on UNM's MSJ, Rivero's MSJ, the Complaints MIL, the Psychological MIL, and the Recusal Motion, but states that the Court will "issue a Memorandum Opinion at a later date more fully detailing its rationale for this decision." Order at 1 n.1. See id. at 1-2. In the Order, the Court first concludes that the statute of limitations bars Dr. Rivero's medical inquiry claim. See Order at 4. The Court also determines that the four-part psychiatric evaluation requirement is job-related and consistent with business necessity and, therefore, permissible. See Order at 5-6. Concluding that Dr. Rivero was not constructively discharged and that any retaliation claim must fail, the Court finds summary judgment for UNM on all of Dr. Rivero's claims proper. See Order at 6.

The Court does not rule on Rivero's MSJ or the Psychological MIL, because its grant of summary judgment for UNM moots those motions. See Order at 6. The Court rules on the Complaints MIL, because "it touches on what the Court may properly consider in deciding UNM's MSJ," and denies it. Order at 6. The Court concludes the older complaints "provide Dr. Rivero's full employment history at UNM and are relevant to the question of whether UNM reasonably doubted Dr. Rivero's ability to professionally interact with patients and co-workers." Order at 6. Finally, the Court denies the Recusal Motion, concluding that there is no reasonable question of the Court's impartiality. See Order at 7.

## <u>LAW REGARDING STATING AFFIRMATIVE DEFENSES</u>

Rule 8(c) of the Federal Rules of Civil Procedure provides:

**(c) Affirmative Defenses.**

    **(1) *In General.*** In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including:

- accord and satisfaction;

- arbitration and award;

- assumption of risk;

- contributory negligence;

- duress;

- estoppel;

- failure of consideration;

- fraud;

- illegality;

- injury by fellow servant;

- laches;

- license;

- payment;

- release;

- res judicata;

- statute of frauds;

- statute of limitations; and

• waiver.

**(2)** ***Mistaken Designation.*** If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.

Fed. R. Civ. P. 8(c). "[A] responsive pleading must set forth certain enumerated substantive defenses as well as 'any other matter constituting an avoidance or affirmative defense.'" 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1270, at 557-58 (3d ed. 2004)(quoting a prior version of rule 8(c)). Modeled after the English and New York rules in force when the Federal Rules of Civil Procedure first were drafted, see Judicature Act (The Annual Practice, 1937) O.19, r. 15; N.Y.C.P.A. (1937) § 242, rule 8(c) makes no attempt to define the concept of affirmative defense. Instead, it obligates defendants to plead affirmatively any of nineteen defenses that rule 8(c)(1) lists that the defendant wishes to assert. See Fed. R. Civ. P. 8(c). If the district court or jury hearing a case accepts the defendant's affirmative defense, the defense defeats the plaintiff's claim. See Rural Water Dist. No. 2 v. City of Glenpool, 698 F.3d 1270, 1274 (10th Cir. 2012)("[O]nce the court's jurisdiction has been properly invoked in the plaintiff's complaint, the assertion of such a defense is relevant only to whether the plaintiff can make out a successful claim for relief, and not to whether the court has original jurisdiction over the claim itself." (internal quotation marks omitted)(quoting S. New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 132 (2d Cir. 2010))); 5 Wright & Miller, supra, § 1270, at 561. The burden of proof for affirmative defenses generally rests on the defendant. See Saldana-Sanchez v. Lopez-Gerena, 256 F.3d 1, 5 n.8 (1st Cir. 2001); Schleibaum

v. Kmart Corp., 153 F.3d 493, 501 (7th Cir. 1998). In stating affirmative defenses, defendants do not need to provide "factual support." Lane v. Page, 272 F.R.D. 581, 594 (D.N.M. 2011)(Browning, J.). In Lane v. Page, the Court "declin[ed] to extend the heightened pleading standard the Supreme Court established in Bell Atlantic v. Twombly[, 550 U.S. 544 (2007)] and Ashcroft v. Iqbal[, 556 U.S. 662 (2009),] to affirmative defenses pled in answers, because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses." Lane v. Page, 272 F.R.D. at 588.[100]

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions: (i) where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-41 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d 1242, 1249 (10th Cir. 2008)(McConnell, J.)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense

---

[100]The Court has stated that "[a] reservation of unpled defenses is not a defense of any kind, much less an affirmative one." Lane v. Page, 272 F.R.D. at 601 (internal quotation marks omitted)(quoting Fogel v. Linnemann (In re Mission Bay Ski & Bike, Inc.), Nos. 07 B 20870, 08 A 55, 2009 WL 2913438, at *5 (Bankr. N.D. Ill. Sept. 9, 2009)). The Court has since retreated from this holding, because it does not want to encourage motions to strike such a defense. See Tavasci v. Cambron, No. CIV 16-0461 JB/LF, 2016 WL 6405896 (D.N.M. Oct. 25, 2016)(Browning, J.). A motion to strike a reservation of defenses does not advance the ball of litigation. Further, "[w]here a defendant reserves unpled defen[s]es yet also agrees to comply with rule 15, . . . a motion to strike may be appropriate." Tavasci v. Cambron, 2016 WL 6405896, at *18.

by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule." (citation omitted)).  The defense of limitations is the affirmative defense that the complaint's uncontroverted facts will most likely establish.  See 5 Wright & Miller, supra, § 1277, at 643.  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Corp., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from caselaw in Courts of Appeals, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. City of New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV-08-140-W, 2008 WL

3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this avoidance practice, <u>see</u> <u>Anderson Living Tr. v. WPX Energy Prod., LLC</u>, 27 F. Supp. 3d 1188, 1208-09, 1234-38 (D.N.M. 2014)(Browning, J.).

## <u>LAW REGARDING RULE 12(b)(6)</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994)(citing <u>Williams v. Meese</u>, 926 F.3d 994, 997 (10th Cir. 1991)). A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned. <u>See</u> <u>Armstrong v. N.M. Disability Det. Servs.</u>, 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned). <u>See also</u> <u>GFF Corp. v. Associated Wholesale Grocers, Inc.</u>, 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007)("[O]nly '[i]f a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts' would the defendant prevail on a motion to dismiss." (second alteration in Tellabs, Inc. v. Makor Issues & Rights, Ltd.)(quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602 (7th Cir. 2006))); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))). At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face." Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v.

Twombly, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation and footnote omitted). See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate." Bragg v. Chavez,

No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.).

The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d at 1247 (citation omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone. See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 25 (10th Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").[101] Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F.

---

[101]Gossett v. Barnhart is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Gossett v. Barnhart, 139 F. App'x 24 (10th Cir. 2005), Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), Nard v. City of Oklahoma City, 153 F. App'x 529 (10th Cir. 2005), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Scherer v. United States Department of Education, 78 F. App'x 687 (10th Cir. 2003), Jones v. United States, 355 F. App'x 117 (10th Cir. 2009), Poche v. Joubran, 389 F. App'x 768 (10th Cir. 2010), Wallace v. United States, 372 F. App'x 826 (10th Cir. 2010), Employers' Mutual Casualty Co. v. Bartile Roofs, Inc., 478 F.

App'x 83 (10th Cir. 2004)(unpublished), states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x at 85 (internal quotation marks omitted)(quoting <u>Jackson v. Integra Inc.</u>, 952 F.2d 1260, 1261 (10th Cir. 1991)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. at 322.  <u>See</u> <u>Brokers' Choice of Am., Inc. v. NBC Universal, Inc.</u>, 861 F.3d 1081, 1104 (10th Cir. 2017)(holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the

App'x 493 (10th Cir. 2012), <u>Anderson v. Clovis Municipal Schools</u>, 265 F. App'x 699 (10th Cir. 2008), <u>Robinson v. Cavalry Portfolio Services, LLC</u>, 365 F. App'x 104 (10th Cir. 2010), <u>Vidacak v. Potter</u>, 81 F. App'x 721 (10th Cir. 2003), <u>Baltazar v. Shinseki</u>, 485 F. App'x 941 (10th Cir. 2012), <u>Detterline v. Salazar</u>, 320 F. App'x 853 (10th Cir. 2009), <u>Corley v. Department of Veterans Affairs ex rel. Principi</u>, 218 F. App'x 727 (10th Cir. 2007), <u>Premratananont v. South Suburban Park & Recreation District</u>, 149 F.3d 1191, 1998 WL 211543 (10th Cir. 1998), <u>Dye v. Moniz</u>, 672 F. App'x 836 (10th Cir. 2016), <u>Mitchell v. City of Wichita</u>, 140 F. App'x 767 (10th Cir. 2005)(Browning, J.), <u>Showalter v. Weinstein</u>, 233 F. App'x 803 (10th Cir. 2007), <u>Pierce v. Amaranto</u>, 276 F. App'x 788 (10th Cir. 2008), <u>Iselin v. Bama Cos.</u>, 690 F. App'x 593 (10th Cir. 2017), <u>United States v. Guthrie</u>, 184 F. App'x 804 (10th Cir. 2006), <u>Levy v. Levitt</u>, 3 F. App'x 944 (10th Cir. 2001), <u>Trujillo v. Board of Education of Albuquerque Public Schools</u>, 212 F. App'x 760 (10th Cir. 2007), and <u>Anderson v. Academy School District 20</u>, 122 F. App'x 912 (10th Cir. 2004), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the EEOC -- which contains time limitations that the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 705.

The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concluded that the Court may consider a defendant's operating certification, to which

plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See also SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MOTIONS TO STRIKE

Rule 12(f) of the Federal Rules of Civil Procedures provides:

**(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

> **(1)** on its own; or

> **(2)** on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f). Professors Charles Alan Wright and Arthur Miller have recognized, however, that such motions are not favored and, generally, the court should deny them:

> The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter. However, because federal judges have made it clear, in numerous opinions they have rendered in many substantive contexts, that Rule 12(f) motions to strike on any of these grounds are not favored, often being considered purely cosmetic or "time wasters," there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy . . . .

5C Wright & Miller, supra, § 1382, at 433-36 (footnotes omitted). Accord Burget v. Capital W. Sec., Inc., No. CIV-09-1015-M, 2009 WL 4807619, at *1 (W.D. Okla. Dec. 8, 2009)(Miles-LaGrange, J.)("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court." (citing Scherer v. U.S. Dep't of Educ., 78 F. App'x 687, 689 (10th Cir. 2003)(unpublished))).

"Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy." Estate of Gonzales v. AAA Life Ins., No. CIV 11-0486 JB/WDS, 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)(internal quotation marks omitted)(quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., No. 09-CV-0455-CVE-FHM, 2010 WL 132414, at *5 (N.D. Okla. Jan. 8, 2010)(Eagan, J.)). "The Court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defenses succeed." Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(internal quotation marks omitted)(quoting Carter Wallace, Inc. v. Riverton Labs., Inc., 47 F.R.D. 366, 368 (S.D.N.Y. 1969)(Cannella, J.). Professors Wright and Miller have also

commented on what constitutes "immaterial" matter in the context of a motion to strike. 5C Wright & Miller, supra, § 1382, at 458-60 (footnotes omitted). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material." 5C Wright & Miller, supra, § 1382, at 458-60 (footnotes omitted).

Moreover, "[o]nly material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly. Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike." Dubrovin v. Ball Corp. Consol. Welfare Benefit Plan for Emps., No. 08-cv-00563-WYD-KMT, 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Daniel, J.)(internal quotation marks omitted)(quoting 2 James Wm. Moore et al., Moore's Federal Practice § 12.37[2] (3d ed. 2004)). Accord Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009)(Browning, J.)("Ysais")("Generally . . . motions, briefs, and memoranda may not be attacked by a motion to strike." (citing Searcy v. Soc. Sec. Admin., 956 F.2d 278, 1992 WL 43490, at *1, *4 (10th Cir. 1992)(unpublished table opinion))). "The Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court orders one, a reply to an answer.'" Ysais, 616 F. Supp. 2d at 1184 (quoting Fed. R. Civ. P. 7(a)).

"Striking a pleading or part of a pleading is 'a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are

disfavored.'" Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5 (quoting Burget v. Capital W. Sec. Inc., 2009 WL 4807619, at *1). "The exception to this principle is that a Court may 'choose to strike a filing that is not allowed by local rule, such as a surreply filed without leave of court.'" Ysais, 616 F. Supp. 2d at 1184 (quoting Superior Prod. P'ship v. Gordon Auto Body Parts Co., No. 2:06-cv-0916, 2008 WL 2230774, at *1 (S.D. Ohio May 28, 2008)(Kemp, J.); and citing In re Hopkins, 162 F.3d 1173, 1998 WL 704710, at *3 (10th Cir. 1998)(unpublished table opinion)).

For example, in Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2012 WL 6846386 (D.N.M. Dec. 31, 2012)(Browning, J.), the Court denied a motion to strike a letter filed with the Court, because the letter was not a pleading, and did not pertain to either party's legal defenses or arguments; the letter expressed one party's position regarding whether the Court should rule on summary judgment motions pending at the close of a bench trial. See 2012 WL 6846386, at *6. Similarly, in Crabtree, the Court denied a plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they were neither pleadings nor irrelevant. See 2012 WL 3656500, at *18. In Applied Capital, Inc. v. Gibson, No. CIV 05-0098 JB/ACT, 2007 WL 5685131 (D.N.M. 2007)(Browning, J.), the Court refused the plaintiff's request to strike a motion to dismiss, because rule 12(f) applies only to pleadings and not to a motion to dismiss. See 2007 WL 5685131, at *18. In Estate of Anderson v. Denny's, Inc., 291 F.R.D. 622, 635 (D.N.M. 2013)(Browning, J.), the Court denied the plaintiff's request to strike a notice of completion of briefing for similar reasons. See 291 F.R.D. at 635.

In Lane v. Page, the plaintiff filed a motion to strike parts of the defendants' answer, because it was "devoid of factual allegations and assert[ed] improper defenses." 272 F.R.D. at 588. Specifically, the plaintiff argued that the defendants' affirmative defenses should "put plaintiff on notice of how the defense applies." 272 F.R.D. at 588 (internal quotation marks and citation omitted). The plaintiff therefore asked the Court not only to strike some of the defendants' answers, but also to "require the Defendants to amend their answers." 272 F.R.D. at 588. The defendants argued "that rule 8 does not require them to provide factual support for their affirmative defenses" and contended that their answers adequately responded to the plaintiff's complaint. 272 F.R.D. at 588. The Court "decline[d] to extend the heightened pleading standard the Supreme Court established in *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal* to affirmative defenses pled in answers, because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses." 272 F.R.D. at 588. The Court struck two improperly labeled affirmative defenses that stated the defendants "reserve the right to assert additional affirmative defenses." 272 F.R.D. at 601 (internal quotation marks and citations omitted). The Court concluded that the statement was not a defense, explaining:

> "[A]n affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." *Roberge v. Hannah Marine Corp.*, [No. 96–1691,] 1997 WL 468330, at *3 [(6th Cir. 1997)]. "A reservation of unpled defenses is not a defense of any kind, much less an affirmative one." *Mission Bay Ski & Bike*, [Nos. 07 B 20870, 08 A 66], 2009 WL 2913438, at *5 [(Bankr. N.D. Ill. Sept. 9, 2009)].

Lane v. Page, 272 F.R.D. at 601.  In Tavasci v. Cambron, No. CIV 16-0461 JB/LF, 2016 WL 6405896 (D.N.M. Oct. 25, 2016)(Browning, J.), the Court retreated some from that holding, however, because it did not want to encourage such motions, which do not advance the ball in a case.  The Court refused to strike a reservation of defenses "[w]here a defendant reserves unpled defen[s]es yet also agrees to comply with rule 15," because "the Court cannot conclude that 'under no set of circumstances' would the reservation of unpled defenses prevail."  2016 WL 6405896, at *18 (quoting Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(citations omitted)).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[102] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-

---

[102] Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided. See 184 F. Supp. 3d at 1067, 1073, 1075, 1079. Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1). Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment. See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR,

2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v.*

*Miller*, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"   Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence provides:  "'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).   Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination."  United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999).  A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness.  See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay.").

Hearsay is generally unreliable and untrustworthy.  See Chambers v. Mississippi, 410 U.S. 284, 298 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v.

United States, 512 U.S. 594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is "inherently untrustworthy" because of the lack of an oath, presence in court, and cross examination (quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence"). The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination. See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. It is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable. See Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination. See, e.g., United States v. Console, 13 F.3d at 656.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting that a hearsay within hearsay issue remains after concluding that 803(8) provided an exception for law enforcement reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(noting that witness statements in police reports may be admissible under hearsay exclusions other than 803(8)).

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories. First, there are motions to reconsider "filed within [twenty-eight] days of the entry of judgment," which are "treated as a motion to alter or amend the judgment under rule 59(e)" of the Federal Rules of Civil Procedure. Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See N.M. Health Connections v. U.S. Dep't of Health & Human Servs., 340 F. Supp. 3d 1112, 1164-75 (D.N.M. 2018)(Browning, J.)(denying motion to reconsider under rule 59(e)). Second, there are motions to reconsider "filed more than [twenty-eight] days after judgment," which are "considered a motion for relief from judgment under rule 60(b)" of the Federal Rules of Civil Procedure. Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462. See Kruskal v. Martinez, No. CIV 16-1075 JB/SCY, 2018 WL 3972910, at *9 (D.N.M. Aug. 18, 2018)(Browning, J.)(denying motion to reconsider under rule 60(b)). Finally, there are motions to reconsider "any order that is not final," which are treated as "a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion." Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462. See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005); Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002). See also United States v. Loera, 182 F. Supp. 3d 1173, 1218-30 (D.N.M. 2016)(Browning, J.)(denying motion to reconsider rulings on a motion to suppress).

1.     **Motions for Reconsideration Under Rules 59(e) and 60(b).**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355 F. App'x 117, 122 (10th Cir. 2009)(unpublished).  Rule 59(e)'s time limit is now twenty-eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends upon the reasons expressed by the movant."  Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011).  Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751, 753 (10th Cir. 1989)).  In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representative
> from a final judgment, order, or proceeding for the following reasons:

(1)       mistake, inadvertence, surprise, or excusable neglect;

(2)       newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)       fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)       the judgment is void;

(5)       the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)       any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Neither a rule 59 nor a rule 60 motion for reconsideration

> are []appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion. . . . Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Servants of the Paraclete v. Does, 204 F.3d at 1012. A district court has considerable discretion in ruling on a motion to reconsider. See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms, . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief." Fed. R. Civ. P. 60(b). A court cannot enlarge

the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 348 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103 JB/WPL, 2012 WL 869000, at *2 (D.N.M. March 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005)(quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney in the litigation has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer

Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

Link v. Wabash R.R., 370 U.S. 626, 633-34 (1962)(quoting Smith v. Ayer, 101 U.S. 320, 326 (1879)). The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct," and has noted that "[t]hose who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks

omitted)(quoting <u>Pierce v. Cook & Co.</u>, 518 F.2d 720, 722 (10th Cir. 1975)). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore et al., <u>supra</u> § 60.48[2], at 60-182. <u>Accord</u> <u>Liljeberg v. Health Servs. Acquisition Corp.</u>, 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" <u>Liljeberg v. Health Servs. Acquisition Corp.</u>, 486 U.S. at 863-84 (citations omitted)(first quoting <u>Klapprott v. United States</u>, 335 U.S. 601, 614-15 (1949); and then quoting <u>Ackermann v. United States</u>, 340 U.S. 193, 199 (1950)).

Generally, the situation must be one beyond the control of the party moving under rule 60(b)(6) to warrant relief. <u>See</u> <u>Ackermann v. United States</u>, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in <u>Van Skiver v. United States</u>:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by *Pierce*. In that case, this court granted

relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." *Pierce*, 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). *Collins v. City of Wichita*, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45 (second alteration in <u>Van Skiver v. United States</u>).

### 2. <u>Motions to Reconsider Interlocutory Orders</u>.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, <u>i.e.</u>, an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions -- "motion[s] to alter or amend a <u>judgment</u>," Fed. R. Civ. P. 59(e) (emphasis added)(title case omitted) -- as "motions to reconsider,"[103] compounds that baseline confusion. <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1012.

---

[103]The Honorable Paul J. Kelly, Jr., now-Senior United States Circuit Judge for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion. <u>E.g.</u>, 204 F.3d at 1012. He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . [final] judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year

Final judgments are different from interlocutory orders. <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>." (emphasis added)). In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways. First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals. <u>See</u> Fed. R. App. P. 4(a)(4)(B). Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case. <u>See</u> Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion. Third, after

---

after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category). These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii). The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight-day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely. Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58-59 (1982)(per curiam), superseded on other grounds by statute Fed. R. App. P. 4(a)(4).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, Griggs v. Provident Consumer Disc. Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals

and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a

district court to conduct in the twenty-eight-day flux period, the Tenth Circuit, in <u>Servants of the Paraclete v. Does</u>, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  <u>See</u> <u>United States v. Alvarez</u>, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in "three exceptionally narrow circumstances: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice"  (citation omitted)); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district

court's ability to do so, other than that it must do so "before the entry of a judgment." Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007). In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" (citation omitted)). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion

to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[104] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion

---

[104]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "**Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its twenty-eight-day time limit -- does not apply to interlocutory orders. See Houston Fearless Corp. v. Teter, 313 F.2d 91, 92 (10th Cir. 1962)("The original order was not a judgment because it was not appealable and, as it was not a judgment, Rules 52(b) and 59(e) do not apply. . . . No rule of which we are aware limits the plenary power of a federal district court which has made an interlocutory order to grant such relief from that order as justice requires while the case is pending before it."). See also Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch., 212 F. App'x 760, 765 (10th Cir. 2007)(unpublished)("A district court has discretion to revise interlocutory orders prior to entry of final judgment."). The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, et al, Federal Practice & Procedure § 4478.1, at 695-96 (2d ed. 2002)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an

entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court is wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party

opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling and not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must

convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling, and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking. See New Mexico v. Valley Meat Co., No. CIV 14-1100 JB/KBM, 2015 WL 9703255, at *16-22 (D.N.M. Dec. 14, 2015)(Browning, J.).

## RELEVANT LAW REGARDING LAW OF THE CASE

"Under the law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Poche v. Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(unpublished)(quoting Dobbs v. Anthem Blue Cross & Blue Shield, 600 F.3d 1275, 1279 (10th Cir. 2010)). The Tenth Circuit has "acknowledged, however, that 'the rule [of law of the case] is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'" Been v. O.K. Indus., Inc., 495 F.3d at 1224 (quoting Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007)). The Tenth Circuit has stated that this flexibility means "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d at 1227). See Homans v. City of Albuquerque, 366

- 186 -

F.3d 900, 904 (10th Cir. 2004)("[T]he doctrine is discretionary rather than mandatory.").  "If the original ruling was issued by a higher court, a district court should depart from the ruling only in exceptionally narrow circumstances."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)).

"Only final judgments may qualify as law of the case."  Poche v. Joubran, 389 F. App'x at 774 (alteration and internal quotation marks omitted)(quoting Unioil, Inc. v. Elledge (In re Unioil, Inc.), 962 F.2d 988, 993 (10th Cir. 1992)).  The doctrine is inapplicable where "a ruling remains subject to reconsideration."  Wallace v. United States, 372 F. App'x 826, 828 (10th Cir. 2010)(unpublished)(internal quotation marks omitted)(quoting Unioil, Inc. v. Elledge (In re Unioil, Inc.), 962 F.2d at 993).  This principle means that "district courts generally remain free to reconsider their earlier interlocutory orders."  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005); United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2004)(per curiam)(explaining that a district court may review its prior rulings so long as it retains jurisdiction over the case)).

Similarly, this Court has stated that "[l]aw of the case is a doctrine that binds the trial court after an appeal."  Lane v. Page, 727 F. Supp. 2d 1214, 1230 n.9 (D.N.M. 2010)(Browning, J.)(citation omitted).  In Weston v. Harmatz, 335 F.3d 1247 (10th Cir. 2003)(McConnell, J.), the Tenth Circuit stated:

> Under the law of the case doctrine, "[a] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and

the parties are deemed to have waived the right to challenge that decision at a later time."

335 F.3d at 1255 (alteration in Weston v. Harmatz)(quoting Concrete Works of Colo., Inc. v. City & Cty. of Denver, 321 F.3d 950, 992 (10th Cir. 2003)).

The law-of-the-case "doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). "A complementary theory, the mandate rule, 'generally requires [district] court conformity with the articulated appellate remand,' but the mandate rule 'is a discretion-guiding rule subject to exception in the interests of justice." United States v. Webb, 98 F.3d 585, 587 (10th Cir. 1996)(alteration in United States v. Webb)(quoting United States v. Moore, 83 F.3d 1231, 1234 (10th Cir. 1996)).

The doctrine has particular relevance following a remand order issued by an appellate court. "[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995). The law of the case doctrine is intended to prevent "continued re-argument of issues already decided," *Gage v. Gen. Motors Corp.*, 796 F.2d 345, 349 (10th Cir. 1986), and to preserve scarce court resources -- to avoid "in short, Dickens's *Jarndyce v. Jarndyce* syndrome." *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000).

. . . .

. . . [T]hree "exceptionally narrow" grounds justify departing from the law of the case doctrine: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *McIlravy*, 204 F.3d at 1035.

Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d 1128, 1132-33 (10th Cir. 2001). Although the law-of-the-case doctrine "is designed to promote finality and prevent re-litigation of previously decided issues," it "does not serve to limit a court's power." Rimbert v. Eli Lilly & Co., 647 F.3d at 1251. "The doctrine applies to issues previously decided, either explicitly or by necessary implication." Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9, 10 F.3d 700, 706 (10th Cir. 1993)(citations omitted), abrogated in part on other grounds on reh'g, 39 F.3d 1078 (10th Cir. 1994)(en banc). See Emp'rs' Mut. Cas. Co. v. Bartile Roofs, Inc., 478 F. App'x 493, 498 (10th Cir. 2012)(unpublished)(holding that, "to the extent that [the defendant] attempts to circumvent our prior legal conclusion concerning what constitutes an 'accident' under the [relevant insurance] policies, the law of the case doctrine bars the attempt"). The Tenth Circuit has long held that there are

> three grounds under the "law of the case" doctrine by which we might conclude an issue was implicitly resolved in a prior appeal, as follows: (1) resolution of the issue was a necessary step in resolving the earlier appeal; (2) resolution of the issue would abrogate the prior decision and so must have been considered in the prior appeal; and (3) the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated.

Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9, 10 F.3d at 707.

### LAW REGARDING TITLE VII EMPLOYMENT DISCRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin." Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3). The Court has noted that Title VII generally

protects individuals from employers' improperly motivated adverse treatment in the workplace: "Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(internal quotation marks and alterations omitted)(quoting 42 U.S.C. § 2000e-2(a)(1)). With the 1972 amendments to the statute, Title VII's protections apply to federal and private employees. See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)); Walton v. N.M. State Land Office, 113 F. Supp. 3d 1178, 1184 (D.N.M. 2015)(Browning, J.); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1098 (D.N.M. 2011)(Browning, J.).

1.    **Title VII Retaliation.**

To establish a prima facie case of retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007)(internal quotation marks omitted)(quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202). "To establish that a causal connection exists," a plaintiff "may proffer 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Proctor v. United Parcel Serv.,

502 F.3d at 1208 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)). Generally speaking, if this temporal proximity between the protected activity and the adverse action are not "very close in time," the plaintiff "must offer additional evidence to establish causation." Proctor v. United Parcel Serv., 502 F.3d at 1209 (internal quotation marks omitted)(quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1228). See Walton v. N.M. State Land Office, 113 F. Supp. 3d at 1190; Gerald v. Locksley, 785 F. Supp. 2d at 1099-1100.

### 2. **Materially Adverse Employment Action.**

The Tenth Circuit liberally defines what constitutes an adverse employment action. See Orr v. City of Albuquerque, 417 F.3d 1144, 1150 (10th Cir. 2005)("Because of the remedial nature of Title VII lawsuits, we broadly define adverse employment action."). The Tenth Circuit has stated:

> Such actions are not simply limited to monetary losses in the form of wages or benefits. *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996). Instead, we take a "case-by-case approach," examining the unique factors relevant to the situation at hand. *Jeffries* [v. Kansas, 147 F.3d 1220, ]1232 [(10th Cir. 1998)]. Nevertheless, we will not consider "a mere inconvenience or an alteration of job responsibilities" to be an adverse employment action. *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) . . . .

Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998). See Proctor v. United Parcel Serv., 502 F.3d at 1208. An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 64 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)(internal quotation marks omitted)(quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. at 68). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. v. White, 548 U.S. at 67-68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms."). "We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'" Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)). Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, Berry v. Stevinson Chevrolet, 74 F.3d at 986, although "'a mere inconvenience or an alteration of job responsibilities' will not suffice," Annett v. Univ. of Kan., 371 F.3d at 1239 (quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 532).

In Anderson v. Clovis Municipal Schools, 265 F. App'x 699 (10th Cir. 2008)(unpublished), the Tenth Circuit, in an unpublished opinion, addressed the requirement of an adverse employment action in the context of a disparate-treatment claim and a hostile work environment claim. There, an employee, who had been placed on a growth plan, alleged other harsh treatment and a written reprimand in support of his claim that he suffered a hostile work environment. See 265 F. App'x at 704. Relying on Schuler v. City of Boulder, 189 F.3d 1304

(10th Cir. 1999), the plaintiff argued that the growth plan and formal reprimand rose to the level of an adverse employment action under Tenth Circuit law. See 265 F. App'x at 704. In MacKenzie v. City & County of Domier, the Tenth Circuit discussed Anderson v. Clovis Municipal School's reliance on Schuler v. City of Boulder and stated: "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." 414 F.3d at 1279 (internal quotation marks omitted)(quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2007)(explaining that Title VII proscribes only discriminatory conduct that "alters the employee's 'compensation, terms, conditions, or privileges of employment,' or 'adversely affect[s] [the employee's] status as an employee" (second alteration added)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533)). "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." Robinson v. Cavalry Portfolio Servs., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(unpublished)(internal quotation marks omitted)(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1222). See Walton v. N.M. State Land Office, 113 F. Supp. 3d at 1190-92; Gerald v. Locksley, 785 F. Supp. 2d at 1100-01.

# RELEVANT LAW REGARDING THE REHABILITATION ACT AND THE ADA

Section 504 of the Rehabilitation Act states: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  Section 504 thus prohibits employers from discriminating against or failing to accommodate employees who are disabled within the meaning of the Rehabilitation Act, and creates a private right of action in favor of a qualified victim of such discrimination.  See, e.g.,  Consol. Rail Corp. v. Darrone, 465 U.S. 624, 629, 632 (1984)(stating that § 504 does not apply only "where a primary objective of the Federal financial assistance was to provide employment," and that "it is unquestionable that [§ 504] was intended to reach employment discrimination"); McGeshick v. Principi, 357 F.3d 1146, 1149 (10th Cir. 2004)("The [Rehabilitation Act] makes available a private right of action to qualified individuals who have been subjected to discrimination by the federal government or by a program or activity receiving federal financial assistance."  (citing 29 U.S.C. § 794(a); Niehaus v. Kan. Bar Ass'n, 793 F.2d 1159, 1162 (10th Cir. 1986)); Pushkin v. Regents of Univ. of Colo., 658 F.2d 1372, 1380 (10th Cir. 1981)(holding that § 504 creates a private right of action).  In cases of employment discrimination brought under 29 U.S.C. § 794, the Rehabilitation Act adopts "the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to

employment." 29 U.S.C. § 794(d). Because of this relationship, "decisions under both acts apply interchangeably to [a court's] analysis." Vidacak v. Potter, 81 F. App'x 721, 723 (10th Cir. 2003)(unpublished).

### 1. Prima Facie Case of Disability Discrimination.

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show: (i) that he or she is disabled under the Rehabilitation Act; (ii) that he or she is a qualified individual for the position; (iii) that the employer receives federal financial assistance; and (iv) the employer discriminated against the plaintiff. See McGeshick v. Principi, 357 F.3d at 1150; Vidacak v. Potter, 81 F. App'x at 723. An employer may discriminate against an employee by subjecting the employee to an adverse employment action, i.e., "acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Dick v. Phone Directories Co., 397 F.3d 1256, 1268 (10th Cir. 2005). An employer can also discriminate by failing to accommodate an employee's disability, unless such an accommodation would create an undue hardship. See 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

### a. Establishing a Person is Disabled Within the Meaning of the Rehabilitation Act.

The Rehabilitation Act defines "individual with a disability" for purposes of subchapter V -- under which 29 U.S.C. § 794 falls -- as "any person who has a disability as defined in section 12102 of Title 42." 29 U.S.C. § 705(20)(B). Accordingly, § 504 of the Rehabilitation

Act adopts the ADA's definition of "disability," which, regarding an individual, means: "**(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual; **(B)** a record of such an impairment; or **(C)** being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Accordingly, a major life activity is not confined to those activities "with a public, economic, or daily aspect." Bragdon v. Abbott, 524 U.S. 624, 639 (1998). Further, "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" 29 C.F.R. § 1630.2(i)(2)(quoting Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002), superseded by statute, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat 3553 ("ADAAA")).

As the Rehabilitation Act adopts the ADA's definition of "disability," ADA regulations interpreting the ADA's definition are applicable to the Rehabilitation Act for § 794 purposes. See McGeshick v. Principi, 357 F.3d at 1150 (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. at 198 to define "substantially limited," which relies on ADA regulations to define

"substantially limited").    ADA regulations provide "rules of construction," 29 C.F.R.

§ 1630.2(j)(1), for determining whether an impairment substantially limits an individual's major

life activity:

> (i) The term "substantially limits" shall be construed broadly in favor of
> expansive coverage, to the maximum extent permitted by the terms of the ADA.
> "Substantially limits" is not meant to be a demanding standard.
>
> (ii) An impairment is a disability within the meaning of this section if it
> substantially limits the ability of an individual to perform a major life activity as
> compared to most people in the general population.    An impairment need not
> prevent, or significantly or severely restrict, the individual from performing a
> major life activity in order to be considered substantially limiting.    Nonetheless,
> not every impairment will constitute a disability within the meaning of this
> section.

29 C.F.R. § 1630.2(j)(1)(i)-(ii).    The regulations underscore that the determination of

"substantially limits" is an individualized assessment and has a standard lower than that applied

before the ADAAA's passage.    29 C.F.R. § 1630.2(j)(1)(iv)("[T]he term 'substantially limits'

shall be interpreted and applied to require a degree of functional limitation that is lower than the

standard for 'substantially limits' applied prior to the ADAAA.").    Further, when making a

determination of "substantially limits," a court should not consider "the ameliorative effects of

mitigating measures" besides "ordinary eyeglasses or contact lenses."    29 C.F.R.

§ 1630.2(j)(1)(vi).    "Whether an individual's impairment 'substantially limits' a major life

activity is not relevant," however, to a plaintiff's establishing that he or she is "regarded as"

having a disability.    29 C.F.R. § 1630.2(j)(2).    See also 29 C.F.R. § 1630.2(g)(3)("[T]he

'regarded as' prong of the definition of disability . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.").

To establish the "regarded as" definition of disability, the plaintiff must show "that he or she has been subjected to [discrimination] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The perceived impairment must not be transitory -- "with an actual or expected duration of 6 months nor less" -- nor "minor." 42 U.S.C. § 12102(3)(B). Congress passed the ADAAA to make it easier for a plaintiff to make out a "regarded as" prong claim by rejecting the narrowed requirement that the Supreme Court proffered in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), and by reinstating the "broad view" in School Board of Nassau County v. Arline, 480 U.S. 273 (1987). Pub. L. No. 110-325, § 2(b)(3), 122 Stat. 3553, 3554. Sutton v. United Air Lines, Inc. required a plaintiff to establish that the employer believed the plaintiff to have an impairment that substantially limits a major life activity. See 527 U.S. at 489. The Supreme Court in School Board of Nassau County v. Arline discussed how Congress "expanded the definition" of "disability"[105] under the Rehabilitation Act "[t]o combat the effects of erroneous but nevertheless prevalent perceptions about the handicapped" and thus to prohibit discrimination based on the perception of an impairment. Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. at 279 (citing Se. Cmty. College v. Davis, 442 U.S. 397, 405-06 n.6 (1979)). The Supreme

---

[105]The Supreme Court uses the term "handicapped individual," because that was the term the Rehabilitation Act used at the time. The definitions of "handicapped individual" that the Supreme Court is discussing, and the current term "disability" are the same. Compare Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. at 279, with 42 U.S.C. § 12102(1)

Court reasoned that a person regarded as impaired could be substantially limited in his or her "ability to work as a result of the negative reactions of others to the impairment." Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. at 283.

The Tenth Circuit discusses the passage of the ADAAA and Congressional abrogation of the Supreme Court's regarded-as-disabled precedent in Adair v. City of Muskogee, 823 F.3d 1297 (10th Cir. 2016). The Tenth Circuit notes that, now, a "regarded as" impairment "need not limit or even be perceived as limiting a major life activity -- the employer need only regard the employee as being impaired, whether or not the employer also believed that the impairment prevented the employee from being able to perform a major life activity." Adair v. City of Muskogee, 823 F.3d at 1305-06. "Unlike pre-ADAAA plaintiffs, an ADAAA plaintiff no longer needs to plead and prove that the actual or perceived impairment 'substantially limited one or more major life activities.'" Adair v. City of Muskogee, 823 F.3d at 1306 (quoting Mercado v. Puerto Rico, 814 F.3d 581, 588 (1st Cir. 2016)). Thus, a regarded-as-disabled claim now requires that the plaintiff establish that "(1) he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." Adair v. City of Muskogee, 823 F.3d at 1306.

If the alleged discrimination occurred before January 1, 2009, the ADAAA's effective date, the Tenth Circuit requires a plaintiff to show that the employer "regarded her as having an impairment that substantially limited the major life activity of working." Baltazar v. Shinseki,

485 F. App'x 941, 944-45 (10th Cir. 2012)(unpublished). See Equal Emp't Opportunity

Comm'n, 853 F.3d 1150, 1155-56 (10th Cir. 2017)(citing Sutton v. United Air Lines, Inc., 527

U.S. at 489). In Detterline v. Salazar, 320 F. App'x 853 (10th Cir. 2009)(unpublished), the

Tenth Circuit stated that, to establish a "regarded as" disability, the

> plaintiff must show that (1) the employer mistakenly believes the plaintiff has a
> physical or mental impairment that substantially limits a major life activity; or
> (2) the employer mistakenly believes that an existing impairment substantially
> limits a major life activity when, in fact, the impairment does not result in a
> limitation.

320 F. App'x at 856 (citing Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1086 (10th Cir.

2008))). "The fact that an employer recognizes an employee's physical restrictions and places

him in a position allowing him to work within those restrictions does not, by itself, [however,]

show that the employer regarded him as disabled." Detterline v. Salazar, 320 F. App'x at 858.

The plaintiff must prove that the employer perceived a disabling impairment under the

Rehabilitation Act. See Detterline v. Salazar, 320 F. App'x at 857 (citing McGeshick v. Principi,

357 F.3d at 1151). The court's "focus is on the employer's subjective state of mind: did the

employer mistakenly believe that the plaintiff was substantially limited in performing a major

life activity?" Justice v. Crown Cork & Seal Co., 527 F.3d at 1086.

### b. Establishing a Person is "Qualified" Under the Rehabilitation Act.

The ADA defines "qualified individual" as "an individual who, with or without

reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires." 42 U.S.C. § 12111(8). Cf. 45 C.F.R. § 84.3(*l*)(1) (defining a

"qualified handicapped person" as "a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question"). Further, "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 1211(8). "Essential functions of the job [are] functions that bear more than a marginal relationship to the job at issue." Adair v. City of Muskogee, 823 F.3d at 1307 (internal quotation marks omitted)(quoting Hawkins v. Schwan's Home Serv., Inc., 778 F.3d 877, 887 (10th Cir. 2015)). To determine if a function is essential, Tenth Circuit considers,

> among other things, (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the time spent performing the particular function; (4) the consequences if the individual cannot perform the function; (5) any collective-bargaining agreement; (6) the work experience of those in the position in the past; and (7) the current work experience of those in similar positions.

Adair v. City of Muskogee, 823 F.3d at 1307 (citing 29 C.F.R. § 1630.2(n)(3)). If a plaintiff cannot perform an essential job function, he or she is nonetheless still considered a "qualified individual" if: (i) "a reasonable accommodation would have enabled [the plaintiff] to perform his [or her] original job," and (ii) the employer could reassign the plaintiff to an existing, vacant position "to which 'a similarly situated, non-disabled employee' could apply." Sanchez v. U.S. Dep't of Energy, 870 F.3d 1185, 1199-1200 (10th Cir. 2017)(quoting Koessel v. Sublette Cty. Sheriff's Dep't, 717 F.3d at 745 (10th Cir. 2013)(Tymkovich, J.)). The plaintiff bears the burden of showing such qualification. See Koessel v. Sublette Cty. Sheriff's Dep't, 717 F.3d at 743 (citing Henagirv. Utah Dep't of Corr., 587 F.3d 1255, 1262 (10th Cir. 2009)).

## 2.     Illegal Medical Inquiry Claims Under the Rehabilitation Act.

Section 504 of the Rehabilitation Act incorporates many of the ADA "Title I's prohibitions on employment discrimination by reference, including § 12112(D)(4)(A)'s medical inquiry prohibition." Taylor v. City of Shreveport, 798 F.3d 273, 283 (5th Cir. 2015)(footnote omitted). See 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) . . . ."). Accordingly, an employer receiving federal financial assistance or a federal agency "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). An employer may, however, "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). Requesting "a prohibited medical examination or inquiry may constitute a form of employment discrimination." Taylor v. City of Shreveport, 798 F.3d at 282. See 42 U.S.C. § 12112(d)(1) ("The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.").

To maintain a prohibited-medical-inquiry claim of discrimination, a plaintiff does not need to assert that he or she "is an individual with a disability." Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1229 (10th Cir. 1997). See Williams v. FedEx Corp.

Servs., 849 F.3d 889, 901 (10th Cir. 2017).  The purpose of bringing such a claim is to prevent employers from inquiring into whether employees have a disability, so requiring a plaintiff to identify as disabled as part of the prima facie case "makes little sense."  Griffin v. Steeltek, Inc., 160 F.3d 591, 594 (10th Cir. 1998).  A prima facie case requires the plaintiff to establish: "(1) that he is an employee of the defendant employer, and (2) that the defendant-employer required him to undergo a medical examination or made a disability-related inquiry of him." Williams v. FedEx Corp. Servs., 849 F.3d at 901 (citing Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d at 1229).  The United States Court of Appeals for the Sixth Circuit has noted that EEOC guidelines define "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health," and discussed factors helpful to this determination:

> (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

Bates v. Dura Auto. Sys., Inc., 767 F.3d at 574-75 (quoting EEOC, No. 915.002 Enforcement Guidance: Disability-Related Injuries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) (2000), 2000 WL 33407171, at *3, ("EEOC Enforcement Guidance")).  The Sixth Circuit has stated that the third factor is "arguably the most

critical in this analysis." <u>Kroll v. White Lake Ambulance Auth.</u>, 691 F.3d 809, 819 (6th Cir. 2012).

The employer may avoid liability "by demonstrating that the medical examination or disability-related inquiry was job-related and consistent with business necessity." <u>Williams v. FedEx Corp. Servs.</u>, 849 F.3d at 901 (citing 42 U.S.C. § 12112(d)(4)(A)). The Tenth Circuit has "recognized that 'courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine whether the employer can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.'" <u>Williams v. FedEx Corp. Servs.</u>, 849 F.3d at 902 (quoting <u>Adair v. City of Muskogee</u>, 823 F.3d at 1312). In <u>Adair v. City of Muskogee</u>, the Tenth Circuit determined that where "an employee has sought workers' compensation benefits based on a potential permanent or temporary physical impairment, an employer has a valid business interest in determining whether the employee is actually able to perform the essential functions of his job," and thus found an evaluation into these essential functions to be "job-related and consistent with business necessity." 823 F.3d at 1313. In <u>Martin v. Kansas</u>, 190 F.3d 1120 (10th Cir. 1999), <u>overruled on other grounds</u>, <u>Bd. of Trs. of Univ of Ala. v. Garrett</u>, 531 U.S. 356, 373-74 (2001), the Tenth Circuit found that a form that "sought verification of an employee's ability to perform the essential functions of his job, or to begin the process of identifying appropriate and necessary reasonable accommodations for employees of need of such accommodation," and used to "set[] post assignments and establish[]

- 204 -

reasonable accommodations," was job-related and consistent with business necessity.  190 F.3d at 1134.

### 3.    Constructive Discharge Claims Under the Rehabilitation Act.

The Rehabilitation Act also adopts ADA standards for constructive discharge claims, and, thus, "[c]onstructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."  Corley v. Dep't of Veterans Affairs ex rel. Principi, 218 F. App'x 727, 739 (10th Cir. 2007)(unpublished)(internal quotation marks omitted)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 534).  The plaintiff must have also resigned to establish a claim for constructive discharge.  See Green v. Brennan, 136 S. Ct. at 1777.  A plaintiff alleging constructive discharge based on disability discrimination under the Rehabilitation Act must also establish: (i) that he or she has a disability as defined under the Rehabilitation Act, see Corley v. Dep't of Veterans Affairs ex rel. Principi, 218 F. App'x at 739 (citing Wells v. Shalala, 228 F.3d 1137, 1146 (10th Cir. 2000)); Lanman v. Johnson Cty., 393 F.3d at 1158), and (ii) that he or she is a qualified individual for the position, see Wells v. Shalala, 228 F.3d at 1146.

When determining whether constructive discharge has occurred, a court must examine the employer's actions objectively.  See, e.g., Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997)(" To determine whether a jury question exists as to the voluntariness of Plaintiffs' respective resignations, we consider the totality of the circumstances under an

objective standard."). "The conditions of employment must be objectively intolerable; the 'plaintiff's subjective views of the situation are irrelevant.'" Sanchez v. Denver Pub. Sch., 164 F.3d at 534 (quoting Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d at 1356). "Essentially, a plaintiff must show that she had '*no other choice* but to quit.'" Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d at 1356 (emphasis in Woodward v. City of Worland)(quoting Woodward v. City of Worland, 977 F.2d 1392, 1401 (10th Cir. 1992)). Thus, a plaintiff cannot successfully allege constructive discharge where the resignation was voluntary. See, e.g., Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d at 1356. In determining voluntariness, the Tenth Circuit has instructed that courts "consider the totality of the circumstances under an objective standard." Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d at 1356. The factors that inform the court's analysis include: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether [the employee] was permitted to select the effective date of resignation." Parker v. Bd. of Regents of Tulsa Junior Coll., 981 F.2d 1159, 1162 (10th Cir. 1992).

Typically, constructive discharge claims rest on an allegation of a hostile work environment. See Premratananont v. S. Suburban Park & Recreation Dist., 149 F.3d 1191, 1998 WL 211543, at *2 (10th Cir. 1998)(unpublished table opinion). "A hostile work environment is a workplace 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working

environment." Dye v. Moniz, 672 F. App'x 836, 840 (10th Cir. 2016)(unpublished). A constructive discharge claim may also rest on "other types of intolerable working conditions such as retaliatory conduct for making a complaint of discrimination or a failure to promote for discriminatory reasons." Premratananont v. S. Suburban Park & Recreation Dist., 1998 WL 211543, at *2 (citations omitted)(citing Woodward v. City of Worland, 977 F.2d at 1402; Irving v. Dubuque Packing Co., 689 F.2d 170, 171-72 (10th Cir. 1982), repudiated on other grounds by Koch v. City of Hutchinson, 814 F.2d 1489 (10th Cir. 1987)). "However, '[a] finding of constructive discharge must not be based on the discriminatory act; there must also be aggravating factors that make staying on the job intolerable.'" Premratananont v. S. Suburban Park & Recreation Dist., 1998 WL 211543, at *2 (alteration in Premratananont v. S. Suburban Park & Recreation Dist.)(quoting James v. Sears Roebuck, 21 F.3d 989, 992 (10th Cir. 1994)). For example, "[a] perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify finding of constructive discharge." James v. Sears Roebuck, 21 F.3d at 993. In Hunt v. Central Consolidated School District, 951 F. Supp. 2d 1136 (D.N.M. 2013)(Browning, J.), the Court dismissed the plaintiff' claims for constructive discharge, because the complaint did not provide "any facts about discriminatory comments, or other discriminatory harassment relating to the Plaintiff's 'race, color, religion, sex, or national origin.'" 951 F. Supp. 2d at 1215-16 (quoting 42 U.S.C. § 2000e-2(a)(1)). See also Gerald v. Locksley, 785 F. Supp. 2d at 1119 (dismissing claim of constructive discharge because the plaintiff did not "allege the requisite

level of severe working conditions required").  Further, in <u>King v. Salazar</u>, Nos. CIV 05-0575 JB/WDS, CIV 05-0997 JB/WDS, 2009 WL 13007401 (D.N.M. March 2, 2009)(Browning, J.), the Court concluded that the plaintiff's resignation was voluntary and granted the defendant summary judgment on the plaintiff's constructive discharge claim.  <u>See</u> 2009 WL 13007401, at *10-11 (noting that "[a] plaintiff seeking to prove a claim of constructive discharge faces a heavy burden").

Moreover, in cases involving alleged constructive discharge, the general rule is that a reasonable employee must remain and fight discrimination on the job.  <u>E.g.</u>, <u>Derr v. Gulf Oil Co.</u>, 796 F.2d 340, 342-43 (10th Cir. 1986).  There is a presumption that, unless the situation becomes intolerable, it is preferable for the employee to seek redress within the context of the employment relationship.  <u>See</u> <u>Perry v. Harris Chernin, Inc.</u>, 126 F.3d 1010, 1015 (7th Cir. 1997)("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."  (quoting <u>Rabinovitz v. Pena</u>, 89 F.3d 482, 489 (7th Cir. 1996)); <u>Garner v. Wal-Mart Stores, Inc.</u>, 807 F.2d 1536, 1539 (11th Cir. 1987)(holding that employee has duty to inform higher management and use available grievance procedures, including the EEOC); <u>Derr v. Gulf Oil Co.</u>, 796 F.2d at 342-43 ("We agree with the Fifth Circuit's statement in <i>Bourque</i> [<u>v. Powell Elec. Mfg. Co.</u>, 617 F.2d 61, 66 (5th Cir. 1980),] that 'society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships.'").  The obligation to seek redress is particularly true given the statutory protections from discrimination

and retaliation that the Rehabilitation Act, through its incorporation of the ADA, affords. <u>Cf.</u> <u>Derr v. Gulf Oil Corp.</u>, 796 F.2d at 342-43 (discussing Title VII's protections); <u>Bourque v.</u> <u>Powell Elec. Mfg. Co.</u>, 617 F.2d at 66 (same).

### 4. <u>Retaliation Claims Under the Rehabilitation Act.</u>

A prima facie case of retaliation requires that the plaintiff demonstrate: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." <u>Argo v. Blue Cross & Blue Shield of</u> <u>Kan., Inc.</u>, 452 F.3d at 1202 (10th Cir. 2006)(footnote omitted). A plaintiff alleging retaliation need not establish that he or she meets the Rehabilitation Act's definition of disabled; rather, the plaintiff's "reasonable, good-faith belief that the statute has been violated suffices." <u>Selenke v.</u> <u>Med. Imaging of Colo.</u>, 248 F.3d 1249, 1264 (10th Cir. 2001). Section 504 of the Rehabilitation Act and the ADA prohibits "discrimination against any individual 'because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." <u>Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.</u>, 595 F.3d at 1131 (quoting 42 U.S.C. § 12203(a)). <u>See</u> 29 U.S.C. § 794(d) (incorporating ADA standards, including 42 U.S.C. §§ 12201-04, into claims of employment discrimination brought under this section of the Rehabilitation Act). "Because the ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), contains essentially the same language as Title VII's provision, 42 U.S.C. § 2000e-3(a), [Title

VII precedent] applies in the ADA context as well" and, thus, to the Rehabilitation Act.  Proctor v. United Parcel Serv., 502 F.3d at 1208 n.4 (citing Burlington N. & Santa Fe Ry. v. White).  See Haynes v. Level 3 Commc'ns, 456 F.3d at 1228 (applying the same elements of a prima facie case to Title VII and to ADA retaliation claims); Lanman v. Johnson Cty., 393 F.3d at 1155-56 (asserting that the shared language, "parallel purposes[,] and remedial structures of the [ADA and of Title VII] support a consistent interpretation").

"Protected activity" refers to activity that the statute protects, such as filing an EEOC claim or other administrative charges.  See Proctor v. United Parcel Serv., 502 F.3d at 1208.  An adverse employment action "must be 'materially adverse' to the employee's job status.  The adverse action must amount to 'a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Meiners v. Univ. of Kan., 359 F.3d 1222, 1230 (10th Cir. 2004)(citation omitted)(first quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533; then quoting Aquilino v. Univ. of Kan., 268 F.3d 930, 934 (10th Cir. 2001)).  Close temporal proximity between the protected activity and the adverse action "is sufficient to allow an inference [of] a causal connection" between them.  Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202 (allowing such inference where there were twenty-four days between the protected activity and adverse action)(citing Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(noting that a six-week period establishes this rebuttable inference but a three-month period does not)).

### 5.    **Direct Evidence of Discrimination.**

A plaintiff must support his or her case with either direct or circumstantial evidence.  See Davidson v. Am. Online, Inc., 337 F.3d 1179, 1189 (10th Cir. 2003).  "Direct evidence is '[e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"  Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999)(alterations in Shorter v. ICG Holdings, Inc.)(quoting Black's Law Dictionary 460 (6th ed. 1990)), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 98-102 (2003).  Moreover, "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002).  "A statement that can plausibly be interpreted two different ways -- one discriminatory and the other benign -- does not directly reflect illegal animus, and, thus, does not constitute direct evidence."  Hall v. U.S. Dep't of Labor, Admin. Review Bd., 476 F.3d 847, 855 (10th Cir. 2007)(internal quotation marks omitted)(quoting Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002)).  "When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, . . . the plaintiff 'must demonstrate a nexus exists between [the] allegedly discriminatory statements and the . . . decision to terminate her.'"  Perry v. Woodward, 199 F.3d 1126, 1134 (10th Cir. 1999)(alteration in Perry v. Woodward)(quoting Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994)).  "Direct evidence is that which demonstrates 'a specific link between the alleged discriminatory animus and the challenged [employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion

actually motivated [the employer's] decision' to take the adverse employment action." Deneen v. Nw. Airlines, Inc., 132 F.3d 431, 436 (8th Cir. 1998)(alterations in Deneen v. Nw. Airlines, Inc.)(quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). "Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements." Hall v. U.S. Dep't of Labor, Admin. Review Bd., 476 F.3d at 855 (citing Shorter v. ICG Holdings, Inc., 188 F.3d at 1207).

## 6. **Burden-Shifting Under McDonnell Douglas.**

In the absence of direct evidence, a plaintiff alleging discrimination under the Rehabilitation Act may rely upon the burden-shifting framework that the Supreme Court, in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)("McDonnell Douglas"), provided. E.g., Pushkin v. Regents of Univ. of Colo., 658 F.2d 1372, 1387 (10th Cir. 1981). Under the McDonnell Douglas framework, once a plaintiff has made out a prima facie Rehabilitation Act case, the burden shifts to the defendant to show either that "the plaintiff was not . . . otherwise qualified" or that there is a nondiscriminatory reason for the adverse action. Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1387. See also Argo v. Blue Cross & Blue Shield of Kan., 452 F.3d at 1202; Mitchell v. City of Wichita, 140 F. App'x 767, 777 (10th Cir. 2005)(Browning, J.)(unpublished). "Upon the employer's articulation of legitimate, nondiscriminatory reasons, the presumption of discrimination established by the prima facie case

'simply drops out of the picture.'" Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). Further, "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 509. "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon these beliefs." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

Once the defendant produces a legitimate, nondiscriminatory explanation for the defendant's action, to survive summary judgment, the plaintiff must establish a genuine question of material fact whether the defendant's explanation is pretextual. See Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1387. To establish a genuine issue of material fact as to pretext, a plaintiff must demonstrate that the defendant's "proffered non-discriminatory reason is unworthy of belief." Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995). To meet this standard, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(internal quotation marks omitted)(quoting Olson v. Gen. Elec.

Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)). "If a plaintiff advances evidence upon which a factfinder could conclude that the defendant's allegedly nondiscriminatory reasons for the employment decisions are pretextual, the court should deny summary judgment." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1134. "[A] plaintiff's prima facie case [of discrimination], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Consequently, "once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005).

> Debunking one of the employer's explanations defeats the case for summary judgment "only if the company has offered no other reason that, *if that reason stood alone* (more precisely if it did not have support from the tainted reason), would have caused the company to take the action of which the plaintiff is complaining."

Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1310 (10th Cir. 2005)(emphasis in Russell v. Acme-Evans Co.)(quoting Russell v. Acme-Evans Co., 51 F.3d 64, 69 (7th Cir. 1995)).

### 7. Exhaustion of Administrative Remedies.

Until recently, the Tenth Circuit remained steadfast that "[t]he exhaustion of administrative remedies is a jurisdictional prerequisite to instituting an action in federal court under both the Rehabilitation Act and Title VII." Showalter v. Weinstein, 233 F. App'x 803,

804 (10th Cir. 2007)(unpublished)(citations omitted).  The Tenth Circuit recently overruled this precedent, however, holding "that a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." Lincoln v. BNSF Ry., 900 F.3d 1166, 1185 (10th Cir. 2018).  This holding rested, in part, on 42 U.S.C. § 2000e-5(f)(3)'s plain language.  See Lincoln v. BNSF Ry., 900 F.3d at 1184-85. Accordingly, the holding also applies to Rehabilitation Act precedent requiring exhaustion, because, the Rehabilitation Act incorporates "[t]he remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k))" for violations of § 501, 29 U.S.C. § 794a(a)(1), and incorporates "[t]he remedies procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.)(and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation)" for violations of §504 "by any recipient of Federal assistance or Federal provider of such assistance," 29 U.S.C. § 794a(a)(2).  See also Woodman v. Runyon, 132 F.3d 1130, 1341 (10th Cir. 1997)(stating that "[t]he Rehabilitation Act encompasses [Title VII's] exhaustion requirement").  Accordingly, federal courts in the Tenth Circuit now have jurisdiction over Rehabilitation Act claims for which a plaintiff has not exhausted administrative remedies, although the failure to exhaust may be grounds for a motion to dismiss.  See Lincoln v. BNSF Ry., 900 F.3d at 1186.  Exhaustion of administrative remedies is not always required, however,

under the Rehabilitation Act.  See McGeshick v. Principi, 357 F.3d at 1149 ("Exhaustion of administrative remedies is not necessary to sustain a Rehabilitation Act claim.").

The United States Department of Health and Human Services regulations regarding the procedures under § 504 provide that "[t]he procedural provisions applicable to title VI of the Civil Rights Act of 1964 apply to this part," and that the "procedures are found in §§ 80.6 through 80.10 and Part 81 of this Title."  45 C.F.R. § 84.61.  See also 45 C.F.R. § 84.1 ("The purpose of this part is to effectuate section 504 of the Rehabilitation Act of 1973, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance.").  These procedures create a public administrative remedy, providing for the "suspension or termination of or refusal to grant or to continue Federal financial assistance."  45 C.F.R. § 80.8(a).  Accordingly, in 1981, the Tenth Circuit determined that a non-federal-employee plaintiff need not exhaust administrative remedies to bring a § 504 claim, as the administrative redress -- "suspension or termination of the federal assistance" -- "would be an empty remedy indeed for the plaintiff herein who was seeking to continue his residency program."  Pushkin v. Regents of the Univ. of Colo., 658 F.3d at 1381.  The Tenth Circuit therefore held that "under s 504 of the Rehabilitation Act the plaintiff is not compelled to pursue a remedy which is irrelevant to his particular need."  Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1382.  The Tenth Circuit reiterated this holding the following year by holding that the plaintiff class did not need to exhaust its state administrative remedy, because the "administrative process provided in this case poses both quality of relief and time lapse problems

to the class." <u>N.M. Ass'n for Retarded Citizens v. New Mexico</u>, 678 F.2d 847, 851 (10th Cir. 1982). Accordingly, there is no exhaustion requirement for a private person to bring a § 504 Rehabilitation Act claim against an employer that receives federal funding. See <u>McGeshick v. Principi</u>, 357 F.3d at 1149; <u>Pushkin v. Regents of Univ. of Colo.</u>, 1380-82; <u>Werback v. Univ. of Ark.</u>, No. 15-9273-CM, 2016 WL 3522042, at *1 (D. Kan. June 28, 2016)(Murguia, J.)("Neither does Section 504 independently require exhaustion of administrative remedies."); <u>Ombe v. Martinez</u>, No. 14-CV-00763 RB/KBM, 2015 WL 13662809, at *2 (D.N.M. May 28, 2015)(Brack, J.)("However, exhaustion of administrative remedies is not a mandatory prerequisite for a non-federal employee filing suit under section 504 of the [Rehabilitation] Act.").

> "[A]ny person aggrieved" by a violation of § 504 may seek relief under § 505(a)(2), which permits plaintiffs to invoke "[t]he remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964. Because exhaustion of administrative remedies is not a prerequisite to a Title VI claim, it is well settled that it is not a prerequisite to a private cause of action under § 504(a)(2).

<u>Ryan v. Shawnee Mission Unified Sch. Dist. No. 512</u>, 437 F. Supp. 2d 1233, 1254 (D. Kan. 2006)(Lungstrum, J.)(quoting 29 U.S.C. § 794(a)). See <u>Taylor v. City of Shreveport</u>, 798 F.3d at 284 ("Although a plaintiff must exhaust his or her administrative remedies before pursuing a Rehabilitation Act claim against a federal *agency*, it need not do so before suing a federal *grantee*." (emphasis in original)).

# LAW REGARDING THE REHABILITATION ACT'S STATUTE OF LIMITATIONS

Congress did not provide a statute of limitations for the Rehabilitation Act.

For federal causes of action created prior to 1990 for which "Congress has not established a time limitation for a federal cause of action, the settled practice [is] to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."

Levy v. Kan. Dep't of Soc. & Rehab. Servs., 789 F.3d at 1171-72 (quoting Wilson v. Garcia, 471 U.S. 261, 266-67 (1985), superseded by statute Judicial Improvements act of 1990, 28 U.S.C. § 1658).[106]  The Tenth Circuit, in accordance with other United States Courts of Appeals, has determined that § 504 of the Rehabilitation Act "is a 'civil rights statute . . . closely analogous to section 1983.'"  Baker v. Bd. of Regents of the State of Kan., 991 F.2d at 631 (quoting Hall v. Knott Cty. Bd. of Educ., 941 F.2d 402, 408 (6th Cir. 1991)).  The Supreme Court held in Wilson v. Garcia that 42 U.S.C. "§ 1983 claims are best characterized as personal injury actions."  471 U.S. at 280.  Accordingly, the Tenth Circuit held that, "[b]ecause a section 504 claim is closely analogous to section 1983, . . . section 504 claims are best characterized as claims for personal injuries."  Baker v. Bd. of Regents of the State of Kan., 991 F.2d at 632.  Accordingly, a § 504 claim "must be brought within the period prescribed by state law for personal injury actions."  Baker v. Bd. of Regents of the State of Kan., 991 F.2d at 632 (citing Wilson v. Garcia, 471 U.S. at 276.  In the State of New Mexico, the statute of limitations for a personal injury action is

---

[106]Section 1658 applies only "with respect to causes of action accruing on or after the date of the enactment of this act," 28 U.S.C. § 1658 note (Effective Date), which is December 1, 1990, see 28 U.S.C. § 1658 note (References in Text).  Wilson v. Garcia still applies, then, to federal causes of action which accrued before that date.

three years, <u>see</u> N.M. Stat. Ann. § 37-1-8, so a Rehabilitation Act claim must be brought within three years of the date of accrual.

## LAW REGARDING CLAIM ACCRUAL

"Federal law controls questions relating to accrual of federal causes of action." <u>Baker v. Bd. of Regents of the State of Kan.</u>, 991 F.2d at 632 (citing <u>Newcomb v. Ingle</u>, 827 F.2d 675, 678 (10th Cir. 1987)). Accrual, and the start of the limitations period, "commences when the plaintiff has a 'complete and present cause of action,'" <u>i.e.</u>, "the plaintiff can file suit and obtain relief." <u>Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.</u>, 522 U.S. 192, 201 (1997)(quoting <u>Rawlings v. Ray</u>, 312 U.S. 96, 98 (1941)). "In general, under the federal discovery rule, claims accrue and '[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.'" <u>Alexander v. Oklahoma</u>, 382 F.3d 1206, 1215 (10th Cir. 2004)(alteration in <u>Alexander v. Oklahoma</u>)(quoting <u>Indus. Constructors Corp. v. U.S. Bureau of Reclamation</u>, 15 F.3d 963, 969 (10th Cir. 1994)). "A plaintiff need not know the full extent of his injuries before the statute of limitations begins to run." <u>Indus. Constructors Corp. v. U.S. Bureau of Reclamation</u>, 15 F.3d at 969 (citing <u>Gustavson v. United States</u>, 655 F.2d 1034, 1036 (10th Cir. 1981); <u>Robbins v. United States</u>, 624 F.2d 971, 973 (10th Cir. 1980)). The focus is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief." <u>Alexander v. Oklahoma</u>, 382 F.3d at 1216 (citations

omitted).  There is no requirement that the plaintiff "have conclusive evidence of the cause of an

injury in order to trigger the statute of limitations."  <u>Alexander v. Oklahoma</u>, 382 F.3d at 1216.

## LAW REGARDING THE RELATION-BACK DOCTRINE

Rule 15(c) reads:

**(1)  When an Amendment Relates Back.**  An amendment to a pleading relates
back to the date of the original pleading when:

>**(A)**  the law that provides the applicable statute of limitations allows relation
>back;
>
>**(B)**  the amendment asserts a claim or defense that arose out of the conduct,
>transaction, or occurrence set out -- or attempted to be set out -- in the original
>pleading; or
>
>**(C)**  the amendment changes the party or the naming of the party against
>whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the
>period provided by Rule 4(m) for serving the summons and complaint, the
>party to be brought in by amendment:
>
>>**(i)**  received such notice of the action that it will not be prejudiced in
>>defending on the merits; and
>>
>>**(ii)**  knew or should have known that the action would have been brought
>>against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).

Rule 15(c) provides that, where an amendment would add a party, "relation back" can

occur if the party to be added by the amendment "has received such notice of the initiation of the

action that the party would not be prejudiced in maintaining a defense on the merits."  <u>Brown v.

Uniroyal, Inc.</u>, 108 F.3d 1306, 1307 (10th Cir. 1997)(internal quotation marks omitted)(quoting a

prior version of Fed. R. Civ. P. 15(c)).  "Relation back is dependent upon four factors, all of

which must be satisfied."  <u>Schiavone v. Fortune</u>, 477 U.S. 21, 29 (1986).  The factors are: (i) "the

basic claim must have arisen out of the conduct set forth in the original pleading"; (ii) the party to be added "must have received such notice that it will not be prejudiced in maintaining its defense"; (iii) "that party must or should have known that, but for the mistake concerning identity, the action would have been brought against it"; and (iv) "the second and third requirement must have been fulfilled within the prescribed limitations period." Schiavone v. Fortune, 477 U.S. at 29. "Rule 15(c), which exists to protect defendants from unfair prejudice caused by a plaintiff's tardiness in naming them, applies to pro se complaints as to any others." Pierce v. Amaranto, 276 F. App'x 788, 792 (10th Cir. 2008)(unpublished). In Krupski v. Costa Crociere S.P.A., 560 U.S. 538 (2010), the Supreme Court held that "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness on seeking to amend the pleading." 560 U.S. at 541. The Supreme Court explained:

> [T]he question under Rule 15(c)(1)(C)(ii) is what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant. To the extent the plaintiff's postfiling conduct informs the prospective defendant's understanding of whether the plaintiff initially made a "mistake concerning the proper party's identity," a court may consider the conduct. Cf. *Leonard v. Parry*, 219 F.3d 25, 29 (C.A.1 2000)("[P]ost-filing events occasionally can shed light on the plaintiff's state of mind at an earlier time" and "can inform a *defendant's* reasonable beliefs concerning whether her omission from the original complaint represented a mistake (as opposed to a conscious choice)"). The plaintiff's postfiling conduct is otherwise immaterial to the question whether an amended complaint relates back.

Krupski v. Costa Crociere S.P.A., 560 U.S. 553-54.

# LAW REGARDING RECUSAL

An important feature of the judicial system is that judges are fair and impartial arbiters of the disputes before them.  28 U.S.C. § 455(a) states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Certain listed circumstances also require a judge to recuse himself:

**(1)**  Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

**(2)**  Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

**(3)**  Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

**(4)**  He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

**(5)**  He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

> **(i)**  Is a party to the proceeding, or an officer, director, or trustee of a party;

> **(ii)**  Is acting as a lawyer in the proceeding;

> **(iii)**  Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

> **(iv)**  Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b).

The Tenth Circuit has emphasized, however, that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995) (citing United States v. Greenspan, 26 F.3d 1001, 1005 (10th Cir. 1994); Lopez v. Behles (In re Am. Ready Mix, Inc.), 14 F.3d 1497, 1501 (10th Cir. 1994); Hinman v. Rogers, 831 F.2d at 939). Thus, the recusal statute "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." United States v. Hines, 696 F.2d 722, 729 (10th Cir. 1982). Moreover, the recusal "statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993)(citing In re United States, 666 F.2d 690, 694 (1st Cir. 1981); United States v. Greenough, 782 F.2d 1556, 1558 (11th Cir. 1986)(per curiam)). See Advanced Optics Elecs., Inc., v. Robins, No. CIV 07-0855 JB/GBW, 2011 WL 1103830, at *4-5 (D.N.M. 2011)(Browning, J.)(finding recusal not warranted where the Court had accounts with Wells Fargo, but Wells Fargo had no interest in the case).

### LAW REGARDING RULE 401 OF THE FEDERAL RULES OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F.Supp.2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402 & 403). "Evidence is relevant if: **(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of consequence in determining the action." Fed. R. Evid. 401.

See United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)("Relevant evidence is evidence that has a tendency to 'make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" (quoting a prior version of Fed. R. Evid. 401)). "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'" United States v. Ganadonegro, 854 F.Supp.2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(alteration in United States v. Ganadonegro)(quoting Fed. R. Evid. 401 advisory committee's notes). Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

### LAW REGARDING RULE 403 OF THE FEDERAL RULES OF EVIDENCE

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." United States v. Naranjo, 710 F.2d 1465, 1469 (10th Cir. 1983)(emphasis in original)(internal quotation marks omitted)(quoting United States v.

McRae, 593 F.2d 700, 707 (5th Cir. 1979)).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)(internal quotation marks omitted)(quoting United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001)).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Guardia, 135 F.3d 1326, 1331 (10th Cir. 1998)("The decision to exclude evidence under Rule 403 is within the sound discretion of the trial court . . . ."), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1274 (10th Cir. 2000); SEC v. Peters, 978 F.2d 1162, 1171 (10th Cir. 1992).  As the Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings.
>
> . . . .
>
> This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven A. Childress & Martha S. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered

evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke the jury's emotional response or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be *unfairly* prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (emphasis in original)(quoting Fed. R. Evid. 403 advisory committee's notes).

## ANALYSIS

The Court will grant UNM's MSJ, because Dr. Rivero has not established a genuine issue of material fact as to UNM's discriminatory conduct. First, the Court can and will reconsider Magistrate Judge Lynch's MTD Order regarding accrual of the illegal-medical-inquiry claim, because it is in contravention of the law. The Court concludes that this claim accrued when Dr. Rivero received the Addendum in early 2011, and thus the statute of limitations bars the illegal-medical-inquiry claim, because Dr. Rivero did not file his first Complaint until April, 2016. Second, the Court concludes that the undisputed evidence does not establish a genuine question whether UNM illegally discriminated against Dr. Rivero because it regarded him as

disabled. Third, as to Dr. Rivero's contention that UNM failed to address his retaliation claim so it is preserved for trial, see Rivero's Response at 35, the Court concludes that Dr. Rivero states a claim for retaliation in his FAC, but UNM's Reply correctly alleges that UNM is entitled to summary judgment on this claim. Accordingly, the Court grants summary judgment in UNM's favor as to all of Dr. Rivero's Rehabilitation Act claims.

This grant of summary judgment moots Rivero's MSJ and the Psychological MIL.[107] The Court nonetheless reaches the merits of these motions. The Court agrees with Magistrate Judge Lynch that Dr. Rivero's FAC "stated a claim for which relief can be granted" and thus would strike affirmative defense I. Answer at 10. The Court would also strike affirmative defense XV -- "Defendant reserves the right to amend its Answer to Plaintiff's Complaint to include additional Affirmative Defenses once facts supporting the same become known" -- because UNM concedes that this defense should be struck. Answer at 11. See June 26 Tr. at 100:22-25 (Marcus). The Court would also strike affirmative defense XIII -- "[a]t all times Defendant UNM acted in accordance with its polices and regulations, and applied such polices and regulations consistent and fairly," Answer at 10 -- because UNM admits that it has no set policies regarding imposing psychiatric examinations to follow, see June 26 Tr. at 102:8-14 (Marcus). The Court would not strike the other affirmative defenses with which Dr. Rivero has

---

[107]The Court's grant of summary judgment for UNM ends the case, because UNM has shown it is entitled to judgment on all of Dr. Rivero's claims as a matter of law, so there is no reason for the Court to decide which affirmative defenses UNM may not utilize, as Rivero's MSJ seeks, or whether UNM should be precluded from using the term "psychological evaluation" at a trial, as the Psychological MIL seeks. Accordingly, Rivero's MSJ and the Psychological MIL are moot.

issue -- II, the "Plaintiff's claims are barred by the statute of limitations"; III, the "Plaintiff's claims are barred by the doctrine of laches and waiver"; and XIV, "Defendant UNM fulfilled any and all obligations it had to Plaintiff under contract or statute" -- because the Court is not convinced that there are no circumstances under which these defenses could succeed.  Answer at 10-11.  See Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. at 1343.  Accordingly, the Court would grant Rivero's MSJ in part, and deny it in part if it were not mooted.  The Court would grant the Psychological MIL if it were not mooted, because using the term "psychological" outside of closing argument would mislead and confuse the jury.  The Complaints MIL discusses the use of pre-2006 complaints at trial, but its argument on their irrelevance touches on what the Court may properly consider in deciding UNM's MSJ, so the Court must reach its merits.  See Complaints MIL at 4.  The Court concludes that the pre-2006 complaints are relevant to whether the psychiatric evaluation requirement is job-related and consistent with business necessity, so the Court will deny the Complaints MIL.

Finally, the Court will deny the Recusal Motion.  There are no facts or circumstances that would lead a reasonable person to question the Court's impartiality.  Further, the Court does not have an interest that could be substantially affected by the proceeding's outcome.  Accordingly, the Court should exercise its strong duty to sit and will not recuse.

I.	**THE COURT MAY RECONSIDER THE MTD ORDER AND CONCLUDES THAT THE STATUTE OF LIMITATIONS BARS THE ILLEGAL-MEDICAL-INQUIRY CLAIM.**

The MTD Order, as an interlocutory order, "may be revised at any time before the entry of a [final] judgement." Fed. R. Civ. P. 54(b). Unlike Dr. Rivero's assertion that the law-of-the-case doctrine applies to cabin the Court's discretion on reconsideration, the Tenth Circuit has stated that, in the interlocutory order context, the "law of the case doctrine has no bearing." Rimbert v. Eli Lilly & Co., 647 F.3d at 1252. The Court makes a practice of de novo review of arguments reasserted at the summary-judgment stage that were originally brought at the motion-to-dismiss stage. Magistrate Judge Lynch made his decision assuming all allegations in the FAC as true; however, at this stage of the proceedings, the Court has undisputed facts on which to base its decision. Accordingly, the Court reviews Magistrate Judge Lynch's ruling on the illegal-medical-inquiry claim's date of accrual de novo, and concludes that the claim accrued in 2011, so Dr. Rivero's FAC -- which relates back to his original Complaint -- is untimely.

A.	**THE ILLEGAL-MEDICAL-INQUIRY CLAIM ACCRUED WHEN DR. RIVERO RECEIVED THE ADDENDUM.**

A claim accrues and starts the limitations period when the plaintiff "knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm." Alexander v. Oklahoma, 382 F.3d at 1216. This rule does not require that the plaintiff "have conclusive evidence of the cause of an injury in order to trigger the statute of limitations." Alexander v. Oklahoma, 382 F.3d at 1216. For example, in Baker v. Board of Regents of the State of Kansas, the Tenth Circuit held that the plaintiff's claim accrued "in early February of 1986," because that

is when the plaintiff "knew that his application had been rejected, and he had met with Dr. Jensen and knew that the reason for rejection was a poor interview," so he "knew, or had reason to know of the injury which formed the basis for this action." 991 F.2d at 632.

Dr. Rivero's alleged injury here is that UNM required that he undergo a four-part psychiatric evaluation as a condition of his increase to 0.75 FTE, in contravention of the Rehabilitation Act. See FAC ¶ 48, at 9 (citing 24 U.S.C. § 12112(d)(4), which the Rehabilitation Act adopts in § 794(d)).[108] Dr. Rivero alleges that these evaluation requirements "were not job-related and were not consistent with business necessity." FAC ¶ 49, at 10. Magistrate Judge Lynch's decision as to the claim's accrual rests on his assumption that "the lack of business necessity is an element of the claim," MTD Order at 8, meaning Dr. Rivero's claim was not "complete and present" until he had reason to believe UNM did not have a business necessity in its evaluation request, Graham Cty. Soil & Water Conservation Dist. v. United States ex rel Wilson, 545 U.S. at 418. This assertion, however, is incorrect. All Dr. Rivero needs to make a prima facie case of an illegal medical inquiry is: "(1) that he is an employee of the defendant employer, and (2) that the defendant-employer required him to undergo a medical examination or made a disability-related inquiry of him." Williams v. FedEx Corp. Servs., 849 F.3d at 901

---

[108]UNM is not a federal agency and Dr. Rivero is not a federal employee. UNM does not dispute, however, that it receives federal funding, thus bringing it under the Rehabilitation Act's auspices. As a non-federal employee, however, Dr. Rivero did not have to exhaust his administrative remedies before suing under § 794. See McGeshick v. Principi, 357 F.3d at 1149. Further, for purposes of deciding the accrual issue, the Court assumes that the psychiatric evaluation requirement constitutes a "medical examination" or an "inquiry" into whether Dr. Rivero has a disability under the ADA § 12112, as it will decide this issue in Section II.A.

(citing <u>Roe v. Cheyenne Mountain Conference Resort, Inc.</u>, 124 F.3d at 1229). Although <u>Williams v. FedEx Corp. Services</u> is an ADA case, discussing the standard under § 12112(d)(A), <u>see</u> 849 F.3d at 901, the Rehabilitation Act adopts this standard so ADA caselaw is applicable, <u>see</u> 29 U.S.C. § 794(d); <u>Woodman v. Runyon</u>, 132 F.3d at 1339 n.8.

Accordingly, Dr. Rivero's claim was "complete and present" once UNM required him to undergo a four-part psychiatric evaluation, because, at that point, he "c[ould] file suit and obtain relief." <u>Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.</u>, 522 U.S. at 201. <u>Cf.</u> <u>Green v. Joy Cone Co.</u>, 107 F. App'x 278, 280 (3d Cir. 2004)("[A] violation of § 12112(d) occurs at the moment an employer conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response." (citing <u>Griffin v. Steeltek, Inc.</u>, 160 F.3d 591 (10th Cir. 1998); <u>Armstrong v. Turner Indus., Inc.</u>, 141 F.3d 554 (5th Cir. 1998))). Dr. Rivero did not need to believe that the evaluation requirement is not job-related or consistent with business necessity for his claim to accrue; rather, a showing that the requirement is job-related and consistent with business necessity would allow UNM to avoid liability for the claim. <u>See</u> 42 U.S.C. § 12112(d)(4)(A); <u>Williams v. FedEx Corp. Servs.</u>, 849 F.3d at 901. Thus, it is UNM's burden to prove job-relatedness and business necessity, and not Dr. Rivero's to disprove them to have a claim for relief. UNM's Addendum to Dr. Rivero's employment contract required that Dr. Rivero undergo a four-part psychiatric evaluation to increase his employment from 0.05 FTE to 0.75 FTE. <u>See</u> Addendum ¶ 2, at 2; <u>id.</u> at 1. The undisputed facts reveal that Dr. Rivero received the Addendum "[i]n early 2011." Rivero's

Response ¶ 30, at 15. The record before the Court does not reveal the exact date when Dr. Rivero received the Addendum.[109] The undisputed facts show, however, that Dr. Rivero sent an email on March 9, 2011, requesting an extension to sign the Addendum, so he knew of UNM's evaluation requirement by March 9, 2011. See UNM's MSJ ¶ 42, at 10; Rivero's Response ¶ 42, at 7. Further, that Dr. Rivero sought access to his credentialing file "to investigate any support whatsoever for the requirement of a psychiatric investigation" indicates that he believed the requirement was improper. Rivero's Response ¶ 36, at 17. That Dr. Rivero did not know until 2014 that he had all of his documents has no bearing on the accrual analysis, however, because the relevant inquiry is when Dr. Rivero knew of the medical inquiry requirement and not when he could establish that UNM allegedly had no business necessity for the requirement. Dr. Rivero's illegal-medical-inquiry claim accrued, therefore, at the latest, on March 9, 2011, because that is when he knew of the evaluation requirement.

## B. THE STATUTE OF LIMITATIONS BARS THE ILLEGAL-MEDICAL-INQUIRY CLAIM.

In New Mexico, the State's personal injury statute of limitations governs a Rehabilitation Act claim for an illegal medical inquiry. See Baker v. Bd. of Regents of the State of Kan., 991 F.2d at 632 (citing Wilson v. Garcia, 471 U.S. at 276). In the State of New Mexico, the statute of limitations for a personal injury action is three years. See N.M. Stat. Ann. § 37-1-8. Thus, in

---

[109]Dr. Rivero stated that he did not "remember exactly" when he received the Addendum, but that he believed "it was at the beginning of March of 2011." Rivero Depo. 191 at 227:2, 5.

New Mexico, a Rehabilitation Act claim must be brought within three years of the date of accrual.

Here, Dr. Rivero's illegal-medical-inquiry claim accrued by March 9, 2011. Dr. Rivero filed his first Complaint on April 19, 2016, more than five years after UNM required that Dr. Rivero undergo psychiatric evaluations to increase his employment. See Complaint at 1. Thus, that the FAC relates back to the Complaint, because the FAC "asserts a claim . . . that arose out of the conduct . . . set out -- or attempted to be set out -- in the original pleading," Fed. R. Civ. P. 15(c), does not save Dr. Rivero's medical inquiry claim, compare Complaint ¶¶ 10-46, at 2-9, with FAC ¶¶ 8-44, at 2-9. The three-year statute of limitations has run. Dr. Rivero waited too long to bring suit on this claim. Dr. Rivero had sufficient knowledge of his injury within the limitations period to bring a timely case on the illegal-medical-inquiry claim. That Dr. Rivero filed a charge of discrimination with the EEOC "claiming that the psychological evaluation requirement was not job related and consistent with business necessity" on January 20, 2012, bolsters this conclusion. UNM's MSJ ¶ 45, at 10. Dr. Rivero does not request that the Court apply the doctrine of equitable tolling, and there is no sound reason to apply this doctrine. Dr. Rivero knew of the examination requirement by March 9, 2011, and as indicated by his EEOC charge, could have filed suit within the three-year statute of limitations. Accordingly, the

statute of limitations bars the illegal-medical-inquiry claim, and UNM is entitled summary judgment on this claim.[110]

## II. THE UNDISPUTED FACTS ESTABLISH THAT THE PSYCHIATRIC EVALUATION REQUIREMENT IS JOB RELATED AND IS CONSISTENT WITH BUSINESS NECESSITY.

UNM argues that, in addition to being time-barred, Dr. Rivero's illegal-medical-inquiry claim fails, because the psychiatric evaluation requirement "was job related and consistent with business necessity." UNM's MSJ at 16. With Dr. Rivero's reliance on this claim as a discriminatory act supporting his constructive discharge claim, the Court finds it prudent to decide the issues whether the psychiatric evaluation requirement is (i) job related and (ii) consistent with business necessity. Although the parties do not raise the issue whether the psychiatric evaluation is a medical examination, the Court concludes that it must determine this issue, because it is an element of Dr. Rivero's prima facie case. The Court concludes that a reasonable jury could conclude that the psychiatric evaluation requirement would constitute a medical examination under the Rehabilitation Act. Dr. Rivero does not, however, show that there is a genuine issue of material fact whether UNM's proffered job-related and consistent-with-business-necessity reason for imposing the requirement was pretextual.

---

[110]Dr. Rivero requests that the Court strike UNM's affirmative defense II -- that Dr. Rivero's "claims are barred by the statute of limitations," Answer at 10 -- alleging that the argument "has already been disposed by the Court[ and] is not supported by record evidence and the law." Rivero's MSJ at 11 (title case omitted). As the Court has discussed in this Part, however, UNM's statute-of-limitations argument regarding the illegal-medical-inquiry claim is sound, and, thus, the Court will not strike this defense.

## A. A REASONABLE JURY COULD CONCLUDE THAT THE ADDENDUM'S FOUR-PART PSYCHIATRIC EVALUATION REQUIREMENT CONSTITUTES A "MEDICAL EXAMINATION" UNDER THE REHABILITATION ACT.

The Rehabilitation Act adopts the ADA's proscription of employers requiring medical examinations or inquiries of employees, absent job relatedness and business necessity. See 29 U.S.C. § 794(d); 42 U.S.C. § 12112(d)(4)(A). The ADA does not, however, define what it means by the term "medical examination." Its legislative history is also unhelpful in illuminating the meaning of this term. See Kroll v. While Lake Ambulance Auth., 691 F.3d at 815 & n.8 ("These pieces of legislative history do not elucidate the meaning of 'medical examination.'"). The Court cannot find a Tenth Circuit case discussing how to determine if an employer's requirement is considered a "medical examination" or a disability-related inquiry under the Rehabilitation Act. The Tenth Circuit has held that, generally, an employer may not "us[e] a medical exam to determine the existence, nature, or severity of a disability." Iselin v. Bama Cos., 690 F. App'x 593, 597 (10th Cir. 2017)(unpublished)(citing 42 U.S.C. § 12112(d)(2)(A), (4)(A)). Further, the Tenth Circuit has cited to the Sixth Circuit's decision in Bates v. Dura Automotive Systems, Inc. for its "identif[ication of] factors relevant to determining whether an employer improperly imposed a medical examination or made a disability-related inquiry." Williams v. FedEx Corp. Servs., 849 F.3d at 901 (citing Bates v. Dura Auto. Sys., Inc., 767 F.3d at 574-75, 578-79).

The Sixth Circuit identified that the medical examination/inquiry prohibition "reflects Congress's effort to 'curtail all questioning that would serve to identify and exclude persons with

disabilities from consideration for employment.'"  Bates v. Dura Auto. Servs., Inc., 767 F.3d at 574 (quoting Griffin v. Steeltek, Inc., 160 F.3d at 594).  To determine what constitutes a "medical examination" or "disability-related inquiry," the Sixth Circuit looks to the EEOC's Enforcement Guidance.  See Bates v. Dura Auto. Servs., Inc., 767 F.3d at 574; Kroll v. White Lake Ambulance Auth., 691 F.3d at 815 (recognizing that the Guidance "is 'very persuasive authority' in questions of statutory interpretation of the ADA" (quoting Lee v. City of Columbus, 636 F.3d 245, 256 (6th Cir. 2011))).  The EEOC Enforcement Guidance is non-binding and "is only entitled to [a court's] respect to the extent that it has the 'power to persuade.'"  EEOC v. C.R. Eng., Inc., 644 F.3d 1028, 1047 n.16 (10th Cir. 2011).

The EEOC's Enforcement Guidance on the definition of "medical examination" is persuasive, however, because it is consistent with the statute's plain language and helps to interpret the term's meaning.  The Guidance defines "medical examination" as a "procedure or test that seeks information about an individual's physical or mental impairments or health," and provides seven factors to consider in determining if a procedure or test meets this definition:

> (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

EEOC Enforcement Guidance, 2000 WL 33407181, at *3.  The Court is cognizant that the psychiatric evaluations never occurred, so it cannot say certainly that they would have

constituted a medical examination. This observation is especially true, because the parties dispute what the evaluation requirement contemplated, with UNM arguing that the evaluations constituted the counseling to which Dr. Rivero agreed, see UNM's Reply at 15 (stating that the Addendum's "language generally followed the agreed upon four counseling sessions with a psychiatrist"), and with Dr. Rivero arguing that the evaluations involved more invasive mental examinations, see Rivero's Response at 24 & n.24 (stating that the Addendum has "no limitations to the scope of the psychiatric evaluation" and that, had the psychiatrist recommended "a frontal lobotomy[,] . . . then it would have been mandatory" (emphasis in original)). Accordingly, the Court must make all inferences for and examine the record in the light most favorable to Dr. Rivero, the nonmoving party. See Liberty Lobby, 477 U.S. at 255.

Here, the first and second factors are met -- a health professional's administration and interpretation -- because the Addendum requires that the evaluation be completed "by a board-certified psychiatrist." Addendum ¶ 2, at 2. A reasonable jury could conclude that the psychiatrist providing the evaluations "would have, at a minimum, done some interpretation of the content of" the evaluations to assist Dr. Rivero with his alleged professionalism problems, as "this was the reason why" UNM imposed the requirement. Kroll v. White Lake Ambulance Auth., 691 F.3d at 819 (examining whether "psychological counseling" is a "medical examination"). Thus, the first two factors weigh in favor of concluding that the Addendum's requirement is a medical examination for Rehabilitation Act purposes.

The third factor, "arguably the most critical in this analysis," is whether these psychiatric evaluations were "designed to reveal a mental-health impairment." Kroll v. White Lake Ambulance Auth., 691 F.3d at 819. The EEOC Enforcement Guidance notes that "psychological tests that are designed to identify a mental disorder or impairment" constitute a "medical examination," but "psychological tests that measure personality traits such as honesty, preferences, and habits" do not. EEOC Enforcement Guidance, 2000 WL 33407181, at *4. There is not any evidence in the record what the psychiatric evaluations were designed to uncover, only the parties' accusations. The term "psychiatric evaluation" seems to have a specific meaning in the medical field, however, with Johns Hopkins Medicine stating that

> [a] comprehensive psychiatric evaluation may be needed to diagnose emotional, behavioral, or developmental disorders. An evaluation of a child, adolescent, or adult is made based on behaviors present and in relation to physical, genetic, environmental, social, cognitive (thinking), emotional, and educational parts that may be affected as a result of these behaviors.

Comprehensive Psychiatric Evaluation, Johns Hopkins Med., https://www.hopkinsmedicine.org/ healthlibrary/conditions/mental_health_disorders/comprehensive_psychiatric_evaluation_85,P00 752 (last visited Feb. 8, 2019). See also Diagnosis and Psychiatric Evaluation, Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/brain-and-nerves/dementia/diagnosis/ psychiatric-evaluation.html (last visited Feb. 9, 2019)("A psychiatric evaluation may be obtained to determine if depression or another psychiatric disorder may be causing or contributing to a person's symptoms."); Understanding Psychiatric Evaluations, 3-C Fam. Servs., P.A. (Jan. 16, 2013), http://www.3cfamilyservices.com/2013/01/16/understanding-psychiatric-evaluations/ ("A

psychiatric evaluation is, in its simplest terms, an evaluation designed to diagnose emotional, behavioral, or developmental conditions or disorders."). Accordingly, a reasonable jury could conclude that UNM imposed the four-part psychiatric evaluation requirement to uncover and treat a mental health defect causing Dr. Rivero's professionalism problems, so this factor also points in favor of concluding that the evaluations constitute a mental examination.

With the evaluations, however, not being completed and the lack of evidence regarding what the evaluations would have entailed, the Court should not speculate as to weigh factors four, five, six, and seven. The Court does not find these factors dispositive to its analysis, and concludes that factors one through three -- especially three -- weighing in favor of concluding that the psychiatric evaluation constitutes a medical examination is enough. Regardless whether it was UNM's intention to determine if Dr. Rivero suffered a mental disability, that the psychiatric evaluations could uncover one is enough for a reasonable jury to conclude that they are a medical examination for Rehabilitation Act purposes. See Kroll v. White Lake Ambulance Auth., 691 F.3d at 820 (citing Karraker v. Rent-A-Ctr., Inc., 411 F.3d 831, 837 (7th Cir. 2005); Barnes v. Cochran, 944 F. Supp. 897, 904-05 (S.D. Fla. 1996)(Gonzalez, J.)).

**B.    UNM'S PROFFERED REASONS FOR THE PSYCHIATRIC EVALUATIONS REQUIREMENT SHOW THAT IT IS JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY.**

As Dr. Rivero did not undergo the psychiatric evaluations, the Court cannot look to the evaluations to determine whether they were job-related and consistent with business necessity. Accordingly, the Court looks at Dr. Rivero's record of professionalism issues to evaluate if it

"provide[s] sufficient objective evidence upon which [UNM] could determine that a medical examination was job-related and consistent with business necessity." Kroll v. White Lake Ambulance Auth., 763 F.3d 619, 624 (6th Cir. 2014).

The Rehabilitation Act, through its adoption of the ADAAA,[111] allows employers to "make inquiries into the ability of an employee to perform job-related functions" during the employment relationship. Adair v. City of Muskogee, 823 F.3d at 1312 (internal quotation marks omitted)(quoting 42 U.S.C. § 12112(d)(4)(B)). Further, an employer's requirement of a medical examination is permissible only if it "is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). In discussing the meaning of the term "business necessity," the Tenth Circuit turned to the United States Court of Appeals for the Second Circuit's case of Conroy v. New York State Department of Correctional Services, 333 F.3d 88 (2d Cir. 2003)("Conroy"). See Adair v. City of Muskogee, 823 F.3d at 1312. The Tenth Circuit provides: "As the Second Circuit has noted, '[r]elatively little case law concerns the proper interpretation of business necessity in this context.'" Adair v. City of Muskogee, 823 F.3d at 1312 (quoting Conroy, 333 F.3d at 97). The Tenth Circuit adopts Conroy's observation that "courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." Adair v. City of Muskogee, 823 at 1312

_____

[111] The ADAAA's effective date is January 1, 2009, so, because UNM gave the Addendum to Dr. Rivero in early 2011, the ADAAA's revised standard applies.

(internal quotation marks omitted)(quoting <u>Conroy</u>, 33 F.3d at 98). In other words, "[a]n employer's request that an employee undergo a medical examination must be supported by evidence that would 'cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" <u>Conrad v. Bd. of Johnson Cty. Comm'rs</u>, 237 F. Supp. 2d at 1230 (alteration omitted)(quoting <u>Sullivan v. River Valley Sch. Dist.</u>, 194 F.3d at 811).

Dr. Rivero did not submit to UNM's psychiatric evaluation requirement, so "he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job or were too broad in scope." <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d at 812. UNM is thus entitled to summary judgment if: (i) the evidence establishes that UNM required Dr. Rivero to submit to an evaluation to measure his ability to perform job-related duties; and (ii) there is evidence that would "cause a reasonable person to inquire as to whether [Dr. Rivero] is still capable of performing his job." <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d at 811. <u>See</u> <u>Kroll v. White Lake Ambulance Auth.</u>, 763 F.3d at 623 (stating that the medical examination is job-related and consistent with business necessity if the employer has "a reasonable belief based on objective evidence threatens a vital function of the business" (citations omitted)).

For example, the Sixth Circuit in <u>Sullivan v. River Valley School District</u> upheld the employer's requirement that the employee submit to a mental examination, because the employee's "behavior had given the school district reason to seek further information about his fitness for continued employment." 197 F.3d at 812. The Sixth Circuit noted that, from 1977

until 1995, the plaintiff taught at the school district without complaint and with "consistently satisfactory job evaluations," but, in 1995, "his behavior apparently changed for the stranger." 197 F.3d at 808. The Sixth Circuit outlined this behavior:

> At a January 23 meeting of the school board that considered grievances he had filed, Sullivan allegedly engaged in disruptive and abusive verbal outbursts, shoved papers in the faces of individual members of the board, and refused to stop when asked by the board president. Around February 6, Sullivan disclosed confidential information about one of his student's grades and a related grade change hearing to a local newspaper. In a February 7 letter to the student government president, Sullivan criticized a decision of the group's faculty sponsor in language deemed inappropriate by the district. Sullivan then failed to report for a March 6 meeting with Superintendent Williams to discuss these incidents.

197 F.3d at 808. In response, "Superintendent Williams contacted psychologist Timothy Onkka for an informal review of Sullivan's behavior," to assess "Sullivan's fitness as a teacher and whether Sullivan needed professional attention." 197 F.3d at 809. After a limited review of materials regarding Sullivan, the psychologist suggested "a more formal psychological assessment," and the Superintendent suspended Sullivan without pay pending the school board's decision on the Superintendent's "recommendation that Sullivan be required to undergo mental and physical fitness-for-duty exams." 197 F.3d at 809. The board ordered that Sullivan undergo mental and physical fitness-for-duty examinations, but he did not comply. See 197 F.3d 809. With Sullivan's "aberrant behavior" affecting his job performance, the Sixth Circuit determined that the school district did not violate the law by requiring examinations to determine Sullivan's ability to "perform some essential aspects of his job." 197 F.3d at 812.

More recently, in <u>Owusu-Ansah v. Coca-Cola Co.</u>, the United States Court of Appeals for the Eleventh Circuit upheld a grant of summary judgment in favor of an employer that required an employee to "undergo a psychiatric/psychological fitness-for-duty examination."  715 F.3d at 1307.  First, in determining "job-relatedness," the Eleventh Circuit looks at "'questions or subject matter contained in a test or criteria used by an employer' as a basis for an employment decision."  715 F.3d at 1311 (quoting <u>Allmond v. Akal Sec., Inc.</u>, 558 F.3d 1312, 1317 (11th Cir. 2009)).  The Eleventh Circuit determined that the required "evaluation was 'job-related' because 'an employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position.'"  715 F.3d at 1311 (quoting <u>Williams v. Motorola, Inc.</u>, 303 F.3d 1284, 1290 (11th Cir. 2002)).  The coworker stated that the employee "banged his fist on the table and said in a raised voice that someone 'was going to pay for this'" while discussing his issues at the workplace.  715 F.3d at 1311.  Further, the employee would not speak to a different supervisor or a psychiatrist about these workplace issues, and a psychologist to whom he spoke voiced concerns about his "emotional and psychological stability, and recommended a psychiatric/psychological fitness-for-duty evaluation."  715 F.3d at 1312.  The Eleventh Circuit determined that all these circumstances provided the employer with "a reasonable, objective concern about [the employee's] mental state, which affected job performance and potentially threatened the safety of its other employees."  715 F.3d at 1312.  As to business necessity, the Eleventh Circuit "'analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria' for such a decision."  715 F.3d at

1311 (quoting <u>Allmond v. Akal Sec., Inc.</u>, 558 F.3d at 1317).  The Eleventh Circuit found that the evaluation was consistent with business necessity "[f]or basically the same reasons," because the employer had "information suggesting that an employee is unstable and may pose a danger to others."  715 F.3d at 1312.

Here, UNM argues that Dr. Rivero's "deterioration in behavior," combined with his "earlier history" of "several incidents of unprofessional behavior," gave it "legitimate concerns that Plaintiff was regressing to his earlier behavioral problems."  UNM's MSJ at 20.  Thus, UNM contends that Dr. Rivero's "long history of lack of professionalism, rudeness, over-reaction, and anger, causing him to insult patients, other physicians, and the university patient advocate" provided grounds for the psychiatric evaluation requirement.  UNM's MSJ at 19.  The undisputed facts support this assertion, as the Court explains below.

Closest in time to Dr. Rivero's request to return to full-time employment is the notice of investigation that UNM received from the United States Department of Health and Human Services' Office for Civil Rights in approximately March, 2007.  <u>See</u> UNM's MSJ ¶ 13, at 5 (citing OCR Letter at 1).[112]  The OCR Letter provides that the investigation stems from a Spanish-speaking-only patient's complaint that Dr. Rivero failed to provide language assistance for her and made "derogatory statements about Mexicans" in February, 2006.  OCR Letter at

---

[112]The Court is careful to rely on only undisputed facts.  Occasionally, the Court will draw a fact from the record that the parties did not use in their briefing and is, therefore, not undisputed as neither party had a chance to dispute it.  The Court will provide footnotes where this occurs.

1.[113]  See UNM's MSJ ¶ 13, at 5.  The record available to the Court does not provide, however, how this investigation was resolved, although Dr. Rivero contends that the allegations were false.[114]  See Rivero's Response ¶ 13, at 3; Rivero Depo. 191 at 188:16.  Dr. Rivero contends

[113]The Court is not relying on the substance of this complaint, or any of the complaints that it discusses in this section, and similarly is not assuming that these complaints are true or grounded in fact.  To rely on the statements in the complaints for the truth of the matters asserted would be relying on inadmissible hearsay, which is improper for purposes of summary judgment.  See Gross v. Burggraf Const. Co., 53 F.3d at 1541.  The Court provides the substance of the complaints only to show what UNM was learning, to explain its state of mind, and to help the Court see to what Dr. Rivero responded in his own emails.  The Court relies on the complaints only for the fact that they were made, and for UNM's state of mind in requiring the Addendum.  These are proper, non-hearsay purposes.  See, e.g., Lee v. Burwell, No. Civ. 16-366 SCY/KK, 2018 WL 4964547, at *3 (D.N.M. Oct. 15, 2018)(Yarbrough, M.J.)(admitting evidence of complaints "to show that the complaints were made, that Dr. Mora and/or Dr. Forman had notice of the complaints at the time they decided to terminate Plaintiff, and that Dr. Mora terminated Plaintiff for a race-neutral reason"); Laul v. Los Alamos Nat'l Labs., 309 F. Supp. 3d 1119, 1130 n.10 (D.N.M. 2016)(Parker, J.)("The court will consider Mr. Selvage's statement as non-hearsay because it is used to show that the complaints were received and not for the truth of the actual complaints."  (citing Fed. R. Evid. 801(c)(2); Fed. R. Civ. P. 56(c)(4))); Peshlakai v. Ruiz, 39 F. Supp. 3d 1264, 1335 (D.N.M. 2014)(Browning, J.)(admitting evidence of complaints "only for the limited purpose of showing that AmRest, LLC knew of the complaints").  Dr. Rivero's responses in his emails are not hearsay, as they are party-opponent statements.  See Fed. R. Evid. 801(d)(2).

[114]Dr. Rivero provides the first four pages of the United States Department of Health and Human Services Office for Civil Rights letter providing the results of its investigation.  See Letter from the United States Department of Health and Human Services Office for Civil Rights to Stephen McKernan (stamped August 27, 2009), filed March 8, 2018 (Doc. 191-7)("OCR Investigation Letter").  The Office for Civil Rights determined that there is "insufficient evidence that the Hospital violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d through d-7 ('Title VI'), in the affected party's case," who had alleged national origin discrimination for the failure to provide language services.  OCR Investigation Letter at 1.  The letter provides that the only witness stated that the complainant's allegation that Dr. Rivero made disparaging comments about Mexicans was a miscommunication.  See OCR Investigation Letter at 4.  The portion of the letter provided does not conclusively establish this finding, however, and states only that the OCR could not determine if UNM had violated Title VI.  See OCR Investigation

that the complaints made against him right before he moved to 0.05 FTE at UNM are also false. E.g., Rivero's Response ¶ 10, at 3 (stating that UNM's proffered fact "ignores the fundamental groundlessness of this and all other complaints against Dr. Rivero"). Two complaints similarly allege mistreatment of Spanish-speaking-only patients, with one stating that Dr. Rivero made fun of her for not speaking English, see UNM's MSJ ¶ 9, at 4; June 30 Barela Email at 23, and the other alleging that he had taken care of the financial part of his surgery but Dr. Rivero acted as if the patient had not and was wasting his time,[115] see Email from Willie Barela to Dr. Dennis Rivero and Dr. Moheb Moneim at 26 (dated June 30, 2006), filed December 8, 2017 (Doc. 143-1). A fourth complaint alleges that Dr. Rivero compared a patient, a former IV-drug user, to a monkey and prescribed church as his treatment. See UNM's MSJ ¶ 14, at 5; Aug. 3 Barela Email at 25. As to this fourth complaint, Dr. Rivero admitted that he discussed a study involving monkeys and addiction with this patient. See UNM's MSJ ¶ 16, at 5; Rivero Depo. 143 at 120:22-121:6. That the allegations in these four complaints could be false is not dispositive. First, the number of them in a short time span -- from February, 2006, to August, 2006 -- is concerning. Second, the complaints show that Dr. Rivero was having misunderstandings with

Letter at 1-4. This conclusion is a separate issue from whether Dr. Rivero had acted inappropriately with this patient or, more importantly, that there had been a patient complaint, regardless whether true.

[115]This fact is not undisputed, and, as discussed supra note 113, is inadmissible hearsay provided only to provide context to Dr. Rivero's response. The complaint in question provides the basis for Dr. Rivero's response cited in UNM's MSJ ¶ 22, at 6.

his patients, so much so that they complained to the hospital's patient advocate and, in one case, to the United States Department of Health and Human Services' Office for Civil Rights.

Dr. Rivero's responses to the patient advocate, Barela, are also concerning.  In response to the first Spanish-speaking-only patient's complaint, Dr. Rivero posits that "[p]erhaps my spanish [sic] is different than her spanish [sic]," and writes that

> [m]y record in this community as a physician is totally at odds with this complaint.  If I was a bad a doctor as you seem to allow this patient to suggest, I would not have a 6 month waiting list for elective surgery and a two month waiting list for appointments, and clinics that are invariably over 100% booked, and in general just find myself overwhelmed with patients and work.

Rivero Email at 22.[116]  Dr. Rivero continues:

> In the future I will go out of my way to avoid contact with patients in the General Ortho clinic, nor will I speak spanish [sic] to them, (although I am fluent in spanish [sic] and as a curtesy to the patients and the hospital I often speak to them in spanish [sic]) as it is in this clinic where I find the most unappreciative patients, who complain the most, demand the most, and believe that somehow I am their slave and I am obligated to do whatever they want from me.  It would seem that this is the clinic where all of the complaints come from.

> If I never had to see another patient in the General Ortho clinic it would be just fine with me., [sic] but I will in the future just keep my distance from those patients who are nothing but problems for me.

---

[116]This portion of the email is not mentioned in UNM's proffered undisputed material facts, but as it is part of the record and is admissible the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).  The Rivero Email itself is admissible nonhearsay, as discussed supra note 113, and Dr. Rivero responded to other portions of the same email which UNM did cite in its proffered undisputed material facts.  See Rivero's Response ¶¶ 10-12, at 3.  Dr. Rivero does not dispute that he wrote this email, only that UNM mischaracterizes it in its MSJ.  See Rivero's Response ¶¶ 10-12, at 3.

Rivero Email at 22-23.  See UNM's MSJ ¶¶ 11-12, at 4-5.  The response to the second Spanish-speaking-only patient's complaint is similarly angry.  He opens:

> Please tell Mr. [patient] that I will NOT be doing his surgery on any date, for any amount of money, under any circumstances and that I will no longer see him.  I am cancelling his surgery with me and removing him from my schedule.  He is to find another doctor.  I am not his servant.  His surgery is elective and can be postponed indefinitely.

Payment Email at 26.  See UNM's MSJ ¶ 22, at 6.  After explaining to Barela his side of what he told the patient and that he does not like to cancel surgeries last minute when a patient is not financially cleared, because of the number of patients needing surgery, Dr. Rivero closed by writing:

> This could be easily resolved in the fuutre [sic] if it can be established that the patient is cleared financially in which case it will not be an issue.  In fact I will require that patients bring me a note from the hospital saying that they are cleared (just as is required for insured patients) BEFORE I schedule them for surgery.  Please take steps to clarify this with the hospital, that I will need something clear and unambiguous, because quite frankly it is rather unseemly that I should even have to discuss this directly with the patient.

Payment Email at 26.[117]  Finally, in response to the monkey complaint, Dr. Rivero stated that the complaint is "a gross misrepresentation of the facts by a manipulative patient who is a demonstrated sociopath, former IV drug abuser," and suggested that Barela "serve as a mediator"

_____

[117]This portion of the email is not mentioned in UNM's proffered undisputed material facts, but the email is mentioned.  See UNM's MSJ ¶ 22, at 6.  As the evidence is part of the record and is admissible the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).  The Payment Email itself is admissible nonhearsay, as discussed supra note 113, and Dr. Rivero responded to UNM's use of the email.  See Rivero's Response ¶ 22, at 5.  Dr. Rivero does not dispute that he wrote this email, only that UNM mischaracterizes it in its MSJ.  See Rivero's Response ¶ 22, at 5.

"[i]nstead of attacking physicians." Aug. 4 Rivero Email at 25. See UNM's MSJ ¶ 17, at 5. Barela responded that it is his job to address patient complaints, but knows there are "two sides to every story" and is "disappointed that you believe that I am attacking you with these complaints." Aug 7. Barela Email at 24. See UNM's MSJ ¶ 19, at 6. Barela wrote that he "hope[s] that in the future we can discuss complaints and bring resolution to them without taking complaints that I address personal. It is certainly not my intention to offend you in any way, however it is my responsibility to address all complaints." Aug. 7 Barela Email at 24.[118]

Dr. Rivero responded:

> Your manner and approach to this, in my opinion is reprehensible and thoroughly disrespectful of Physicians, and I am amazed that you have no idea how much I dislike you and your methods, which effectively try to lower our status to servants who are expected to get on our knees before patients. You may think you are doing what your job requires, and so be it, but it is WRONG WRONG and WRONG, and I intend to bring it up with your boss.

> As far as your reputation with me, do not count me as someone who thinks highly of you, on the contrary, right now I think you are one of my least favorite individuals in this institution.

> Sending reckless and disparaging comments to my chairman is not objective at all. If this institution really wanted to be fair to Physicians, it would put a Physician advocate between you and me, just as they have put you between me and the patient, allowing you to beat me over the head. You have no idea how unpleasant I find your emails.

---

[118]Again, UNM does not quote this portion of the email, but cites to the entire email in UNM's MSJ ¶ 19, at 6. As the evidence is part of the record and is admissible the Court may consider it. See Fed. R. Civ. P. 56(c)(3). Dr. Rivero disputed the fact on hearsay grounds, and stated it was inconsistent with the exhibit. See Rivero's Response ¶ 19, at 4. The email is not offered to prove the truth of the matters asserted therein, but to provide context to Dr. Rivero's response. There is no issue with inconsistency here, as the Court is directly quoting the exhibit.

Aug. 7 Rivero Email at 24.  See UNM's MSJ ¶ 20, at 6.  Dr. Rivero further asked why he had four complaints "in the past few months" while he had not heard from a patient advocate in the past fourteen years.  Aug. 7 Rivero Email at 24.[119]  Dr. Rivero tells Barela that that he is "a physician antagonist" and that, by providing the complaints to Dr. Rivero's supervisor, he is humiliating Dr. Rivero and "clos[ing] all doors to resolution."  Aug. 7 Rivero Email at 24.

These email responses provide sufficient evidence to cause a reasonable person to question whether Dr. Rivero could handle his temper and interact with his colleagues professionally.  That Dr. Rivero shows little empathy for these patients who felt compelled to report his behavior, and accuses the patient advocate of promulgating lies, is also telling.  Dr. Rivero's earlier temper issues also influence the reasonableness of UNM's decision, because they show that Dr. Rivero has not learned from this earlier conduct -- he still fails to accept any responsibility.  For example, in discussing the screaming match he had with a resident, Dr. Rivero maintains that he "used obscene language in response to their obscene language" and "that's the way men talk to each other in a locker room."  Rivero Depo. 143 at 35:12-13, 15-16.  See UNM's MSJ ¶ 3, at 4.  Further, in requesting an increase to 0.75 or higher FTE, Dr. Rivero writes:

---

[119]This sentence and the next are not contained in UNM's MSJ.  UNM cites to the Aug. 7 Rivero Email in its MSJ, however, and Dr. Rivero responded to its use.  See UNM's MSJ ¶ 20, at 6; Rivero's Response ¶ 20, at 4.  Dr. Rivero disputes UNM's fact as inconsistent with the exhibit, but does not dispute that he wrote the email.  See Rivero's Response ¶ 20, at 4.  The Court is directly quoting the exhibit in both this sentence and the next, so there is no inconsistency issue.  Further, as the evidence is part of the record and is admissible the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

> I would like to reassure you that I have learned my lesson and my goal in returning is to serve the Department in the area of Adult Reconstruction, devote greater efforts than before in resident education, and rebuild the practice area up for the benefit of the Department and the institution. You have my personal assurance that all my effort will be towards working harmoniously with others.

Request Letter at 28. See UNM's MSJ ¶ 27, at 7. Dr. Rivero explained that the lesson is that "[i]t's important to get along with people," although he did not believe he "had been having trouble getting along with people." Rivero Depo. 143 at 163:9, 11. See id. at 163:5-12; UNM's MSJ ¶ 28, at 7. Dr. Rivero admitted, however, that "I did have episodes where I would not take things lying down, and I came to realize that it wasn't productive."[120] Rivero Depo. 143 at 163:16-18. Accordingly, the Court determines that these issues and complaints provided UNM with reasonable, objective grounds to question Dr. Rivero's ability to work well with others and to act professionally in the face of stress. As the Eleventh Circuit found, "an employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." Williams v. Motorola, Inc., 303 F.3d at 1290.

The undisputed evidence therefore points to UNM requiring that Dr. Rivero complete the psychiatric evaluations to measure his ability to handle stress and act professionally -- job-related duties. See Williams v. Motorola, Inc., 303 F.3d at 1290. The Addendum itself makes this clear, for as introduction to the requirements the Addendum states:

> Whereas, Rivero also understands and acknowledges that UNM has expressed good faith concerns about Rivero's professional conduct as a member of the UNM medical staff;

---

[120]This statement is not an undisputed fact, but is part of the record so the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

> Whereas, Rivero has expressed a willingness to dedicate himself to addressing those concerns;
>
> . . . .
>
> Whereas, Rivero is willing to offer the undertakings set forth herein as an inducement to UNM to accept an increase in his FTE appointment, conditioned upon those undertakings[.]

Addendum at 1.[121]  Moreover, in the paragraph following the psychiatric evaluation requirement, the Addendum provides that, should Dr. Rivero "engage[] in any professionally disruptive conduct," he "will be deemed to have resigned his SOM faculty appointment and his employment with the University."  Addendum ¶ 3, at 3.  The Addendum then sets forth "Guidelines for Professionalism in Interpersonal Relationships," and "Guidelines for Professionalism in Relationships with the Hospital and Community."  Addendum ¶ 4(B), at 3-4.  Further, Dr. Schenck's requirement that Dr. Rivero apologize to Barela exemplifies that UNM believed that Dr. Rivero crossed the line.  See Rivero Depo. 143 at 171:10-14.  Dr. Rivero writes that he acknowledges that his responses to Barela "were harsh and impolite, and excessively critical," but reiterated that he did nothing wrong, and did not "do anything inappropriate or unprofessional in regards to the allegations that were made by a few patients."  Apology Letter at

---

[121]This portion of the Addendum is not contained in the motion for summary judgment briefing, but UNM does cite to the Addendum in UNM's MSJ ¶ 41, at 9.  The Addendum is central to Dr. Rivero's claims against UNM, so the Court concludes that it is prudent to examine the Addendum as a whole, and as the Addendum is part of the record, the Court may do so.  See Fed. R. Civ. P. 56(c)(3).  It is undisputed that the Addendum to which the Court looks is the Addendum Dr. Rivero received.  See Rivero's Response ¶ 30, at 15.  Further, the Court provides the language to show what the Addendum says, not to prove the truth of the statements about Dr. Rivero therein.

29.   All this evidence is substantial, and would cause a reasonable person to question Dr. Rivero's ability to act calmly in the face of stress and in a professional manner, an essential function of his job.  See, e.g., Williams v. Motorola, Inc., 303 F.3d at 1290.  It is also undisputed that Dr. Schenck did not want Dr. Rivero to take call when he increased his employment, see Rivero's Response ¶ 29, at 15; Schenck Depo. 191 at 108:7-9, which Dr. Schenck stated is an essential job function in orthopedics,[122] see Schenck Depo. 191 at 121:9-10.  See Davidson v. Am. Online, Inc., 337 F.3d at 1191 (stating that in deciding what is an essential job function, "courts must give consideration to the employer's judgment as to what functions of a job are essential").

Dr. Rivero argues that, because he was working at a 0.05 FTE without issue, "UNM has no objective basis in requiring Dr. Rivero to submit to the medical psychiatric examination in the Addendum."  Rivero's Response at 21 (bolding omitted).  Dr. Rivero posits that, if his "lack of professionalism were truly at issue with his performance of essential job junctions," then "UNM cannot justify allowing Dr. Rivero to have worked even those limited days" at 0.05 FTE. Rivero's Response at 23.  He also argues that "the mere submission of a complaint does not represent 'deterioration,' especially if UNM is unwilling to investigate the attacks on Dr. Rivero's character" and, "[c]oupled with the administrative vendetta pursued against Dr. Rivero by Dr. Pitcher, Dr. Bailey, Dr. Roth, and Dr. Katz, the complaints appear to be mere pretext for a more insidious endeavor."  Rivero's Response at 23.  Dr. Rivero presents no

---

[122]This statement is part of the record, but not part of the parties' undisputed material facts, but as part of the record the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

evidence of "an administrative vendetta," but, even assuming UNM had one against Dr. Rivero, the Court determines that the number of patient complaints UNM received regarding Dr. Rivero just before his reduction to 0.05 FTE is concerning, especially because he ostensibly had not received complaints before that flurry and because of his rude responses to the patient advocate Barela. See Aug. 7 Rivero Email at 24. Working one day a month is very different from working full-time or 0.75 FTE, with at least fifteen times more opportunity for stressors as it involves working fifteen times more often. At 0.05 FTE, Dr. Rivero would go to UNM only to operate -- he would not perform pre-op or post-op -- and could not assume full responsibility for the care, because he was only there for one day a month. See UNM's MSJ ¶¶ 24-25, at 6; Rivero Depo. 143 at 176:15-20. Further, Dr. Schenck stated that Dr. Rivero rarely saw patients at the clinic and that he did not take call.[123] See Schenck Depo. 191 at 49:15-17; id. at 50:10. Dr. Rivero thus had much less opportunity to interact with patients, and often the patients on whom he operated had requested him; this reduced interaction with patients all would change should he increase his time at UNM. See UNM's MSJ ¶ 25, at 6; Rivero Depo. 143 at 175:15-18. UNM thus had objective justification for its concern that Dr. Rivero would have professionalism issues again should he increase to 0.75 FTE or full-time employment.[124]

---

[123]This statement is part of the record, but not part of the parties' undisputed material facts, but as part of the record the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

[124]Although the Court does not extensively rely on the older complaints and issues Dr. Rivero had before 2006 in deciding whether the psychiatric evaluation is job-related and consistent with business necessity, it does consider Dr. Rivero's response to them as provided above. Many of the incidents themselves have not been presented in an admissible form, so the

Further, Dr. Rivero cannot point to any evidence that creates a genuine question of material fact whether UNM's reason for the evaluation is pretextual. He argues that "the Addendum's psychiatric evaluation requirement is overbroad and invasive of Dr. Rivero's innermost privacy," so much so that UNM must have "regarded Dr. Rivero as disabled -- or sought to discover a presumed disability." Rivero's Response at 24. The act of requesting the psychiatric evaluations is not sufficient to establish that UNM regarded Dr. Rivero as disabled, see Lanman v. Johnson Cty., 393 F.3d at 1157 ("Nor does the County's order that Ms. Lanman take a fitness for duty exam show that Ms. Lanman was perceived as mentally impaired."), and as described more fully in the next Part, there is no evidence in the record showing that UNM regarded Dr. Rivero as disabled. Dr. Rivero argues that, because of the Addendum's overbreadth, "there exists a genuine issue of material fact as to the nature and scope of the

_____

Court cannot rely on them for the truth of the matter in ruling on UNM's MSJ. See Gross v. Burggraf Const. Co., 53 F.3d at 1541. The fact that the complaints were made is admissible, however, as Dr. Rivero discussed them in his deposition and they point to UNM's state of mind. As discussed in the analysis above, the Court focuses on Dr. Rivero's responses to these older complaints as he discusses them in his deposition. Dr. Rivero argues these older complaints are irrelevant and should be excluded, but the Court disagrees. See Complaints MIL at 4.

UNM must show that the psychiatric evaluation requirement is job-related and consistent with business necessity to overcome Dr. Rivero's argument that this requirement is illegal. See 42 U.S.C. § 12112(d)(4)(A). The older incidents help paint a more complete picture of what Dr. Rivero's professional life was like and why UNM imposed the requirement when it did. These incidents thus make it more probable that UNM has a true basis for questioning Dr. Rivero's ability to act professionally, on which its defense rests, so these older incidents are relevant. See Fed. R. Evid. 401. Further, these incidents are not likely to provoke the jury's emotional response or otherwise tend to adversely affect the jury's attitude toward a particular matter, so they are not unfairly prejudicial. See United States v. Rodriguez, 192 F.3d at 951. The Court will not preclude the admission of these older complaints under rule 403, and denies the Complaints MIL.

psychiatric examination that in turn gives rise to a question of fact as to whether it is 'job-related and consistent with business necessity.'"  Rivero's Response at 25.  Dr. Rivero has "precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job or were too broad in scope," however, because he did not submit to the psychiatric evaluations.  <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d at 812.  Dr. Rivero notes the reappointment letters which state that he does not have a mental condition that interferes with the essential functions of his position, but notably does not include in the record a reappointment letter from 2007, which would have followed his harsh emails to Barela.  Dr. Rivero therefore has not produced evidence which demonstrates that, despite the objective evidence of his inability to act professionally, the proffered reasons for UNM's psychiatric evaluation requirement "is unworthy of belief."  <u>Randle v. City of Aurora</u>, 69 F.3d at 453.  Accordingly, summary judgment for UNM is appropriate on Dr. Rivero's illegal-medical-inquiry claim.

## III.    THERE IS NO EVIDENCE IN THE RECORD THAT UNM CONSTRUCTIVELY DISCHARGED DR. RIVERO.

Dr. Rivero argues that UNM regarded him as disabled -- as the Addendum's onerous requirements exemplify -- and, by withdrawing the Addendum and precluding access to Dr. Rivero's credentialing file, constructively discharged him in violation of the Rehabilitation Act.  <u>See</u> Rivero's Response at 28-34.  A prima facie case of constructive discharge under the Rehabilitation Act requires that: (i) Dr. Rivero has a disability as the Rehabilitation Act defines that term, <u>see</u> <u>Corley v. Dep't of Veterans Affairs ex rel. Principi</u>, 218 F. App'x at 739 (citing <u>Wells v. Shalala</u>, 228 F.3d at 1146); (ii) Dr. Rivero is a qualified individual for the position, <u>see</u>

Wells v. Shalala, 228 F.3d at 1146; (iii) "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in [Dr. Rivero's] position would feel compelled to resign," Corley v. Dep't of Veterans Affairs ex rel. Principi, 218 F. App'x at 739 (internal quotation marks omitted)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 534); and (iv) Dr. Rivero resigned, see Green v. Brennan, 136 S. Ct. at 1777. UNM asks for summary judgment on this claim, because it argues that "[t]he undisputed material facts of the case conclusively demonstrate that Plaintiff was not a disabled person, as defined by the ADA," and, thus, that he cannot make a prima facie case for constructive discharge. UNM's MSJ at 21. The Court examines only elements (i) and (iii) of the prima facie case, as the other two are not in dispute. Concluding (i) that Dr. Rivero does not have a disability as the Rehabilitation Act defines that term, and (iii) that UNM did not make Dr. Rivero's working conditions objectively intolerable, the Court determines that Dr. Rivero voluntarily resigned and that UNM is entitled summary judgment on this claim. See Sanchez v. Denver Pub. Sch., 164 F.3d at 534; Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d at 1356.

### A. THERE IS NO EVIDENCE TO ESTABLISH THAT UNM DID NOT REGARD DR. RIVERO AS DISABLED UNDER THE REHABILITATION ACT'S STANDARD.

Dr. Rivero does not allege that he has a disability, but, rather, that UNM regarded him as disabled. See FAC ¶ 50, at 10. To establish this element, Dr. Rivero must show that UNM has discriminated against him, "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C.

§ 12102(3)(A).  UNM need not have "believed that the impairment prevented [Dr. Rivero] from being able to perform a major life activity."  <u>Adair v. City of Muskogee</u>, 823 F.3d at 1306.  The inquiry is focused on UNM's subjective belief, and not Dr. Rivero's.  <u>See</u> <u>Justice v. Crown Cork & Seal Co.</u>, 527 F.3d at 1086.  This relaxed ADAAA standard applies, because the alleged discriminatory conduct of which Dr. Rivero complains -- the Addendum's imposition -- occurred after the ADAAA's effective date of January 1, 2009.

Dr. Rivero asserts that the Addendum's psychiatric evaluation requirement "is an act of discrimination giving rise to an implication that Dr. Rivero was regarded as disabled."  Rivero's Response at 28.  Dr. Rivero argues that "[t]he Addendum's invasiveness, its limitless scope, and waiver of all legal rights present exactly the type of exam that is not even vaguely permissible," so much so that "[a]nyone subjected to it must be presumed to be mentally ill."  Rivero's Response at 29.  Dr. Rivero stated that the psychiatric evaluation requirement put "no question in [his] mind" that UNM "felt that [he] had a psychiatric problem."[125]  Rivero Depo. 191 at 299:12-14.  Because Dr. Rivero did not submit to the evaluations, the Court cannot determine their invasiveness or scope.  The Addendum, when read as a whole, is not as invasive or limitless in scope as Dr. Rivero alleges.  As discussed earlier, the Addendum is targeted to addressing Dr. Rivero's professionalism issues.  <u>See</u>, <u>e.g.</u>, Addendum at 1.  Further, the Addendum does not contain a waiver of all legal rights, but rather "grievances, complaints, and appeals, arising from [UNM's] conduct prior to the execution of this Addendum and from the terms of this Addendum,

_____

[125]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  <u>See</u> Fed. R. Civ. P. 56(c)(3).

- 258 -

or arising from [Dr. Rivero's] resignation in accordance with the terms of this Addendum." Addendum ¶ 7, at 5.  <u>Contra</u> Rivero's Response ¶ 31, at 16.  As the Court has determined that the psychiatric evaluation requirement is job-related and consistent with business necessity, <u>see</u> <u>supra</u> Section II.B, the Court concludes that the Addendum is not an act of discrimination by UNM.

Although Dr. Rivero is a well-respected surgeon, he had received some complaints and sent some harsh emails before reducing his time at UNM.  The Eighth Circuit has determined that "[e]mployers need to be able to ascertain the cause of troubling behavior without exposing themselves to ADA claims" and so an employer's request for a mental "evaluation is not equivalent to treatment of the employee as though []he were substantially impaired." <u>Cody v.</u> <u>CIGNA Healthcare of St. Louis, Inc.</u>, 139 F.3d 595, 599 (8th Cir. 1998).  The Sixth Circuit has explained that an "employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." <u>Sullivan</u> <u>v. River Valley Sch. Dist.</u>, 197 F.3d at 810.  The Tenth Circuit similarly has held that an employer's request that an employee take a fitness-for-duty examination does not establish that the employer regarded the employee as disabled.  <u>See</u> <u>Lanman v. Johnson Cty.</u>, 393 F.3d at 1157. Accordingly, the Court determines that the Addendum's psychiatric evaluation requirement does not establish that UNM regarded Dr. Rivero as having a mental disability.[126]

---

[126]The Court notes that both parties analyze the issue whether Dr. Rivero was considered disabled under the older, pre-ADAAA standard, which is inapplicable to Dr. Rivero's claim.

Dr. Rivero asserts that "being disabled or regarded as disabled is not the sole means by which to assert a discriminatory basis for a constructive discharge claim," but cites no authority for this proposition besides saying "[a]s set out above." Rivero's Response at 29. Nothing Dr. Rivero cites to "above" provides that a constructive discharge claim under the Rehabilitation Act does not require establishing that the plaintiff meets the Act's definition of disabled. Rivero's Response at 29. See id. at 28-29. In fact, Rehabilitation Act precedent makes clear that Dr. Rivero must establish that he has a disability as the Act defines that term. See, e.g., Corley v. Dep't of Veterans Affairs ex rel. Principi, 218 F. App'x at 739 (stating that the plaintiff's constructive discharge claim fails because he did not establish that he is disabled); Wells v. Shalala, 228 F.3d at 1146 (concluding that there can be no constructive discharge claim where the plaintiff is not a "qualified individual with a disability").

Dr. Rivero argues that "a person is regarded as having an impairment that substantially limits the person's major life activities when other people treat the person as having a substantially limiting impairment, regardless of whether the individual actually has an impairment." Rivero's Response at 30 (emphasis in Rivero's Response)(internal quotation marks omitted)(quoting Martin v. Kansas, 996 F. Supp. at 1289-90). Dr. Rivero contends that, through the Addendum, UNM "is seeking to confirm its presupposition" that Dr. Rivero has an impairment. Rivero's Response at 30 (citing Dr. Rivero's additional undisputed material fact ¶ 31, at 15-16). There is no evidence, however, that UNM imposed the Addendum to find a disability and, as previously discussed, the psychiatric evaluation requirement does not establish

that UNM regarded Dr. Rivero as disabled.  Dr. Rivero notes that Dr. Schenck "stated that Dr. Rivero's reaction to the stress of being on call was one reason that 'no call' was listed as an element of the December 2010 meeting between the two."  Rivero's Response at 30 (citing Dr. Rivero's additional undisputed material fact ¶ 29, at 15).  See Schenck Depo. 191 at 41:8-18; id. at 78:15-80:7.  Dr. Schenck explained that he did not want Dr. Rivero being on call, because he "wanted [Dr. Rivero] not to become . . . testy when he was on call and have some professional issue."  Schenck Depo. 191 at 79:13-15.  See Rivero's Response ¶ 29, at 15 (citing this portion of the record).[127]  That Dr. Schenck did not want Dr. Rivero on call, however, does not establish that Dr. Schenck -- and by extension UNM -- treated Dr. Rivero as disabled.  Dr. Schenck stated that being on call is stressful and "makes many orthopedic surgeons testy," so Dr. Rivero's issues with it were not unique.[128]  Schenck Depo. 191 at 78:25-79:1.  See id. at 41:13-17.  Rather, Dr. Schenck stated that he did not want Dr. Rivero being on call, because "[w]e did not want to risk him to become unprofessional, and on top of it I didn't need him for that."  Schenck

---

[127] This quote is not included in Dr. Rivero's proffered undisputed material fact.  Dr. Rivero's proffered fact states, in part: "Dr. Rivero was not to be on call if he were to return. The stated reason for this was that being 'on call' created too much stress for Dr. Rivero, which triggered his 'lack of professionalism.'"  Rivero's Response ¶ 29, at 15 (first quoting Schenck Depo. 191 at 79:19; then quoting id. at 79:25-80:1).  Here, the Court quotes what Dr. Schenck said and, as part of the record, may consider it.  See Fed. R. Civ. P. 56(c)(3).

[128] This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

Depo. 191 at 79:22-24.  <u>See</u> Rivero's Response ¶ 29, at 15 (citing this portion of the record).[129] Thus, the restriction was for Dr. Rivero's benefit, because, to increase Dr. Rivero's employment, Dr. Rivero would have to be professional, and Dr. Schenck wanted Dr. Rivero "to be successful professionally."[130]  Schenck Depo. 191 at 78:14.  <u>See id.</u> at 78:3-14.

This action shows that UNM knew of Dr. Rivero's professionalism issues and wanted to try to prevent them as he increased his time at UNM.  As the United States Court of Appeals for the Seventh Circuit has written, "[d]ecent managers try to help employees cope with declining health without knowing or caring whether they fit the definition in some federal statute."  <u>Cigan v. Chippewa Falls Sch. Dist.</u>, 388 F.3d 331, 335 (7th Cir. 2004).  The Court concludes that Dr. Schenck's attempt to help Dr. Rivero succeed by suggesting that he not be on call does not establish that UNM regarded Dr. Rivero as suffering from some impairment which caused his professionalism issues.  Being on call is stressful, and it is not logically sound to suggest that a jury could conclude that a supervisor who is trying to help his employee succeed and increase in employment by removing this stressor is doing so because he believes the employee has a disability.  Dr. Rivero has noted no evidence that would lead a reasonable jury to conclude that

---

[129] This quote is not included in Dr. Rivero's proffered undisputed material fact. Dr. Rivero's proffered fact states, in part: "Dr. Rivero was not to be on call if he were to return. The stated reason for this was that being 'on call' created too much stress for Dr. Rivero, which triggered his 'lack of professionalism.'"  Rivero's Response ¶ 29, at 15 (first quoting Schenck Depo. 191 at 79:19; then quoting id. at 79:25-80:1).  Here, the Court quotes what Dr. Schenck said and, as part of the record, the Court may consider it.  <u>See</u> Fed. R. Civ. P. 56(c)(3).

[130] This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  <u>See</u> Fed. R. Civ. P. 56(c)(3).

UNM regarded him as disabled. Further, besides the Addendum, Dr. Rivero notes no discriminatory action that UNM took against him because it allegedly perceived him as disabled. As discussed, the Addendum requirement is job-related and consistent with business necessity, so it is not an act of discrimination. Dr. Rivero, therefore, cannot establish that UNM regarded him as disabled, which precludes his constructive discharge claim. Even if he could establish that UNM regarded him as disabled, however, his constructive discharge claim would still fail, because the evidence shows no discriminatory acts by UNM that made his working conditions objectively intolerable. See Sanchez v. Denver Pub. Sch., 164 F.3d at 534.

**B. THERE IS NO EVIDENCE THAT UNM TOOK ANY ILLEGAL DISCRIMINATORY ACTIONS AGAINST DR. RIVERO THAT MADE HIS WORKING CONDITIONS SO INTOLERABLE THAT A REASONABLE PERSON WOULD FEEL COMPELLED TO RESIGN.**

Dr. Rivero substantially rests his constructive discharge claim on his assertion that the Addendum's psychiatric evaluation requirement is a "*per se* discriminatory act." Rivero's Response at 32. Dr. Rivero notes a few other actions that UNM took which he contends created intolerable working conditions leading to his constructive discharge. See Rivero Response at 32-34. First, Dr. Rivero outlines his dispute with Dr. Pitcher, and asserts that Dr. Pitcher "engage[d] in a tacit campaign against Dr. Rivero with fellow administrators, communicating openly in a negative light, potentially as disabled (citing 'grave' concerns without basis[)]." Rivero's Response at 33 (citing Dr. Rivero's additional undisputed material fact ¶ 12, at 11-12). Second, Dr. Rivero asserts that "Dr. Schenck played a deceitful and manipulative game with Dr. Rivero, at once purporting to be his friend, facilitating the delay engaged in by other administrators, and

then . . . baiting and switching the agreement to return." Rivero's Response at 33 (citing Dr. Rivero's additional undisputed material fact ¶ 25, at 14). This alleged deceit includes Dr. Schenck's presentment of the Addendum, which contains a psychiatric examination requirement rather than the counseling to which Dr. Rivero agreed, and Dr. Schenck's withdrawal of the Addendum after Dr. Rivero sought access to his credentialing file. See Rivero's Response at 33 (citing Dr. Rivero's additional undisputed material facts ¶¶ 30-32, at 15-16; id. ¶¶ 36-39, at 17-18). Third, Dr. Rivero contends that "UNM then went into full obstruction, unlawfully withholding Dr. Rivero's own documents and impeding Dr. Rivero's return." Rivero's Response at 33-34 (citing Dr. Rivero's additional undisputed material facts ¶¶ 40-44, at 18).

Most of these allegations are just that -- bare assertions that lack support in the factual record. The facts regarding Dr. Rivero's dispute with Dr. Pitcher establish that they had a disagreement in 2003 regarding the transfer of a patient over PALS, and Dr. Pitcher sent an email to Dr. Rivero's department chair about the incident. See Rivero's Response ¶ 7, at 10; Rivero Depo. 191 at 44:11-49:16; Pitcher Depo. at 19:9-21:25; Pitcher Complaint at 12. Dr. Pitcher recalls that an administrative supervisor came to him concerning an interaction she had with Dr. Rivero in which he did not want to follow the PALS policy.[131] See Pitcher Depo. at

---

[131]This statement and the next statement are not part of the parties' undisputed material facts, but as they are part of the record the Court may consider them. See Fed. R. Civ. P. 56(c)(3). Rivero does provide as a fact that he had a disagreement with Dr. Pitcher about PALS policy, and that Dr. Pitcher informed Dr. Rivero's supervisor. See Rivero's Response ¶ 7, at 10-11.

19:21-14.  <u>See</u> <u>also</u> Rivero's Response ¶ 7, at 10 (citing this portion of the record).  Dr. Pitcher had a conversation with Dr. Rivero about this incident, felt put off by the conversation, and felt that it was not collegial, and so he emailed Dr. Rivero's immediate supervisor his concerns.  <u>See</u> Pitcher Depo. at 21:10-19.  <u>See</u> <u>also</u> Rivero's Response ¶ 7, at 10 (citing this portion of the record).  Dr. Rivero states that he told Dr. Pitcher that he wanted a private conversation, but that Dr. Pitcher ordered him to follow the policy and was not very nice to him, and that Dr. Pitcher's email to his supervisor made "all kinds of allegations that were false based on hearsay and third-party information that was clearly false."[132]  Rivero Depo. 191 at 48:23-25.  <u>See</u> <u>id.</u> at 48:1-25.  <u>See</u> <u>also</u> Rivero's Response ¶ 7, at 10 (citing this portion of the record).  In 2004, the then-Vice Dean of the School of Medicine released a memorandum on the incident, which caused Dr. Pitcher to recuse himself from handling any issue involving Dr. Rivero.  <u>See</u> Rivero's Response ¶ 11, at 11; Trotter Memorandum at 13; Pitcher Depo. at 38:2-17.  After the Vice Dean issued this memorandum, Dr. Pitcher continued to email Dr. Rivero's and his colleagues about incidents between them that concerned him.  <u>See</u> Rivero's Response ¶ 12, at 11; May 6 Pitcher Email at 1; Aug. 10 Pitcher at 3.  Dr. Rivero did not know of these emails, however, during his employment at UNM.  <u>See</u> Rivero's Response ¶ 12, at 11; First Rivero Aff. ¶ 3, at 1.

---

[132]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  <u>See</u> Fed. R. Civ. P. 56(c)(3).  Dr. Rivero proffers as fact that Dr. Pitcher's complaint was false and based on hearsay, but this fact was based on inadmissible hearsay and could not be found as fact.  <u>See</u> Rivero's Response ¶ 8, at 11.

As to Dr. Schenck, the record shows that Dr. Rivero was in constant communication with Dr. Schenck every quarter about increasing Dr. Rivero's employment at UNM, with Dr. Schenck saying that he was working on it.[133]  See Rivero Depo. 191 at 183:5-20.  See also Rivero's Response ¶ 25; at 14 (citing this portion of the record).  Dr. Schenck stated that, by September, 2007, there was no agreement whether to bring Dr. Rivero back, surmising that this situation was because Dr. Rivero had hurt some feelings and caused some damage.[134]  See Schenck Depo. 191 at 81:14-23.  See also Rivero's Response ¶ 25; at 14 (citing this portion of the record). Dr. Schenck asserted that he was trying to bring back Dr. Rivero, but "couldn't get it accomplished at the rate he wanted it done."[135]  Schenck Depo. 191 at 84:1-2.  See id. at 83:23-84:4.  See also Rivero's Response ¶ 25; at 14 (citing this portion of the record).  Dr. Rivero believed that, in August, 2008, Dr. Roth told his colleagues at a meeting that Dr. Rivero would not be allowed to return full-time, because it would result in lawsuits.[136]  See Rivero Depo. 191 at 184:19-185:5.  See also Rivero's Response ¶ 25; at 14 (citing this portion of the record). Then, in September, 2008, Dr. Schenck was in Tulsa and met with Dr. Rivero, to say that there

---

[133]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[134]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[135]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[136]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

was nothing else he could do, implying Dr. Rivero would not be brought up to 0.75 FTE.[137]  See Rivero Depo. 191 at 185:10-22.  See also Rivero's Response ¶ 25; at 14 (citing this portion of the record).  There is no evidence of Dr. Rivero's assertion that Dr. Schenck or other UNM administrators "obstructed, delayed, and withheld approval of Dr. Rivero's increase."  Rivero's Response ¶ 25, at 14.  Rather, the record shows that Dr. Schenck was advocating for Dr. Rivero's return and the issues stemmed from administrators' concerns with Dr. Rivero himself -- not any manipulative game that Dr. Schenck was playing.

Further, Dr. Schenck was instrumental in the drive to increase Dr. Rivero's employment with UNM and "had a plan in place to get him back," which included Dr. Rivero not taking call so he could "have a good success so that [he] didn't have any professionalism issues, and if there were ones, [Dr. Schenck] could help him through them." [138]  Schenck Depo. 191 at 51:8-12.  Dr. Schenck explained that, when he was negotiating for Dr. Rivero's return, he was still taking call as the department chair -- which is "almost unheard of." [139]  Schenck Depo. 191 at 79:5.  See id. at 79:3-8.  Dr. Schenck also met with Dr. Rivero on December 10, 2010, to come to an agreement as to how to bring Dr. Rivero up to 0.75 FTE at UNM.  See Rivero's Response ¶ 27, at 14-15; Schenck Depo. 191 at 107:8-22; Rivero Depo. 143 at 206:14-22.  The agreement, as a

---

[137]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[138]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[139]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

handwritten note represents and as the two men remember it, provides that Dr. Rivero would first increase to 0.25 FTE, would increase by 0.25 every six months to a maximum of 0.75 FTE, would not take call, would achieve full status as a faculty member in two years, and would attend four counseling sessions. See Rivero's Response ¶ 27, at 14-15; Note at 13; Rivero Depo. 143 at 206:14-207:14; Schenck Depo. 191 at 107:8-109:15. Dr. Schenck maintains that a psychiatrist or a psychologist would conduct the counseling which he envisioned, see Schenck Depo. 191 at 108:11-14, whereas Dr. Rivero stated that they did not discuss who would do the counseling, see Rivero Depo. 143 at 208:14-18.[140] Nonetheless, at Dr. Strasburger's suggestion, Dr. Rivero contacted Dr. Katzman, a licensed psychiatrist, to set up counseling sessions. See UNM's MSJ ¶¶ 38-39, at 9; Strasburger Email at 32; Counseling Email at 32.

Although the Addendum does not exactly match the agreement that Dr. Rivero and Dr. Schenck reached, the undisputed facts show that Dr. Schenck did not draft the Addendum, although he "participated in giving some of the bullet points of how" to structure Dr. Rivero's return.[141] Schenck Depo. 191 at 113:14-15. See id. at 113:9-16. The Addendum provides that Dr. Rivero would start at 0.25 FTE and increase by 0.25 every six months to a 0.75 FTE maximum if he fulfills his obligations under paragraph 2. See Addendum ¶ 5, at 4. Paragraph 2 provides that Dr. Rivero "shall successfully complete a four-part psychiatric evaluation by a

---

[140]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

[141]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

board-certified psychiatrist." Addendum ¶ 2, at 2. As previously discussed, this evaluation requirement was imposed to address Dr. Rivero's professionalism issues, which is why Dr. Schenck suggested counseling in his oral agreement with Dr. Rivero. See Schenck Depo. 191 at 112:3 (responding that he recommended "[c]ounseling for professionalism" to Dr. Rivero). [142] Although the term "psychiatric evaluation"[143] sounds more onerous than the term "counseling," and in practice is likely more onerous, they were both recommended for the same purpose -- to address Dr. Rivero's professionalism issues. This enhanced requirement cannot be blamed on Dr. Schenck, however, as Dr. Rivero would like to do, because Dr. Schenck did not, and states he could not, draft the Addendum. See UNM's Reply ¶ 33, at 12; Schenck Depo. 191 at 113:16.[144]

---

[142]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

[143]Dr. Rivero requests that UNM stick to the term "psychiatric evaluation" during trial rather than the term "psychological evaluation" that it uses throughout its briefing. Psychological MIL at 1. Although the Court's grant of summary judgment for UNM moots this request, the Court decides the issue and concludes that, because the Addendum uses the term "psychiatric evaluation," Addendum ¶ 2, at 2, UNM must stick to that language in its opening and during the trial as to not misstate the evidence, and thus mislead and confuse the jury. UNM's use of the proper term during trial will not preclude its defense that it did not regard Dr. Rivero as disabled, as it may still present evidence and make argument as to what it meant by use of the term "psychiatric evaluation." The Court, therefore, would grant the Psychological MIL and preclude UNM from using the improper term "psychological evaluation" outside of its closing argument. At closing, it can argue and use what is an argumentative phrasing.

[144]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

Dr. Rivero stated that Dr. Schenck's demeanor changed when he realized that Dr. Rivero would likely not sign the Addendum.[145]  See Rivero Depo. 191 at 300:20-23.  Dr. Rivero also stated that Dr. Schenck extended his deadline from March 10, 2011, to sign the Addendum and to obtain a letter from a psychiatrist agreeing to perform the psychiatric evaluation, see Addendum ¶ 2(a), at 2, to April 10, 2011, see Rivero Depo. 191 at 245:4-5.  See also UNM's MSJ ¶ 42, at 10; Extension Email at 1.  Dr. Rivero then attempted to look at his credentialing file and stated that, immediately before he was going to review it with the records custodian Kelley, Dr. Bailey called her and instructed her not to show Dr. Rivero his file.  See Rivero's Response ¶ 37, at 17; Rivero Depo. 191 at 251:14-252:10.  Dr. Bailey then emailed Dr. Schenck, stating that legal had to first determine if Dr. Rivero could access his file and called him asking if they really wanted to increase Dr. Rivero's employment.  See Rivero's Response ¶ 38, at 17; Schenck Depo. 191 at 142:7-17.  Dr. Schenck stated that he was disappointed, because he "had to withdraw the agreement [he] had worked on for three years, because," Schenck Depo. 191 at 143:21-23, if Dr. Rivero had then signed the Addendum, "[t]here would have been reason for him to be let go, and [Dr. Schenck] did not want that to happen," Schenck Depo. 191 at 143:25-144:2.[146]  Dr. Schenck stated that Dr. Bailey was upset with his interaction with Dr. Rivero and that he did not think Dr. Rivero would sign the Addendum.  See Schenck Depo. 191 at 145:12-

---

[145]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[146]These statements are not part of the parties' undisputed material facts but, as part of the record, the Court may consider them.  See Fed. R. Civ. P. 56(c)(3).

20.[147]  Dr. Schenck also felt that, if Dr. Rivero did sign the Addendum, he would still have professionalism issues and lose his job, Schenck Depo. 191 at 145:20-25,[148] so Dr. Schenck withdrew the Addendum on April 5, 2011, see UNM's MSJ ¶ 44, at 10; Withdrawal Email at 1.

Finally, although UNM unlawfully withheld Dr. Rivero's credentialing file, resulting in two years of litigation for him to obtain it, this action did not impede Dr. Rivero's return, because Dr. Schenck had already withdrawn the Addendum.  See Rivero's Response ¶ 42, at 18; Order on Petition ¶ B(5), at 5; Schenck Depo. 191 at 145:25.  Dr. Rivero received his full credentialing file by January, 2014.  See Rivero's Response ¶ 43, at 18; Trotter Aff. at 2; Bailey Aff. at 1.  Dr. Rivero then resigned on May 21, 2014.  See UNM's MSJ ¶ 46, at 10; Resignation Letter at 1.  Viewing all these facts in the light most favorable to Dr. Rivero, there is no evidence of any discriminatory actions that UNM took against Dr. Rivero because of a perceived disability, an essential element of his claim.  See Premratananont v. S. Suburban Park & Recreation Dist., 1998 WL 211543, at *2.  There is no evidence of a work environment so intolerable that a reasonable person in Dr. Rivero's position would have felt compelled to quit, another essential element of his claim.  See Sanchez v. Denver Pub. Sch., 164 F.3d at 534.  Further, there is no evidence that Dr. Rivero's work environment was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter

---

[147]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[148]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)(citation omitted)(first quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986); and then quoting id. at 67). Although Dr. Rivero may have felt frustrated by UNM's failure to increase his employment and its precluding access to his credentialing file, in determining whether constructive discharge occurred the plaintiff's subjective views are irrelevant. See Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d at 1356. Viewing the totality of the circumstances objectively, no reasonable jury could conclude that Dr. Rivero was constructively discharged. Accordingly, the Court also grants summary judgment for UNM on this claim.[149]

---

[149]Dr. Rivero argues that the MTD Order also dealt with UNM's affirmative defense III -- that Dr. Rivero's "claims are barred by the doctrine of laches and waiver." Answer at 10. The MTD Order does not discuss laches or waiver. See MTD Order at 1-10. Further, neither party has specifically briefed the application of the laches and waiver defense to Dr. Rivero's claims. UNM argued at the June 26, 2018, hearing that the laches and waiver doctrine applies to the constructive discharge claim, because Dr. Rivero worked for three years under "supposedly intolerable working conditions" after UNM withdrew the Addendum. June 26 Tr. at 23-24 (Marcus). See id. at 101:16-24 (Marcus). See also Nat'l R.R. Passenger v. Morgan, 536 U.S. 101, 121-22 (2002)(discussing the availability of the waiver and laches defenses for an employer where the plaintiff's unreasonable delay in filing suit prejudiced the employer); Whitfield v. Anheuser-Busch, Inc., 820 F.2d 243, 244 (8th Cir. 1987)(stating that the "doctrine of laches is a proper defense in a Title VII action"); Bishopp v. District of Columbia, 788 F.2d 781, 783 n.1 (D.C. Cir. 1986)(considering a laches defense to a constructive discharge claim, but rejecting it on the merits). The record supports this assertion of delay, although UNM has not stated how this delay has materially prejudiced it. See Jacobsen v. Deseret Book Co., 287 F.3d at 949 (stating that the laches defense requires that the plaintiff unreasonably delayed in asserting the claim, and that this delay materially prejudiced the defendant). Motions to strike, however, are generally disfavored, and the decision to strike rests in the Court's sound discretion. See Scherer v. U.S. Dep't of Educ., 78 F. App'x at 689. As the Court is not convinced on the little record before the Court that there is no way UNM could prevail on its laches-and-waiver-doctrine defense, the Court would not strike this defense if Rivero's MSJ were not mooted.

**IV.    DR. RIVERO'S FAC STATES A CLAIM FOR RETALIATION, BUT THERE IS NO EVIDENCE THAT UNM RETALIATED AGAINST DR. RIVERO.**

Dr. Rivero alleges that, because UNM does not address his retaliation claim in its MSJ, the retaliation claim is preserved for trial.  See Rivero's Response at 35.  UNM responds that Magistrate Judge Lynch did not find a cause of action for retaliation in his MTD Order and that it reasonably relied on his determination.  See UNM's Reply at 28.  UNM further argues that, even if Dr. Rivero's FAC states a claim for retaliation, "the undisputed material facts of the case demonstrate that UNM is entitled to summary judgment on that claim."  UNM's Reply at 28. The Court concludes first that Dr. Rivero's FAC states a claim for retaliation, and second that UNM is entitled to summary judgment on this claim.

**A.    DR. RIVERO HAS ALLEGED FACTS IN HIS FAC SUFFICIENT TO STATE A CLAIM OF RETALIATION UNDER THE REHABILITATION ACT.**

In deciding whether Dr. Rivero has stated a claim for retaliation, the Court looks at the allegations within the FAC's four corners, taking those allegations as true.  Mobley v. McCormick, 40 F.3d at 340.  The FAC refers to and attaches the Addendum, the authenticity of which is undisputed, so in deciding this issue the Court may consider the Addendum, because it is central to Dr. Rivero's claims.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d at 1201 n.3.  In deciding whether the FAC states a claim for retaliation, the Court must "accept as true all well-pleaded factual allegations in [the FAC] and view these allegations in the light most favorable to [Dr. Rivero]."  Smith v. United States, 561 F.3d at 1098.  Mere "labels and conclusions" are insufficient; the "[f]actual allegations must be enough to raise a right to relief

above the speculative level." Bell Atl. Corp v. Twombly, 550 U.S. at 555. To establish a prima facie case of retaliation, a plaintiff must demonstrate that he or she: (i) engaged in protected activity; (ii) suffered a materially adverse employment action; and (iii) a causal connection exists between the protected activity and the materially adverse action. See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1202.

With these principles in mind, the Court determines that Dr. Rivero has alleged sufficient facts in his FAC to state a claim of retaliation under the Rehabilitation Act. Dr. Rivero alleges that UNM violated the Rehabilitation Act by requiring that he undergo psychiatric evaluations in exchange for an increase in his hours. See FAC ¶ 48, at 9. Dr. Rivero alleges that these evaluations could not be job-related or consistent with business necessity, because he remained at 0.05 FTE performing "complex adult reconstructive surgeries" and receiving "recommendations for reappointment to the surgical staff" until he left UNM in 2014. FAC ¶ 49, at 10. Dr. Rivero alleges that UNM "regarded Dr. Rivero as a person with a disability, namely an unspecified mental impairment, that he in fact did not have, and refused to permit Dr. Rivero to work more hours than 0.05 FTE." FAC ¶ 50, at 10. Dr. Rivero states that the "Defendant's only articulated reason for the adverse treatment was the unspecified mental impairment." FAC ¶ 51, at 10. Dr. Rivero alleges that he "objected to the illegal medical inquiry" in April, 2011, and then UNM "acted on its belief that Dr. Rivero had a mental disability which prevented him from working more than .05 FTE by revoking the offer to increase his FTE entirely." FAC ¶ 52, at 10. The FAC does not provide how Dr. Rivero objected to the evaluation requirement,

although Dr. Rivero states that, in April, 2011, he "sought advice of counsel and legally requested access to his own personnel files to determine the basis for" the evaluation requirement. FAC ¶ 40, at 8. Finally, Dr. Rivero alleges that UNM's "decision to revoke the offer of more hours was also motivated by retaliation because Dr. Rivero objected to the illegal medical inquiry," FAC ¶ 53, at 10, and that "[n]o legitimate business reason was ever offered for the adverse action," FAC ¶ 54, at 10.

Dr. Rivero has sufficiently pled that he suffered an adverse employment action -- the revocation of the Addendum that would have increased his hours, essentially a "fail[ure] to promote." Meiners v. Univ. of Kan., 359 F.3d at 1230. Dr. Rivero does not explicitly state in what protected activity he engaged for his retaliation claim. Although sparse, there are allegations that Dr. Rivero believed in good faith that UNM violated the Rehabilitation Act by requiring he undergo psychiatric evaluations before he could be promoted and that he somehow objected to these evaluations. See FAC ¶¶ 48-49, 52, at 9-10. This allegation plausibly shows that Dr. Rivero engaged in protected activity by opposing an act made unlawful by the Rehabilitation Act. See Umholtz v. Kan. Dep't of Soc. & Rehab. Servs., 926 F. Supp. 2d 1222, 1235 (D. Kan. 2013)(Rogers, J.)(stating that the Rehabilitation Act incorporates the ADA's anti-retaliation provisions, which "state that: 'No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . .'" (quoting 42 U.S.C. § 12203(a))). Further, Dr. Rivero alleges that he suffered the adverse action -- the withdrawal of the Addendum -- the same month he objected to the evaluations. See FAC

¶ 52, at 10.  This close temporal proximity allows an inference of a causal connection between the protected activity and the adverse action.  See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202.  Accordingly, Dr. Rivero's FAC states a claim for retaliation.

B.     THE STATUTE OF LIMITATIONS BARS THE RETALIATION CLAIM.

Dr. Rivero's retaliation claim accrued, commencing the start of the limitations period, upon the retaliatory adverse employment action: when Dr. Schenck withdrew the Addendum in April, 2011.  See Graham Cty. Soil & Water Conservation Dist. v. United States ex rel Wilson, 545 U.S. at 419 (stating that, "in retaliation actions," the statute of limitations starts to run "when the retaliatory action occurs").  As previously stated, the statute of limitations for Rehabilitation Act claims in the State of New Mexico is three years.  See N.M. Stat. Ann. § 37-1-8 (three-year statute of limitations for personal injury actions); Baker v. Bd. of Regents of the State of Kan., 991 F.2d at 632 (providing that the applicable state's statute of limitations for personal injury actions apply to Rehabilitation Act claims).  Dr. Rivero did not file his Complaint until April, 2016, five years after Dr. Schenck withdrew the Addendum.  See Complaint at 1.  Accordingly, the three-year statute of limitations has run, barring Dr. Rivero's retaliation claim.  There is no sound reason to apply the doctrine of equitable tolling to this claim, as Dr. Rivero had sufficient knowledge of his alleged injury within the limitations period to bring a timely retaliation case.  Although Dr. Rivero is correct in stating that UNM did not address this claim in its MSJ, see Rivero's Response at 35, he pointed out that he had this retaliation claim in his response, and UNM addresses the claim in its Reply and asks that the Court grant summary judgment on it, see

UNM's Reply at 27-28. UNM asserts that, "even assuming, *ad arguendo*, that Plaintiff stated a claim for retaliation in his Amended Complaint, the undisputed material facts of the case demonstrate that UNM is entitled to summary judgment as to the claim." UNM's Reply at 28. This statement is a clear request for a grant of summary judgment, and the Court concludes that, because the statute of limitations bars the retaliation claim, UNM is thus entitled to summary judgment on this claim.[150]

### C. THE RECORD CONTAINS NO EVIDENCE THAT DR. RIVERO ENGAGED IN PROTECTED ACTIVITY OR THAT UNM HAD A RETALIATORY MOTIVE IN WITHDRAWING THE ADDENDUM.

UNM contends that, even if the statute of limitations does not bar the retaliation claim, Dr. Rivero cannot make a prima facie case of retaliation, because he did not engage in a protected activity and because UNM did not have a retaliatory motive in withdrawing the Addendum. See UNM's Reply at 28. Dr. Rivero did not respond to this argument and thus note

---

[150]Dr. Rivero has not responded to UNM's argument why it is entitled to summary judgment on his retaliation claim. He did not request leave of the Court allow him to file a surreply to respond, which the Court would have granted. Further, the Court held a hearing on this matter on June 26, 2018, and all that Dr. Rivero said in favor of his retaliation claim is: "[T]here is a retaliation claim hanging out there that was not briefed, that I think still exists." June 26 Tr. at 107:6-8 (Norvell). At this hearing, UNM reiterated its argument that the retaliation claim is time-barred, but did not address the claim's merits. See June 26 Tr. at 108:2-7 (Marcus). Dr. Rivero did not respond to UNM's statute-of-limitations argument at the June 26 hearing, as he could have, stating only that whether there is a retaliation claim is "in dispute," "pending determination by the Court, pursuant to these motions." June 26 Tr. at 108:11, 18-19 (Norvell). Dr. Rivero also did not address the merits of his retaliation claim at the June 26 hearing. That Dr. Rivero has not taken advantage of his opportunities to argue against UNM's assertion that it is entitled to summary judgment on his retaliation claim does not mean the issue is not ripe for a decision. The Court accordingly considers UNM's arguments that it is entitled summary judgment on this claim and concludes they are sound.

facts that he contends establish his prima facie case.[151]  This lack of Dr. Rivero's facts makes the

Court's job more difficult.  The Court has searched the record for an action that Dr. Rivero took

which could be construed as a protected activity to form a basis for his retaliation claim.

Although filing an EEOC claim is clearly a protected activity, see Proctor v. United Parcel Serv.,

502 F.3d at 1208, and here Dr. Rivero filed two, they were filed in 2012 and 2014, see UNM's

MSJ ¶ 45, at 10; Rivero's Response ¶ 45, at 7; EEOC Charge of Discrimination Charge No. 543-

2012-00600 at 1; EEOC Charge of Discrimination at 1-2 (dated November 4, 2014), filed March

8, 2018 (Doc. 191-11), which is after the allegedly retaliatory withdrawal of the Addendum

occurred in 2011, see UNM's MSJ ¶ 44, at 10; Withdrawal Email at 1.  Dr. Rivero's FAC states

that he objected to the Addendum's psychiatric evaluation requirement, but does not provide

how.  See FAC ¶ 52, at 10.  As the Tenth Circuit has stated, "to qualify as protected opposition[,]

the employee must convey to the employer his or her concern that the employer has engaged in a

practice made unlawful by the" Rehabilitation Act.  Hinds v. Sprint/United Mgmt. Co., 523 F.3d

1187, 1203 (10th Cir. 2008).[152]

---

[151]As Dr. Rivero does not present direct evidence of discrimination, relying only on circumstantial evidence, the Court applies the McDonnell Douglas burden shifting framework. See Reynolds v. Sch. Dist. No. 1, Denver, 69 F.3d 1523, 1533 (10th Cir. 1995).  "Under the *McDonnell Douglas* scheme, in order to survive summary judgment on a circumstantial case, the plaintiff must first establish a prima facie case of discrimination."  Reynolds v. Sch. Dist. No. 1, Denver, 69 F.3d at 1533.

[152]Hinds v. Sprint/United Mgmt. Co. deals with a retaliation claim under the ADEA, but cites for this proposition Anderson v. Academy Sch. Dist. 20, 122 F. App'x 912, 916 (10th Cir. 2004)(unpublished), which is a Title VII case.  See Hinds v. Sprint/United Mgmt. Co., 523 F.3d at 1203 n.13 (citing Anderson v. Academy Sch. Dist. 20, 122 F. App'x at 916).  Accordingly, the

In the Extension Email, Dr. Rivero requests that Dr. Schenck "extend the [Addendum's] dates of March 10 and April 1 by a month," so that he may have the time to "review the addendum with an attorney as recommended to [him] in the document" and "arrange for an appropriate individual for the counseling that [he] agreed to." Extension Email at 1. <u>See</u> UNM's MSJ ¶ 42, at 10. Dr. Rivero writes that he is "concerned about some aspects of the [A]ddendum that are different from what [he] agreed to in [his] discussion" with Dr. Schenck. Extension Email at 1. He states:

> My two major concerns about the addendum are that it stipulates that the addendum is to be in effect indefinitely at the discretion of the SOM, but in our conversation, I agreed to two years at your request. The second issue is that I agreed to counseling, but I find the language in the document rather harsh in that regard.

Extension Email at 1.[153] This email is not a protected action, because it does not mention any discriminatory treatment by UNM based on a disability it believed Dr. Rivero to have or that Dr. Rivero believed that the psychiatric evaluation requirement is illegal. Dr. Rivero does not convey any concern in the Extension Email that he believed UNM has violated the Rehabilitation Act, or any other statute, and contains mere "[g]eneral complaints" about the Addendum's

---

Court concludes that this logic is applicable in the Rehabilitation Act context as well, because of Title VII precedent's applicability to the ADA and, thus, the Rehabilitation Act. <u>See</u> 29 U.S.C. § 794(d) (incorporating the ADA's anti-retaliation standards into claims of employment discrimination brought under the Rehabilitation Act's § 794); <u>Proctor v. United Parcel Serv.</u>, 502 F.3d at 1208 n.4 (stating that Title VII retaliation precedent applies in the ADA context).

[153]UNM's proffered undisputed material facts do not discuss this portion of the Extension Email, but UNM cites to the Email and Dr. Rivero responds. <u>See</u> UNM's MSJ ¶ 42, at 10; Rivero's Response ¶ 42, at 7. Dr. Rivero does not dispute that he wrote the email, only how UNM characterizes it. <u>See</u> Rivero's Response ¶ 42, at 7. Further, as this evidence is part of the record the Court may consider it. <u>See</u> Fed. R. Civ. P. 56(c)(3).

requirements.  Hinds v. Sprint/United Mgmt. Co., 523 F.3d at 1203 ("General complaints about company management . . . will not suffice.").

The Court could find no other emails in the record from Dr. Rivero that raised any concerns with the Addendum.  On April 3, 2011, Dr. Rivero sent an email to "reiterate [his] continuing interest in seeing the content of" his credentialing file, "which has been referenced in the Addendum that [he has] been presented and would like to sign, so that [he] can return to UNM at a meaningful level of participation."  Email from Dr. Dennis Rivero to Dr. Robert Bailey at 4 (dated April 3, 2011), filed March 8, 2018 (Doc. 191-5)("Credentialing Email").[154] Dr. Rivero also states that, "as suggested in the Addendum, [he] need[s] to get legal advice before [he] can sign the document with appropriate guidance."  Credentialing Email at 4.  He mentions that he would also like to see the file resulting from the OCR Letter, and review it with his attorney so that he can receive the attorney's "guidance regarding what significance it may have to the content of the Addendum that alludes to unprofessional conduct on [Dr. Rivero's] part, something that [he] has always denied."  Credentialing Email at 4.  Again, Dr. Rivero communicates no concerns in this email that UNM violated the Rehabilitation Act with the Addendum, and thus this email is also not a protected action.  See Hinds v. Sprint/United Mgmt. Co., 523 F.3d at 1203.

---

[154]This email is part of the record, so the Court may consider it, but is not quoted in the parties' undisputed facts.  See Fed. R. Civ. P. 56(c)(3).  Dr. Rivero cites to this email in one of his proffered undisputed material facts.  See Rivero's Response ¶ 40, at 18.

Dr. Rivero states that he sought access to his credentialing file in March, 2011, to find grounds for the psychiatric evaluation requirement. See, e.g., Rivero's Response ¶ 36, at 17; Rivero Depo. 191 at 271:12-13 ("I wanted to get to the bottom of the addendum."). Dr. Schenck stated that he did not know why Dr. Rivero wanted his files at that time, and thus did not know that Dr. Rivero sought them to find grounds for the required psychiatric evaluations.[155] See Schenck Depo. 191 at 144:11-21; id. at 145:2-8. Accordingly, there is no evidence that Dr. Rivero's attempt to view his credentialing file in any way conveyed to UNM his concern that UNM violated the Rehabilitation Act, so this action is also not protected. See Hinds v. Sprint/United Mgmt. Co., 523 F.3d at 1203. Dr. Schenck also stated that there was nothing wrong with Dr. Rivero's seeking access to his file and that his request did not form grounds to dismiss him. See Rivero's Response ¶ 39, at 17; Schenck Depo. 191 at 146:1-11. Further, even if a reasonable factfinder could conclude that Dr. Rivero's attempt to view his credentialing file is a protected activity, Dr. Schenck, who withdrew the Addendum, did not know that Dr. Rivero sought to view his file in opposition to an action illegal under the Rehabilitation Act, so Dr. Rivero cannot show a causal connection between the two events.[156] See Montes v. Vail

---

[155]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

[156]There is no evidence in the record before the Court, and Dr. Rivero does not allege, that Dr. Schenck withdrew the Addendum at anybody's urging, so there is no cat's paw issue. Even though Dr. Bailey's call to Dr. Schenck in which he asked, "Do we really want to do this?" influenced Dr. Schenck's decision to withdraw the Addendum, Schenck Depo. 191 at 143:16-17, see id. at 143:19-144:7, there is no evidence that Dr. Bailey was biased against Dr. Rivero as needed for the cat's paw doctrine to apply, see Young v. Dillon Cos., 468 F.3d at 1253 ("In order

Clinic, Inc., 497 F.3d 1160, 1176 (10th Cir. 2007)(stating that, to establish the causal nexus, "a 'plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity'" or that a person "harboring discriminatory animus, knew and used . . . the person who effected the adverse action, 'as a cat's paw to effect . . . her own biased designs'" (alteration in Montes v. Vail Clinic, Inc.)(first quoting Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993); and then quoting Young v. Dillon Cos., 468 F.3d 1243, 1253 (10th Cir. 2006))).

From the Court's review of the record before it, it does not appear that Dr. Rivero communicated his belief that UNM violated the Rehabilitation Act through the Addendum's requirements until after Dr. Schenck revoked the Addendum. Dr. Rivero stated that he sought his credentialing file "to get to the bottom of the [A]ddendum," but that it "took three years to get the mandamus thing resolved where [he] was finally allowed to see [his] file."[157] Rivero Depo. 191 at 271:12-15. See Rivero's Response ¶ 42, at 18 (stating that it took "two years of litigation" for a court to order production of Dr. Rivero's file). Dr. Rivero also stated that, "[d]uring that time, [h]e did not communicate [his] problems with . . . [his] colleagues" and just

_____

to succeed under such a theory, however, a plaintiff must show that the allegedly biased investigator's discriminatory reports, recommendation, or other actions were the proximate cause of the adverse employment action.").

[157] This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

told them that he was working with UNM to return.[158]  Rivero Depo. 191 at 271:16-18.  The first

mention of discrimination to UNM the Court found in the record is in June, 2011, when

Dr. Rivero emailed Dr. Bailey to complain about how he still has not been allowed access to his

credentialing file and states:

> It is very disappointing to me that even though initially it was clear that I would
> be allowed to see my file, at your last minute direction I was denied access to my
> file.  I do not understand why I am being discriminated against, when it was clear
> from the actions of the staff in your office that faculty members are allowed to see
> their own file.

Email from Dr. Dennis Rivero to Dr. Robert Bailey at 9 (dated June 21, 2011), filed March 8,

2018 (Doc. 19 -5).[159]  This "vague reference to discrimination," however, "without any

indication that this misconduct was motivated by [disability] . . . does not constitute protected

activity and will not support a retaliation claim."  Anderson v. Academy Sch. Dist. 20, 122

F. App'x at 916.  The clear protected activities -- the filing of his EEOC complaints -- did not

take place until years after Dr. Schenck revoked the Addendum and, thus, cannot provide a basis

for the retaliation claim.  Accordingly, the Court concludes that Dr. Rivero did not engage in a

protected activity and thus has not established a prima facie case of retaliation.

Even if there is a protected activity that the Court is missing, UNM is still entitled to

summary judgment on the merits of this claim, because Dr. Schenck did not withdraw the

---

[158]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it.  See Fed. R. Civ. P. 56(c)(3).

[159]This email is part of the record, so the Court may consider it, but is not quoted in the parties' undisputed facts.  See Fed. R. Civ. P. 56(c)(3).  Dr. Rivero cites to this email in one of his proffered undisputed material facts.  See Rivero's Response ¶ 40, at 18.

Addendum in retaliation of such action. Preliminarily, the Addendum's revocation is an adverse employment action because it is, in effect, a failure to promote. See Meiners v. Univ. of Kan., 359 F.3d at 1230. The Addendum, as discussed in Section II.B., addresses Dr. Rivero's professionalism problems. Dr. Rivero adamantly denies any professionalism issues. See, e.g., Rivero's Response ¶ 7, at 10; Resignation Letter at 1 ("Your testimony in court under oath was a profound disappointment, upholding a letter that you prepared, falsely accusing me of professional wrongdoing and unprofessional behavior, without supporting evidence. I have never engaged in unprofessional behavior as defined by law, as you admitted under oath."); Credentialing Email at 4 ("[T]he Addendum . . . alludes to unprofessional conduct on my part, something that I have always denied."). Dr. Rivero's lack of acknowledgment of his issues implies that the Addendum would be pointless, as UNM asserts. See UNM's Reply at 28. Further, Dr. Schenck states that he withdrew the Addendum, because of Dr. Rivero's adversarial interaction with Dr. Bailey over the credentialing file issue and because, if Dr. Rivero signed it, Dr. Schenck believed he would continue to have professionalism issues and would be fired.[160] See Schenck Depo. 191 at 145:12-25.

Dr. Schenck's concerns provide a legitimate, non-retaliatory reason for pulling the Addendum, so under the McDonnell Douglas framework, Dr. Rivero would have to establish a genuine question of material fact whether this reason is pretext. See Pushkin v. Regents of Univ.

---

[160]This statement is not part of the parties' undisputed material facts but, as part of the record, the Court may consider it. See Fed. R. Civ. P. 56(c)(3).

of Colo., 658 F.2d at 1387.  To establish such a question, Dr. Rivero must demonstrate that UNM's "preferred non-discriminatory reason is unworthy of belief."  Randle v. City of Aurora, 69 F.3d at 453.  The record before the Court contains no "evidence upon which a factfinder could conclude that the defendant's allegedly nondiscriminatory reasons for the employment decisions are pretextual."  Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1134. With no prima facie case of retaliation, and a legitimate, non-retaliatory reason for withdrawing the Addendum, summary judgment for UNM on the retaliation claim is appropriate.[161]

## V.  THE COURT'S TIES WITH THE SCHOOL OF LAW AND MEMBERS OF THE BOARD OF REGENTS DO NOT MANDATE RECUSAL, SO RECUSAL IS INAPPROPRIATE.

Dr. Rivero contends that the Court should recuse itself from this matter, asserting that that the Court's "relationship with the University of New Mexico and its Regents give rise to an objectively reasonable question of impartiality."  Recusal Motion at 3.  Dr. Rivero moves for recusal under 28 U.S.C. § 455(a) and § 455(b)(4).  See Recusal Motion at 7.  Section 455(a) mandates a judge's recusal "in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), while § 455(b)(4) mandates recusal where the judge "has a

---

[161]With its grant of summary judgment for UNM on all of Dr. Rivero's claims, the Court concludes that striking affirmative defense XIV, "Defendant UNM fulfilled any and all obligations it had to Plaintiff under contract or statute" is improper.  Answer at 10.  In granting summary judgment for UNM, the Court determines that UNM did not violate the Rehabilitation Act as Dr. Rivero alleges.  The Court is not convinced that Dr. Rivero can disprove this defense, i.e., that he can show UNM violated statutory or contractual obligations.  This defense is clearly relevant to the controversy, and the Court would therefore not strike it if Rivero's MSJ were not mooted by the grant of summary judgment.  Estate of Gonzales v. AAA Life Ins., 2012 WL 1684599, at *5.

financial interest in the subject matter in controversy or in a party in the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," 28 U.S.C. § 455(b)(4). Dr. Rivero does not contend that any other grounds for recusal apply in this case. See Recusal Motion at 7-10. The Court concludes that no grounds for recusal are present in this case -- specifically, that there is no objectively reasonable question of the Court's impartiality and that the Court does not have an interest that could be substantially affected by the outcome of the case -- and therefore denies the Recusal Motion.

A.     THE COURT'S TIES WITH THE SCHOOL OF LAW AND MEMBERS OF THE BOARD OF REGENTS DO NOT GIVE RISE TO AN OBJECTIVELY REASONABLE QUESTION OF THE COURT'S IMPARTIALITY.

Federal law mandates a judge's recusal from any "proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The Tenth Circuit has held that "[a]n unsubstantiated suggestion of personal bias or prejudice is insufficient to mandate recusal under section 455(a)"; rather, there must be facts "that would 'cause a reasonable man to doubt the judge's impartiality.'" Willner v. Univ. of Kan., 848 F.2d at 1027 (quoting United States v. Hines, 696 F.2d 722, 729 (10th Cir. 1982)). Adverse rulings do not per se create an appearance of impropriety. See In re Int'l. Bus. Machs. Corp., 618 F.2d 923, 929 (2d Cir. 1980). "The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." Hinman v. Rogers, 831 F.2d at 939 (citing United States v. Hines, 696 F.2d at 728). "A judge should not recuse himself on unsupported, irrational, or highly tenuous speculation." Hinman v. Rogers, 831 F.2d at 939. Further, "a judge has as strong a duty to sit

when there is no legitimate reason to recuse as he does to recuse when the law and facts require." Nichols v. Alley, 71 F.3d at 351.

In Willner v. University of Kansas, the plaintiff requested recusal based on the judge's position as the director of the University of Kansas Alumni Association. See 848 F.2d at 1026, 1028. The plaintiff did not present, however, any facts showing that the judge "was actually biased against her as the result of his leadership position." 848 F.2d at 1028. The Tenth Circuit concluded that "[t]he law of this circuit does not require recusal on the basis of mere speculation that such activities would cause him to harbor prejudice against her." 848 F.2d at 1028 (citing Hinman v. Rogers, 831 F.2d at 939-40).

In Lunde v. Helms, the Eighth Circuit determined that the trial judge did not abuse its discretion in not recusing, concluding that "the district judge's having graduated from the university law school, even though the university is a party defendant, without more, is [not] a reasonable basis for questioning the judge's impartiality." 29 F.3d at 370. The plaintiff also moved for recusal based on the judge's making financial contributions to the law school's foundation and the judge's having presented two educational programs at the university. See 29 F.3d at 370. The Eighth Circuit concluded that these contributions or presentations, "without more, is [not] a reasonable basis for questioning the judge's impartiality." 29 F.3d at 371.

In Wu v. Thomas, 996 F.2d 271 (11th Cir. 1993), the Eleventh Circuit considered whether a federal district judge should recuse from a case involving a university for which he serves as an adjunct professor and to which he had made financial contributions. See 996 F.2d at

275.  The judge noted that he did not receive a salary from the university, "that his duties are limited to letting law students intern in federal court and judicial chambers for one semester," and that he had not made a financial contribution to the university "for many years."  996 F.2d at 275.  The Eleventh Circuit agreed with the district judge, finding that, "[o]n these facts (which are uncontested), no reasonable observer would assume that [the district judge] had extra-judicial knowledge of this case or otherwise question [the judge's] impartiality," so none of these connections with the university disqualified the judge "under section 455(a)."  996 F.2d at 275.

In United States ex rel. Hochman v. Nackman, 145 F.3d 1069 (9th Cir. 1998), the United States Court of Appeals for the Ninth Circuit considered whether a district judge should recuse from a case involving a university, where the judge made "a small yearly contribution to the law school's alumni association."  145 F.3d at 1076.  The Ninth Circuit noted that the university is not a named party, and that the relationship between the law school and the case "is virtually nonexistent."  145 F.3d at 1076.  The Ninth Circuit determined that the judge's "insignificant contact" with the university thus "would not reasonably lead one to question his impartiality."  145 F.3d at 1076.

Here, the Court's connections with UNM are insubstantial and weak, and do not support a reasonable finding of prejudice.  First, the Court has no connection with the School of Medicine or the Health Sciences Center, where Dr. Rivero and his supervisors worked.  The Court does not know any of people with whom Dr. Rivero has issue.  The Court has taught a one-semester class at the School of Law on five occasions with Andy Shultz.  The Court has not

taught this class since the fall of 2017, is unlikely to teach it in the foreseeable future, and is not

teaching it next fall.[162] The Court refused payment[163] for the first three classes it taught and, for

the last two classes, the Court received a research assistant -- one in the fall of 2015 and another

in the fall of 2017 -- to help in writing a law review article.[164] One of these research assistants

has accepted an offer to serve as a law clerk for the Court from 2019-2020. This is not the first

UNM law student the Court has hired as a law clerk, and likely will not be the last, because

UNM has the only law school in the state. The Court thus also often has externs from the School

of Law, at least during the school year, because they are the only students available to extern

while school is in session. Providing externship opportunities for and hiring law clerks from the

---

[162]The Court currently has an MDL, and Mr. Schultz is local counsel for the defendant. It thus is unlikely that the Court will be teaching in the future at UNM School of Law.

[163]The Court has never received any payment from UNM, so it is uncertain of the amount involved. The Court remembers being offered around $857.00 one year for the semester course. The Court uses an accountant to help with its financial disclosure forms. The Court never reported any amounts of income for the three times it waived payment. For the first year it got a research assistant, the Court was told to report the arrangement on its financial disclosure forms and reported that $644.00 would have been paid, but was paid to someone else. This amount was not reported as income, because someone else received the payment. For the next time, it was told that it was not necessary to report, and the Court did not report. The Court's accountant has advised that there are no amounts needed to be reported to the IRS, and none has been reported. The Court has not received any tax documents, like a W-2, from UNM and thus no tax has been paid. So UNM never employed and compensated the Court and thus the Court has not been a compensated UNM employee.

[164]Because of the crush of cases in this district, and because the Court is particularly short-handed right now, it is unlikely the Court will be able to finish the article. Of course, the Court would not use a law clerk to work on a law review article while the law clerk is working for the Court.

nearby law school is not a unique practice, and does not show bias for the school.  E.g., Wu v. Thomas, 996 F.2d at 275 (allowing law students intern to with court is not grounds for recusal from case involving the university).

The Court's ties with the Board of Regents are even more weak.  The Court has been acquainted with many previous and current members of the Board.  These acquaintances include the current President, Robert M. Doughty III, who attended a dinner party at the Court's home years ago.[165]  The Court knows Mr. Doughty because he is an attorney, and does not have a substantially different relationship with Mr. Doughty than he does with other members of the bar.  As the Court sits in a relatively small city and state, it knows many attorneys.  The Student Regent on the Board for 2017-2018, Mr. Adcock, externed for the Court in the summer of 2017,

---

[165]The Court is relatively certain that Mr. Doughty was not a member of the Board at the time of Dr. Rivero's alleged discrimination.  Mr. Doughty became a Board member in December, 2014.  See Regents Doughty, Lee Re-Elected to UNM Board of Regents' Positions, UNM Newsroom (March 13, 2017), https://news.unm.edu/news/regents-doughty-lee-re-elected-to-unm-board-of-regents-positions.  At the time of the alleged discrimination, from 2011 until 2015, Mr. Doughty served as the chairman of the New Mexico Racing Commission.  See Robert M. Doughty III, Doughty Alcatraz, P.A., https://www.doughtyalcaraz.com/About/Robert-M-Doughty-Iii.shtml (last visited Feb. 25, 2019).  The Court has been unable to determine when the dinner occurred, but it thinks it was before Mr. Doughty was on the Racing Commission, because it had a case shortly after the dinner involving the Racing Commission and it did a disclosure letter about Mr. Doughty.  The Court recalls that it had some invitees say that they could not come to the dinner, and one or more invitees suggested inviting Mr. Doughty.  The Court and Mr. Doughty did not have a significant or long-standing relationship with each other, but it was more fortuitous that Mr. Doughty and his wife were invited and were there.

before the Court was assigned this case in October, 2017.[166]  See Reassignment Notice, filed

October 3, 2017 (Doc. 123)("Reassignment Notie").  The Court is also acquainted with two of

the newly selected Board members, Doug Brown and Robert Schwartz.[167]  The members serving

on the Board of Regents on April 12, 2011, were: Jack L. Fortner, Don L. Calmers, Carolyn J.

Abeita, J.E. "Gene" Gallegos, Bradley C. Hosmer, James. H. Koch, and Jacob P. Wellman.  See

U. N.M. Board of Regents, University of New Mexico Board of Regents Minutes for April 12,

2011 at 1, http://digitalrepository.unm.edu/bor_minutes/59 (last visited Feb. 25, 2019).  The

Court knows Mr. Gallegos as a member of the bar and has socialized with him in that capacity.

Mr. Gallegos has had at least one case before the Court.  The Court may have met Mr. Fortner,

Mr. Koch, and Ms. Abeita, but does not recall having met them and does not believe it would

recognize them.  The Court does not socialize with them.  The Court taught Mr. Fortner's

daughter in the School of Law class.  The Court notes that its relationships with the Board

members it knows are insubstantial, mere acquaintances resulting from the Court's involvement

in the community.  The Court is not so close with any of these members that its impartiality is

reasonably questioned.  See United States v. Guthrie, 184 F. App'x 804, 807 (10th Cir.

2006)(unpublished)("Mere acquaintance does not require recusal[.]").

---

[166]Adcock is no longer on the Board of Regents, as his term has expired and Governor
Lujan Grisham has nominated, and the State Senate confirmed, Melissa C. Henry as the Board's
student regent.

[167]Mr. Brown has previously served on the Board of Regents, from 2003 until 2005, but
Mr. Schwartz has not.  See Board of Regents Members, UNM Board of Regents,
http://regents.unm.edu/members/index.html (last visited Feb. 25, 2019).

These relationships with UNM and its Board of Regents are insubstantial and weak, and would not "cause a reasonable man to doubt the judge's impartiality." [168] United States v. Hines, 696 F.2d at 729. There is no evidence that the Court is biased, and the Court is not biased. The Court has not taught at the School of Law for very long, and likely will not be teaching there again. Cf. United States v. Moskovits, 866 F. Supp. at 179, 181-82 (finding recusal appropriate where defendant attended and committed crimes at university where judge taught for twenty years and where judge's wife has worked for twenty years). The connection between the Court and the School of Law is tenuous, and the relationship between the School of Law and the School of Medicine or the Health Sciences Center is virtually nonexistent. Cf. Easley v. Univ. of Mich. Bd. of Regents, 906 F.2d 1143, 1145-47 (6th Cir. 1990)(finding recusal not necessary where judge, in case involving alleged constitutional violations by a law school, graduated from the law school and participated on its Committee of Visitors). Nobody from the School of Law is implicated in this case. [169] Further, the Board of Regents has broad policy-making power and

---

[168]The Court draws comfort in its conclusion that this is not a "proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), from the fact that the Court has had other cases involving UNM over the years, has made similar disclosures and, to the Court's memory, no one has contacted the Court expressing a problem. See Williams v. Bd. of Regents of the Univ. of N.M., No. CIV 13-0479 JB\WPL, Letter from the Court to Elias Barela, Henry F. Narvaez, and Carlos M. Quinones (dated November 19, 2013), filed November 19, 2013 (Doc. 26); Gerald v. Locksley, No. CIV 10-0721 JB\LFG, Letter from the Court to Dennis W. Montoya, Mark T. Baker, and Jennifer L. Attrep (dated January 26, 2011), filed January 26, 2011 (Doc. 33), and Letter from the Court to Dennis W. Montoya, Mark T. Baker, and Jennifer L. Attrep (dated January 26, 2011), filed January 26, 2011 (Doc. 34).

[169]The Judicial Conference's Advisory Committee on Codes of Conduct has provided advice on recusal, noted in the Guide to Judiciary Policy Volume 2B, Chapter 3, Compendium of

fiduciary responsibility over UNM.  See Regents' Policy Manual - Section 1.1: Responsibilities of the Board of Regents, U. N.M. Pol'y Off., https://policy.unm.edu/regents-policies/section-1/1-1.html (last visited Feb. 28, 2019).  It does not appear to be involved in the day-to-day operation and management of either the School of Medicine or the Health Sciences Center,[170] or to be involved in faculty appointment.  See Regents' Policy Manual - Section 1.1: Responsibilities of the Board of Regents, supra ("The Board vests responsibility for the operation and management of the University in the President of the University.").  There is no indication that the Board or any Board member, past or present, has any knowledge of this case.  Accordingly, Dr. Rivero's Recusal Motion rests "on unsupported, irrational, or highly tenuous speculation."  Hinman v. Rogers, 831 F.2d at 939.  Recusal is therefore not mandated, and the Court is thus obligated to preside over the case.  See Hinman v. Rogers, 831 F.2d at 939.

---

Selected Opinions ("Compendium"), which the Court has reviewed in deciding the Recusal Motion.  The Court notes that, if the School of Law or any of its employees were a party, then it may need to recuse, because, although it is not currently teaching at the School of Law, it has in the past.  See Compendium §§ 3.4-3(a), 4.1-1[1](b).  As discussed, this case is not one in which the Court's impartiality may reasonably be questioned merely because it has taught at the School of Law, necessitating recusal.  See Compendium § 3.4-3(a).  The Compendium states that "no lawyer who serves on the body setting the judge's teaching salary should appear before the judge," but as the Court received no salary for its teaching, this limitation is inapplicable. Compendium § 4.1-1[1](b).

[170]The Court notes that the Health Sciences Center has its own Board of Trustees which "oversees the hospitals clinical operations."  See UNM Hospital Board of Trustees, U. N.M. Health Sci., https://hsc.unm.edu/health/about/leadership/governing-boards/index.html (last visited Feb. 28, 2019).

**B.    THE COURT DOES NOT HAVE AN INTEREST THAT COULD BE SUBSTANTIALLY AFFECTED BY THE OUTCOME OF THE PROCEEDINGS.**

Dr. Rivero also asserts that, should he win the case, UNM's federal funding could face "scrutiny or sanction," and this adverse financial outcome "could negatively impact what appears to be a mutually beneficial relationship" between UNM and the Court.  Recusal Motion at 10.  A judge must recuse from a proceeding in which he or she "has a financial interest . . . or any other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4).  The statute defines the term "financial interest." with certain exclusions, as "ownership of a legal or equitable interest, however small, or a relationship as director, adviser or other active participant in the affairs of a party."  28 U.S.C. § 455(d)(4).

> The statute differentiates between two kinds of interests.  If the judge has direct ownership, legal or equitable, then disqualification is required regardless of the size of the interest, unless one of the specified exceptions applies.  On the other hand, an interest not entailing direct ownership falls under "other interest," and requires disqualification only if the litigation could substantially affect it.

In re N.M. Nat. Gas Antitrust Litig., 620 F.2d 794, 796 (10th Cir. 1980)(quoting 28 U.S.C. § 455(b)(4)).

The Tenth Circuit has determined "that a remote, contingent benefit, such as a possible beneficial effect on future utility bills, is not a 'financial interest' within the meaning of the statute.  It is an 'other interest,' requiring disqualification under a 'substantially affected' test." In re N.M. Nat. Gas Antitrust Litig., 620 F.2d at 796 (citing In re Va. Elec. & Power Co., 539 F.2d 357 (4th Cir. 1976)).  "Courts faced with construing subsection (b)(4) have inferred that

'any other interest that could be substantially affected' also means an interest in the subject matter of the litigation or a party to it."  In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1314 (2d Cir. 1988)(citing Dep't of Energy v. Brimmer, 673 F.2d 1287 (Temp. Emer. Ct. App. 1982); In re N.M. Nat. Gas Antitrust Litig., 620 F.2d 794; In re Va. Elect & Power Co., 539 F.2d 357).  For example, the Eleventh Circuit determined that a district judge's minor "children are technically members of this class and possess an interest in the outcome of this litigation." United States v. Alabama, 528 F.3d 1532 , 1541 (11th Cir. 1987), superseded by statute on other grounds as recognized in Lussier v. Dugger, 904 F.2d 661 (11th Cir. 1990).  The Eleventh Circuit concluded that these interests "are not 'substantial' enough to merit disqualification," because "[a]ny beneficial effects of this suit upon these children were remote, contingent and speculative."  United States v. Alabama, 528 F.3d at 1541 (quoting 28 U.S.C. § 455(b)(4)).

Dr. Rivero alleges that the Court possesses an interest in the outcome of this litigation, because, should it rule against UNM, UNM's reputation and federal funding could be endangered, and this adverse ruling could negatively influence UNM's relationship with the Court.  See Recusal Motion at 10.  Dr. Rivero also asserts that a ruling adverse to UNM could harm the current Board of Regents' reputation, which could negatively impact the members' relationships with the Court.  See Recusal Reply at 4.  Dr. Rivero is "only able to make this argument by layering several speculative premises on top of one another to reach a speculative conclusion:" if UNM loses the case, its reputation and federal funding may be harmed; and if the Court wanted to teach again, UNM might not allow it.  Sensley v. Albritton, 385 F.3d 591, 600

(5th Cir. 2004). These potential effects are "remote, contingent and speculative," and therefore not substantial. United States v. Alabama, 528 F.3d at 1541. As discussed in the previous subsection, the Court has never received payment from UNM and is unlikely to teach at the School of Law in the future. Moreover, it is unclear how the case could possibly impact federal funding, and Dr. Rivero does not elaborate on what would make the funding "face additional scrutiny or sanction, including withdrawal of funding, pursuant to an adverse holding of discrimination." Recusal Motion at 10 (citing 10 C.F.R. §§ 4.233, 4.46, 4.48). Even if UNM lost federal funding because of an adverse ruling, this loss of an opportunity to teach and mentor students, and do public service, would have no financial impact on the Court. See Lunde v. Helms, 29 F.3d at 371 Further, the Court is not close with the Board of Regents members whom it knows, and an adverse ruling against UNM would not financially impact the Board members individually. The Court does not believe it is intellectually sound to say that it has an interest in the outcome of the litigation merely because of its occasional relationship with UNM and the Board of Regents, but, even if it had an interest, this case's outcome will not substantially affect this interest. See Brody v. President & Fellows of Harvard Coll., 664 F.2d 10, 11 (1st Cir. 1981)("The mere association of a judge with a party, without indication that the judge stands to obtain financial or other gain from a particular outcome, may similarly be insufficient to mandate disqualification."). Accordingly, recusal is not mandated, and the Court is obligated to preside over the case. See Hinman v. Rogers, 831 F.2d at 939.

### C.  THE RECUSAL MOTION IS UNTIMELY, AND GRANTING IT WOULD ENCOURAGE MANIPULATION OF THE JUDICIAL PROCESS.

In addition to challenging the propriety of recusal here, UNM asserts that Dr. Rivero's Recusal Motion is untimely.  See Recusal Response at 1.  The Tenth Circuit has held that "[t]he remedy for judicial prejudice is a motion for recusal that 'must be timely filed,' and a party must act promptly in filing its motion once it knows of the facts on which it relies."  Levy v. Levitt, 3 F. App'x 944, 951 (10th Cir. 2001)(unpublished)(quoting Willner v. Univ. of Kan., 848 F.2d at 1028-29).  See United States v. Stenzel, 49 F.3d 658, 661 (10th Cir. 1995)("We have held that under either 28 U.S.C. § 144 or § 455, the party seeking recusal must act in a timely fashion to request recusal.").  Prompt filing "conserves judicial resources and alleviates the concern that it is motivated by adverse rulings or an attempt to manipulate the judicial process."  United States v. Pearson, 203 F.3d 1243, 1276 (10th Cir. 2000)(citing Willner v. Univ. of Kan., 848 F.2d at 1028-29).

Here, the Court was assigned to the case on October 3, 2017, see Reassignment Notice, and sent the First Disclosure Letter on January 23, 2018, see First Disclosure Letter at 1.  The First Disclosure Letter outlines the Court's teaching relationship with the School of Law and how it received research assistants instead of payment.  See First Disclosure Letter at 1-2.  On June 22, 2018, the Court sent the Second Disclosure Letter, which elaborates on the teaching at UNM, and disclosed that the Court knows Mr. Doughty and Mr. Adcock.  See Second Disclosure Letter at 1-2.  Thus, on June 22, 2018, Dr. Rivero had all the facts on which he bases his Recusal Motion.  His counsel told the Court's Courtroom Deputy Clerk, Ms. Bevel, on June

25, 2018, that Dr. Rivero had no issue with the Court's disclosure. <u>See</u> Second Rivero Aff. ¶¶ 2-3, 5, at 1. On June 26, 2018, the Court met with the parties for the first time and held an extensive hearing that lasted for a little under three hours. <u>See</u> Clerk's Minutes at 1. The Court prepared extensively for this hearing, and provided its strong inclination that it would rule against Dr. Rivero and grant summary judgment for UNM. Then, nine months after the Court was assigned this case and twenty-five days after the Second Disclosure Letter, Dr. Rivero filed his Recusal Motion. As for the delay, Dr. Rivero stated that, as of June 25, 2018, he did not have "sufficient time to reflect upon the disclosures." Second Rivero Aff. ¶ 3, at 1.

The Court concludes that Dr. Rivero had sufficient time to consider the disclosures and receive advice from counsel on how to proceed. The Second Disclosure Letter is short, consisting of two pages and seven short paragraphs. The disclosures do not require much reflection and, as discussed in the last two subsections, do not require recusal. Further, the fact that the Recusal Motion came after the Court indicated it would rule against Dr. Rivero adds an air of impropriety to the Recusal Motion, suggesting that the true motive for the Motion is to get the Court off the case because of its adverse rulings against Dr. Rivero. As the Supreme Court has stated, 28 U.S.C. § 455 "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made[.]" <u>Ex parte Am. Steel Barrel Co.</u>, 230 U.S. 35, 44 (1913). Granting the Recusal Motion would "waste[] judicial resources and encourage[] manipulation of the judicial process." <u>Willner v. Univ. of Kan.</u>, 848 F.2d at 1029. This would waste the Court's

and UNM's resources. The Court will therefore deny the Recusal Motion, because it is untimely and the grounds it asserts are legally insufficient.

**IT IS ORDERED** that: (i) the requests in the Defendant University of New Mexico Board of Regents' Motion and Memorandum for Summary Judgment, filed December 5, 2017 (Doc. 139), and in the Defendant University of New Mexico Board of Regents' Amended Motion and Memorandum for Summary Judgment, filed December 8, 2017 (Doc. 143), are granted; (ii) the requests in the Plaintiff's Motion for Summary Judgment and Memorandum of Law as to Certain of Defendant Board of Regents of the University of New Mexico's Affirmative Defenses, filed December 8, 2017 (Doc. 144), are denied as moot; (iii) the Plaintiff's Motion in Limine to Exclude Complaints Against Plaintiff Prior to 2006, filed December 8, 2017 (Doc. 145), is denied; and (iv) the Plaintiff's Motion in Limine to Prohibit and Exclude Use of the Term "Psychological" in Reference to "Psychiatric" Evaluations, filed December 8, 2017 (Doc. 146), is denied as moot; and (v) the Plaintiff's Motion to Recuse the Honorable James O. Browning, filed July 17, 2018 (Doc. 203), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Eric D. Norvell
Eric D. Norvell, Attorney, P.A.
Carlsbad, California

     *Attorney for the Plaintiff*

Alfred A. Park
Lawrence M. Marcus
Park & Associates, LLC
Albuquerque, New Mexico

     *Attorneys for the Defendant*